UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| U.S. BANK TRUST COMPANY, NATIONAL ASSOCIATION, SOLELY IN ITS CAPACITY AS TRUSTEE FOR NATIXIS COMMERCIAL MORTGAGE SECURITIES TRUST 2022-JERI, COMMERCIAL MORTGAGE PASS-THROUGH CERTIFICATES, SERIES 2022-JERI (FOR THE BENEFIT OF THE CERTIFICATEHOLDERS), acting by and Midland Loan Services, a division of PNC Bank National Association as Special Servicer under the Trust Servicing Agreement dated as of April 18, 2022,<br><br>Plaintiff,<br><br>v.<br><br>JERICHO PLAZA PORTFOLIO LLC; MENACHEM MEISNER; POWER-FLO TECHNOLOGIES INC. d/b/a UNITED ELECTRIC POWER; NEW YORK STATE DEPARTMENT OF TAXATION AND FINANCE; LIBERTY ELEVATOR CORPORATION; JE GRANT ASSOCIATES LLC d/b/a ENERGY PLUS SOLUTIONS; and "JOHN DOE" NO. 1 THROUGH "JOHN DOE" NO. 100,<br><br>The names of the "John Doe" Defendants being Fictitious and Unknown to Plaintiff, the Persons and Entities Intended Being Those Who May Be in Possession of, or May Have Possessory Liens or Other Interests in, the Premises Herein Described,<br><br>Defendants. | Civil Action File No.<br>_____ |

**DECLARATION OF CHRISTOPHER G. HAMILTON IN SUPPORT OF
PLAINTIFF'S MOTION FOR THE APPOINTMENT OF A RECEIVER**

Pursuant to 28 U.S.C. § 1746, I, CHRISTOPHER G. HAMILTON, declare under penalty of perjury as follows:

1.    My name is Christopher G. Hamilton. I am over 21 years of age and am competent to give testimony.

1

2. I currently serve as a Senior Asset Resolution Consultant with Midland Loan Services, a division of PNC Bank National Association ("Special Servicer"), pursuant to the Trust and Servicing Agreement dated as of April 18, 2022 (the "TSA"), as the authorized agent for plaintiff U.S. Bank Trust Company, National Association, solely in its capacity as Trustee ("Trustee") for Natixis Commercial Mortgage Securities Trust 2022-Jeri, Commercial Mortgage Pass-Through Certificates, Series 2022-Jeri (the "Trust"), for the benefit of the Certificateholders ("Plaintiff").

3. In connection with performing its duties as Special Servicer for Plaintiff, Special Servicer creates, receives, and maintains records, including the exhibits attached to the complaint and/or this declaration, in the regular course of the Special Servicer's business activities. It is the regular practice of Special Servicer to integrate and incorporate Plaintiff's and its predecessor in interest's business records and to routinely rely upon the accuracy of those records in providing its loan servicer functions and business. Based on my review of and familiarity with Plaintiff's records, maintained by the Special Servicer, all the exhibits attached to this declaration were received, created, or otherwise generated at or near the dates reflected on such documents. Such exhibits also are true and correct copies of the corresponding documents in the Special Servicer's business records that are in the custody and control of the Special Servicer. I make this Declaration: (i) based upon my personal knowledge of the facts set forth below; and (ii) based

2
#240426815_v4 516952.00645

upon my review of the business records relating to Borrowers' mortgage loan and from my own personal knowledge of how they are kept and maintained.

A. **The Loan Documents**

4. On or about December 31, 2021, Borrower obtained a loan in the original principal amount of $149,180,000.00 (the "Loan") from Natixis Real Estate Capital LLC ("Original Lender").

5. The Loan is governed by that certain Loan Agreement between Original Lender and Borrower, dated as of December 31, 2021 (the "Loan Agreement"). A true and correct copy of the Loan Agreement is attached hereto as Exhibit 1.

6. To evidence the Loan, Borrower acknowledged, executed and delivered to Original Lender that certain Consolidated, Amended and Restated Promissory Note dated December 31, 2021, in the original principal amount of $149,180,000.00 (the "Note"). A true and correct copy of the Note is annexed hereto as Exhibit 2.

7. As collateral security for the payment of the Note, Borrower executed, acknowledged and delivered to Original Lender a Consolidated, Amended and Restated Mortgage, Assignment of Rents and Leases, and Security Agreement dated as of December 31, 2021 (the "Mortgage") as security for the real property commonly known and located at One Jericho Plaza and Two Jericho Plaza, Jericho, New York (Section: 11; Block: 355; Lots: 31 and 32), and more particularly described in Exhibit A to the Mortgage (the "Property"). A true and correct copy of the Mortgage is annexed hereto as Exhibit 3.

8. On February 18, 2022, Original Lender recorded the Mortgage with the Clerk's Office for Nassau County ("Nassau County Clerk's Office") in Liber 46359, Page 137, and duly paid the mortgage recording taxes.

9. As additional collateral security for the payment of the Loan, Borrower executed and delivered to Original Lender an Assignment of Leases and Rents dated as of December 31, 2021 (the "ALR") pursuant to which Borrower granted to Original Lender a security interest in all Leases and Rents generated from the Property.

10. On February 18, 2022, Original Lender recorded the ALR with the Nassau County Clerk's Office as Document Number 2022-00022349, in Book M, Volume 46359, Page 166. A true and correct copy of the ALR is annexed hereto as Exhibit 4.

11. To perfect its interest in the Collateral, on January 20, 2022, Original Lender recorded a Uniform Commercial Code Financing Statement with the Nassau County Clerk's Office as Document Number: 2022-00256730 (the "County UCC-1"). The County UCC-1 names Original Lender as the secured party and Borrower as the Debtor.

12. To further perfect its interest in the Collateral, on January 7, 2022 Original Lender filed a Uniform Commercial Code Financing Statement with the Delaware Secretary of State ("DE SOS") as File Number 2022-0177857 (the "State UCC-1"). The State UCC-1 names Original Lender as the secured party and Borrower as the debtor.

13. To induce Original Lender to extend the Loan and to further secure its repayment, Menachem Meisner ("Guarantor") executed a Guaranty of Recourse Obligations dated as of December 31, 2021 (the "Guaranty"), wherein and whereby Guarantor irrevocably, absolutely and unconditionally guaranteed the full, prompt and complete payment when due of the Guaranteed Obligations (as defined in the Guaranty). A true and correct copy of the Guaranty is annexed hereto as Exhibit 5.[1]

---

[1] The Loan Agreement, Note, Mortgage, ALR, County UCC-1, State UCC-1, Guaranty and all related loan documents shall be referred to collectively herein as the "Loan Documents." Capitalized terms not otherwise defined herein shall have the same meanings as ascribed in the Loan Documents.

B. **Assignment of the Loan Documents to Plaintiff**.

14. Original Lender executed and delivered to Plaintiff an Allonge specially indorsed in favor of Plaintiff, dated as of April 18, 2022, firmly affixed to the Note (the "Allonge"). A true and correct copy of the Note with the Allonge, firmly affixed thereto, is annexed hereto as <u>Exhibit 2</u>.

15. By virtue of the delivery of the Original Note, with the Allonge firmly affixed thereto, Original Lender assigned, transferred and delivered to Plaintiff all of its rights, title and interest in and to the Note, and Plaintiff became the owner and holder of the original Note, with the Allonge firmly affixed thereto.

16. Plaintiff has been in physical possession of the original Note, with the Allonge firmly affixed thereto, and was so on the date this action was commenced.

17. Original Lender executed and delivered that certain Assignment of Mortgage dated as of May 24, 2022, effective as of April 18, 2022 ("Plaintiff Assignment of Mortgage"), pursuant to which Original Lender assigned, transferred and delivered to Plaintiff all of Original Lender's right, title and interest in and to the Mortgage. A true and correct copy of the Plaintiff Assignment of Mortgage is annexed hereto as <u>Exhibit 6.</u> The Plaintiff Assignment of Mortgage was duly recorded on October 25, 2022, in the Nassau County Clerk's Office at Document Number: 2022-00105316.

18. Pursuant to the Assignment of Assignment of Leases and Rents dated as of May 24, 2022, effective as of April 18, 2022, Original Lender assigned, transferred and delivered to Plaintiff all of Original Lender's right, title and interest in and to the ALR ("Plaintiff Assignment of ALR"). A true and correct copy of the Plaintiff Assignment of ALR is annexed hereto as

#240426815_v4 516952.00645

Exhibit 7. The Plaintiff Assignment of ALR was duly recorded on October 22, 2022, in the Nassau County Clerk's Office at Document Number: 2022-00105317, Liber 46916, Mp 921.

19. As a result of the foregoing, Plaintiff is the current owner, assignee and holder of the Note, with Allonge firmly affixed thereto, Mortgage and Loan Documents.

### C. The Mezzanine Loan

20. On or about December 31, 2021, Jericho Plaza Mezz LLC ("Mezzanine Borrower") and Original Lender entered into that certain Mezzanine Loan Agreement ("Mezzanine Loan Agreement"), pursuant to which Original Lender made a Loan to Borrower in the original principal amount of $20,000,000.00 (the "Mezzanine Loan"), evidenced by a Mezzanine Promissory Note dated as of December 31, 2021 made by Borrower in favor of Original Lender, as assigned to RICP V Holdings, LLC ("Mezzanine Lender") pursuant to that certain Allonge, dated as of February 4, 2022 (as may have been amended, modified and assigned, the "Mezzanine Note").

21. The Mezzanine Loan is subordinate to the Loan at issue in this foreclosure action.

### D. Relevant Loan Document Provisions Regarding Plaintiff's Right to the *Ex Parte* Appointment of a Receiver Upon an Event of Default

22. The Loan Documents expressly grant Plaintiff the right, upon an Event of Default, for the appointment of a temporary receiver of the Property without notice, and without regard for the adequacy of the security for the Debt or the solvency of the Borrower or of any person liable for the Debt.

23. Section 10.2.1 of the Loan Agreement provides, in relevant part:

> Upon the occurrence and during the continuance of an Event of Default . . . *Lender may, in addition to any other rights and remedies at law or in equity, take such action, without notice or demand (and Borrower hereby expressly waives such notice or demand), that Lender deems advisable to protect and enforce its rights against Borrower in and to the Property* . . . *and Lender may enforce or avail itself of any or all rights and remedies provided in the Loan*

#240426815_v4 516952.00645

Documents against Borrower and the Property, including all rights and remedies available at law or in equity . . .

*See* Ex. 1 §10.2.1 (emphasis added).

24. Similarly, Section 10(a)(vii) of the Mortgage provides that upon any Event of Default, Lender may take such action, without notice or demand, as it deems advisable to protect and enforce its rights against Borrower in and to the Property, including:

> *apply for the appointment of a trustee, receiver, liquidator or conservator of the Property, without notice and without regard for the adequacy of the security for the Debt and without regard to the solvency of the Borrower or of any Person liable for the Debt*

*See* Ex. 3 §10(a)(vii) (emphasis added).

25. Section 2(a) of the Mortgage provides:

> Borrower does hereby absolutely and unconditionally assign to Lender all of Borrower's right, title and interest in all current and future Leases and Rents . . . *Upon an Event of Default, without the need for notice or demand, the license granted to Borrower herein shall automatically be revoked, and Lender shall immediately be entitled to possession of all Rents in (or required by the terms of the Loan Documents to be deposited in) the Clearing Account, the Deposit Account (including all Subaccounts thereof) and all Rents collected thereafter (including Rents past due and unpaid), whether the Lender enters upon or takes control of the Property.* Borrower hereby grants and assigns to Lender the right, at its option, upon revocation of the license granted herein, to enter upon the Property in person, by agent or by court-appointed receiver to collect the Rents. Any Rents collected after the revocation of such license may be applied toward the payment of the Debt in such priority and proportions as Lender in its sole discretion shall deem proper.

*See* Ex. 3 § 2(a) (emphasis added).

26. Sections 2(a) and (b) of the ALR provide:

> As part of the consideration for the Debt, Borrower does hereby absolutely and unconditionally assign to Lender all right, title and interest of Borrower in and to all present and future Leases and Rents, and this Assignment constitutes a present and absolute assignment and is intended to be unconditional and not as an

7

> assignment for security only. It is further intended that it not be necessary for Lender to institute legal proceedings, absent any requirements of law or regulation to the contrary, to enforce the provisions hereof. Borrower hereby authorizes Lender or its agents to collect the Rents; provided, however, that prior to an Event of Default, Borrower shall have a revocable license, but limited as provided in this Assignment and any of the other Loan Documents, to otherwise deal with, and enjoy the rights of lessor under, the Leases.
>
> Upon the occurrence and the continuance of an Event of Default, and without the necessity of Lender entering upon and taking and maintaining full control of the Property in person, by agent or by court-appointed receiver, *the license referred to in Subsection (a) above shall immediately be revoked and Lender* shall have the right at its option, to exercise all rights and remedies contained in the Loan Documents, or otherwise available at law or in equity.

*See* Ex. 4 §§2(a)-(b) (emphasis added).

27. Section 5 of the ALR provides "[u]pon or at any time after the occurrence and during the continuance of an Event of Default, then in addition to and without limiting any of Lender's rights and remedies hereunder and under the other Loan Documents and as otherwise available at law or in equity:

> Lender may, at its option, without waiving such Event of Default and without regard to the adequacy of the security for the Debt, either in person or by agent, without bringing an action or proceeding, or by a receiver appointed by a court, without taking possession of the Property in its own name, demand, sue for, direct tenants to pay Rents directly or into any Clearing Account or otherwise collect and receive all Rents, including those past-due and unpaid, for application to the payment of the Debt in accordance with the terms of the Loan Documents, and Lender may enter into, and to the extent that Borrower would have the right to do so, cancel, enforce or modify any Lease. The exercise by Lender of this option granted in this Section 5(a) and the collection of Rents and the application thereof as herein provided shall not be considered a waiver of any Event of Default.

*See* Ex. 4 §5(a).

28. Pursuant to Schedule 4 of the Loan Agreement, Borrower represented, warranted and covenanted that:

> (d) Borrower has not incurred and will not incur any Indebtedness[2] other than Permitted Indebtedness. No Indebtedness other than the Debt may be secured (senior, subordinate or pari passu) by the Property.
>
> (f) Borrower has been, is, and intends to remain solvent and Borrower has paid and intends to pay its debts and liabilities (including, as applicable, shared personnel and overhead expenses) from its assets; provided that the foregoing shall not require any direct or indirect member, partner or shareholder of Borrower to make any additional capital contributions to Borrower.

*See* Ex. 1, Sch. 4.

29. Section 3.11 of the Loan Agreement provides that "as security for payment of the Debt and the performance by Borrower of all other terms, conditions and provisions of the Loan Documents, Borrower hereby pledges and assigns to Lender, and grants to Lender a security interest in, all of Borrower's right, title and interest in and to all Gross Revenue and in and to all payments to or monies held in the Clearing Account, the Deposit Account and all Subaccounts created pursuant to this Agreement (collectively, the "Cash Management Accounts").

30. The Loan Agreement sets forth Borrower's cash management obligations and requirements for the Cash Management Accounts. Specifically, Section 3.1 of the Loan Agreement provides, in relevant part, that:

> Borrower shall cause all Rents and other Gross Revenue . . . to be transmitted by Tenants of the Property directly into a trust account (the "Clearing Account") established and maintained by Borrower at an Eligible Institution selected by Borrower and reasonably approved by Lender (the "Clearing Bank")"

---

[2] "Permitted Indebtedness" is defined in the Loan Agreement as: "(i) the Debt and (ii) unsecured trade payables and operational debt not evidenced by a note and in an aggregate amount not to exceed two percent (2%) of the original principal amount of the Loan at any one time; provided that any Indebtedness incurred pursuant to subclause (ii) shall be (A) not more than sixty (60) days past due and (B) incurred in the ordinary course of business."

9

Funds deposited into the Clearing Account shall be swept by the Clearing Bank on a daily basis into an Eligible Account at the Deposit Bank controlled by Lender (the "Deposit Account") and applied and disbursed in accordance with this Agreement and the Deposit Account Agreement.

See Ex. 1, §3.1

31. Pursuant to Section 3.7 of the Loan Agreement:

Amounts deposited from time to time into the Operating Expense Subaccount pursuant to this Section 3.7 are referred to herein as the "Operating Expense Funds". Provided no Event of Default shall have occurred and be continuing, Lender shall, or shall direct Servicer to, within fifteen (15) days after delivery by Borrower to Lender of a request therefor (but not more often than once per month) *disburse funds held in the Operating Expense Subaccount*, in increments of at least $1,000, *provided (i) such disbursement is for an Approved Operating Expense*; and (ii) such disbursement is accompanied by (A) an Officer's Certificate certifying (w) that such funds will be used to pay Approved Operating Expenses and a description thereof, (x) that all outstanding trade payables (other than those to be paid from the requested disbursement or those constituting Permitted Indebtedness) have been paid in full, (y) that the same has not been the subject of a previous disbursement, and (z) that all previous disbursements have been or will be used to pay the previously identified Approved Operating Expenses, and (B) reasonably detailed documentation satisfactory to Lender as to the amount, necessity and purpose therefor

See Ex. 1, §3.7 (emphasis added).

32. Section 3.12 of the Loan Agreement provides:

On each Payment Date during the Term, except during the continuance of an Event of Default, all funds deposited into the Deposit Account during the immediately preceding Interest Period shall be applied on such Payment Date in the following order of priority: . . . First, to make the required payment of Tax Funds into the Tax Subaccount (ii) then, to make the required payment of Insurance Funds into the Insurance Subaccount as required under Section 3.4; (iii) then, to pay the monthly portion of all fees charged by the Deposit Bank in accordance with the Deposit Account Agreement, into a Subaccount established for such purpose, (iv) then, to Lender to pay the Monthly Debt Service Payment Amount due on such Payment Date (plus, if applicable, interest at the Default Rate, late payment charges and all other amounts, other than those

#240426815_v4 516952.00645

described under other clauses of this Section 3.12.1, then due to Lender under the Loan Documents), which payments shall be made into a Subaccount established for such purpose; (v) then, to make the required payment of Capital Expenditure Funds into the Capital Expenditure Subaccount as required under Section 3.5; (vi) then, to make the required payment of Rollover Funds into the Rollover Reserve Subaccount as required under Section 3.6; (vii) then, during a Cash Management Trigger Event Period, to make payments for Approved Operating Expenses into the Operating Expense Subaccount as required under Section 3.7; (viii) then, as a distribution permitted under applicable law, payment to Mezzanine Lender of an amount equal to Mezzanine Loan Debt Service Payment Amount; (ix) [intentionally deleted]; (x) then, following the commencement, and at all times during the continuance of a Cash Management Trigger Event, all amounts remaining in the Deposit Account after deposits for items (a) through (ix) above (the "Excess Cash Flow") into the Cash Collateral Reserve Subaccount as required under Section 3.12 (xi) then, provided no Cash Management Trigger Event Period shall then be in effect, if Lender has received notice that a Mezzanine Loan Event of Default has occurred and is continuing, payment to Mezzanine Lender, as a distribution permitted under applicable law, of all Excess Cash Flow, and (xii) Lastly, provided no Cash Management Trigger Event Period shall then be in effect and Lender has not received notice that a Mezzanine Loan Event of Default has occurred and is continuing, payment to Borrower of all Excess Cash Flow.

*See* Ex. 1, §3.12

E. **Events of Default which Exist and are Continuing and Warrant the Appointment of a Temporary Receiver**

As explained more fully below, numerous Events of Default have occurred and are continuing under the Loan Documents that affect the Property, its value, and pose a significant to the operation, maintenance and safety of the tenants of the Property.

#240426815_v4 516952.00645

*(i)* *<u>The Maturity Default</u>*

33. Section 2.3.1 of the Loan Agreement provides that commencing on February 9, 2022 and each Payment Date thereafter throughout the Term, Borrower shall pay an amount equal to the Monthly Debt Service Payment Amount.[3] *See* Ex. 1 §2.3.1.

34. Section 1 of the Note provides "Borrower shall pay the Monthly Debt Service Payment Amount to Lender in the manner and at the times specified in <u>Article 2</u> of the Loan Agreement . . . The balance of the Principal, together with all accrued and unpaid interest thereon, and all other amounts payable to Lender hereunder, under the Loan Agreement and under the other Loan Documents shall be due and payable on the Maturity Date." *See* Ex. 2 §1.

35. The "Stated Maturity Date" is defined in the Loan Agreement as January 9, 2023, as the same may be extended pursuant to <u>Section 2.9</u>." *See* Ex. 1, page 26.

36. The Maturity Date was not extended by Original Lender or Plaintiff.

37. Borrower failed to pay all amounts due and owing to Lender under the Loan Agreement and other Loan Documents on or before the Maturity Date.

38. Section 10.1(a) of the Loan Agreement, provides, each of the following events shall constitute an event of default hereunder (an "*Event of Default*"):

> If (A) the Debt not paid in full on the Maturity Date, (B) any regularly scheduled monthly payment of interest, and, if applicable, principal due under the Note is not paid in full on the applicable Payment Date, (C) any prepayment of principal due under the Agreement or the Note is not paid when due, (d) the Spread Maintenance Premium is not paid when due, or (E) any deposit of Reserve Funds is not made on the required deposit date therefor;

*See* Ex. 1 §10.1(a) (emphasis in original).

---

[3] Monthly Debt Service Amount is defined in the Loan Agreement as "interest on the Outstanding Principal Balance accrued and accruing from the first day of the applicable Interest Period through and including the last day of the Interest Period. *See* Ex 1, page 16.

12

39. Accordingly, an Event of Default has occurred under the Loan Documents as a result of Borrower's failure to pay the outstanding indebtedness on or before the Maturity Date (the "Maturity Default").

40. Although no notice is required under the Loan Documents, Plaintiff sent a Notice of Maturity Default/Demand for Payment dated January 16, 2024 ("Notice of Default"), notifying Borrower of its Maturity Default, and revoking Borrower's license to collect Rents and profits generated by the Property, and demanding Borrower remit all sums due and owing under the Loan Documents. A true and correct copy of the Notice of Default is annexed hereto as Exhibit 8.

41. Despite the Notice of Default, Borrower failed to cure the Maturity Default.

*(ii) Borrower's Cash Management Defaults, Misappropriation of Operating Expenses and Failure to Pay Other Amounts Due*

42. Section 5.2 of the Loan Agreement provides:

> Subject to Borrower's right to consent to the same in accordance with the terms hereof, Borrower shall pay (or cause to be paid) all Property Taxes and Other Charges[4] now or hereafter levied, assessed or imposed as the same become due and payable, and deliver to Lender receipts for payment or other evidence satisfactory to Lender that the Property Taxes and Other Charges have been so paid no later than 30 days before they would be delinquent if not paid. . .

*See* Ex. 1 §5.2.

43. Section 5.3.1 of the Loan Agreement provides:

> Borrower shall . . . cause the Property to be maintained in a good and safe condition . . . Borrower shall promptly comply with all Legal Requirements and promptly cure property any violation of Legal Requirement. Borrower shall promptly notify Lender in

---

[4] "Other Charges" is defined in the Loan Agreement as "all ground rents, maintenance charges, impositions other than Property Taxes and other charges, . . . now or hereafter levied or assessed or imposed against the Property or any part thereof." *See* Ex. 1, p. 18.

writing after Borrower first receives notice of any such non-compliance.

*See* Ex. 1 §5.3.1.

44. Section 5.4 of the Loan Agreement provides:

Borrower shall in a timely manner observe, perform and fulfill in all material respects each and every term to be observed, performed or fulfilled by it pursuant to the terms of any agreement or instrument affecting or pertaining to the Property. Borrower shall in a timely manner observe, perform and fulfill each and every covenant term and provision of each Loan Document

*See* Ex. 1 §5.4.

45. Sections 10.1(b) and (c) of the Loan Agreement provide that it shall be an Event of Default if "any . . . Other Charges are not paid when due . . ." or "if any other amount payable pursuant to this Agreement, the Note or any other Loan Document . . . is not paid in full when due and payable in accordance with the provisions of the applicable Loan Document . . . [subject to applicable notice and cure periods]". *See* Ex. 1 §10.1(b)-(c).

46. Pursuant to Section 10.1 (g), it is an Event of Default if Borrower or Guarantor shall "generally not be paying its debts as they become due." *See* Ex. 1 §10.1(g).

47. Section 11.1 of the Loan Agreement provides that Borrower's liability under the Loan Documents shall become full recourse ". . . to the extent of any loss, damage, reasonable third-party out of pocket cost, expense, liability, claim or other obligation actually incurred by Lender (including attorneys' fees and costs reasonably incurred) arising out of or in connection with the following (all such liability and obligation of Borrower for any or all of the following being referred to herein as "***Borrower's Recourse Liabilities***"):

(c) any intentional physical waste of the Property

(d) the misapplication, misappropriation or conversion by Borrower of . . . (y) any Gross Revenue (including any Rents, security

deposits, advance deposits or any other deposits and Lease Termination Payments . . . any, refund of Taxes or amounts in any Subaccount (including any distributions or payments to members/partners/shareholders of Borrower during a period which Lender did not receive the full amounts required to be paid to Lender under the Loan Documents)

(e) failure to pay charges (including charges for labor and materials) that can create Liens on any portion of the Property to the extent such Liens are not bonded over or discharged in accordance with the terms of the Loan Documents; unless . . . (y) there is insufficient cash flow from the Property to pay the same

See Ex. 1 §11.1(c), (d), (e).

48. In accordance the Loan Agreement, during the period December 9, 2022 through December 9, 2023, Special Servicer provided funds to Borrower in the amount of $6,343,242.12 to be used by Borrower solely for the payment of Borrower's approved Operating Budget Expenses ($5,348,246.90) for that period and the remainder (approximately $994,995.22) to be treated as Additional Excess Cash Flow for Borrower. A true and correct excel spreadsheet detailing the allocation of the funds in the Deposit Account during this period is annexed hereto as Exhibit 9.

49. Despite Special Servicer providing more than $5 million to Borrower, in direct violation of its obligations under the Loan Documents, Borrower failed to pay operating expenses at the Property – committing waste, causing liens to be filed against the Property and threatening the operation and maintenance of the Property and the safety of its tenants (and their employees).

50. As a result, and as demonstrated on the Open Invoice List (the "Open Invoice List") prepared by Borrower's management company, AMI Management LLC, there is more than $3 million in amounts due to vendors for the Property. Some of the open vendor expenses relate to vital services such as: sanitation, elevator maintenance, electricity, fire safety, security and porter

and cleaning services, and HVAC repairs. A true and correct copy of the Open Invoice List is annexed hereto as Exhibit 10.

51. Further, PSEG, the provider of electricity to the Property, placed a "Notice of Intention to Discontinue Electric Service" on the doors of all tenants at the Property advising that unless payment in the amount of approximately $660,000.00 was received before 9:00 am. on February 6, 2024, electric service to the Property will be discontinued. Representatives of tenants at the Property provided the notice to Plaintiff advising that "[t]his notice was placed on the doors of all tenants in the building . . . EY and Cantor are incredibly concerned about their ability to operate their businesses in the complex. . . ." A copy of the email from tenants' representative with the Notice from PSEG is annexed hereto as Exhibit 11.

52. Despite demand to Borrower to pay the amounts due to PSEG prior to February 6, 2024, and to pay all amounts due on the Open Invoice List, Borrower refused to pay unless Plaintiff agreed to enter into a forbearance agreement with Borrower.

53. As a result, Special Servicer on behalf of Plaintiff, contacted PSEG and obtained an extension to pay the amount due (now approximately $841,234.87) by February 9, 2024.

54. In addition, two (2) mechanics liens[5] have been recorded against the Property as a result of Borrower's failure to pay for work performed at the Property. True and correct copy of the Mechanic's Liens against the Property are annexed hereto as Exhibit 12.

55. Further, a Judgment in the amount of $20,867.94 obtained by Power-Flo Technologies Inc. dba United Electric Power, has been filed against the Property. A true and correct copy of the Judgment is annexed hereto as Exhibit 13.

---

[5] Defendants Liberty Elevator Company filed a mechanics lien on December 21, 2023 against the Property in the amount of $49,903.02; and J.E.Grant Associates LLC d/b/a Energy Plus Solutions filed a mechanic's lien against the Property on January 23, 2024 in the amount of $78,514.13.

#240426815_v3 516952.00645

56. As explained above, Borrower's failure to timely pay its Operating Expenses is an Event of Default pursuant to Sections 10.1(b).(c) and (g) of the Loan Agreement.

57. Borrower's failure to pay charges with respect to the Property, including Other Charges, and charges for labor and materials, constitutes an event of default pursuant to Section 10.1 [ ] of the Loan Agreement. *See* Ex. 1 §10.1.

58. Moreover, the failure to pay Operating Expenses amounts to an "intentional physical waste of the Property" and a misappropriation by Borrower of such funds, and the failure to pay charges (including charges for labor and materials) that can create liens on the Property also triggers recourse liability to the Borrower and Guarantor pursuant to the Loan Agreement and Guaranty.

F. **The Appointment of Temporary Receiver of the Property is Urgent**

59. The Loan Documents provide that upon an event of default, Plaintiff is entitled to move for the appointment of a receiver for the Property, without notice and without regard to the adequacy of the security for the Debt. *See* Ex. 1 §10.2.1.

60. Borrower's failure and refusal to use the funds provided to it by Plaintiff for their intended purpose (*i.e.* the payment of Borrower's approved Operating Budget Expenses) has resulted in safety, security and maintenance issues at the Property impacting tenants, their employees, workers at the Property, and foreseeably, any emergency fire, police, ambulance workers directed to the Property.

61. The Events of Default further demonstrate that a receiver is needed in order to effectively operate and manage the Property and prevent further waste by Borrower.

62. Thus, based on the circumstances and conditions caused by Borrower, the appointment of a receiver of the Property is justified and imperative.

17
#240426815_v4 516952.00645

63. Moreover, after the recent discovery of Borrower's failure to pay its operating expenses, I demanded that Borrower provide financial documents, including general ledgers. I reviewed the general ledgers and Borrower distributed $4,806,000.00 between March 2022 and December 2023.

64. Upon information and belief, and based on conversations with Borrower's representatives, I was informed that rather than paying its operating expenses as required under the Loan Documents, Borrower made distributions of almost $5 million to its investors.

65. In light of Borrower's blatant disregard for the operation, management and safety of the work environment at the Property, and payment of amounts due and owing to vendors who provided services, materials and labor at the Property, a receiver is not only permitted under the Loan Documents but is also needed to ensure the continued operation of the Property.

66. As an interested and secured party, Plaintiff is threatened with material losses and injuries, including the Borrower's Assets suffering waste and a dissipation or diminution in value if a receiver is not appointed and Borrower remains in control of the Property.

67. As a result of the foregoing, Plaintiff respectfully requests the immediate appointment of Ian Lagowitz of Trigild IVL Group, LLC as receiver of the Borrower's Assets. Executed on this 7th day of February, 2024.

_____
CHRISTOPHER HAMILTON

#240426815_v3 516952.00645