# EXHIBIT 1

---

# LOAN AGREEMENT

Dated as of December 31, 2021

Between

## JERICHO PLAZA PORTFOLIO LLC,
as Borrower

and

## NATIXIS REAL ESTATE CAPITAL LLC,
as Lender

---

<u>Table of Contents</u>

<u>Page</u>

**1.** **DEFINITIONS; PRINCIPLES OF CONSTRUCTION** ...................................... 1
    **1.1** **Terms and Definitions.** ................................................................ 1
    **1.2** **Principles of Construction** ........................................................ 28

**2.** **GENERAL LOAN TERMS** ................................................................... 29
    **2.1** **The Loan** .......................................................................... 29
    **2.2** **Interest Rate.** .................................................................... 29
    **2.3** **Loan Payments.** .................................................................. 34
    **2.4** **Loan Repayment.** ................................................................ 39
    **2.5** **Release on Payment in Full.** ................................................... 41
    **2.6** **REMIC Test on Property Release.** ............................................. 42
    **2.7** **Interest Rate Protection Agreements.** ........................................ 42
    **2.8** **Fees.** ............................................................................... 46
    **2.9** **Extension of the Maturity Date.** .............................................. 46

**3.** **CASH MANAGEMENT AND RESERVES** ............................................. 47
    **3.1** **Cash Management Arrangements.** ............................................. 47
    **3.2** **Required Repairs Funds.** ...................................................... 48
    **3.3** **Tax Funds.** ....................................................................... 49
    **3.4** **Insurance Funds.** ................................................................ 50
    **3.5** **Capital Expenditure Funds.** ................................................... 51
    **3.6** **Rollover Reserve Funds.** ....................................................... 52
    **3.7** **Operating Expense Subaccount.** .............................................. 54
    **3.8** **Casualty/Condemnation Subaccount.** ........................................ 54
    **3.9** **Security Deposits.** ............................................................... 54
    **3.10** **Cash Collateral Reserve Funds.** .............................................. 54
    **3.11** **Grant of Security Interest; Application of Funds.** ......................... 55
    **3.12** **Property Cash Flow Allocation.** .............................................. 55
    **3.13** **Additional Provisions Regarding Cash Management** ...................... 56
    **3.14** **Rent Abatement Reserve Funds.** ............................................. 57

**4.** **REPRESENTATIONS AND WARRANTIES.** ......................................... 57
    **4.1** **Organization; Special Purpose.** ............................................... 57
    **4.2** **Proceedings; Enforceability.** .................................................. 58
    **4.3** **No Conflicts.** .................................................................... 58
    **4.4** **Litigation.** ........................................................................ 58
    **4.5** **Agreements.** ...................................................................... 58
    **4.6** **Property; Title.** .................................................................. 58
    **4.7** **No Bankruptcy Filing.** ......................................................... 59
    **4.8** **Full and Accurate Disclosure; No Change in Facts.** ...................... 60
    **4.9** **ERISA; No Plan Assets.** ....................................................... 60
    **4.10** **Compliance.** ..................................................................... 60
    **4.11** **Contracts.** ....................................................................... 61
    **4.12** **Federal Reserve Regulations.** ................................................. 61
    **4.13** **Easements; Utilities and Public Access.** .................................... 61
    **4.14** **Physical Condition.** ............................................................ 62
    **4.15** **Leases.** ........................................................................... 62
    **4.16** **Fraudulent Transfer.** .......................................................... 63

i

| | | |
|---|---|---|
| 4.17 | Organizational Chart. | 63 |
| 4.18 | Management Agreement. | 63 |
| 4.19 | Hazardous Substances. | 63 |
| 4.20 | Organizational Status; Principal Place of Business. | 64 |
| 4.21 | Boundaries. | 64 |
| 4.22 | Flood Zone. | 64 |
| 4.23 | Purchase Options. | 64 |
| 4.24 | Other Debt. | 64 |
| 4.25 | Embargoed Person; Patriot Act Compliance. | 64 |
| 4.26 | Illegal Activity. | 65 |
| 4.27 | FIRPTA. | 65 |
| 4.28 | Investment Company Act. | 65 |
| 4.29 | Bank Holding Company. | 65 |
| 4.30 | Operations Agreements. | 65 |
| 4.31 | Fiscal Year. | 65 |
| 4.32 | O&M Program. | 65 |
| 4.33 | Intentionally Deleted | 65 |
| 4.34 | Sanctionable Activity. | 65 |

**5. COVENANTS** .......................... 66

| | | |
|---|---|---|
| 5.1 | Existence. | 66 |
| 5.2 | Taxes and Other Charges. | 66 |
| 5.3 | Repairs; Maintenance and Compliance; Alterations. | 67 |
| 5.4 | Performance by Borrower; Compliance with Agreements. | 68 |
| 5.5 | Cooperate in Legal Proceedings. | 68 |
| 5.6 | Further Assurances. | 69 |
| 5.7 | Environmental Matters. | 69 |
| 5.8 | Title to the Property; Liens. | 71 |
| 5.9 | Leases. | 71 |
| 5.10 | Estoppel Statement. | 74 |
| 5.11 | Property Management. | 74 |
| 5.12 | Special Purpose Entity. | 76 |
| 5.13 | Assumption in Insolvency Opinion. | 76 |
| 5.14 | Change In Business and Operation of Property. | 76 |
| 5.15 | Principal Place of Business. | 76 |
| 5.16 | Change of Name, Identity or Structure. | 76 |
| 5.17 | Certain Prohibited Actions. | 76 |
| 5.18 | Due on Sale and Encumbrance; Change of Control; Transfers of Interests. | 76 |
| 5.19 | Costs and Expenses. | 77 |
| 5.20 | Indemnity. | 78 |
| 5.21 | Embargoed Person. | 79 |
| 5.22 | Major Contract; Operations Agreement. | 81 |
| 5.23 | ERISA. | 81 |
| 5.24 | Intentionally Deleted | 81 |
| 5.25 | Intentionally Deleted | 82 |
| 5.26 | Intentionally Deleted | 82 |
| 5.27 | Intentionally Deleted | 82 |
| 5.28 | Anti-Corruption | 82 |
| 5.29 | Sanctionable Activity | 82 |

6.     **NOTICES AND REPORTING**..........................................................................82
    6.1     **Notices.**..............................................................................................82
    6.2     **Borrower Notices and Deliveries.**...................................................83
    6.3     **Financial Reporting.**.......................................................................84

7.     **INSURANCE; CASUALTY; AND CONDEMNATION**.................................86
    7.1     **Insurance.**.........................................................................................87
    7.2     **Casualty and Condemnation**...........................................................90
    7.3     **Delivery of Net Proceeds.**...............................................................91

8.     **PERMITTED TRANSFERS**...........................................................................95
    8.1     **Permitted Transfers.**.......................................................................95
    8.2     **Replacement Guarantor.**.................................................................97
    8.3     **Costs and Expenses.**........................................................................97
    8.4     **Compliance with other Covenants.**.................................................97

9.     **SECONDARY MARKET PROVISIONS**.......................................................98
    9.1     **Transfer of Loan.**.............................................................................98
    9.2     **Use of Information.**........................................................................101
    9.3     **Borrower Indemnity.**....................................................................102
    9.4     **Restructuring or Componentization of Loan.**..............................104
    9.5     **Costs and Expenses.**......................................................................108

10.     **DEFAULTS**................................................................................................108
    10.1     **Events of Default.**..........................................................................108
    10.2     **Remedies.**.......................................................................................111

11.     **MISCELLANEOUS**....................................................................................113
    11.1     **Exculpation.**...................................................................................113
    11.2     **Brokers and Financial Advisors.**..................................................116
    11.3     **Retention of Servicer.**...................................................................116
    11.4     **Survival.**.........................................................................................117
    11.5     **Lender's Discretion; Rating Agency Review Waiver.**..................117
    11.6     **Governing Law.**.............................................................................118
    11.7     **Modification, Waiver in Writing.**.................................................119
    11.8     **Trial by Jury.**................................................................................119
    11.9     **Headings; Schedules and Exhibits.**...............................................119
    11.10     **Severability.**..................................................................................119
    11.11     **Preferences.**...................................................................................119
    11.12     **Waiver of Notice.**..........................................................................120
    11.13     **Remedies of Borrower.**.................................................................120
    11.14     **Prior Agreements.**.........................................................................120
    11.15     **Offsets, Counterclaims and Defenses.**.........................................120
    11.16     **Publicity.**.......................................................................................120
    11.17     **Certain Additional Rights of Lender (VCOC).**............................121
    11.18     **Certain Waivers.**...........................................................................121
    11.19     **Conflict; Construction of Documents**..........................................121
    11.20     **No Third Party Beneficiaries.**......................................................122
    11.21     **Set-Off.**..........................................................................................122
    11.22     **Assignments and Participations.**..................................................122
    11.23     **Counterparts.**................................................................................122

11.24    **Registers**..........................................................................................................122

**12.    MEZZANINE LOAN.** .................................................................................123
12.1    **Mezzanine Loan Notice.** .......................................................................123
12.2    **Mezzanine Loan Estoppels.**..................................................................123
12.3    **Intercreditor Agreement.** ....................................................................123
12.4    **Mezzanine Loan Notices.**.....................................................................123
12.5    **Borrower Distributions.** ......................................................................124

Schedule 1    –    Rent Roll
Schedule 2    –    Required Repairs
Schedule 3    –    Organization of Borrower
Schedule 4    –    Definition of Special Purpose Entity
Schedule 5    –    Tenant Direction Letter
Schedule 6    –    Calculation of UNOI
Schedule 7    –    Existing Approved Leasing Expenses Deposit
Schedule 8    –    REA
Schedule 9    –    O&M Program
Schedule 10   –    Rent Abatement Schedule


Exhibit A            Approved 2022 Annual Budget
Exhibit B            Hotel Parcel

THIS **LOAN AGREEMENT** (as the same may be modified, supplemented, amended or otherwise changed, this "*Agreement*"), is made as of December 31, 2021, by and between **JERICHO PLAZA PORTFOLIO LLC**, a Delaware limited liability company, having an address 101 Hudson Street, Suite 1703, Jersey City, New Jersey 07302 (together with its permitted successors and assigns, "*Borrower*"), and **NATIXIS REAL ESTATE CAPITAL LLC**, a Delaware limited liability company, having an address at 1251 Avenue of the Americas, New York, New Yok 10020 (together with its successors and assigns, individually and collectively as the context may require, the "*Lender*").

1.     **DEFINITIONS; PRINCIPLES OF CONSTRUCTION**

     1.1     Terms and Definitions.   The following terms have the meanings set forth below:

     *Act:*  shall have the meaning provided in <u>Schedule 4</u>.

     *Affiliate*:  as to any Person, any other Person that (i) owns directly or indirectly twenty percent (20%) or more of all equity interests in such Person, (ii) is in Control of, is Controlled by or is under common ownership or Control with such Person, (iii) is a director or executive officer of such Person or of an Affiliate of such Person, and/or (iv) is the spouse, issue or parent of such Person.

     *Affiliated Manager*:  any Manager that is an Affiliate of Borrower, or any Guarantor.

     *Agreement*:  shall have the meaning provided in the preamble hereto.

     *Alteration Threshold*:  shall mean $1,000,000.00.

     *Annual Budget:*  shall mean the operating and capital budget for the Property setting forth, on a month-by-month basis, in reasonable detail, each line item of Borrower's good faith estimate of anticipated Gross Revenue, Operating Expenses and Capital Expenditures for the applicable Fiscal Year.

     *Anti-Corruption Rules*:  any law or regulation aiming at preventing and/or sanctioning corruption, influence peddling or bribery including the Sapin II Law of France 2016, as well as the United Kingdom Bribery Act 2010 and the United States Foreign Corrupt Practices Act of 1977.

     *Approved Annual Budget*:  shall have the meaning provided in <u>Section 6.3.6</u>.

     *Approved Capital Expenditures*:  Capital Expenditures incurred by Borrower, and either (i) included in the Approved Annual Budget, or (ii) approved by Lender.

     *Approved Leasing Expenses*:  actual out-of-pocket expenses incurred by Borrower and payable to third parties that are not Affiliates of Borrower or any Guarantor in leasing space at the Property pursuant to Leases entered into in accordance with the Loan Documents, including brokerage commissions and Tenant improvements, which expenses (i) are (A) specifically approved by Lender (in its reasonable discretion) in connection with approving the applicable Lease, (B) incurred in the ordinary course of business and on market terms and conditions in connection with Leases which do not require Lender's approval under the Loan Documents, and at Lender's request, Lender shall have received and approved a budget for such tenant improvement costs and a schedule of leasing commissions payments payable in connection therewith or (C) otherwise approved by Lender, which approval shall not be unreasonably

withheld, conditioned or delayed, and (ii) are substantiated by executed Lease documents and brokerage agreements..

**Approved Operating Expenses**: Expenses incurred by Borrower which (i) are included in the Approved Annual Budget for the current calendar month, (ii) are for Property Taxes, Insurance Premiums, electric, gas, oil, water, sewer or other utility service to the Property, (iii) are for property management fees payable to Manager under the Management Agreement, such amounts not to exceed two and one-half percent (2.5%) of the monthly Gross Revenue, or (iv) have otherwise been approved by Lender (in its reasonable discretion).

**Assignment of Contracts**: that certain Assignment of Agreements, Licenses, Permits and Contracts, dated as of the date hereof, among Borrower, Manager and Lender, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

**Assignment of Interest Rate Protection Agreement**: shall have the meaning provided in Section 2.7.1(b).

**Assignment of Leases**: shall mean that certain first priority Assignment of Leases and Rents, dated as of the date hereof, from Borrower, as assignor, to Lender, as assignee, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

**Assignment of Management Agreement**: that certain Assignment of Management Agreement and Subordination of Management Fees, dated as of the date hereof, among Borrower, Manager and Lender, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

**Award**: any compensation paid by any Governmental Authority in connection with a Condemnation in respect of all or any part of the Property.

**Bail-In Action**: means the exercise of any Write-Down and Conversion Powers by (i) the applicable EEA Resolution Authority in respect of any liability of an EEA Financial Institution or (ii) the applicable U.K. Resolution Authority in respect of any liability of a U.K. Financial Institution.

**Bail-In Legislation**: means, (a)(i) with respect to any EEA Member Country implementing Article 55 of the Bank Recovery and Resolution Directive, the implementing law for such EEA Member Country from time to time which is described in the EU Bail-In Legislation Schedule and (ii) the then applicable Commission Delegated Regulation (if any) supplementing the Bank Recovery and Resolution Directive in relation to Article 55 thereof and (b) with respect to the United Kingdom, Part I of the United Kingdom Banking Act 2009 (as amended from time to time) and any other law, regulation or rule applicable in the United Kingdom relating to the resolution of unsound or failing banks, investment firms or other financial institutions or their affiliates (other than through liquidation, administration or other insolvency proceedings).

**Bank Recovery and Resolution Directive**: means Directive 2014/59/EU of the European Parliament and of the Council of the European Union.

**Bankruptcy Action**: shall mean with respect to any Person (i) such Person filing a voluntary petition under the Bankruptcy Code or any other federal, state, local or foreign bankruptcy or insolvency law; (ii) the filing of an involuntary petition against such Person under the Bankruptcy Code or any other federal, state, local or foreign bankruptcy or insolvency law, or soliciting or causing to be solicited

DM_US 183358854-7.105065.0051

petitioning creditors for any involuntary petition against such Person; (iii) such Person filing an answer consenting to or otherwise acquiescing in or joining in any involuntary petition filed against it, by any other Person under the Bankruptcy Code or any other federal, state, local or foreign bankruptcy or insolvency law, or soliciting or causing to be solicited petitioning creditors for any involuntary petition from any Person; (iv) such Person consenting to or acquiescing in or joining in an application for the appointment of a custodian, receiver, trustee, or examiner for such Person or any portion of the Property; or (v) such Person making an assignment for the benefit of creditors, or admitting, in writing or in any legal proceeding, its insolvency or inability to pay its debts as they become due.

*Bankruptcy Code*:  shall mean Title 11 of the United States Code entitled "Bankruptcy", as amended from time to time, and any successor statute or statutes and all rules and regulations from time to time promulgated thereunder, and any comparable foreign laws relating to bankruptcy, insolvency or creditors' rights.

*Base Rate:*  with respect to each Interest Period, the Prime Rate**,** determined as of the Determination Date related to such Interest Period.

*Base Rate Loan*:  the Loan at such time as interest thereon accrues at a per annum rate of interest based upon the Base Rate plus the Base Rate Spread following a conversion in accordance with Section 2.2.2 hereof.

*Base Rate Spread*: in connection with any conversion of the Loan from (i) a SOFR Loan to a Base Rate Loan, the difference (expressed as the number of basis points) between (a) the applicable SOFR Index plus the Spread on the date  the applicable SOFR Index was last applicable to the Loan minus (b) the Base Rate on the date that the applicable SOFR Index was last applicable to the Loan; or (ii) a Benchmark Replacement Loan to a Base Rate Loan, the difference (expressed as the number of basis points) between (1) the Benchmark Replacement on the date that the Benchmark Replacement was last applicable to the Loan minus (2) the Base Rate on the date that the Unadjusted Benchmark Replacement was last applicable to the Loan, provided, however, that in either (i) or (ii), if such difference is a negative number, then the Base Rate Spread shall be zero.

*Benchmark*: means, initially, the SOFR Index; provided that if a Benchmark Transition Event and its related Benchmark Replacement Date have occurred with respect to the SOFR Index or the then-current Benchmark, then "Benchmark" means the applicable Benchmark Replacement to the extent that such Benchmark Replacement has become effective pursuant to clause (a) of Section **Error! Reference source not found.** hereof.

*Benchmark Replacement*:  means, for any Interest Period, the sum of: (a) the alternate rate of interest that has been selected by Lender (which selection shall be conclusive and binding absent manifest error) as the replacement for the then-current Benchmark for the applicable Corresponding Tenor giving due consideration to (i) any selection or recommendation of a replacement rate or the mechanism for determining such a rate by the Relevant Governmental Body at such time or (ii) any evolving or then-prevailing market convention for determining a rate of interest as a replacement for the then-current Benchmark for U.S. dollar-denominated floating rate credit facilities at such time and (b) the Benchmark Replacement Adjustment. If the Benchmark Replacement as determined pursuant to this definition would be less than zero, the Benchmark Replacement will be deemed to be zero for the purposes of this Agreement.

*Benchmark Replacement Adjustment*:  means, for any Interest Period, the spread adjustment, or method for calculating or determining such spread adjustment, (which may be a positive or negative

value or zero) that has been selected by Lender for the applicable Corresponding Tenor giving due consideration to (i) any selection or recommendation of a spread adjustment, or method for calculating or determining such spread adjustment, for the replacement of the then-current Benchmark with the applicable Unadjusted Benchmark Replacement by the Relevant Governmental Body at such time or (ii) any evolving or then-prevailing market convention for determining a spread adjustment, or method for calculating or determining such spread adjustment, for the replacement of the then-current Benchmark with the applicable Unadjusted Benchmark Replacement for U.S. dollar-denominated floating rate credit facilities at such time.

*Benchmark Replacement Conforming Changes*:  means, with respect to any Benchmark Replacement, any technical, administrative or operational changes (including changes to the definition of "Interest Period," Business Day", "Determination Date", "Interest Period", "Payment Date", timing and frequency of determining rates and making payments of interest and other administrative matters) that Lender decides may be appropriate to reflect the adoption and implementation of such Benchmark Replacement and to permit the administration thereof by Lender in a manner substantially consistent with market practice (or, if Lender decides that adoption of any portion of such market practice is not administratively feasible or if Lender determines that no market practice for the administration of the Benchmark Replacement exists, in such other manner of administration as Lender decides is reasonably necessary in connection with the administration of this Agreement).

*Benchmark Replacement Date*:  means the earliest to occur of the following events with respect to the then-current Benchmark:

    (1)    in the case of clause (1) or (2) of the definition of "Benchmark Transition Event," the later of (a) the date of the public statement or publication of information referenced therein and (b) the date on which the administrator of the Benchmark permanently or indefinitely ceases to provide the Benchmark; or

    (2)    in the case of clause (3) of the definition of "Benchmark Transition Event," the date of the public statement or publication of information referenced therein.

*Benchmark Replacement Loan*:  the Loan at such time as interest thereon accrues at a per annum rate of interest equal to the Benchmark Replacement following a conversion in accordance with Section 2.2.2 hereof.

*Benchmark Transition Event*:  means the occurrence of one or more of the following events with respect to the then-current Benchmark:

    (1)    a public statement or publication of information by or on behalf of the administrator of the Benchmark announcing that such administrator has ceased or will cease to provide the Benchmark, permanently or indefinitely, provided that, at the time of such statement or publication, there is no successor administrator that will continue to provide the Benchmark;

    (2)    a public statement or publication of information by the regulatory supervisor for the administrator of the Benchmark, the central bank for the currency of the Benchmark, an insolvency official with jurisdiction over the administrator for the Benchmark, a resolution authority with jurisdiction over the administrator for the Benchmark or a court or an entity with similar insolvency or resolution authority over the administrator for the Benchmark, which states that the administrator of the Benchmark has ceased or will cease to provide the

Benchmark permanently or indefinitely, provided that, at the time of such statement or publication, there is no successor administrator that will continue to provide the Benchmark;

(3)     a public statement or publication of information by the regulatory supervisor for the administrator of the Benchmark announcing that the Benchmark is no longer representative; or

(4)     adequate and reasonable means do not exist for ascertaining Term SOFR (which determination by Lender shall be conclusive and binding in the absence of manifest error).

For the avoidance of doubt, a Term SOFR Transition Event shall not be deemed a Benchmark Transition Event.

*Benchmark Unavailability Period*: means, if a Benchmark Transition Event and its related Benchmark Replacement Date have occurred with respect to the then-current Benchmark and solely to the extent that the then-current Benchmark has not been replaced with a Benchmark Replacement pursuant to clauses (1) or (2) of the definition of "Benchmark Replacement Date," the period (x) beginning at the time that such Benchmark Replacement Date pursuant to clauses (1) or (2) of that definition has occurred if, at such time, no Benchmark Replacement has replaced the then-current Benchmark for all purposes hereunder or under any Loan Document in accordance with Section 2.2.2 hereof and (y) ending at the time that a Benchmark Replacement has replaced the then-current Benchmark for all purposes hereunder or under any Loan Document in accordance with Section 2.2.2 hereof.

*Borrower*: shall have the meaning provided in the preamble hereto.

*Borrower's Recourse Liabilities*:  shall have the meaning provided in Section 11.1.

*Broker*:  shall have the meaning provided in Section 11.2.

*Business Day*:  any day other than a Saturday, a Sunday or a legal holiday on which national banks are not open for general business in (i) the State of New York, (ii) the state where the corporate trust office of the Trustee is located, or (iii) the state where the servicing offices of the Servicer are located.

*Capital Expenditure*:  for any period, the amounts expended for items required to be capitalized under GAAP (including expenditures for replacements, building improvements, major repairs, alterations, tenant improvements and leasing commissions).

*Capital Expenditure Funds*:  shall have the meaning provided in Section 3.5.1.

*Capital Expenditures Subaccount*:  shall have the meaning provided in Section 3.5.1.

*Cash Collateral Reserve Funds*:  shall have the meaning provided in Section 3.10.

*Cash Collateral Reserve Subaccount*:  shall have the meaning provided in Section 3.10.

*Cash Management Accounts*:  shall have the meaning provided in Section 3.11.

*Cash Management Trigger Event*: the occurrence of:

(i)     an Event of Default; or

(iii) the failure by Borrower to maintain a Debt Yield of at least seven and thirty-seven hundredths of one percent (7.37%).

***Cash Management Trigger Event Cure***:  shall mean:

(i) if the Cash Management Trigger Event is caused solely by the occurrence of clause (i) in the definition of "Cash Management Trigger Event," the date on which a cure of the Event of Default which gave rise to such Cash Management Trigger Event is accepted or waived in writing by Lender in its sole and absolute discretion; provided that Lender shall not have exercised any of its rights under Section 10.2 to accelerate the Loan, move to appoint a receiver or commence a foreclosure action; or

(ii) if the Cash Management Trigger Event is caused solely by the occurrence of clause (ii) in the definition of "Cash Management Trigger Event," the date on which the Debt Yield at the is at least equal to seven and sixty-five hundredths of one percent (7.65%) for six (6) consecutive months;

provided that each Cash Management Trigger Event Cure set forth above shall be subject to the following conditions:  for six (6) connective months since the commencement of the most recent Cash Management Trigger Event Period, (1) no Default or Event of Default shall have occurred, (2) no Cash Management Trigger Event shall have occurred, and (3) Borrower shall have paid all of Lender's reasonable third-party out-of-pocket costs and expenses actually incurred in connection with such Cash Management Trigger Event Cure (including reasonable attorneys' fees and expenses).

***Cash Management Trigger Event Period***:  any period commencing on the occurrence of a Cash Management Trigger Event and continuing until the earlier of (i) the Payment Date following the occurrence of the applicable Cash Management Trigger Event Cure or (ii) the payment in full of all principal and interest on the Loan and all other amounts payable under the Loan Documents, including the Spread Maintenance Premium, if applicable, in accordance with the terms and provisions of the Loan Documents.

***Casualty***:  shall have the meaning provided in Section 7.2.1.

***Casualty/Condemnation Funds***:  shall have the meaning provided in Section 3.8.

***Casualty/Condemnation Subaccount***:  shall have the meaning provided in Section 3.8.

***Casualty Consultant***:  shall have the meaning provided in Section 7.3.2(c).

***Casualty Retainage***:  shall have the meaning provided in Section 7.3.2(d).

***Cause***:  shall have the meaning provided in Schedule 4.

***Clearing Account***:  shall have the meaning provided in Section 3.1.

***Clearing Account Agreement***:  shall mean that certain Deposit Account Control Agreement, dated as of the date hereof, by and among Borrower, Manager, Lender and the Clearing Bank, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time or, if the context requires, a replacement clearing account agreement executed in accordance with the terms and provisions of this Agreement.

***Clearing Bank***:  shall have the meaning provided in Section 3.1.

DM_US 183358854-7.105065.0051

***Closing Date***: the date of the initial funding of the Loan.

***Code***: the Internal Revenue Code of 1986, as amended and as it may be further amended from time to time, any successor statutes thereto, and applicable U.S. Department of Treasury regulations issued pursuant thereto in temporary or final form.

***Committee***: shall have the meaning provided in Schedule 4.

***Componentization Notice***: shall have the meaning provided in Section 9.4(c).

***Compounded SOFR***: shall mean, as of the Determination Date for any Interest Period, the rate of interest equal to the compounded average of SOFR over a rolling 30-calendar day period as such rate is currently published on the SOFR Administrator's Website as "30-Day Average SOFR".

***Condemnation***: shall have the meaning provided in Section 7.2.2.

***Connection Income Taxes***: Other Connection Taxes that are imposed on or measured by net income (however denominated) or that are franchise Taxes or branch profits Taxes.

***Control***: with respect to any Person, either (i) the ownership, directly or indirectly, in the aggregate of more than forty-nine percent (49%) of the beneficial ownership interests of such Person or (ii) the possession, directly or indirectly, of the power to direct or cause the direction of the management, policies or activities of such Person, whether through ownership of voting securities or other beneficial interests, by contract or otherwise, and the terms "controlled" or "controlling" shall have a correlative meaning.

***Converted Interest Rate Protection Agreement***: shall have the meaning provided in Section 2.7.1(e)(i).

***Corresponding Tenor***: with respect to a Benchmark Replacement means a tenor (including overnight) having approximately the same length (disregarding business day adjustment) as the applicable tenor for the applicable Interest Period with respect to the then-current Benchmark.

***Covered Bond Pool Pledge***: shall have the meaning provided in Section 9.1(a).

***Covered Disclosure Information***: shall have the meaning provided in Section 9.3(b).

***Debt***: the Outstanding Principal Balance together with all interest accrued and unpaid thereon, and all other sums, including the Spread Maintenance Premium, if applicable, and all other sums due to Lender in respect of the Loan or under any Loan Document.

***Debt Service***: with respect to any particular period, the scheduled interest due and payable under the Note and this Agreement.

***Debt Service Coverage Ratio***: as of any date of determination, the ratio calculated by Lender of (i) the Net Operating Income for the twelve (12) month period ending with the most recently completed calendar month to (ii) the Debt Service with respect to such period (provided that, during any period when Debt Service requires the payment of interest only, for the purposes of calculating the Debt Service Coverage Ratio Lender shall do so on an assumed amortizing basis based upon a thirty (30) year amortization schedule).

**Debt Yield**: the ratio, as determined by Lender, in its reasonable discretion of (i) the UNOI for the twelve (12) month period ending with the most recently completed calendar month, to (ii) the maximum principal amount of the Loan as of such date.

**Default**: the occurrence of any event under any Loan Document which, with the giving of notice or passage of time, or both, would be an Event of Default.

**Default Rate**: a rate per annum equal to the lesser of (i) the Maximum Legal Rate, or (ii) five percent (5%) above the Interest Rate.

**Deposit Account**: shall have the meaning provided in Section 3.1.

**Deposit Account Agreement**: that certain Deposit Account Agreement dated as of the date hereof by and among Lender, Borrower and Deposit Bank. as the same may be amended, restated, replaced, supplemented or otherwise modified, setting forth the parties' obligations relating to the funds transferred from the Deposit Account pursuant to the provisions of this Agreement.

**Deposit Bank:** PNC Bank, National Association, and any successor Eligible Institution thereto under the Cash Management Agreement in effect from time to time.

**Determination Date:** shall mean, with respect to any determination of the Benchmark Rate applicable to an Interest Period:

(1)     if the Benchmark is Term SOFR or SOFR Average, 3:00 p.m. (New York City time) on the day that is two (2) U.S. Government Securities Business Days prior to the fifteen (15th) day of the calendar month prior to the month in which the next Payment Date shall occur; provided, however, that Lender may elect, in its sole discretion to change the Determination Date upon written notice thereof to Borrower setting forth such changed date, in which event, upon the effective date of such notice, the Determination Date hereunder shall be the date set forth therein; and

(2)     if the Benchmark is not Term SOFR or SOFR Average, the date and time determined by Lender in accordance with the Benchmark Replacement Conforming Changes.

**Disclosure Document**: shall have the meaning provided in Section 9.2.

**EEA Financial Institution**: means (a) any credit institution or investment firm established in any EEA Member Country which is subject to the supervision of an EEA Resolution Authority, (b) any entity established in an EEA Member Country which is a parent of an institution described in clause (a) of this definition, or (c) any financial institution established in an EEA Member Country which is a subsidiary of an institution described in clauses (a) or (b) of this definition and is subject to consolidated supervision with its parent.

**EEA Member Country**: means any of the member states of the European Union, Iceland, Liechtenstein, and Norway.

**EEA Resolution Authority**: means any public administrative authority or any person entrusted with public administrative authority of any EEA Member Country (including any delegee) having responsibility for the resolution of any EEA Financial Institution.

**Election:** shall have the meaning provided in Section 5.26(f).

DM_US 183358854-7.105065.0051

*Eligible Account*:  a separate and identifiable account from all other funds held by the holding institution that is either (i) an account maintained with the Deposit Bank or another depository institution or trust company; provided (x) the short term unsecured debt obligations or commercial paper of such other depository institution or trust company are rated at least "A 1" by S&P, "P-1" by Moody's and "F1" by Fitch (in the case of accounts in which funds are held for thirty (30) days or less) or (y) the long term unsecured debt obligations of which are rated at least "A" by S&P, "A" by Fitch (and the short term deposits or short term unsecured debt obligations or commercial paper of such depository institution are rated no less than "F1" by Fitch) and "A2" by Moody's (in the case of accounts in which funds are held for more than thirty (30) days) or (ii) a segregated trust account maintained with the trust department of a federal or state chartered depository institution or trust company acting in its fiduciary capacity which institution or trust company is subject to regulations similar to 12 C.F.R. §9.10(b), having in either case a combined capital and surplus of at least $50,000,000 and is subject to federal and state authorities and having a long-term unsecured debt rating of "BBB-" or higher by S&P and "A2" or higher by Moody's and a short-term unsecured debt rating of "A-1" or higher by S&P and "P-1" or higher by Moody's.  An Eligible Account will not be evidenced by a certificate of deposit, passbook or other instrument.

*Eligible Institution*:  a depository institution or trust company insured by the Federal Deposit Insurance Corporation the short term unsecured debt obligations or commercial paper of which are rated at least "A-1" by S&P, "P-1" by Moody's and "F1" by Fitch (and the long term unsecured debt obligations of such depository institution are rated at least "A" by Fitch) in the case of accounts in which funds are held for thirty (30) days or less or, in the case of accounts in which funds are held for more than thirty (30) days, the long term unsecured debt obligations of which are rated at least (i) "A" by S&P, (ii) "A" by Fitch (and the short term deposits or short term unsecured debt obligations or commercial paper of such depository institution are rated no less than "F1" by Fitch), and (iii) "A2" by Moody's, or in the case of Letters of Credit, the long term unsecured debt obligations of which are rated at least (i) "A+" by S&P, (ii) "A+" by Fitch (and the short term deposits or short term unsecured debt obligations or commercial paper of such depository institution are rated no less than "F1" by Fitch) and (iii) "A1" by Moody's; provided, however, for purposes of the Deposit Bank, the definition of Eligible Institution shall have the meaning set forth in the Deposit Account Agreement.

*Embargoed Person*:  shall have the meaning provided in <u>Section 5.21(b)</u>.

*Environmental Laws*:  shall have the meaning provided in <u>Section 4.19</u>.

*Equipment*:  shall have the meaning provided in the Security Instrument.

*ERISA*:  the Employee Retirement Income Security Act of 1974, as amended from time to time, and the regulations promulgated and the ruling issued thereunder.

*ERISA Affiliate*:  any trade or business (whether or not incorporated) which is a member of the same controlled group of corporations or group of trades or businesses under common control with Borrower or any Guarantor, or is treated as a single employer together with Borrower or any Guarantor under Section 414 of the Code or Title IV of ERISA.

*EU Bail-In Legislation Schedule*:  means the EU Bail-In Legislation Schedule published by the Loan Market Association (or any successor person), as in effect from time to time.

*Excess Cash Flow*:  shall have the meaning provided in <u>Section 3.12.1</u>.

*Exchange Act*:  shall have the meaning provided in <u>Section 9.2</u>.

DM_US 183358854-7.105065.0051

*Exchange Act Filing*:  shall have the meaning provided in <u>Section 9.1(d)</u>.

*Excluded Taxes*: means any of the following Taxes imposed on or with respect to a Lender or required to be withheld or deducted from a payment to a Lender, (a) Taxes imposed on or measured by net income (however denominated), franchise Taxes, and branch profits Taxes, in each case, (i) imposed as a result of such Lender being organized under the laws of, or having its principal office or its applicable lending office located in, the jurisdiction imposing such Tax (or any political subdivision thereof) or (ii) that are Other Connection Taxes, (b) U.S. federal withholding Taxes imposed on amounts payable to or for the account of such Lender with respect to an applicable interest in the Loan or otherwise under a Loan Document pursuant to a law in effect on the date on which (i) such Lender acquires such interest in the Loan or becomes a party to this Agreement or any other Loan Document or (ii) such Lender changes its lending office, except in each case to the extent that, pursuant to <u>Section 2.3.5</u>, amounts with respect to such Taxes were payable either to such Lender's assignor immediately before such assignee became a party hereto or to such Lender immediately before it changed its lending office, (c) Taxes attributable to such Lender's failure to comply with <u>Section 2.3.5(e)</u>, and (d) any withholding Taxes imposed under FATCA.

*Existing Approved Leasing Expenses*: shall have the meaning provided in <u>Section 3.6.1</u>.

*Existing Approved Leasing Expenses Deposit*: shall have the meaning provided in <u>Section 3.6.1</u>.

*Event of Default*:  shall have the meaning provided in <u>Section 10.1</u>.

*Extended Maturity Date*:  shall have the meaning provided in <u>Section 2.9.1</u>.

*Extension Option:* shall have the meaning provided in <u>Section 2.9.1</u>.

*Extension Period:* shall have the meaning provided in <u>Section 2.9.1</u>.

*FATCA*: Sections 1471 through 1474 of the Code, as of the date of this Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with), any current or future regulations or official interpretations thereof and any agreements entered into pursuant to Section 1471(b)(1) of the Code and any fiscal or regulatory legislation, rules or official administrative practices adopted pursuant to any intergovernmental agreement, treaty, or convention entered into in connection with Sections 1471 through 1474 of the Code.

*FATF*:  shall have the meaning provided in <u>Section 5.21</u>.

*Federal Reserve Bank of New York's Website*:  the website of the Federal Reserve Bank of New York at <u>http://www.newyorkfed.org</u>, or any successor source.

*Fiscal Year*:  shall mean each twelve (12) month period commencing on January 1 and ending on December 31 during each year of the Term.

*Fitch*:  Fitch IBCA, Inc.

*Foreign Lender*: a Lender that is not a U.S. Person.

*GAAP*:   generally accepted accounting principles set forth in the opinions and pronouncements of the Accounting Principles Board and the American Institute of Certified Public

Accountants and statements and pronouncements of the Financial Accounting Standards Board (or agencies with similar functions of comparable stature and authority within the accounting profession), or in such other statements by such entity as may be in general use by significant segments of the U.S. accounting profession.

*Governmental Authority*:  shall mean any court, board, agency, department, committee, commission, central bank, office or authority of any nature whatsoever (including any political subdivision or instrumentality thereof) for any governmental or quasi-governmental unit (whether federal, state, commonwealth, county, district, municipal, city, parish, provincial or otherwise) (whether of the government of the United States or any other nation) now or hereafter in existence (including any supra-national bodies such as the European Union or the European Central Bank and any intergovernmental organizations such as the United Nations).

*Government Lists*:  shall have the meaning provided in Section 5.21.

*Gross Revenue*:  all revenue, including, without limitation, Rents, derived from the ownership and operation of the Property from whatever source.

*Guarantor:*  Menachem Meisner, or any other Person that now or hereafter guarantees any of Borrower's obligations under any Loan Document.

*Guaranty:*  that certain Guaranty of Recourse Obligations, dated as of the date hereof, from Guarantor for the benefit of Lender, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

*Hazardous Substances*:  shall have the meaning provided in Section 4.19.

*Hotel Parcel*:  that certain parcel of land described on Exhibit B attached hereto.

*Immediate Family Member*:  a spouse, parent, child or grandchild of any applicable Person.

*Improvements*:  shall have the meaning provided in the Security Instrument.

*Indebtedness*: for any Person, without duplication: (i) all indebtedness of such Person for borrowed money, for amounts drawn under a letter of credit, or for the deferred purchase price of property for which such Person or its assets is liable, (ii) all unfunded amounts under a loan agreement, letter of credit, or other credit facility for which such Person would be liable if such amounts were advanced thereunder, (iii) all amounts required to be paid by such Person as a guaranteed payment to partners or a preferred or special dividend, including any mandatory redemption of shares or interests, (iv) all indebtedness guaranteed by such Person, directly or indirectly, (v) all obligations under leases that constitute capital leases for which such Person is liable, (vi) all obligations of such Person under interest rate swaps, caps, floors, collars and other interest hedge agreements, in each case for which such Person is liable or its assets are liable, whether such Person (or its assets) is liable contingently or otherwise, as obligor, guarantor or otherwise, or in respect of which obligations such Person otherwise assures a creditor against loss, (vii) all obligations under any PACE Loans, and (viii) and (vii) any other contractual obligation for the payment of money which are not settled within thirty (30) days.

*Indemnified Liabilities*:  shall have the meaning provided in Section 5.20.

***Indemnified Party***:  shall have the meaning provided in <u>Section 5.20</u>.

***Indemnified Taxes***: (a) Taxes, other than Excluded Taxes, imposed on or with respect to any payment made by or on account of any obligation of Borrower under any Loan Document and (b) to the extent not otherwise described in <u>clause (a)</u> above, Other Taxes.

***Independent Director***:  shall have the meaning provided in <u>Schedule 4</u>.

***Independent Manager***:  shall have the meaning provided in <u>Schedule 4</u>.

***Insolvency Opinion*** shall mean, as the context may require, (i) that certain bankruptcy non-consolidation opinion letter dated the date hereof delivered by Cole Schotz P.C. in connection with the Loan or (ii) any other bankruptcy non-consolidation opinion letter delivered to Lender in connection with the Loan, including any bankruptcy non-consolidation opinion letter delivered to Lender after the closing of the Loan pursuant to the terms and conditions of the Loan Documents, which post-closing opinion shall be from counsel, and in form and substance, in each case, reasonably acceptable to Lender and acceptable to the Rating Agencies in their sole discretion.

***Insurance Funds***:  shall have the meaning provided in <u>Section 3.4.1</u>.

***Insurance Premiums***:  shall have the meaning provided in <u>Section 7.1.2</u>.

***Insurance Proceeds*** shall mean all payments from any insurance company payable as a result of the Policies required by <u>Article 7</u> or any other insurance policy covering the Property and/or Borrower.

***Insurance Subaccount***:  shall have the meaning provided in <u>Section 3.4.1</u>.

***Intercreditor Agreement***: shall have the meaning provided in <u>Section 12.3</u>.

***Interest Rate Protection Agreement***:  shall have the meaning provided in <u>Section 2.7.1</u>.

***Interest Period***:  (i) the period from the Closing Date through the first day thereafter that is the eighth (8th) day of a calendar month, and (ii) each period thereafter from the ninth (9th) day of each calendar month through the eighth (8th) day of the next calendar month; except that the Interest Period, if any, that would otherwise commence before and end after the Maturity Date shall end on the Maturity Date. In the event Lender shall have elected to change the date on which scheduled payments under the Loan are due, as described in the definition of "Payment Date", Lender shall have the option, but not the obligation, to adjust the Interest Period and the Determination Date.

***Interest Rate***:  for any Interest Period, an interest rate per annum equal to (i) for a SOFR Loan, the Spread plus the applicable SOFR Index for such Interest Period; (ii) for a Base Rate Loan, the Base Rate Spread plus the Base Rate for such Interest Period; and (iii) for a Benchmark Replacement Loan, the Spread plus the Benchmark Replacement for such Interest Period; provided, however, that the Interest Rate as determined pursuant to the foregoing clauses (i), (ii) and (iii) shall in no event be less than the sum of the Spread plus the SOFR Floor.

***Investor***:  shall have the meaning provided in <u>Section 9.1(a)</u>.

DM_US 183358854-7.105065.0051

***ISDA Definitions***:  means the 2006 ISDA Definitions published by the International Swaps and Derivatives Association, Inc. or any successor thereto, as amended or supplemented from time to time, or any successor definitional booklet for interest rate derivatives published from time to time.

***Issuer***:  shall have the meaning provided in Section 9.3(a).

***I/O Note***:  shall mean a note which solely evidences an obligation to pay interest on a notional principal balance and which is otherwise on the same terms and conditions as the other notes evidencing the Loan (or any portion thereof or interest therein); provided that, other than the right to receive such interest on a notional principal balance and the right to consent to modifications of the Loan Documents that would change the economic terms (including, to the extent applicable, by changing the amount or timing of principal payments on the loan) of such I/O Note, neither such note nor any other documents entered into in connection therewith (including, any documents entered into by the holders of any notes evidencing the Loan or any interests in the Loan (or any portion thereof or interest therein)) confers upon the holder thereof any other right or interest in the Loan (or any portion thereof or interest therein.

***Jericho Plaza GP***:  Jericho Plaza GP LLC, a Delaware limited liability company.

***Key Principals***:  shall mean Guarantor.

***Late Payment Charge***:  shall have the meaning provided in Section 2.3.3.

***Lease***:  any lease, sublease or sub-sublease, letting, license, concession or other agreement (whether written or oral and whether now or hereafter in effect) pursuant to which any Person is granted a possessory interest in, or right to use or occupy, all or any portion of any space in the Property, and every modification, amendment or other agreement (whether written or oral and whether now or hereafter in effect) relating to such lease, sublease, sub-sublease or other agreement entered into in connection with such lease, sublease, sub-sublease or other agreement, and every guarantee of the performance and observance of the covenants, conditions and agreements to be performed and observed by the other party thereto, whether before or after the filing by or against Borrower of any petition for relief under the Bankruptcy Code.

***Lease Termination Payments***:  shall have the meaning provided in Section 5.9.4(a).

***Legal Requirements***:   shall mean all federal, state, county, municipal and other governmental statutes, laws, rules, orders, regulations, ordinances, judgments, decrees, demands and injunctions of Governmental Authorities affecting the Loan, Borrower, Guarantor or the Property or any part thereof or the ownership, construction, alteration, use, management or operation of the Property or any part thereof, whether now or hereafter enacted and in force, including, without limitation, the Securities Act, the Exchange Act, Regulation AB, the Dodd-Frank Wall Street Reform and Consumer Protection Act, zoning and land use laws and the Americans with Disabilities Act of 1990, the rules and regulations promulgated pursuant to any of the foregoing, and all permits, licenses and authorizations relating thereto, and all covenants, agreements, restrictions and encumbrances contained in any instruments, either of record or known to Borrower, at any time in force affecting Borrower, Guarantor or the Property or any part thereof, including, without limitation, any which may (i) require repairs, modifications or alterations in or to the Property or any part thereof or (ii) in any way limit the use and enjoyment thereof.

***Lender***:  shall have the meaning provided in the preamble hereto.

DM_US 183358854-7.105065.0051

*Lender's Consultant*:  shall have the meaning provided in Section 5.7.1.

*Lender Group*:  shall have the meaning provided in Section 9.3(a).

*Lender Parties*:  shall have the meaning provided in Section 11.25.

*Lender Transfer Requirements*:  Borrower's requirement  to deliver, or cause to be delivered, at Borrower's sole cost and expense, such customary searches (including credit, negative news, OFAC, litigation, judgment, lien and bankruptcy searches) as Lender may reasonably require with respect to such transferee, its owners and/or Controlling Persons, as applicable, the results of which must be reasonably acceptable to Lender (unless such transferee, its owners and/or Controlling Persons, as applicable, were previously the subject of searches by Lender which were reasonably acceptable to Lender, in which case Borrower's obligation to deliver or cause the delivery of such searches with respect to such Person(s) shall be satisfied to the extent reasonably acceptable updates to such searches are delivered to Lender), and such transferee, its owners and Controlling Persons shall otherwise satisfy Lender's then current applicable underwriting criteria and requirements.

*Liabilities*:  shall have the meaning provided in Section 9.3(a).

*Licenses*:  shall have the meaning provided in Section 4.10.

*Lien*:  any mortgage, deed of trust, lien (statutory or otherwise), pledge, hypothecation, easement, restrictive covenant, preference, assignment, security interest, PACE Loan, or any other encumbrance, charge or transfer of, or any agreement to enter into or create any of the foregoing, on or affecting all or any part of the Property or any interest therein, or any direct or indirect interest in Borrower, including any conditional sale or other title retention agreement, any financing lease having substantially the same economic effect as any of the foregoing, the filing of any financing statement, and mechanic's, materialmen's and other similar liens and encumbrances.

*Loan*:  shall mean the loan in the original principal amount of One Hundred Forty-Nine Million One Hundred Eighty Thousand and No/100 Dollars ($149,180,000.00) made by Lender to Borrower pursuant to this Agreement.

*Loan Documents*:  this Agreement and all other documents, agreements and instruments now or hereafter evidencing, securing or delivered to Lender in connection with the Loan, including the following, each of which is dated as of the Closing Date:  (i)  the Note, (ii) Security Instrument, (iii) the Assignment of Leases, (iv) the Assignment of Contracts, (v) the Clearing Account Agreement, (vi) the Deposit Account Agreement (vii) the Assignment of Interest Rate Protection Agreement, and (viii) the Guaranty, and any other documents, agreements, certificates, affidavits and instruments now or hereafter evidencing, securing or delivered to Lender in connection with the Loan, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

*Loan-to-Value Ratio*:  a ratio, as determined by Lender, in which, as of any date of determination by Lender:  (i) the numerator is equal to the maximum principal amount of the Loan, and (ii) the denominator of which is the appraised value of the Property as determined by Lender based upon a current "as-is" MAI appraisal for the Property obtained by and acceptable to Lender at Borrower's sole cost and expense.

*Major Contract*:  shall mean (i) any management (other than the Management Agreement), brokerage or leasing agreement, (ii) any cleaning, maintenance, service or other contract or agreement of

any kind (other than Leases) of a material nature (materiality for these purposes to include contracts in excess of $500,000.00 or which extend beyond one year (unless cancelable on thirty (30) days or less notice without requiring the payment of material termination fees or payments of any kind)), or (iii) any contract or agreement with an Affiliate of Borrower, in any case relating to the ownership, leasing, management, use, operation, maintenance, repair or restoration of the Property, whether written or oral.

*Management Agreement*: shall mean the management agreement entered into by and between Borrower and Manager, pursuant to which Manager is to provide management and other services with respect to the Property, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time in accordance with the terms and provisions of this Agreement, or, if the context requires, the Replacement Management Agreement executed in accordance with the terms and provisions of this Agreement.

*Management Control*: shall mean the possession, directly or indirectly, of the power to direct or cause the direction of the management, policies or activities of such Person, whether through ownership of voting securities or other beneficial interests, by contract or otherwise, and the terms "management controlled" or "management controlling" shall have a correlative meaning.

*Manager*: Onyx Management Group, L.L.C., a New Jersey limited liability company, or any successor, assignee or replacement manager approved by Lender and the Rating Agencies in accordance with the terms and conditions of the Loan Documents, including, without limitation, Section 5.11 of this Agreement.

*Material Alteration*: any (i) individual alteration affecting (A) structural elements of the Property (including, without limitation, the roof of the Property) or (B) any building system of the Property (including, without limitation, any utility or HVAC system contained in any Improvements), (ii) alteration to any Improvements during the continuance of an Event of Default, or (iii) non-structural alteration the cost of which exceeds the Alteration Threshold; provided, however, that in no event shall any of the following constitute a Material Alteration (a) any Required Repairs, (b) any tenant improvement work performed pursuant to any Lease existing on the date hereof or entered into hereafter in accordance with the provisions of this Agreement, or (c) alterations performed as part of a Restoration.

*Material Lease*: any Lease which, either individually, or when taken together with any other Lease with the same Tenant or its Affiliates, and assuming the exercise of all expansion rights and all preferential rights to lease additional space contained in such Lease, (i) constitutes sixty thousand (60,000) square feet of gross leasable area at the Property, (ii) intentionally omitted, (iii) intentionally omitted, (iv) is with an Affiliate of Borrower or Guarantor, as Tenant, (v) is entered into during the continuation of an Event of Default, (vi) is for a co-working arrangement for shared space, or (vii) to the extent any Lease is for multifamily residential property, any Lease which is not for the residential use of the lessee thereunder.

*Maturity Date*: the date on which the final payment of principal of the Note becomes due and payable as herein and therein provided, whether at the Stated Maturity Date or Extended Maturity Date, by declaration of acceleration, or otherwise.

*Maximum Legal Rate*: the maximum nonusurious interest rate, if any, that at any time or from time to time may be contracted for, taken, reserved, charged or received on the indebtedness evidenced by the Note and as provided for herein or the other Loan Documents, under the laws of such Governmental Authority whose laws are held by any court of competent jurisdiction to govern the interest rate provisions of the Loan.

*Mezzanine Borrower*:  Jericho Plaza Mezz LLC, a Delaware limited liability company], the borrower under the Mezzanine Loan, together with its successors and permitted assigns.

*Mezzanine Lender*:  the owner and holder of the Mezzanine Loan, from time to time.

*Mezzanine Loan*:  that certain loan in the original principal amount of Twenty Million and No/100 Dollars ($20,000,000.00) made by Mezzanine Lender to Mezzanine Borrower pursuant to the Mezzanine Loan Agreement.

*Mezzanine Loan Agreement*:  that certain Mezzanine Loan Agreement, dated as of the date hereof, by and between Mezzanine Borrower and Mezzanine Lender, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

*Mezzanine Loan Debt Service Payment Amount*:  as of any date of determination, the "Monthly Debt Service Payment Amount" due under the Mezzanine Loan, as set forth in the Mezzanine Loan Agreement.

*Mezzanine Loan Documents*:  the Mezzanine Loan Agreement and all other documents or instruments evidencing, securing or guaranteeing the Mezzanine Loan executed and delivered by Mezzanine Borrower, in connection with the Mezzanine Loan, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time, subject to the terms of the Intercreditor Agreement.

*Mezzanine Loan Event of Default*:  an "Event of Default" as defined in the Mezzanine Loan Agreement.

*Mezzanine Note*:  that certain Promissory Note (Mezzanine Loan) dated as of the date hereof made by Mezzanine Borrower to Mezzanine Lender, in the original principal amount of the Mezzanine Loan, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

*Monthly Debt Service Payment Amount*:  shall mean interest on the Outstanding Principal Balance accrued and accruing from the first day of the applicable Interest Period through and including the last day of the Interest Period.

*Monthly Insurance Deposit*: shall have the meaning provided in Section 3.4.1.

*Moody's*:  Moody's Investors Service, Inc.

*Nationally Recognized Service Company*:  shall have the meaning provided in Schedule 4.

*NATIXIS*:  Natixis Real Estate Capital LLC, a Delaware limited liability company, the initial Lender hereunder.

*Net Operating Income*:  for any period, the amount obtained by subtracting Operating Expenses and Reserve Funds to be deposited, in each case, for such period from Gross Revenue for such corresponding period.

***Net Proceeds***:  shall mean:  (i) the net amount of all Insurance Proceeds payable as a result of a Casualty to the Property, after deduction of reasonable costs and expenses (including reasonable attorneys' fees and costs), if any, in collecting such Insurance Proceeds or (ii) the net amount of the Award payable as a result of any Condemnation of the Property, after deduction of reasonable costs and expenses (including reasonable attorneys' fees and costs), if any, in collecting such Award.

***Net Proceeds Deficiency***:  shall have the meaning provided in <u>Section 7.3.2(f)</u>.

***New Mezzanine Borrower***:  the Borrower under the New Mezzanine Loan.

***New Mezzanine Loan***:  shall have the meaning provided in <u>Section 9.4(a)</u>.

***New Mezzanine Loan Documents***:  all documents evidencing or securing any New Mezzanine Loan.

***New Mezzanine Loan Note***:  the promissory note(s) evidencing the New Mezzanine Loan, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

***Note***:  shall have the meaning provided in <u>Section 2.1.2</u>.

***Notice***:  shall have the meaning provided in <u>Section 6.1(a)</u>.

***NRSRO***:  shall mean any credit rating agency that has elected to be treated as a nationally-recognized statistical rating agency for purposes of the Exchange Act irrespective of whether or not such credit rating agency has been engaged by Lender or another Indemnified Party to rate any of the Securities issued in connection with a Secondary Market Transaction involving the Loan or any portion thereof.

***O&M Program***: shall have the meaning provided in <u>Section 4.32</u>.

***OFAC***:  shall have the meaning provided in <u>Section 5.21(c)</u>.

***Officer's Certificate***:  a certificate delivered to Lender by Borrower which is signed by an officer of Borrower.

***Operating Expenses***:  all costs and expenses relating to the operation, maintenance and/or management of the Property, including utilities, repairs and maintenance, insurance, property taxes and assessments, advertising expenses, payroll and related taxes, equipment lease payments and management fees payable under the Management Agreement, but excluding (i) actual Capital Expenditures, (ii) depreciation and amortization, (iii) any Debt Service, (iv) deposits of Reserve Funds required to be made pursuant to <u>Article 3</u> of this Agreement, and (v) any item of expense which would otherwise be considered within Operating Expenses pursuant to the provisions above but is paid directly by any Tenant.

***Operating Expense Funds***:  shall have the meaning provided in <u>Section 3.7</u>.

***Operating Expense Subaccount***:  shall have the meaning provided in <u>Section 3.7</u>.

***Operations Agreements*** shall mean the REA, and any other covenants, restrictions, easements, declarations or agreements of record relating to the construction, operation or use of the Property, together with all amendments, modifications or supplements thereto.

***Other Charges***:  all ground rents, maintenance charges, impositions other than Property Taxes and any other charges, including vault charges and license fees for the use of vaults, chutes and similar areas adjoining the Property, now or hereafter levied or assessed or imposed against the Property or any part thereof.

***Other Connection Taxes***: with respect to any Lender, Taxes imposed as a result of a present or former connection between such Lender and the jurisdiction imposing such Tax (other than connections arising solely from such Lender having executed, delivered, become a party to, performed its obligations under, received payments under, received or perfected a security interest under, engaged in any other transaction pursuant to or enforced any Loan Document, or sold or assigned an interest in the Loan or any Loan Document).

***Other Taxes***:  all present or future stamp, court or documentary, intangible, recording, filing or similar Taxes that arise from any payment made under, from the execution, delivery, performance, enforcement or registration of, from the receipt or perfection of a security interest under, or otherwise with respect to, any Loan Document, except any such Taxes that are Other Connection Taxes imposed with respect to an assignment.

***Outstanding Principal Balance***:  as of any date, the outstanding principal balance of the Loan.

***PACE Loan***:   (x) any "Property-Assessed Clean Energy loan" or (y) any other indebtedness, without regard to the name given to such indebtedness, which is (i) incurred for improvements to the Property for the purpose of increasing energy efficiency, increasing use of renewable energy sources, resource conservation, or a combination of the foregoing, and (ii) repaid through multi-year assessments against the Property.

***Participant Register***:  shall have the meaning provided in <u>Section 11.24</u>.

***Patriot Act:*** the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act (USA PATRIOT ACT) of 2001, as the same may be amended from time to time, and corresponding provisions of future laws.

***Patriot Act Offense:*** shall have the meaning provided in <u>Section 5.21(c)</u>.

***Payment Date:***  the ninth (9th) day of each calendar month or, if such day is not a Business Day, the immediately preceding Business Day; provided, however, that Lender shall have the right from time to time, in its sole discretion, upon not less than fifteen (15) Business Days prior written notice to Borrower, to change the Payment Date to a different calendar day and, if requested by Lender, Borrower shall promptly execute an amendment to this Agreement to evidence such change; provided, however, that if Lender shall have elected to change the Payment Date as aforesaid, Lender shall have the option, but not the obligation, to adjust the Interest Period and the Determination Date accordingly.

***Permitted Encumbrances***: (i) the Liens created by the Loan Documents and liens in favor of Mezzanine Lender pursuant to the Mezzanine Loan Documents, (ii) all Liens and other matters disclosed in the Title Insurance Policy, (iii) Liens, if any, for Taxes, Property Taxes or Other Charges, in each case, imposed by any Governmental Authority not yet due or delinquent, (iv) any workers', mechanics' or other similar Liens on the Property provided that any such Lien is bonded or discharged within forty-five (45) days after Borrower first receives notice of such Lien or is being contested in good faith in accordance with the requirements of <u>Section 5.2</u>, (v) rights of Tenants pursuant to existing Leases and new Leases entered

18

into in accordance with the terms, provisions and conditions of this Agreement, and (vi) such other title and survey exceptions as Lender approves in writing in Lender's reasonable discretion.

**Permitted Indebtedness**:  (i) the Debt and (ii) unsecured trade payables and operational debt not evidenced by a note and in an aggregate amount not to exceed two percent (2%) of the original principal amount of the Loan at any one time; <u>provided</u> that any Indebtedness incurred pursuant to <u>subclause (ii)</u> shall be (A) not more than sixty (60) days past due and (B) incurred in the ordinary course of business.

**Permitted Investments**:  shall mean any one or more of the following obligations or securities payable on demand or having a scheduled maturity on or before the Business Day preceding the date upon which such funds are required to be drawn, and having at all times the required ratings, if any, provided for in this definition, unless each Rating Agency shall have confirmed in writing to the Lender that a lower rating would not, in and of itself, result in a downgrade, qualification or withdrawal of the then current ratings assigned to any securities:

(a)    any Money Market Fund so long as such Fund is rated "AAA M" or "AAA M-G" by each Rating Agency (or, if not rated by any Rating Agency other than S&P, otherwise acceptable to such Rating Agency or Agencies, as applicable, as confirmed in writing that such investment would not, in and of itself, result in a downgrade, qualification or withdrawal of the then current ratings assigned to any securities); and

(b)    such other obligations as are acceptable as Permitted Investments to each Rating Agency, as confirmed in writing to the Lender, that such obligations would not, in and of itself, result in a downgrade, qualification or withdrawal of the then current ratings assigned to any securities;

*provided, however*, that the investments  must (A) have a predetermined fixed dollar of principal due at maturity that cannot vary or change, (B) if rated by S&P, must not have an "r" highlighter affixed to their rating, (C) if such investments have a variable rate of interest, such interest rate must be tied to a single interest rate index plus a fixed spread (if any) and must move proportionately with that index, and (D) such investments must not be subject to liquidation prior to their maturity; and *provided, further*, that, with respect to each investment described above, in the judgment of the Lender, such instrument continues to qualify as a "cash flow investment" pursuant to Code Section 860G(a)(6) earning a passive return in the nature of interest and that no instrument or security shall be a Permitted Investment if (x) such instrument or security evidences a right to receive only interest payments or (y) the right to receive principal and interest payments derived from the underlying investment provides a yield to maturity in excess of one hundred twenty percent (120%) of the yield to maturity at par of such underlying investment.

**Permitted Transfers**:  shall have the meaning provided in <u>Section 8.1</u>.

**Person**:  any individual, corporation, partnership, limited liability company, joint venture, estate, trust, real estate investment trust, unincorporated association, any other person or entity, any Governmental Authority and any fiduciary acting in such capacity on behalf of any of the foregoing.

**Physical Conditions Report**:  that certain Property Condition Report prepared by Partner and dated as of November 1, 2021, Partner Project Number: 21-342099.2.

**Plan**:  (i) an employee benefit or other plan established or maintained by Borrower or any ERISA Affiliate or to which Borrower or any ERISA Affiliate makes or is obligated to make contributions and (ii) which is covered by Title IV of ERISA or Section 302 of ERISA or Section 412 of the Code.

19

***Policy*** and ***Policies***:  shall have the meaning provided in <u>Section 7.1.2</u>.

***Prime Rate***:  on a particular date, a rate per annum equal to the rate of interest published in *The Wall Street Journal* as the "prime rate", as in effect on such day, with any change in the prime rate resulting from a change in said prime rate to be effective as of the date of the relevant change in said prime rate; provided, however, that if more than one prime rate is published in *The Wall Street Journal* for a day, the average of the prime rates shall be used; provided, further, however, that the Prime Rate (or the average of the prime rates) will be rounded to the nearest 1/1000 of 1% or, if there is no nearest 1/1000 of 1%, to the next higher 1/1000 of 1%.  In the event that *The Wall Street Journal* should cease or temporarily interrupt publication, then the Prime Rate shall mean the daily average prime rate published in another business newspaper, or business section of a newspaper, of national standing chosen by Lender.  If *The Wall Street Journal* resumes publication, the substitute index will immediately be replaced by the prime rate published in *The Wall Street Journal*.  In the event that a prime rate is no longer generally published or is limited, regulated or administered by a governmental or quasi-governmental body, then Lender shall select a comparable interest rate index which is readily available to Borrower and verifiable by Borrower but is beyond the control of Lender.  Lender shall give Borrower prompt written notice of its choice of a substitute index and when the change became effective.  Such substitute index will also be rounded to the nearest 1/1000 of 1% or, if there is no nearest 1/1000 of 1%, to the next higher 1/1000 of 1%.  The determination of the Prime Rate by Lender shall be conclusive and binding absent manifest error.

***Property***:  the parcel of real property, the Improvements thereon and all personal property owned by Borrower and encumbered by the Security Instrument; together with all rights pertaining to such property and Improvements, and all other collateral for the Loan as more particularly described in the granting clauses of the Security Instrument.  The Property is located in Jericho, New York.

***Provided Information***:  any and all financial and other information at any time prepared by, or on behalf of, Borrower, Guarantor, Key Principals and/or Manager and provided to Agent or Lender by Borrower and its agents, counsel and representatives.

***Property Taxes***:  all real estate and personal property taxes, assessments, water rates or sewer rents, now or hereafter levied or assessed or imposed by any Governmental Authority against all or part of the Property and, until the Hotel Parcel is a legally separate tax parcel from the Property with a separate tax bill, the Hotel Parcel, together with all interest and penalties thereon.  In no event shall any PACE Loan be considered Property Taxes for purposes of this Agreement.

***Qualified Manager***:  shall mean (i) Manager or (ii) a reputable and experienced manager (which may be an Affiliate of Borrower) which, in the reasonable judgment of Lender, possesses experience in managing properties similar in location, size, class, use, operation and value as the Property; provided, that Borrower shall have obtained Lender's prior written consent to such manager, which consent shall not be unreasonably withheld, delayed or conditioned, and Lender, at its option, may require following a Secondary Market Transaction only that Borrower (a) shall have obtain a Rating Comfort Letter from the Rating Agencies, and (b) and if such Person is an Affiliate of Borrower, and an Insolvency Opinion has previously been delivered in connection with the Loan, a new Insolvency Opinion**.**

***Rating Agency***:  prior to the final Securitization of the Loan, each of S&P, Moody's, Fitch, DBRS, Inc. and Morningstar Credit Ratings, LLC or any other nationally-recognized statistical rating agency which has been designated by Lender and, after the final Securitization of the Loan, shall mean any of the foregoing that have rated any of the Securities.

20

**Rating Comfort Letter**:  shall mean, collectively, in connection with or following a rated Securitization, a written affirmation from each of the Rating Agencies that the credit rating of the Securities given by such Rating Agency of such Securities immediately prior to the occurrence of the event with respect to which such Rating Comfort Letter is sought will not be qualified, downgraded or withdrawn as a result of the occurrence of such event, which affirmation may be granted or withheld in such Rating Agency's sole and absolute discretion.  In the event that, at any given time, any Rating Agency elects not to consider whether to grant or withhold such an affirmation and Lender does not otherwise have an approval right with respect to such event, then the term Rating Comfort Letter by such Rating Agency shall be deemed instead to require the written reasonable approval of Lender.

**REA**:  collectively, those certain agreement(s) more particularly described on Schedule 8 attached hereto and made a part hereof, as the same may be amended, restated, supplemented or otherwise modified from time to time in accordance with the terms of this Agreement.

**Register**:  shall have the meaning provided in Section 11.24.

**Regulation AB**:  Regulation AB under the Securities Act and the Exchange Act, as such Regulation may be amended from time to time.

**Regulation S-K**:  Regulation S-K under the Securities Act, as such Regulation may be amended from time to time.

**Regulation S-X**:  Regulation S-X (17 C.F.R. Part 210) as it applies under the Securities Act and the Exchange Act, as such Regulation may be amended from time to time.

**Related Loan**:  a loan to an Affiliate of Borrower or secured by a Related Property, which is included in a Secondary Market Transaction with the Loan, and any other loan that is cross-collateralized with the Loan.

**Related Property**:  a parcel of real property, together with improvements thereon and personal property related thereto, that is "related" within the meaning of the definition of Significant Obligor, to the Property.

**Relevant Governmental Body**:  means the Federal Reserve System and/or the Federal Reserve Board, or a committee officially endorsed or convened by the Federal Reserve Board and/or the Federal Reserve Bank of New York or any successor thereto.

**Remedial Work**:  shall have the meaning provided in Section 5.7.2(c).

**REMIC Trust**:  a "real estate mortgage investment conduit" within the meaning of Section 860D of the Code that holds the Note, or any interest therein.

**Rent Abatement Reserve Funds**:  shall have the meaning provided in Section 3.14.1.

**Rent Abatement Reserve Subaccount**:  shall have the meaning provided in Section 3.14.1.

**Rents**:  all rents, rent equivalents, moneys payable as damages (including payments by reason of the rejection of a Lease in a Bankruptcy Action) or in lieu of rent or rent equivalents, royalties (including all oil and gas or other mineral royalties and bonuses), income, fees, receivables, receipts,

revenues, deposits (including security, utility and other deposits), accounts, cash, issues, profits, charges for services rendered, and other payment and consideration of whatever form or nature received by or paid to or for the account of or benefit of Borrower, Manager or any of their agents or employees from any and all sources arising from or attributable to the Property and the Improvements, including all receivables, customer obligations, installment payment obligations and other obligations now existing or hereafter arising or created out of the sale, lease, sublease, license, concession or other grant of the right of the use and occupancy of the Property or rendering of services by Borrower, Manager or any of their agents or employees and proceeds, if any, from business interruption or other loss of income insurance.

*Replacement Management Agreement*:  shall mean, collectively, (i)(a) a management agreement with a Qualified Manager substantially in the same form and substance as the Management Agreement, or (b) a management agreement with a Qualified Manager, which management agreement shall be in form and substance reasonably acceptable to Lender; provided, that, with respect to this clause (b), Lender, at its option, may require following a Secondary Market Transaction only that Borrower shall have obtained a Rating Comfort Letter, and (ii) an assignment of management agreement and subordination of management fees substantially in the form then used by Lender (or in such other form and substance reasonably satisfactory to Lender), executed and delivered to Lender by Borrower and such Qualified Manager.

*Required Records*:  shall have the meaning provided in Section 6.3.7.

*Required Repairs*:  shall have the meaning provided in Section 3.2.1.

*Required Repairs Funds*:  shall have the meaning provided in Section 3.2.1.

*Required Repairs Subaccount*:  shall have the meaning provided in Section 3.2.1.

*Required Special Servicer Rating*:  means a special servicer that (i) has a rating of "CSS3" in the case of Fitch, (ii) is on S&P's select servicer list as a "U.S. Commercial Mortgage Special Servicer" in the case of S&P, (iii) in the case of Moody's, such special servicer is acting as a transaction-level special servicer in a commercial mortgage loan securitization that was rated by Moody's within the twelve (12) month period prior to the date of determination and Moody's has not downgraded or withdrawn the then-current rating on any class of commercial mortgage securities or placed any class of commercial mortgage securities on watch citing the continuation of such special servicer as special servicer of such commercial mortgage securities as the reason for such downgrade or withdrawal, (iv) in the case of Morningstar Credit Ratings, LLC, such special servicer has a ranking by Morningstar Credit Ratings, LLC equal to or higher than "MOR CS3" as a special servicer, or if not ranked at the date of determination is acting as special servicer in a commercial mortgage loan securitization that was rated by a Rating Agency within the twelve (12) month period prior to the date of determination, and Morningstar Credit Ratings, LLC has not downgraded or withdrawn the then-current rating on any class of commercial mortgage securities or placed any class of commercial mortgage securities on watch citing the continuation of such special servicer as special servicer of such commercial mortgage securities as the reason for such downgrade or withdrawal, and (v) in the case of DBRS, Inc., such special servicer is acting as special servicer in a commercial mortgage loan securitization that was rated by DBRS, Inc., within the twelve (12) month period prior to the date of determination and DBRS, Inc., has not downgraded or withdrawn the then-current rating on any class of commercial mortgage securities or placed any class of commercial mortgage securities on watch citing the continuation of such special servicer as special servicer of such commercial mortgage securities as the sole or material reason for such downgrade or withdrawal or

placement on watch status. The requirement of any rating agency that is not a Rating Agency shall be disregarded.

**Reserve Funds**: collectively, all funds deposited by Borrower with Lender or the Cash Management Bank pursuant to Article 3 of this Agreement, including, but not limited to, the Required Repair Funds, the Capital Expenditure Funds, the Insurance Funds, the Tax Funds, the Operating Expense Funds, the Rollover Funds, the Cash Collateral Reserve Funds, Casualty/Condemnation Funds, Rent Abatement Reserve Funds, and any other escrow or reserve fund established by the Loan Documents and such other amounts deposited by or on behalf of Borrower with Lender as security for the Loan pursuant to the Loan Documents.

**Resolution Authority**: (i) with respect to any EEA Financial Institution, an EEA Resolution Authority or (ii) with respect to any U.K. Financial Institution, a U.K. Resolution Authority.

**Restoration**: shall have the meaning provided in Section 7.2.1.

**Restoration Threshold**: shall mean $750,000.00.

**Review Waiver**: shall have the meaning provided in Section 11.5(b).

**Rollover Funds**: shall have the meaning provided in Section 3.6.1.

**Rollover Subaccount**: shall have the meaning provided in Section 3.6.1.

**S&P**: Standard & Poor's Ratings Group, a division of the McGraw-Hill Companies.

**Sanctionable Activity**: shall mean any condition or activity specifically identified under any Sanctions as constituting a basis for the imposition of Sanctions against a Person engaged in such activity or described by such condition.

**Sanctioned Country**: shall mean any country or territory with which dealings are broadly restricted or prohibited by any Sanctions (as of the date hereof, Crimea, Cuba, Iran, North Korea, and Syria, but subject to such changes as take place over time).

**Sanctioned Person**: shall mean any Person with whom dealings are restricted or prohibited by any Sanctions, including any Person (a) that is named as a target of Sanctions in any list of such Persons; (b) that is located, organized or resident in, or owned by, controlled by, or acting on behalf of the government of, a Sanctioned Country; or (c) with which dealings are otherwise restricted or prohibited pursuant to any Sanctions, including by reason of any relationship of ownership, control, or agency with, or any direct or indirect commercial dealings with, any Person described in (a) or (b).

**Sanctions**: shall mean any statute, executive order, regulation, decree, judicial decision, or any other legally binding act with respect to the imposition or administration of any economic, financial or trade sanctions or embargoes, export controls or other restrictive measures imposed by the United States of America, Canada, the European Union or a member state of the European Union, the United Kingdom, or the United Nations.

**Satisfactory Replacement Guarantor**: a replacement guarantor that is acceptable to Lender, which determination shall be based upon, inter alia, (A) such replacement guarantor having (1) a direct or indirect ownership interest in Borrower, which is reasonably satisfactory to Lender, and (2) the

23

ability to control the management of Borrower, (B) such replacement guarantor having a net worth and liquidity reasonably satisfactory to Lender, (C) Lender's receipt of searches (including credit, negative news, OFAC, litigation, judgment, lien and bankruptcy searches) reasonably required by Lender on such replacement guarantor, the results of which must be reasonably acceptable to Lender, (D) such replacement guarantor otherwise satisfying Lender's then current applicable underwriting criteria and requirements, and (E) such replacement guarantor being an experienced operator and/or owner of properties similar in location, size, class, use, operation and value as the Property, as evidenced by financial statements and other information reasonably requested by Lender or requested by the Rating Agencies.

*Secondary Market Transaction*:  shall have the meaning provided in Section 9.1(a).

*Securities*:  shall have the meaning provided in Section 9.1(a).

*Securities Act*:  shall have the meaning provided in Section 9.2.

*Security Deposit Account*:  shall have the meaning provided in Section 3.9.

*Security Deposit Subaccount*:  shall have the meaning provided in Section 3.9.

*Security Instrument*:  shall mean that certain first priority Consolidated, Amended and Restated Mortgage, Assignment of Leases and Rents and Security Agreement, dated as of the date hereof, executed and delivered by Borrower as security for the Loan and encumbering the Property, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

*Securitization*:  shall have the meaning provided in Section 9.1(a).

*Servicer*:  shall have the meaning provided in Section 11.3.

*Servicing Agreement*:  shall have the meaning provided in Section 11.3.

*Significant Obligor*:  shall have the meaning provided in Item 1101(k) of Regulation AB under the Securities Act.

*SOFR:*  shall mean a rate per annum equal to the secured overnight financing rate published by the SOFR Administrator on the SOFR Administrator's Website.

*SOFR Adjustment Conforming Changes*  shall mean, with respect to any SOFR Index, any technical, administrative or operational changes (including, without limitation, changes to the definitions of "Business Day", "Determination Date", "Interest Period", "Payment Date", and the timing and frequency of determining rates and making payments of interest, preceding and succeeding business day conventions, and rounding of amounts) that Lender decides may be appropriate to reflect the adoption and implementation of such SOFR Index and to permit the administration thereof by Lender.

*SOFR Administrator:*  shall mean the Federal Reserve Bank of New York (or a successor, as the administrator of the secured overnight financing rate).

*SOFR Administrator's Website:*  shall mean the website the Federal Reserve Bank of New York, currently at http:www.newyorkfed.org, or any successor source for the secured overnight financing rate identified as such by the SOFR Administrator from time to time.

***SOFR Average:*** shall mean, as of the Determination Date for any Interest Period, the rate of interest equal to the compounded average of SOFR over a rolling 30-calendar day period as such rate is currently published on the SOFR Administrator's Website as "30-Day Average SOFR."

***SOFR Conversion:*** shall have the meaning provided in <u>Section 2.7</u>.

***SOFR Floor:*** 0.0%

***SOFR Index:*** shall mean:

(1) initially, Term SOFR; and

(2) subsequently, commencing on the Term SOFR Transition Date, SOFR Average.

Notwithstanding the foregoing or anything herein to the contrary, in no event shall the SOFR Index be less than the SOFR Floor.

***SOFR Loan:*** shall mean the Loan at such time as interest thereon accrues at a rate of interest based upon a SOFR Index.

***Sole Member***: shall have the meaning provided in <u>Schedule 4</u>.

***Special Member***: shall have the meaning provided in <u>Schedule 4</u>.

***Special Purpose Entity***: shall have the meaning provided in <u>Schedule 4</u>.

***Spread:*** (i) 3.5003% for the initial Term and first Extension Period and (ii) 3.6503% for the second Extension Period and third Extension Period.

***Spread Maintenance Date***: April 9, 2023; provided that if Lender elects to change the Payment Date set forth herein on the date hereof as provided in the definition of "Payment Date", for all purposes of this Agreement the Spread Maintenance Date shall be and become the same day of the month and the year set forth above as the day in the month to which Lender elects to change the Payment Date.

***Spread Maintenance Premium***: with respect to any payment or prepayment of the Outstanding Principal Balance (including payments made as a result of the acceleration of the Loan) on or before the Spread Maintenance Date, an amount equal to the product of the following: (A) the amount of such prepayment (or the amount of the Outstanding Principal Balance so accelerated), multiplied by (B) the Spread, multiplied by (C) a fraction (expressed as a percentage) having a numerator equal to the number of days difference between the Spread Maintenance Date (whether or not the extension option is exercised pursuant to <u>Section 2.9</u> of the Loan Agreement) and the date such prepayment occurs (or the next succeeding Payment Date through which interest has been paid by Borrower) and a denominator equal to three hundred sixty (360), it being expressly understood and agreed that the payment of the Spread Maintenance Premium (if and when required pursuant to the terms of this Note and the Loan Agreement) shall be in addition any payment or prepayment of the Outstanding Principal Balance (including payments made as a result of the acceleration of the Loan).

DM_US 183358854-7.105065.0051

*Springing Recourse Event*:  shall have the meaning provided in <u>Section 11.1</u>.

*State*:  the state, commonwealth or district in which the Property or any part thereof is located.

*Stated Maturity Date:*  January 9, 2024, as the same may be extended pursuant to <u>Section 2.9</u>.

*Strike Price:* shall mean two and forty-five hundredths of one percent (2.45%).

*Subaccounts*:  shall have the meaning provided in <u>Section 3.1</u>.

*Substitute Interest Rate Protection Agreement*:  shall have the meaning provided in <u>Section 2.7.1(f)</u>.

*Substitution*:  shall have the meaning provided in <u>Section 8.2</u>.

*Survey*:  a survey of the Property prepared by a surveyor licensed in the State and satisfactory to Lender and the company or companies issuing the Title Insurance Policy, and containing a certification of such surveyor satisfactory to Lender.

*Tax Funds*:  shall have the meaning provided in <u>Section 3.3.1</u>.

*Tax Subaccount*:  shall have the meaning provided in <u>Section 3.3.1</u>.

*Taxes*:  all present or future taxes, levies, imposts, duties, deductions, withholdings (including backup withholding), assessments, fees or other charges imposed by any Governmental Authority, including any interest, additions to tax or penalties applicable thereto.

*Tenant*:  any Person obligated by contract or otherwise to pay monies (including a percentage of gross income, revenue or profits) under any Lease now or hereafter affecting all or any part of the Property.

*Tenant Direction Letter*: shall have the meaning provided in <u>Section 3.1</u>.

*Term*:  the entire term of this Agreement, which shall expire upon repayment in full of the Debt, and full performance of each and every obligation to be performed by Borrower and Guarantors pursuant to this Agreement and the other Loan Documents, subject, however, to those representations, covenants and other terms of this Agreement and the other Loan Documents which, by their terms, survive such repayment and performance and which shall, therefore, remain in effect after said term of this Agreement.

*Term SOFR*: means, for any calculation with respect to a SOFR Loan, the Term SOFR Reference Rate for a tenor comparable to the applicable Interest Period on the Determination Date, as such rate is published by the Term SOFR Administrator; <u>provided</u>, however, that if as of 5:00 p.m. (New York City time) on any Determination Day the Term SOFR Reference Rate for the applicable tenor has not been published by the Term SOFR Administrator and a Benchmark Replacement Date with respect to the Term SOFR Reference Rate has not occurred, then Term SOFR will be the Term SOFR Reference Rate for such tenor as published by the Term SOFR Administrator on the first preceding U.S. Government Securities Business Day for which such Term SOFR Reference Rate for such tenor was published by the Term SOFR

Administrator so long as such first preceding U.S. Government Securities Business Day is not more than three (3) U.S. Government Securities Business Days prior to such Periodic Term SOFR Determination Day; provided, further that if such Term SOFR Reference Rate for the applicable tenor was last published by the Term SOFR Administrator more than three (3) U.S. Government Securities Business Days prior to such Periodic Term SOFR Determination Day, a Benchmark Unavailability Period with respect to the Term SOFR Reference Rate will be deemed to have occurred. Notwithstanding the foregoing or anything herein to the contrary, in no event shall Term SOFR be less than the SOFR Floor.

**Term SOFR Administrator**: means CME Group Benchmark Administration Limited (CBA) (or a successor administrator of the Term SOFR Reference Rate selected by Lender in its reasonable discretion).

**Term SOFR Reference Rate**: means the forward-looking term rate based on SOFR, identified on the CME Group's website at https://www.cmegroup.com/market-data/cme-groupbenchmark-administration/term-sofr.html, or any successor source.

**Term SOFR Transition Date:** the date on which the Lender has made a determination that a Term SOFR Transition Event has occurred.

**Term SOFR Transition Event:** shall mean the determination by Lender (which shall be conclusive and binding absent manifest error) that SOFR Average has been selected by Lender.

**Terrorism Insurance**: shall have the meaning provided in Section 7.1(h).

**Title Insurance Policy**: shall mean an ALTA mortgagee title insurance policy in the form acceptable to Lender issued with respect to the Property and insuring the Lien of the Security Instrument.

**Toxic Mold**: any fungus that reproduces through the release of spores or the splitting of cells or other means that may pose a risk to human health or the environment or negatively affect the value of the Property, including, but not limited to, mold, mildew, fungi, fungal spores, fragments and metabolites such as mycotoxins and microbial volatile organic compounds.

**Transfer**: shall have the meaning provided in Section 5.18.

**TRIPRA**: shall have the meaning provided in Section 7.1(h).

**Trustee**: any trustee holding the Loan in a Securitization.

**UCC**: the Uniform Commercial Code as in effect in the State or the state in which any of the Cash Management Accounts are located, as the case may be.

**U.K. Financial Institution**: means any BRRD Undertaking (as such term is defined under the PRA Rulebook (as amended from time to time) promulgated by the United Kingdom Prudential Regulation Authority) or any person falling within IFPRU 11.6 of the FCA Handbook (as amended from time to time) promulgated by the United Kingdom Financial Conduct Authority, which includes certain credit institutions and investment firms, and certain affiliates of such credit institutions or investment firms.

**U.K. Resolution Authority**: the Bank of England or any other public administrative authority having responsibility for the resolution of any U.K. Financial Institution.

DM_US 183358854-7.105065.0051

*Unadjusted Benchmark Replacement*:  means the Benchmark Replacement excluding the Benchmark Replacement Adjustment.

*Underwriter Group*:  shall have the meaning provided in Section 9.3(a).

*UNOI (Underwritten Net Operating Income)***:**  the stabilized, recurring net operating income of the Property determined by Lender in accordance with the provisions contained in Schedule 6.

*U.S. Government Securities Business Day*:  means any day except for (a) a Saturday, (b) a Sunday or (c) a day on which the Securities Industry and Financial Markets Association recommends that the fixed income departments of its members be closed for the entire day for purposes of trading in United States government securities.

*U.S. Person*: any Person that is a "United States person" as defined in Section 7701(a)(30) of the Code.

*U.S. Tax Compliance Certificate*:  shall have the meaning provided in Section 2.3.5(e)(ii)(2).

*Valley National Lease*:  that certain Agreement of Lease dated July 16,1996 between Hubspot Company, LLC (Borrower's predecessor-in-interest), as landlord, and State Bancorp, Inc., as tenant, as amended by that certain Lease Extension Modification and Addition of Space Agreement dated January 17, 2002, as further amended by that certain Second Amendment to Lease dated December 27, 2011 entered into by One-Two Jericho Plaza Owner, LLC (Borrower's predecessor-in-interest), as landlord, and State Bancorp, Inc., as tenant, as further amended by that certain Third Amendment to Lease dated February 14, 2013 between G&I IX Jericho Plaza, LLC (Borrower's predecessor-in-interest), as landlord, and Valley National Bank, as tenant, as further amended by that certain Fourth Amendment to Lease dated January 14, 2020 between G&I IX Jericho Plaza, LLC (Borrower's predecessor-in-interest), as landlord, and Valley National Bank, as tenant, as the same may be amended, modified, restated or supplemented in accordance with this Agreement.

*Valley National Termination Fee*:  the "Termination Fee" as defined in the Valley National Lease in the amount of $1,023,256.11, and which is payable in thirty-six (36) equal monthly installments of $28,423.78.

*Welfare Plan*:  an employee welfare benefit plan, as defined in Section 3(1) of ERISA.

*Write-Down and Conversion Powers*:  means (a) with respect to any EEA Resolution Authority, the write-down and conversion powers of such EEA Resolution Authority from time to time under the Bail-In Legislation for the applicable EEA Member Country, which write-down and conversion powers are described in the EU Bail-In Legislation Schedule and (b) with respect to the United Kingdom, any powers of the applicable U.K. Resolution Authority under the Bail-In Legislation to cancel, reduce, modify or change the form of a liability of any U.K. Financial Institution or any contract or instrument under which that liability arises, to convert all or part of that liability into shares, securities or obligations of that person or any other person, to provide that any such contract or instrument is to have effect as if a right had been exercised under it or to suspend any obligation in respect of that liability or any of the powers under that Bail-In Legislation that are related to or ancillary to any of those powers.

**1.2**     **Principles of Construction**.   Unless otherwise specified, (i) all references to sections and schedules are to those in this Agreement, (ii) the words "hereof," "herein" and "hereunder" and words of

28

similar import refer to this Agreement as a whole and not to any particular provision, (iii) all definitions are equally applicable to the singular and plural forms of the terms defined, (iv) the word "including" means "including but not limited to," and (v) accounting terms not specifically defined herein shall be construed in accordance with GAAP.

## 2.    GENERAL LOAN TERMS

### 2.1    The Loan

**2.1.1    Agreement to Lend and Borrow.**  Subject to and upon the terms and conditions set forth herein, Lender shall make the Loan to Borrower and Borrower shall accept the Loan from Lender on the Closing Date, which shall mature on the Stated Maturity Date.

**2.1.2    The Note.**  The Loan shall be evidenced by that certain Consolidated, Amended and Restated Promissory Note of even date herewith in the stated principal amount of One Hundred Forty-Nine Million One Hundred Eighty Thousand and No/100 Dollars ($149,180,000.00) executed by Borrower and payable to the order of Lender in evidence of the Loan (as the same may hereafter be amended, supplemented, restated, increased, extended or consolidated from time to time, the "*Note*") and shall be repaid in accordance with the terms of this Agreement and the Note.

**2.1.3    Use of Proceeds.**  Borrower shall use proceeds of the Loan to (i) acquire the Property, (ii) pay and discharge any existing loans relating to the Property, (iii) pay all past-due Property Taxes, Insurance Premiums and Other Charges, if any, in respect of the Property, (iv) make initial deposits of Reserve Funds into the Subaccounts, (v) pay costs and expenses incurred in connection with the closing of the Loan, as reasonably approved by Lender, and (vi) to the extent any proceeds remain after satisfying clauses (i) through(v) above, for such lawful purpose as Borrower shall designate, provided such purpose does not violate the terms of any Loan Documents.  Borrower shall not use, directly or indirectly, the proceeds of the Loan for purposes that would breach the Anti-Corruption Rules applicable to it.

**2.1.4    Single Disbursement to Borrower.**  Borrower shall receive only one borrowing hereunder in respect of the Loan and any amount borrowed and repaid hereunder in respect of the Loan may not be reborrowed.

### 2.2    Interest Rate.

**2.2.1    SOFR Loan**.  Interest on the Outstanding Principal Balance shall accrue throughout the Term at the Interest Rate and be payable as herein provided. Subject to the terms and conditions of this Section **Error! Reference source not found.**, the Loan shall be a SOFR Loan.

**2.2.2    Rate Conversion**.

(a)    If at any time the Loan is outstanding as a SOFR Loan or Benchmark Replacement Loan and Lender has determined in its sole but good faith discretion that a Benchmark Transition Event has occurred (which determination shall be conclusive and binding upon Borrower absent manifest error) and the applicable SOFR Index or the Unadjusted Benchmark Replacement, as applicable, has not been succeeded by an Unadjusted Benchmark Replacement or other index, as applicable, then Lender shall give notice of such determination to Borrower (which may be by electronic mail) at least one (1) U.S Government Securities Business Day prior to the next succeeding Determination Date. If such notice is given, the Loan shall bear interest based on the Base Rate beginning on the first day of the Interest Period for which the applicable SOFR Index or the Unadjusted Benchmark Replacement, as applicable, was not

available (and for each subsequent Interest Period until Lender provides notice, if applicable, pursuant to Section **Error! Reference source not found.**). Notwithstanding any provision of this Agreement to the contrary, in no event shall Borrower have the right to convert (1) a SOFR Loan for which interest thereon accrues at a rate of interest based upon Term SOFR to a SOFR Loan for which interest thereon accrues at a rate of interest based upon SOFR Average, (2) a SOFR Loan to a Base Rate Loan, (3) a Base Rate Loan to a SOFR Loan, (4) a Benchmark Replacement Loan to a Base Rate Loan, or (5) a Base Rate Loan to a Benchmark Replacement Loan.

(b)     If at any time the Loan is outstanding as a SOFR Loan and Lender has determined, in its sole but good faith discretion (which determination shall be conclusive and binding upon Borrower absent manifest error) that a Benchmark Transition Event has occurred and the applicable SOFR Index has been succeeded by an Unadjusted Benchmark Replacement, then the Loan shall be converted from a SOFR Loan to a Benchmark Replacement Loan in accordance with clause (f) below, provided that Lender shall have received (A) if the Loan is then held in a REMIC Trust, an opinion of nationally recognized REMIC counsel as to the compliance of such conversion with applicable REMIC requirements as determined under the Code, the regulations, revenue rulings, revenue procedures and other administrative, legislative and judicial guidance relating to the tax treatment of REMIC Trusts (which such opinion shall be, in form and substance and from a provider, in each case, acceptable to Lender in its sole discretion and acceptable to the Rating Agencies); provided, however, such condition may be satisfied with the issuance of a general guidance, ruling, bulletin or decision by the Internal Revenue Service reasonably acceptable to the Lender, (B) a Rating Comfort Letter in connection with such conversion, and (C) evidence satisfactory to Lender that such conversion does not violate ERISA. Lender shall provide notice of the foregoing conversion to a Benchmark Replacement Loan to Borrower (which may be by electronic mail) at least one (1) U.S Government Securities Business Day prior to the next succeeding Determination Date. If such notice is given, the Loan shall be converted, as of the Benchmark Replacement Date, to a Benchmark Replacement Loan. Notwithstanding any provision of this Agreement to the contrary, in no event shall Borrower have the right to convert (1) a SOFR Loan for which interest thereon accrues at a rate of interest based upon Term SOFR to a SOFR Loan for which interest thereon accrues at a rate of interest based upon SOFR Average,  (2) a SOFR a SOFR Loan to a Benchmark Replacement Loan, or (3) to convert a Benchmark Replacement Loan to a SOFR Loan or a Base Rate Loan.

(c)     If the Loan is bearing interest based on the Base Rate but thereafter;

(i)     Lender shall determine, in its sole but good faith discretion (which determination shall be conclusive and binding upon Borrower absent manifest error) that the event(s) or circumstance(s) which resulted in such conversion to Base Rate shall no longer be applicable, Lender shall give notice of such determination to Borrower (which may be by electronic mail), at least one (1) U.S Government Securities Business Day prior to the next succeeding Determination Date. If such notice is given, the Loan shall bear interest based on the SOFR Index beginning on the first day of the next succeeding Interest Period; or

(ii)     Lender shall determine, in its sole but good faith discretion (which determination shall be conclusive and binding upon Borrower absent manifest error) the SOFR Index has been succeeded by an Unadjusted Benchmark Replacement (and the requirements in the proviso to the first sentence of Section 2.2.2(b) above have been met), Lender shall give notice of such determination to Borrower (which may be by electronic mail), at least one (1) U.S Government Securities Business Day prior to the next succeeding Determination Date. If such notice is given the Loan shall be converted to a Benchmark Replacement Loan on the first day of the next-succeeding Interest Period.

Notwithstanding any provision of this Agreement to the contrary, in no event shall Borrower have the right to elect to have the Loan bear interest either based on the SOFR Index or based on the Base Rate or the Unadjusted Benchmark Replacement.

(d)     If any requirement of law or any change therein or in the interpretation or application thereof, shall hereafter make it unlawful for Lender in good faith to make or maintain the portion of the Loan bearing interest based on the SOFR Index or the Unadjusted Benchmark Replacement, then (i) the obligation of Lender hereunder to make the Loan bearing interest based on the SOFR Index or the Unadjusted Benchmark Replacement, as applicable, shall be canceled forthwith and (ii) subject to the terms and conditions in this Section **Error! Reference source not found.** with respect to any conversion to the Benchmark Replacement, the Loan shall automatically bear interest at the Base Rate on the first day of the immediately succeeding Interest Period or within such earlier period as required by applicable law.

(e)     Borrower hereby agrees promptly to, within ten (10) Business Days of Lender's written demand therefor, (i) pay Lender any additional amounts necessary to compensate Lender for any reasonable third-party out-of-pocket costs actually incurred by Lender in making any conversion in accordance with this Agreement, including, without limitation, any interest or fees payable by Lender to lenders of funds obtained by it in order to make or maintain the Loan hereunder and (ii) deliver to Lender, at Borrower's cost and expense, all further acts, deeds, conveyances, assignments, financing statements, transfers, documents, agreements, assurances, and such other instruments as Lender may reasonably require from time to time in order to make such technical, administrative or operational changes (including changes to timing and frequency of determining rates and making payments of interest, and other administrative matters) that Lender decides may be appropriate to reflect the adoption of an Alternative Index in a manner as Lender determines in its sole and absolute discretion is reasonably necessary to implement the Alternative Index. Upon written demand from Borrower, Lender shall disclose any additional costs incurred by Lender in making the conversion. Lender's written notice of such costs, as certified to Borrower, shall be conclusive absent manifest error.

(f)     Notwithstanding anything to the contrary herein or in any other Loan Document:

(i)     Subject to any requirement for the delivery of an opinion or Rating Comfort Letter as set forth in clause (b) above, if a Benchmark Transition Event, as applicable, and its related Benchmark Replacement Date have occurred in respect of any determination of the Benchmark on any date, the Benchmark Replacement will replace the then-current Benchmark for all purposes hereunder or under any Loan Document in respect of such determination on such date and all determinations on all subsequent dates. Such Benchmark Replacement will become effective at 5:00 p.m. on the fifth (5th) Business Day after Lender has posted such proposed amendment to Borrower.

(ii)     In connection with the implementation of a Benchmark Replacement, Lender will have the right to make Benchmark Replacement Conforming Changes from time to time and, notwithstanding anything to the contrary herein or in any other Loan Document, any amendments implementing such Benchmark Replacement Conforming Changes will become effective without any further action or consent of any other party to this Agreement.

(iii)     Lender will promptly notify the Borrower (which may be by electronic mail) of (A) any occurrence of a Benchmark Transition Event and its related Benchmark Replacement Date, (B) the implementation of any Benchmark Replacement, (C) the effectiveness of any Benchmark Replacement Conforming Changes, (D) the removal or reinstatement of any tenor of Term SOFR pursuant to clause (iv) below and (E) the commencement or conclusion of any Benchmark Unavailability Period.

Any determination, decision or election that may be made by the Lender pursuant to this Section 2.2.2, including any determination with respect to a tenor, rate or adjustment or of the occurrence or non-occurrence of an event, circumstance or date and any decision to take or refrain from taking any action or any selection, will be conclusive and binding absent manifest error and may be made in its sole discretion and without consent from Borrower.

(iv)     At any time and with respect to any Interest Period, if the Benchmark at such time is Term SOFR and Term SOFR for the applicable tenor is not displayed on a screen or other information service that publishes such rate from time to time as selected by the Lender in its reasonable discretion, Lender may (i) modify the definition of "Interest Period" for all determinations of interest at or after such time to remove such unavailable tenor and (ii) if Term SOFR, as applicable, for the applicable tenor is displayed on such screen or information service after its removal pursuant to clause (i) above, modify the definition of "Interest Period" for all determinations of interest at or after such time to reinstate such previously removed tenor.

(g)     SOFR Index.

(i)     SOFR Adjustment Conforming Changes. Lender will have the right, from time to time and in Lender's sole discretion, to make SOFR Adjustment Conforming Changes, including, without limitation, in connection with a Term SOFR Transition Event.  Notwithstanding anything to the contrary in this Agreement or in any other Loan Document, any amendments to this Agreement or the other Loan Documents implementing such SOFR Adjustment Conforming Changes will become effective without any further action or consent by Borrower. Lender will promptly notify the Borrower of the effectiveness of any SOFR Adjustment Conforming Changes.

(ii)     SOFR Transition. If a Term SOFR Transition Event occurs:

(1)     Lender will provide notice to Borrower in writing (which may be by electronic mail) of the Term SOFR Transition Date before the first Payment Date following the Term SOFR Transition Date.

(2)     Beginning on the first day of the Interest Period immediately following the Term SOFR Transition Date and during each Interest Period thereafter, interest will accrue at the Interest Rate calculated using SOFR Average as specified in such notice, without the necessity of any amendment or other modification of this Agreement, the Note or any other Loan Document.

(3)     Standards for SOFR Decisions and Determinations. Any determination, decision or election that may be made by Lender pursuant to this Section 2.2(g) or Section 2.7 hereof, including, without limitation, any determination with respect to a tenor, rate or adjustment or of the occurrence or non-occurrence of an event, circumstance or date, any SOFR Adjustment Conforming Changes, any replacement Interest Rate Protection Agreement or date and any decision to take or refrain from taking any action or any selection, will be conclusive and binding and may be made in its sole discretion and without consent from Borrower.

2.2.3     **Default Rate.**  In the event that, and for so long as, any Event of Default shall have occurred and be continuing, the Outstanding Principal Balance and, to the extent not prohibited by applicable law, all other portions of the Debt, shall accrue interest at the Default Rate, calculated from the date the Default occurred which led to such Event of Default, taking into account any grace or cure periods

32

contained herein. Interest at the Default Rate shall be paid immediately upon demand, which demand may be made as frequently as Lender shall elect, to the extent not prohibited by applicable law.

**2.2.4** **Interest Calculation.** Interest on the Outstanding Principal Balance shall be calculated by multiplying (A) the actual number of days elapsed in the period for which the calculation is being made by (B) a daily rate based on a three hundred sixty (360) day year (that is, the Interest Rate expressed as an annual rate divided by 360) by (C) the Outstanding Principal Balance. The accrual period for calculating interest due on each Payment Date shall be the Interest Period immediately prior to such Payment Date.

**2.2.5** **Usury Savings.** This Agreement and the other Loan Documents are subject to the express condition that at no time shall Borrower be required to pay interest on the Outstanding Principal Balance at a rate which could subject Lender to either civil or criminal liability as a result of being in excess of the Maximum Legal Rate. If by the terms of this Agreement or the other Loan Documents, Borrower is at any time required or obligated to pay interest on the Outstanding Principal Balance at a rate in excess of the Maximum Legal Rate, the Interest Rate shall be deemed to be immediately reduced to the Maximum Legal Rate and all previous payments in excess of the Maximum Legal Rate shall be deemed to have been payments in reduction of principal and not on account of the interest due hereunder. All sums paid or agreed to be paid to Lender for the use, forbearance, or detention of the sums due under the Loan, shall, to the extent permitted by applicable law, be amortized, prorated, allocated and spread throughout the full stated term of the Loan until payment in full so that the rate or amount of interest on account of the Loan does not exceed the Maximum Legal Rate from time to time in effect and applicable to the Loan for so long as the Loan is outstanding.

**2.2.6** **Breakage Indemnity**.

(a) Borrower shall indemnify Lender against any third-party out-of-pocket loss or expense which Lender may actually sustain or incur in liquidating or redeploying deposits from third parties acquired to effect or maintain the Loan or any part thereof (including without limitation, the cost of breaking any SOFR contract, Benchmark Replacement contract or Base Rate contract, as and if applicable, or funding losses determined on the basis of Lender's reinvestment rate and the interest rate thereon) as a consequence of (i) any payment or prepayment of the Loan or any portion thereof made on a date other than a Payment Date and (ii) any default in payment or prepayment of the Loan or any part thereof or interest accrued thereon, as and when due and payable (at the date thereof or otherwise, and whether by acceleration or otherwise). Lender shall deliver to Borrower a statement for any such sums which it is entitled to receive pursuant to this Section 2.2.6(a), which statement shall be binding and conclusive absent manifest error. Borrower's obligations under this Section 2.2.6(a) are in addition to Borrower's obligations to pay any Spread Maintenance Premium, applicable to a payment or prepayment of the Loan.

(b) If any successor or assignee to or of NATIXIS becomes a Lender hereunder and such Lender requests compensation under Section 2.3.6, or Borrower is required to pay any Indemnified Taxes or additional amounts to such Lender or any Governmental Authority for the account of such Lender pursuant to Section 2.3.5, then such Lender shall (at the request of Borrower) use reasonable efforts to designate a different lending office for funding or booking its Loan hereunder or to assign its rights and obligations hereunder to another of its offices, branches or affiliates, if, in the judgment of such Lender, such designation or assignment (i) would eliminate or reduce amounts payable pursuant to Section 2.3.5 or 2.3.6, as the case may be, in the future, and (ii) would not subject such Lender to any unreimbursed cost or expense and would not otherwise be disadvantageous to such Lender. Borrower hereby agrees to pay

all reasonable third-party out-of-pocket costs and expenses incurred by such Lender in connection with any such designation or assignment.

### 2.3     Loan Payments.

    **2.3.1     Generally**.  On the Closing Date, Borrower shall make a payment to Lender of interest only for the period from the Closing Date through and including the next succeeding eighth (8th) day of a calendar month, whether such eighth (8th) day shall occur in the calendar month in which the Closing Date occurs or in the month immediately succeeding the month in which the Closing Date occurs (unless the Closing Date is the ninth (9th) day of a calendar month, in which case no such separate payment of interest shall be due).  On February 9, 2022 and each Payment Date thereafter throughout the Term, Borrower shall pay an amount equal to the Monthly Debt Service Payment Amount.  The Monthly Debt Service Payment Amount due on any Payment Date shall first be applied to the payment of interest accrued from the scheduled Payment Date preceding the Payment Date on which such Monthly Debt Service Payment Amount is paid through the day of the month immediately preceding the Payment Date on which such Monthly Debt Service Payment Amount is paid, notwithstanding that the actual Payment Date may not have been the scheduled Payment Date because the scheduled Payment Date is not a Business Day.  The remainder of such Monthly Debt Service Payment Amount shall be applied to the reduction of the Outstanding Principal Balance.  If the Loan is repaid on any date other than on a Payment Date (whether prior to or after the Stated Maturity Date), Borrower shall also pay interest that would have accrued on such repaid principal to but not including the next Payment Date.

    **2.3.2     Payment on Maturity Date.**  Borrower shall pay to Lender on the Maturity Date the Outstanding Principal Balance, all accrued and unpaid interest and all other amounts due hereunder and under the Note and the other Loan Documents.

    **2.3.3     Late Payment Charge**.  If any principal, interest or other sum due under any Loan Document is not paid by Borrower on the date on which it is due, other than the payment of the Outstanding Principal Balance due on the Maturity Date, Borrower shall pay to Lender upon written demand an amount equal to the lesser of four percent (4%) of such unpaid sum or the maximum amount permitted by applicable law (the "*Late Payment Charge*"), in order to defray the expense incurred by Lender in handling and processing such delinquent payment and to compensate Lender for the loss of the use of such delinquent payment; provided, however, Borrower shall be entitled to one (1) written notice during the term of the Loan before Lender may assess any late charge to Borrower after delivery of such notice (which late charge shall be assessed after the expiration of five (5) Business Days after such notice), although nothing herein shall obligate Lender to accept a cure of an Event of Default).  For the avoidance of doubt, after the sending of the first notice described in the preceding sentence, Lender shall have no obligation to send any further such notices prior to assessing any late charge.  Such amount shall be secured by the Security Instrument and the other Loan Documents to the extent permitted by law.

    **2.3.4     Method and Place of Payment.**

    (a)     Except as otherwise specifically provided herein, all payments and prepayments under this Agreement and the Note shall be made to Lender not later than 3:00 P.M., New York City time, on the date when due and shall be made in lawful money of the United States of America in immediately available funds at Lender's office or at such other place as Lender shall from time to time designate, and any funds received by Lender after such time shall, for all purposes hereof, be deemed to have been paid on the next succeeding Business Day.

(b)     Whenever any payment to be made under any Loan Document shall be stated to be due on a day which is not a Business Day, the due date thereof shall be the immediately preceding Business Day.

(c)     All payments required to be made by Borrower under the Loan Documents shall be made irrespective of, and without deduction for, any setoff, claim, counterclaim or otherwise and shall be made irrespective of any defense thereto.

### 2.3.5   Taxes.

(a)     Payments Free of Taxes.  Any and all payments by or on account of any obligation of Borrower (or Guarantor, as applicable) under any Loan Document shall be made free and clear of and without deduction or withholding for any Taxes, except as required by applicable law.  If Borrower (or Guarantor) shall be required by any applicable law (as determined in the good faith discretion of Borrower or Guarantor, as applicable) to deduct or withhold any Tax from or in respect of any such payment, the following shall apply:  (i) Borrower (or Guarantor, as applicable) shall be entitled to make such deduction or withholding, (ii) if such Tax is an Indemnified Tax, then the sum payable by Borrower (or Guarantor, as applicable) shall be increased as may be necessary so that after such required deduction or withholding for Indemnified Tax has been made (including such deductions and withholdings applicable to additional sums payable under this Section 2.3.5), Lender receives an amount equal to the sum it would have received had no such deduction or withholding been made, and (iii) Borrower (or Guarantor, as applicable) shall timely pay the full amount deducted or withheld to the relevant Governmental Authority in accordance with applicable law.

(b)     Payment of Other Taxes by Borrower.  Borrower shall timely pay to the relevant Governmental Authority in accordance with applicable law, or at the option of Lender, timely reimburse it for the payment of, any Other Taxes.

(c)     Indemnification by Borrower.  Borrower shall indemnify Lender, within fifteen (15) Business Days after written demand therefor, for the full amount of any Indemnified Taxes (including Indemnified Taxes imposed or asserted on or attributable to amounts payable under this Section 2.3.5) payable or paid by Lender or required to be withheld or deducted from a payment to Lender and any reasonable third-party out-of-pocket expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority; provided that, for the avoidance of doubt, no indemnification payment shall be due under this Section 2.3.5(c) to the extent such payment would be duplicative of any payment made by Borrower or Guarantor under any other provision of this Agreement (including Section 2.3.5(a) or (b)) or under any other Loan Document.  A certificate as to the amount of such payment or liability (setting forth in reasonable detail the basis and calculation of such amount) delivered to Borrower by Lender shall be conclusive absent manifest error.

(d)     Evidence of Payments.  As soon as practicable after any payment of Taxes by Borrower to a Governmental Authority pursuant to this Section 2.3.5, Borrower shall deliver to Lender the original or a certified copy of a receipt issued by such Governmental Authority evidencing such payment, a copy of the return reporting such payment or other evidence of such payment reasonably satisfactory to Lender.

(e)     Status of Lenders.

(i)        Any Lender that is entitled to an exemption from or reduction of withholding Tax with respect to payments made under any Loan Document shall deliver to Borrower, at the time or times reasonably requested by Borrower, such properly completed and executed documentation reasonably requested by Borrower as will permit such payments to be made without withholding or at a reduced rate of withholding. In addition, any Lender, if reasonably requested by Borrower, shall deliver such other documentation prescribed by applicable law or reasonably requested by Borrower as will enable Borrower to determine whether or not such Lender is subject to backup withholding or information reporting requirements. Notwithstanding anything to the contrary in the preceding two sentences, the completion, execution and submission of such documentation (other than such documentation set forth in Sections 2.3.5(e)(ii)(1), (ii)(2) and (ii)(4) below) shall not be required if in Lender's reasonable judgment such completion, execution or submission would subject such Lender to any material unreimbursed cost or expense or would materially prejudice the legal or commercial position of such Lender.

(ii)        Without limiting the generality of the foregoing:

(1)        any Lender that is a U.S. Person shall deliver to Borrower on or about the date on which such Lender becomes a Lender under this Agreement (and from time to time thereafter promptly upon the reasonable request of Borrower), properly completed and executed valid copies of IRS Form W-9 (or any applicable successor form) certifying that such Lender is exempt from U.S. federal backup withholding tax;

(2)        any Foreign Lender shall, to the extent it is legally entitled to do so, deliver to Borrower (in such number of copies as shall be requested by Borrower) on or about the date on which such Foreign Lender becomes a Lender under this Agreement (and from time to time thereafter promptly upon the reasonable request of Borrower), whichever of the following is applicable: (i) in the case of a Foreign Lender claiming the benefits of an income tax treaty to which the United States is a party (x) with respect to payments of interest under any Loan Document, properly completed and executed valid copies of IRS Form W-8BEN-E (or IRS Form W-8BEN, as applicable) (or any applicable successor form) establishing an exemption from, or reduction of, U.S. federal withholding Tax pursuant to the "interest" article of such tax treaty and (y) with respect to any other applicable payments under any Loan Document, properly completed and executed valid copies of IRS Form W-8BEN-E (or IRS Form W-8BEN, as applicable) (or any applicable successor form) establishing an exemption from, or reduction of, U.S. federal withholding Tax pursuant to the "business profits" or "other income" article of such tax treaty; (ii) properly completed and executed valid copies of IRS Form W-8ECI (or any applicable successor form); (iii) in the case of a Foreign Lender claiming the benefits of the exemption for portfolio interest under Section 881(c) of the Code, (x) a certificate reasonably satisfactory to Borrower to the effect that such Foreign Lender is not a "bank" within the meaning of Section 881(c)(3)(A) of the Code, a "10 percent shareholder" of Borrower (or, to the extent Borrower is disregarded for U.S. federal income tax purposes, Borrower's regarded owner for U.S. federal income tax purposes) within the meaning of Section 881(c)(3)(B) of the Code, or a "controlled foreign corporation" described in Section 881(c)(3)(C) of the Code (a "*U.S. Tax Compliance Certificate*") and (y) properly completed and executed valid copies of IRS Form W-8BEN-E (or IRS Form W-8BEN, as applicable) (or any applicable successor form); or (iv) to the extent a Foreign Lender is not the beneficial owner, properly completed and executed valid copies of IRS Form W-8IMY (or any applicable successor form), accompanied by IRS Form W-8ECI, IRS Form W-8BEN-E (or IRS Form W-8BEN, as applicable), and/or IRS Form W-9 (or, in each case, an applicable successor form), a U.S. Tax Compliance Certificate reasonably satisfactory to Borrower, and/or other certification documents from each beneficial owner, as applicable; provided that if the Foreign

36

Lender is a partnership and one or more direct or indirect partners of such Foreign Lender are claiming the portfolio interest exemption, such Foreign Lender may provide a U.S. Tax Compliance Certificate reasonably satisfactory to Borrower on behalf of each such direct and indirect partner;

(3)     any Foreign Lender shall, to the extent it is legally entitled to do so, deliver to Borrower (in such number of copies as shall be requested by Borrower) on or prior to the date on which such Foreign Lender becomes a Lender under this Agreement (and from time to time thereafter promptly upon the reasonable request of Borrower), properly completed and executed valid copies of any other form prescribed by applicable law as a basis for claiming exemption from or a reduction in U.S. federal withholding Tax, duly completed, together with such supplementary documentation as may be prescribed by applicable law to permit Borrower to determine the withholding or deduction required to be made; and

(4)     if a payment made to a Lender under any Loan Document would be subject to U.S. federal withholding Tax imposed by FATCA if such Lender were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Section 1471(b) or 1472(b) of the Code, as applicable), such Lender shall deliver to Borrower at the time or times prescribed by law and at such time or times reasonably requested by Borrower such documentation prescribed by applicable law (including as prescribed by Section 1471(b)(3)(C)(i) of the Code) and such additional documentation reasonably requested by Borrower as may be necessary for Borrower (or, to the extent Borrower is disregarded for U.S. federal income tax purposes, Borrower's regarded owner for U.S. federal income tax purposes) to comply with its obligations under FATCA and to determine that such Lender has complied with such Lender's obligations under FATCA or to determine the amount to deduct and withhold from such payment. Solely for purposes of this clause (4), "FATCA" shall include any amendments made to FATCA after the date of this Agreement.

Each Lender agrees that if any form or certification it previously delivered expires or becomes obsolete or inaccurate in any respect, it shall update such form or certification or promptly notify Borrower in writing of its legal inability to do so.

(f)     Intentionally Deleted.

(g)     Survival. Each party's obligations under this Section 2.3.5 shall survive any assignments of rights by, or the replacement of, Lender and the repayment, satisfaction or discharge of all obligations under any Loan Document.

(h)     **Defined Terms**. For purposes of this Section 2.3.5, the term "applicable law" includes FATCA.

## 2.3.6    Requirements of Law.

(a)     If any Legal Requirement or any change in the interpretation or application thereof or compliance by Lender with any request or directive (whether or not having the force of law) from any central bank or other Governmental Authority made subsequent to the date hereof:

(i)     shall subject Lender to any Taxes (other than (A) Indemnified Taxes, (B) Taxes described in clauses (b) through (d) of the definition of Excluded Taxes and (C) Connection Income Taxes) on its loans, loan principal, or other obligations, or its deposits, reserves, other liabilities or capital attributable thereto;

37

(ii)      shall impose, modify or hold applicable any reserve, special deposit, compulsory advance or similar requirement against assets held by, deposits or other liabilities in or for the account of, advances or other extensions of credit by, or any other acquisition of funds by, any office of Lender which is not otherwise included in the determination of the applicable Interest Rate hereunder;

(iii)      shall impose on Lender any other condition (other than with respect to Taxes);

and the result of any of the foregoing is to increase the cost to Lender, by an amount which Lender deems to be material, of making or maintaining the Loan or to reduce any amount receivable hereunder in respect thereof, then, in any such case, Borrower shall, from time to time, upon receipt of prior written notice of not less than fifteen (15) Business Days of such fact and a reasonably detailed description of the circumstances, promptly pay Lender such additional amount or amounts as will compensate Lender for such increased cost or reduced amount receivable (provided such additional amounts are then being charged by Lender to its borrowers under similar loans generally) and are not prohibited by such Legal Requirement to be charged back.

(b)      If Lender shall have determined that, subsequent to the Closing Date, the adoption of or any change in any Legal Requirement regarding capital adequacy or in the interpretation or application thereof or compliance by Lender or any corporation controlling Lender with any request or directive regarding capital adequacy (whether or not having the force of law) from any Governmental Authority made subsequent to the date hereof shall have the effect of reducing the rate of return on Lender's or such corporation's capital as a consequence of its obligations hereunder by an amount deemed by Lender to be material (taking into consideration Lender's or such corporation's policies with respect to capital adequacy), then from time to time, Borrower shall within fifteen (15) Business Days of written notice from Lender, pay to Lender such additional amount or amounts as will compensate Lender for such reduction (provided such additional amounts are then being charged by Lender to its borrowers under similar loans generally).

(c)      If Lender becomes entitled to claim any additional amounts pursuant to this Section 2.3.6, it shall promptly notify Borrower of the event by reason of which it has become so entitled. A certificate as to any additional amounts payable pursuant to this subsection submitted by Lender to Borrower shall be conclusive in the absence of manifest error or the provision of immediate proof by Borrower to the contrary.

(d)      Notwithstanding anything to the contrary in this Agreement or in any of the other Loan Documents, Borrower acknowledges that any liability of any EEA Financial Institution or any U.K. Financial Institution, including without limitation Lender or any of its successors or assigns, arising under this Agreement or under any of the other Loan Documents, except to the extent such liability is excluded under the Bail-In Legislation from the scope of any Bail-In Action, may be subject to the Write-Down and Conversion Powers of an applicable Resolution Authority and agrees and consents to, and acknowledges and agrees to be bound by:

(i)      the application of any Write-Down and Conversion Powers by an applicable Resolution Authority to any such liabilities arising under this Agreement or under any of the other Loan Documents which may be payable to it by any party hereto that is an EEA Financial Institution or a U.K. Financial Institution; and

(ii)      the effects of any Bail-in Action on any such liability, including, if applicable, (X) a reduction in full or in part or cancellation of any such liability including without limitation

a reduction in any accrued or unpaid interest in respect of such liability, (Y) a conversion of all, or a portion of, such liability into shares or other instruments of ownership in such EEA Financial Institution or such U.K. Financial Institution, its parent undertaking, or a bridge institution that may be issued to it or otherwise conferred on it, and that such shares or other instruments of ownership will be accepted by it in lieu of any rights with respect to any such liability under this Agreement or under any of the other Loan Documents, or (Z) the variation of the terms of this Agreement or under any of the other Loan Documents to give effect to the exercise of the Write-Down and Conversion Powers of any applicable Resolution Authority.

### 2.4 **Loan Repayment.**

#### 2.4.1 **Voluntary Prepayments; Application of Proceeds.**

(a)     Except as otherwise provided herein, Borrower shall not have the right to prepay the Loan in whole or in part prior to the Stated Maturity Date. Subject to <u>Section 2.4.3</u> hereof, Borrower may, at its option and upon not less than thirty (30) days prior notice to Lender, prepay all or any portion of the Outstanding Principal Balance. Any prepayment received by Lender under this <u>Section 2.4.1</u> shall be accompanied by (i) all interest which would have accrued on the principal amount prepaid through, but not including, the next occurring Payment Date (or, if such prepayment occurs on a Payment Date, through, but not including, such Payment Date), (ii) if such prepayment is made prior to the Spread Maintenance Date, such prepayment is accompanied with payment of the Spread Maintenance Premium; (iii) all other sums due and payable under the Loan Documents, and (iv) all reasonable third-party out-of-pocket costs and expenses actually incurred by Lender in connection with such prepayment. A notice of prepayment may be revoked by Borrower if written notice of such revocation is delivered by Borrower to Lender on or before the date that is five (5) Business Days prior to the prepayment date set forth in the notice of prepayment. If Borrower delivers to Lender notice of prepayment and subsequently revokes such notice prior to prepayment, Borrower shall promptly reimburse Lender for all reasonable third-party out-of-pocket costs and expenses actually incurred by Lender (including any attorneys' fees) due to such revoked notice or otherwise in connection with the anticipated prepayment.

(b)     Except during the continuance of an Event of Default, all proceeds of any repayment, including permitted prepayments of the Loan, shall be applied by Lender as follows in the following order of priority: *First,* to the Spread Maintenance Premium (if such repayment or prepayment occurs on or prior to the Spread Maintenance Date) any other amounts (other than principal and interest) then due and payable under the Loan Documents, including any costs and expenses of Lender in connection with such repayment); *Second*; accrued and unpaid interest at the Interest Rate; and *Third,* to unpaid principal**.** If prior to the Stated Maturity Date the Debt is accelerated by reason of an Event of Default, then Lender shall be entitled to receive, in addition to the unpaid principal and accrued interest and other sums due under the Loan Documents, an amount equal to the Spread Maintenance Premium (if such repayment occurs on or prior to the Spread Maintenance Date). During the continuance of an Event of Default, all proceeds of repayment, including any payment or recovery on the Property (whether through foreclosure, deed-in-lieu of foreclosure, or otherwise) shall, unless otherwise provided in the Loan Documents, be applied in such order and in such manner as Lender shall elect in Lender's discretion.

#### 2.4.2 **Mandatory Prepayments.** If Lender is not obligated to make Net Proceeds available to Borrower for Restoration, on the next occurring Payment Date following the date on which Lender actually receives a distribution of Net Proceeds, Borrower shall, at Lender's option, prepay, or authorize Lender to apply such Net Proceeds as a prepayment of the Debt in an amount equal to one hundred percent (100%) of such Net Proceeds, such Net Proceeds shall be applied by Lender in accordance with <u>Section 2.4.1</u>. Notwithstanding anything herein to the contrary, no Spread Maintenance Premium or any

39

other prepayment premium, penalty or fee shall be due in connection with any prepayment made pursuant to this Section 2.4.2, provided, however, if an Event of Default has occurred and is continuing, Lender may apply such Net Proceeds to the Debt in any order, portion or priority as Lender may determine in its sole and absolute discretion.

2.4.3    **Prepayments After Default.**  If, during the continuance of an Event of Default, payment of all or any part of the Debt is tendered by Borrower and accepted by Lender or is otherwise recovered by Lender (including through application of any Reserve Funds), such tender or recovery shall be deemed to be a voluntary prepayment by Borrower in violation of the prohibition against prepayment set forth in Section 2.4.1 hereof, and Borrower shall pay, as part of the Debt, all of: (i) all accrued interest calculated at the Default Rate on the amount of principal being prepaid through and including the date of such prepayment together with an amount equal to the interest that would have accrued at the Default Rate on the amount of principal being prepaid through the end of the Interest Period in which such prepayment occurs, notwithstanding that such Interest Period extends beyond the date of prepayment and (ii) the Spread Maintenance Premium applicable thereto.  If any such prepayment is not made on a Payment Date, Borrower shall also pay interest that would have accrued on such prepaid principal to but not including the next Payment Date.

2.4.4    **Spread Maintenance Premium.**

(a)    Upon any repayment or prepayment of the Loan (including in connection with an acceleration of the Loan) made prior to the Spread Maintenance Date, Borrower shall pay to Lender on the date of such repayment or prepayment (or acceleration of the Loan) the Spread Maintenance Premium applicable thereto.  All Spread Maintenance Premium payments hereunder shall be deemed to be earned by Lender upon the funding of the Loan.

(b)    Borrower acknowledges that (a) Lender is making the Loan in consideration of the receipt by Lender of all interest and other benefits intended to be conferred by the Loan Documents and (b) if payments of principal are made to Lender on or prior to the Spread Maintenance Date, for any reason whatsoever, whether voluntary, as a result of Lender's acceleration of the Loan after an Event of Default, by operation of law or otherwise, Lender will not receive all such interest and other benefits and may, in addition, incur costs.  For these reasons, and to induce Lender to make the Loan, Borrower agrees that, except as expressly provided in Article 7, all prepayments made prior to the Spread Maintenance Date, if any, whether voluntary or involuntary, will be accompanied by the Spread Maintenance Premium.  Such Spread Maintenance Premium shall be required whether payment is made by Borrower, by a Person on behalf of Borrower, or by the purchaser at any foreclosure sale, and may be included in any bid by Lender at such sale.  Borrower further acknowledges that (A) it is a knowledgeable real estate developer or investor; (B) it fully understands the effect of the provisions of this Section 2.4.4, as well as the other provisions of the Loan Documents; (C) the making of the Loan by Lender at the Interest Rate and other terms set forth in the Loan Documents are sufficient consideration for Borrower's obligation to pay a Spread Maintenance Premium (if required); and (D) Lender would not make the Loan on the terms set forth herein without the inclusion of such provisions.  Borrower also acknowledges that the provisions of this Agreement limiting the right of prepayment and providing for the payment of the Spread Maintenance Premium and other charges specified herein were independently negotiated and bargained for, and constitute a specific material part of the consideration given by Borrower to Lender for the making of the Loan except as expressly permitted hereunder.

2.4.5    **Certain Payments.**  Notwithstanding anything to the contrary contained in this Agreement, in connection with and for the purposes of any payment or prepayment of all or any portion of

the Loan pursuant to Sections 2.3.1, 2.4.1 or 2.4.2 on any date after the Payment Date and prior to the Determination Date with respect to the next succeeding Interest Period, the applicable Interest Rate shall be determined as of the U.S. Government Securities Business Day immediately preceding the date of such payment or prepayment and Lender shall thereafter, reasonably promptly after the occurrence of such next succeeding Determination Date, make any necessary adjustment in the amount actually required to be paid or prepaid based upon the applicable Interest Rate as determined on such next succeeding Determination Date.

### 2.4.6    Prepayments in connection with the Mezzanine Loan.

(a)    As a condition to making any prepayment under this Section 2.4 (other than as a result of the application of funds during the continuance of an Event of Default or the application of Net Proceeds pursuant to Section 2.4.2), Borrower shall deliver evidence to Lender that simultaneously with any such prepayment, Mezzanine Borrower shall be making pro rata prepayment(s) of the Mezzanine Loan in accordance with their then-outstanding principal balances.  If such prepayment is a prepayment of the Loan in full (other than as a result of the application of funds during the continuance of an Event of Default or the application of Net Proceeds pursuant to Section 2.4.2), Lender shall have received a written consent to the repayment from the Mezzanine Lender or confirmation that the Mezzanine Loan has been (or is simultaneously being) satisfied in full.

(b)    In the event of any repayment or partial prepayment of the Mezzanine Loan, Lender shall have the right to cause Borrower to prepay a portion of the Loan in an amount equal to the product of (x) the outstanding principal balance of the Loan and (y) a fraction, the numerator of which is the amount of the Mezzanine Loan being repaid or prepaid and the denominator of which is the then-outstanding principal balance of the Mezzanine Loan being repaid or prepaid (i.e., without taking into account the repayment or prepayment of such Mezzanine Loan), which repayment or prepayment shall otherwise be in accordance with Section 2.4 hereof and shall include the payment of the applicable Spread Maintenance Premium, if such repayment occurs before the Spread Maintenance Date.

(c)    Notwithstanding anything to the contrary set forth herein, Borrower shall not permit any repayments or prepayments of the Mezzanine Loan, except to the extent expressly provided in this Section 2.4.6, before the Debt has been paid in full.

**2.5    Release on Payment in Full.**  Lender shall, upon the written request and at the expense of Borrower with respect to any assignment of the Debt, upon payment in full of the Debt in accordance with the terms and provisions of the Loan Documents, release the Lien of the Security Instrument or assign the Security Instrument to a new lender designated by Borrower (other than Borrower or a nominee of Borrower) without recourse, covenant or warranty of any nature, express or implied.  In connection with such release or assignment of the Lien of the Security Instrument, Borrower shall submit to Lender, proposed documents which a prudent lender would require to effectuate such a release or assignment of Lien of the Security Instrument for execution by Lender.  Such release or assignment documents shall be in a form appropriate in the jurisdiction in which the Property is located and contain standard provisions protecting the rights of Lender.  Borrower shall be responsible for all mortgage recording taxes, recording fees and other charges payable in connection with any such release or assignment of the Lien of the Security Instrument, including Lender's reasonable third-party out-of-pocket attorneys' fees.  The release of the Security Instrument or assignment to a new lender shall be accomplished by an escrow closing conducted through an escrow agent reasonably satisfactory to Lender and pursuant to an escrow agreement in form and substance reasonably satisfactory to Lender.

**2.6** **REMIC Test on Property Release.** Notwithstanding anything to the contrary contained herein or in any other Loan Document, if the Loan is included in a REMIC Trust and (a) any portion of the Property is sought to be released from the Lien of the Security Instrument, whether in connection with a Casualty or Condemnation or otherwise, and (b) immediately after any such release the ratio of the Outstanding Principal Balance of the Loan to the value of the remaining Property (but, in the case of a Casualty or Condemnation, taking into account any proposed Restoration of the remaining Property) is greater than one hundred twenty-five percent (125%) (based solely on real property and excluding any personal property or going concern value) (such value to be determined, in Lender's sole discretion, by any commercially reasonable method permitted to a REMIC Trust), the Outstanding Principal Balance must first be paid down by a "qualified amount" as such term is defined in Internal Revenue Service Revenue Procedure 2010-30, as the same may be modified, supplemented, superseded or amended from time to time (regardless of whether Borrower or Lender actually receive or are entitled to receive any related Net Proceeds in the case of a Casualty or Condemnation), unless Lender receives an opinion of counsel that, if the foregoing prepayment is not made, the applicable REMIC Trust will neither fail to maintain its status as a "real estate mortgage investment conduit" within the meaning of Section 860D of the Code or be subject to any tax, in either case, as a result of such release. If and to the extent the release is in connection with a Casualty or Condemnation, and if Borrower shall have otherwise satisfied each of the conditions to release of Net Proceeds as set forth in Section 2.6, only such amount of the Net Proceeds then held or controlled by Lender, if any, in excess of the "qualified amount" required to pay down the principal balance of the Loan may be released for purposes of Restoration or released as otherwise expressly provided in Section 7.3. Any prepayment made under this Section 2.6 shall be accompanied by payment of and the Spread Maintenance Premium, if applicable, except that so long as no Event of Default shall have occurred and be continuing, no Spread Maintenance Premium shall be due in connection with any such prepayment made by reason of a release in connection with a Casualty or Condemnation.

**2.7** **Interest Rate Protection Agreements.**

**2.7.1** **Interest Rate Protection Agreement.** As of the Closing Date, Borrower has entered into, made all payments required under, and satisfied all conditions precedent to the effectiveness of, an interest rate protection agreement that satisfies all of the following conditions (such interest rate protection agreement together with (i) any extension thereof or (ii) any other interest rate protection agreement entered into pursuant to Section 2.9, being referred to herein as the "***Interest Rate Protection Agreement***"):

(a) the Interest Rate Protection Agreement is with a financial institution having a long term, unsecured and unsubordinated debt rating of at least "A+" by S&P; has a term ending no earlier than the Stated Maturity Date; is an interest rate cap in respect of a notional amount not less than the maximum principal amount of the Loan that, subject to Section 2.7.1(e), has a strike price equal to the Strike Price; and provides that the only obligation of Borrower thereunder is the making of a single payment upon the execution and delivery thereof.

(b) Borrower's interest in such Interest Rate Protection Agreement has been assigned to Lender pursuant to documentation reasonably satisfactory to Lender in form and substance (the "***Assignment of Interest Rate Protection Agreement***"), and the counterparty to such Interest Rate Protection Agreement has executed and delivered to Lender an acknowledgment of such assignment, which acknowledgment shall be reasonably satisfactory to Lender in form and substance and, without limitation, shall include such counterparty's agreement to (i) pay directly into the Clearing Account all sums payable by such counterparty pursuant to the Interest Rate Protection Agreement and (ii) designate a successor counterparty under the Interest Rate Protection Agreement, which successor counterparty shall satisfy the

criteria set forth in <u>subsection (a)</u> above and this <u>subsection (b)</u>, not later than ten (10) Business Days after the long term, unsecured and unsubordinated debt rating of such counterparty is downgraded below "A+" by S&P, unless such counterparty deposits with Lender collateral, in form, value and substance acceptable to Lender in its sole discretion and pursuant to documentation acceptable to Lender in its sole discretion.

(c)     Intentionally Omitted.

(d)     In connection with an Interest Rate Protection Agreement (including any Interest Rate Protection Agreement entered into pursuant to <u>Section 2.9</u> or <u>Section  2.7.1(e)</u>,  Borrower shall obtain and deliver to Lender an opinion of counsel from counsel for the counterparty (which counsel may be in-house counsel for the counterparty), upon which Lender and its successors and assigns and the Rating Agencies may rely, which shall provide, in relevant part, that:

(i)     the counterparty is duly organized, validly existing, and in good standing under the laws of its jurisdiction of incorporation or organization and has the organizational power and authority to execute and deliver, and to perform its obligations under, the Interest Rate Protection Agreement;

(ii)     the execution and delivery of the Interest Rate Protection Agreement by the counterparty, and any other agreement which the counterparty has executed and delivered pursuant thereto, and the performance of its obligations thereunder have been and remain duly authorized by all necessary action and do not contravene any provision of its certificate of incorporation or by-laws (or equivalent organizational documents) or any law, regulation or contractual restriction binding on or affecting it or its property;

(iii)     all consents, authorizations and approvals required for the execution and delivery by the counterparty of the Interest Rate Protection Agreement, and any other agreement which the counterparty has executed and delivered pursuant thereto, and the performance of its obligations thereunder have been obtained and remain in full force and effect, all conditions thereof have been duly complied with, and no other action by, and no notice to or filing with any governmental authority or regulatory body is required for such execution, delivery or performance; and

(iv)     the Interest Rate Protection Agreement, and any other agreement which the counterparty has executed and delivered pursuant thereto, has been duly executed and delivered by the counterparty and constitutes the legal, valid and binding obligation of the counterparty, enforceable against the counterparty in accordance with its terms, subject to applicable bankruptcy, insolvency and similar laws affecting creditors' rights generally, and subject, as to enforceability, to general principles of equity (regardless of whether enforcement is sought in a proceeding in equity or at law).

(e)     Notwithstanding anything to the contrary contained in this <u>Section 2.7.1</u> or elsewhere in this Agreement, if, at any time, Lender converts the Loan from a SOFR Loan to either a Base Rate Loan or a Benchmark Replacement Loan or from a Base Rate Loan to a Benchmark Replacement Loan in accordance with <u>Section 2.2.2</u> (each, a "***SOFR Conversion***"), then:

(i)     within thirty (30) days after such SOFR Conversion, Borrower shall either (A) enter into, make all payments under, and satisfy all conditions precedent to the effectiveness of, a Substitute Interest Rate Protection Agreement (and in connection therewith, but not prior to Borrower taking all the actions described in this <u>clause (i)</u>, Borrower shall have the right to terminate any then-existing Interest Rate Protection Agreement) or (B) cause the then-existing Interest Rate Protection Agreement to be modified such that such then-existing Interest Rate Protection Agreement satisfies the requirements of a

43

Substitute Interest Rate Protection Agreement as set forth below in the definition thereof (a "***Converted Interest Rate Protection Agreement***"); and

     (ii) following such SOFR Conversion (provided Lender has not converted the Loan back to a SOFR Loan in accordance with <u>Section 2.2.2</u> hereof), in lieu of satisfying the condition described in <u>Section 2.9(d)</u> with respect to any extension option, Borrower shall instead enter into, make all payments under, and satisfy all conditions precedent to the effectiveness of a Substitute Interest Rate Protection Agreement on or prior to the exercise of such extension option.

    (f) As used herein, "***Substitute Interest Rate Protection Agreement***" shall mean an interest rate cap agreement between a counterparty and Borrower, obtained by Borrower and collaterally assigned to Lender pursuant to this Agreement and shall contains each of the following:

     (i) a term expiring no earlier than the end of the Interest Period in which the then-applicable Maturity Date occurs;

     (ii) the notional amount of the Substitute Interest Rate Protection Agreement shall be not less than the maximum principal amount of the Loan;

     (iii) it provides that the only obligation of Borrower thereunder is the making of a single payment to the counterparty thereunder upon the execution and delivery thereof;

     (iv) it provides to Lender and Borrower (as determined by Lender in its sole but good faith discretion), for the term of the Substitute Interest Rate Protection Agreement, a hedge against rising interest rates that is no less beneficial to Borrower and Lender than (A) in the case of <u>clause (e)(i)</u> above, that which was provided by the Interest Rate Protection Agreement being replaced by the Substitute Interest Rate Protection Agreement and (B) in the case of <u>clause (e)(ii)</u> above, that which was intended to be provided by the Interest Rate Protection Agreement that, but for the operation of this <u>Section 2.7.1(f)</u>, would have been required to have been delivered by Borrower pursuant to <u>Section 2.9.1(d)</u> as a condition to the requested extension period; and

     (v) without limiting any of the provisions of the preceding <u>clauses (i)</u> through <u>(iv)</u> above, it satisfies all of the requirements set forth in <u>Section 2.7.1(a)</u>, <u>(b)</u> and <u>(d)</u> hereof.

    (g) From and after the date of any SOFR Conversion, all references to "Interest Rate Protection Agreement" herein shall be deemed to refer or relate, as applicable, to a Substitute Interest Rate Protection Agreement or a Converted Interest Rate Protection Agreement, as the case may be.

    (h) Notwithstanding anything to the contrary set forth in <u>Section 2.7.1(e)</u> and <u>(f)</u>, Borrower shall not be required to obtain a Substitute Interest Rate Protection Agreement or Converted Interest Rate Protection Agreement, as applicable, during any period when the Loan is outstanding as a Base Rate Loan or a Benchmark Replacement Loan, as applicable, if such a Substitute Interest Rate Protection Agreement or Converted Interest Rate Protection Agreement, as the case may be, is not then commercially available, in which event Borrower and Lender shall work together to find a mutually agreeable alternative to a Substitute Interest Rate Protection Agreement or Converted Interest Rate Protection Agreement that would afford Lender substantially equivalent protection from increases in the interest rate.

**2.7.2    Execution of Documents.**  Borrower shall promptly execute and deliver to the counterparty of the Interest Rate Protection Agreement such confirmations and agreements as may be requested by such counterparty in connection with such Interest Rate Protection Agreement.

**2.7.3    No Obligation of Lender.**  Borrower agrees that Lender shall not have any obligation, duty or responsibility to Borrower or any other Person by reason of, or in connection with, any Interest Rate Protection Agreement (including any duty to provide or arrange any Interest Rate Protection Agreement, to consent to any mortgage or pledge of the Property or any portion thereof as security for Borrower's performance of its obligations under any Interest Rate Protection Agreement, or to provide any credit or financial support for the obligations of Borrower or any other Person thereunder or with respect thereto).  No Interest Rate Protection Agreement shall alter, impair, restrict, limit or modify in any respect the obligation of Borrower to pay interest on the Loan as and when the same becomes due and payable in accordance with the provisions of the Loan Documents.

**2.7.4    Receipts from Interest Rate Protection Agreements.**  All payments made by the counterparty to the Interest Rate Protection Agreement shall be deposited into the Clearing Account and applied in the same manner as Rents are applied under Section 3.12.1.

**2.7.5    Downgrade of Counterparty.**  Borrower shall cause any counterparty under any Interest Rate Protection Agreement to be replaced with a successor counterparty, which successor counterparty shall satisfy the criteria set forth in Section 2.7.1(a), not later than ten (10) Business Days after the long term unsecured and unsubordinated debt rating of such counterparty is downgraded below "A+" by S&P.

**2.7.6    Interest Rate Protection Agreement Covenants.**

(a)    Borrower shall not (i) without the prior written consent of Lender, modify, amend or supplement the terms of the Interest Rate Protection Agreement, (ii) without the prior written consent of Lender, except in accordance with the terms of the Interest Rate Protection Agreement, cause the termination of the Interest Rate Protection Agreement prior to its stated maturity date, (iii)  without the prior written consent of Lender, except as aforesaid, waive or release any obligation of the counterparty (or any successor or substitute party to the Interest Rate Protection Agreement) under the Interest Rate Protection Agreement, (iv) without the prior written consent of Lender, consent or agree to any act or omission to act on the part of the counterparty (or any successor or substitute party to the Interest Rate Protection Agreement) which, without such consent or agreement, would constitute a default under the Interest Rate Protection Agreement, (v) fail to exercise promptly and diligently each and every material right which it may have under the Interest Rate Protection Agreement, (vi) take or intentionally omit to take any action or intentionally suffer or permit any action to be omitted or taken, the taking or omission of which would result in any right of offset against sums payable under the Interest Rate Protection Agreement or any defense by the counterparty (or any successor or substitute party to the Interest Rate Protection Agreement) to payment, (vii) without the prior written consent of Lender, enter into any collateral arrangement with counterparty (or any successor or substitute party to the Interest Rate Protection Agreement) under the Interest Rate Protection Agreement or (viii) fail to give prompt notice to Lender of any notice of default given by or to Borrower under or with respect to the Interest Rate Protection Agreement, together with a complete copy of such notice.  If Borrower shall have received written notice that a Securitization shall have occurred, no consent by Lender provided for in this Section 2.7.6(a) shall be given by Lender unless Lender shall have received a Rating Comfort Letter.

(b)      Other than the Assignment of Interest Rate Protection Agreement, Borrower shall not sell, assign, or otherwise dispose of, or mortgage, pledge or grant a security interest to or in the Interest Rate Cap Protection Agreement or any interest therein, and any sale, assignment, mortgage, pledge or security interest whatsoever made in violation of this covenant shall be null and void and of no force and effect, and upon demand of Lender, shall forthwith be cancelled or satisfied by an appropriate instrument in writing.

**2.8      Fees.**

**2.8.1      Structuring Fee**.  On the Closing Date, Borrower shall pay to Lender a structuring fee of $839,137.50, which fee shall be deemed to be earned in full by Lender upon the funding of the Loan.

**2.8.2      Origination Fee**.  On the Closing Date, Borrower shall pay to Lender an origination fee of $839,137.50, which fee shall be deemed to be earned in full by Lender upon the funding of the Loan.

**2.9      Extension of the Maturity Date.**

**2.9.1      Extension Option**.  Upon the satisfaction of the terms and conditions set forth in this Section 2.9.1, Borrower shall have the option (the "*Extension Option*") to extend the term of the Loan beyond the Stated Maturity Date for three (3) terms of twelve (12) months each (each an "*Extension Period*") to January 9, 2025, January 9, 2026 and January 9, 2027, respectively (as extended, the "*Extended Maturity Date*"):

(a)      no Event of Default shall have occurred or is continuing at the time each request is made and on the initial Stated Maturity Date (or the first Extended Maturity date or the second Extended Maturity Date, as applicable);

(b)      Borrower delivers to Lender an Officer's Certificate confirming the accuracy of the information contained in clause (a) above;

(c)      Borrower shall notify Lender, in writing, of its irrevocable election to extend the Loan not later than thirty (30) days prior to the initial Stated Maturity Date (or first Extended Maturity Date or second Extended Maturity Date, as applicable);

(d)      on or prior to the Stated Maturity Date, Borrower either (i) extends the term of the Interest Rate Protection Agreement (or Substitute Interest Rate Protection Agreement, if applicable) until the first or second or third, as applicable, Extended Maturity Date or (ii) enters into a new interest rate protection agreement which expires no earlier than the new Extended Maturity Date, and which extension or new agreement is on the same terms set forth in Section 2.7.1 and has a strike price equal to the Strike Price;

(e)      For (i) the second Extension Option, on January 9, 2025, the Debt Yield is at least nine and ninety-two hundredths of one percent (9.92%); provided that if the Debt Yield is less than nine and ninety-two hundredths of one percent (9.92%), Borrower may prepay a portion of the Outstanding Principal Balance of the Loan to a level such that the Debt Yield of the Outstanding Principal Balance of the Loan is equal to or greater than nine and ninety-two hundredths of one percent (9.92%), and (ii) the third Extension Option, on January 9, 2026, the Debt Yield is at least ten and twenty-one hundredths of one percent (10.21%); provided that if the Debt Yield is less than ten and twenty-one hundredths of one percent (10.21%), Borrower may prepay a portion of the Outstanding Principal Balance of the Loan to a level such

that the Debt Yield of the Outstanding Principal Balance of the Loan is equal to or greater than ten and twenty-one hundredths of one percent (10.21%);

(f)     Lender shall have received from Borrower all sums then due and payable under the Loan Documents, including all payments of (or reimbursement of Lender for) any reasonable third-party out of pocket miscellaneous fees or expenses (including, without limitation, any "protective advances" made by Lender in respect of the Loan);

(g)     intentionally omitted;

(h)     (i) no Mezzanine Loan Event of Default shall be continuing and (ii) any required pro-rata prepayment under the Mezzanine Loan shall have been made; and

(i)     Borrower shall deliver to Lender an Officer's Certificate stating that all representations and warranties of Borrower set forth in Article 3 remain true and correct in all material respects, subject to any changes in facts or circumstances permitted to have occurred, or not prohibited from having occurred, pursuant to the terms of the Loan Documents (in which case such change of facts and circumstances shall be set forth in such Officer's Certificate with reference to the applicable representation(s) and warranty(ies)) or setting forth any exceptions to such representations and warranties, which exceptions shall be reasonably satisfactory to Lender.

**2.9.2     Extension Option.**  If Borrower is unable to satisfy all of the foregoing conditions set forth in Section 2.9.1 within the applicable time frames for each, Lender shall have no obligation to extend the initial Stated Maturity Date (or first Extended Maturity Date or second Extended Maturity Date, if applicable) hereunder.  All references in this Agreement and in the other Loan Documents to the Maturity Date shall include the Extended Maturity Date in the event the Extension Option is exercised and Borrower fulfills the conditions set forth in Section 2.9.1.

**2.9.3     Extension Documentation.**  As soon as practicable following an extension of the Maturity Date pursuant to this Section 2.9, Borrower shall, if requested by Lender, execute and deliver an amendment of and/or restatement of the Note and shall, if requested by Lender, enter into such amendments to the related Loan Documents as may be reasonably necessary or appropriate to evidence the extension of the Maturity Date as provided in this Section 2.9; provided, however, that no failure by Borrower to enter into any such amendments and/or restatements shall affect the rights or obligations of Borrower or Lender with respect to the extension of the Maturity Date.

**3.     CASH MANAGEMENT AND RESERVES.**

**3.1     Cash Management Arrangements.**  Borrower shall cause all Rents and other Gross Revenue and all items required to deposited pursuant to Section 5.9.4 hereof to be transmitted by Tenants of the Property directly into a trust account (the "*Clearing Account*") established and maintained by Borrower at an Eligible Institution selected by Borrower and reasonably approved by Lender (the "*Clearing Bank*") as more fully described in the Clearing Account Agreement.  Without in any way limiting the foregoing, from and after the date hereof, Borrower or Manager shall notify and advise each Tenant under each Lease (whether such Lease is presently effective or executed after the date hereof) to send directly to the Clearing Account all payments of Rent pursuant to an instruction letter substantially in the form attached hereto as Schedule 5 (a "*Tenant Direction Letter*").  Borrower hereby represents and warrants that Borrower has delivered or caused to be delivered a Tenant Direction Letter to each Tenant under each presently effective Lease.  If, notwithstanding the provisions of this Section 3.1, Borrower or Manager receive any Rents or other Gross Revenue from the Property (other than the National Valley Termination

Fee), then (i) such amounts shall be deemed to be collateral for the Debt and shall be held in trust for the benefit, and as the property, of Lender, (ii) such amounts shall not be commingled with any other funds or property of Borrower or Manager, and (iii) Borrower or Manager shall deposit such amounts in the Clearing Account within three (3) Business Days of receipt.

Funds deposited into the Clearing Account shall be swept by the Clearing Bank on a daily basis into an Eligible Account at the Deposit Bank controlled by Lender (the "*Deposit Account*") and applied and disbursed in accordance with this Agreement and the Deposit Account Agreement. Funds in the Deposit Account that are invested shall be invested at Lender's discretion only in Permitted Investments, as more particularly set forth in the Deposit Account Agreement. Lender may also establish or cause to be established subaccounts of the Deposit Account which shall at all times be Eligible Accounts (and may be ledger or book entry accounts and not actual accounts) (such subaccounts are referred to herein as "*Subaccounts*"). The Clearing Account, the Deposit Account and all other Subaccounts shall be under the sole control and dominion of Lender, and Borrower shall have no right of withdrawal therefrom. Borrower shall pay for all expenses of opening and maintaining all of the above accounts. In the event of a resignation by Clearing Bank, Borrower shall, promptly after receipt of notice of such resignation, designate a successor to Clearing Bank, which successor shall be subject to the reasonable approval of Lender, cause the execution of a replacement Clearing Account Agreement in form and substance reasonably satisfactory to Lender and deliver revised Tenant Direction Letters to all Tenants in accordance with the terms and provisions of this Section 3.1.

### 3.2     Required Repairs Funds.

**3.2.1     Deposit of Required Repairs Funds**. Borrower shall perform the repairs and other work at the Property as set forth on Schedule 2 attached hereto (such repairs and other work hereinafter referred to as "*Required Repairs*") and shall complete each of the Required Repairs on or before March 31, 2022. On the Closing Date, Borrower shall deposit with or on behalf of Lender $38,875.00 (the "*Required Repairs Funds*"), which Required Repairs Funds shall be transferred by or at the direction of Lender to a Subaccount (the "*Required Repairs Subaccount*").

**3.2.2     Release of Required Repairs Funds**. Provided no Event of Default has occurred and is continuing, Lender shall disburse funds held in the Required Repairs Subaccount to Borrower within ten (10) days after the delivery by Borrower to Lender of a request therefor (but not more often than once per month), in increments of at least $10,000 (or a lesser amount if the total amount in the Required Repairs Subaccount is less than $10,000, in which case only one disbursement of the amount remaining in the account shall be made) provided that: (i) such disbursement is for Required Repairs; (ii) the request for disbursement is accompanied by (A) an Officer's Certificate from Borrower (1) stating that the items to be funded by the requested disbursement are for Required Repairs, and a description thereof, (2) stating that all Required Repairs to be funded by the requested disbursement have been completed in a good and workmanlike manner and in accordance with all applicable Legal Requirements, (3) identifying such Person that supplied materials or labor in connection with the Required Repairs to be funded by the requested disbursement, (4) stating that each such Person has been paid in full or will be paid in full upon such disbursement, or if such payment is a progress payment, that such payment represents full payment to such Person, less any applicable retention amount, for work completed through the date of the relevant invoice from such Person, (5) stating that the Required Repairs (or relevant portion thereof) to be funded have not been the subject of a previous disbursement, (6) stating that all previous disbursements of Required Repair Funds have been used to pay the previously identified Required Repairs, and (7) stating that all outstanding trade payables relating to Required Repairs (other than those to be paid from the requested disbursement or those constituting Permitted Indebtedness) have been paid in full other than any applicable

retention amount, (B) a copy of any license, permit or other approval by any Governmental Authority required, if any, in connection with the Required Repairs and not previously delivered to Lender, (C) copies of appropriate lien waivers (or conditional lien waivers) or other evidence of payment reasonably satisfactory to Lender, (D) in connection with disbursements of Required Repair Funds exceeding $100,000.00, at Lender's option, a title search for the Property indicating that the Property is free from all Liens, claims and other encumbrances not previously approved by Lender, and (E) such other customary evidence as Lender shall reasonably request to demonstrate that the Required Repairs to be funded by the requested disbursement have been completed (or completed to the extent of the requested payment) and are paid for or will be paid upon such disbursement to Borrower. Upon Borrower's completion of all Required Repairs in accordance with this Section 3.2, Lender shall direct Servicer to release any remaining Required Repairs Funds, if any, in the Required Repairs Subaccount to Borrower. Upon Borrower's completion of all Required Repairs in accordance with this Section 3.2, Lender shall, or shall direct Servicer to, deposit any remaining Required Repairs Funds held in the Required Repairs Subaccount into the Deposit Account to be applied in accordance with Section 3.12.1.

(a)     Nothing in this Section 3.2.2 shall (i) make Lender responsible for performing or completing any Required Repairs; (ii) require Lender to expend funds in addition to the Required Repairs Funds to complete any Required Repairs; (iii) obligate Lender to proceed with any Required Repairs; or (iv) obligate Lender to demand from Borrower additional sums to complete any Required Repairs.

(b)     Borrower shall permit Lender and Lender's agents and representatives (including Lender's engineer, architect or inspector) or third parties to enter onto the Property upon reasonable prior written notice during normal business hours (subject to the rights of Tenants under their Leases) to inspect the progress of any Required Repairs and all materials being used in connection therewith and to examine all plans and shop drawings relating to such Required Repairs, but not more than once in any quarter. Borrower shall cause all contractors and subcontractors to cooperate with Lender or Lender's representatives or such other Persons described above in connection with inspections described in this Section 3.2.2(b)).

(c)     If a disbursement of Required Repair Funds will exceed $100,000.00, Lender may require an inspection of the Property at Borrower's expense prior to making a disbursement of Required Repairs Funds in order to verify completion of the Required Repairs for which reimbursement is sought. Lender may require that such inspection be conducted by an appropriate independent architect, engineer or other qualified professional selected by Lender and may require a certificate of completion by such architect, engineer or independent qualified professional, reasonably acceptable to Lender, prior to the disbursement of Required Repairs Funds. Borrower shall pay the expense of the inspection as required hereunder, if such inspection is conducted by an independent third-party qualified professional.

(d)     In addition to any insurance required under the Loan Documents, Borrower shall provide or cause to be provided workmen's compensation insurance, builder's risk insurance, public liability insurance and other insurance to the extent required under applicable Legal Requirements in connection with the Required Repairs. All such policies shall be in form and amount reasonably satisfactory to Lender.

**3.3**     **Tax Funds.**

**3.3.1     Deposits of Tax Funds.** Borrower shall deposit or cause to be deposited with or on behalf of Lender on each Payment Date, an amount equal to one-twelfth of the Property Taxes that Lender estimates will be payable during the next ensuing twelve (12) months in order to accumulate

49

sufficient funds to pay all such Property Taxes at least ten (10) days prior to their respective due dates, which amounts shall be transferred by or at the direction of Lender into a Subaccount established to hold such funds (the "*Tax Subaccount*"). Amounts deposited from time to time into the Tax Subaccount pursuant to this Section 3.3.1 are referred to herein as the "*Tax Funds*". If at any time, Lender reasonably determines that the Tax Funds will not be sufficient to pay the Property Taxes as and when due, Lender shall notify Borrower of such determination and the monthly deposits for Property Taxes shall be increased by the amount that Lender estimates is sufficient to make up the deficiency at least ten (10) days prior to the respective due dates for the Property Taxes; provided that if Borrower receives notice of any deficiency after the date that is ten (10) days prior to the date that Property Taxes are due, Borrower will deposit with or on behalf of Lender, such amount within five (5) Business Day after its receipt of such notice.

        **3.3.2**    **Release of Tax Funds.** Provided no Event of Default shall have occurred and be continuing, Lender shall, or shall direct Servicer to, apply the Tax Funds in the Tax Subaccount to payments of Property Taxes. In making any payment relating to Property Taxes, Lender may do so according to any bill, statement or estimate procured from the appropriate public office (with respect to Taxes) without inquiry into the accuracy of such bill, statement or estimate or into the validity of any tax, assessment, sale, forfeiture, tax lien or title or claim thereof. If at any time the amount of the Tax Funds shall exceed the amounts due for Property Taxes (as determined by Lender in its reasonable discretion), Lender shall, or shall direct Servicer to, deposit such excess into the Deposit Account to be applied in accordance with Section 3.12.1 or credit such excess against future payments to be made to the Tax Funds, such election to be made by Lender in its sole discretion.

    **3.4**    **Insurance Funds.**

        **3.4.1**    **Deposits of Insurance Funds.** Borrower shall deposit or cause to be deposited with or on behalf of Lender (a) on the Closing Date, the amount of Sixty-One Thousand Six Hundred Twenty-Nine and 74/100 Dollars ($61,629.74) and (b) on each Payment Date, an amount equal to one-twelfth of the Insurance Premiums that Lender estimates will be payable for the renewal of the coverage afforded by the Policies upon the expiration thereof in order to accumulate sufficient funds to pay all such Insurance Premiums at least thirty (30) days prior to the expiration of the Policies (the "*Monthly Insurance Deposit*"), which amounts shall be transferred by or at the direction of Lender into a Subaccount established to hold such funds (the "*Insurance Subaccount*"). Amounts deposited from time to time into the Insurance Subaccount pursuant to this Section 3.4.1 are referred to herein as the "*Insurance Funds*". If at any time, Lender reasonably determines that the Insurance Funds will not be sufficient to pay the Insurance Premiums, Lender shall notify Borrower of such determination and the monthly deposits for Insurance Premiums shall be increased by the amount that Lender estimates is sufficient to make up the deficiency at least ten (10) days prior to expiration of the Policies; provided that if Borrower receives notice of any deficiency after the date that is ten (10) days prior to expiration of the Policies, Borrower will deposit with or on behalf of Lender, such amount within five (5) Business Days after its receipt of such notice.

        **3.4.2**    **Release of Insurance Funds**. Provided no Event of Default shall have occurred and be continuing, Lender shall, or shall direct Servicer to, apply the Insurance Funds in the Insurance Subaccount to payment of Insurance Premiums. In making any payment relating to Insurance Premiums, Lender may do so according to any bill, statement or estimate procured from the insurer or its agent, without inquiry into the accuracy of such bill, statement or estimate. If at any time the amount of the Insurance Funds shall exceed the amounts due for Insurance Premiums, Lender shall, or shall direct Servicer to, deposit such excess (as determined by Lender in its reasonable discretion) into the Deposit Account to be applied in accordance with Section 3.12.1 or credit such excess against future payments to be made to the Insurance Funds, such election to be made by Lender in its sole discretion.

DM_US 183358854-7.105065.0051

### 3.5 Capital Expenditure Funds

**3.5.1 Deposits of Capital Expenditure Funds.** Borrower shall deposit or cause to be deposited with or on behalf of Lender on each Payment Date, an amount equal to Eleven Thousand Ninety-Three and 50/100 Dollars ($11,093.50) for Approved Capital Expenditures, which amounts shall be transferred by or at the direction of Lender into a Subaccount established to hold such funds (the "*Capital Expenditure Subaccount*"). Amounts deposited from time to time into the Capital Expenditure Subaccount pursuant to this Section 3.5.1 are referred to herein as the "*Capital Expenditure Funds*". Lender may reassess its estimate of the amount necessary for Approved Capital Expenditures but not more than twice during the Term and based upon updated information contained in a property condition report obtained by Lender, and may require Borrower to increase the monthly deposits required pursuant to this Section 3.5.1 upon thirty (30) days' notice to Borrower if Lender determines in its reasonable discretion that an increase is necessary to maintain proper operation of the Property.

**3.5.2 Release of Capital Expenditure Funds.**

(a) Provided no Event of Default shall have occurred and be continuing, Lender shall direct Servicer to disburse Capital Expenditure Funds to Borrower out of the Capital Expenditure Subaccount, within ten (10) days after the delivery by Borrower to Lender of a request therefor (but not more often than once per month), in increments of at least $10,000 (or a lesser amount if the total amount in the Capital Expenditure Subaccount is less than $10,000 in which case only one disbursement of the amount remaining in the account shall be made) provided that: (i) such disbursement is for an Approved Capital Expenditure; and (ii) the request for disbursement is accompanied by (A) an Officer's Certificate from Borrower (1) stating that the items to be funded by the requested disbursement are Approved Capital Expenditures, and a description thereof, (2) stating that all Approved Capital Expenditures to be funded by the requested disbursement have been completed (or completed to the extent of the requested disbursement) in a good and workmanlike manner and in accordance with all applicable Legal Requirements, (3) identifying such Person that supplied materials or labor in connection with the Approved Capital Expenditures to be funded by the requested disbursement, (4) stating that each such Person has been paid in full or will be paid in full upon such disbursement, or if such payment is a progress payment, that such payment represents full payment to such Person, less any applicable retention amount, for work completed through the date of the relevant invoice from such Person, (5) stating that the Approved Capital Expenditures (or the relevant portions thereof) to be funded from the disbursement in question have not been the subject of a previous disbursement, (6) stating that all previous disbursements of Capital Expenditure Funds have been used to pay the previously identified Approved Capital Expenditures, and (7) stating that all outstanding trade payables (other than those to be paid from the requested disbursement or those constituting Permitted Indebtedness) have been paid in full other than any applicable retention amount, (B) if applicable, a copy of any license, permit or other approval required by any Governmental Authority in connection with the Approved Capital Expenditures and not previously delivered to Lender, (C) copies of appropriate lien waivers, conditional lien waivers, or other evidence of payment reasonably satisfactory to Lender, (D) in connection with disbursements of Capital Expenditure Funds exceeding $100,000.00, at Lender's option, a title search for the Property indicating that the Property is free from all Liens, claims and other encumbrances not previously approved by Lender, and (E) such other customary evidence as Lender shall reasonably request to demonstrate that the Approved Capital Expenditures to be funded by the requested disbursement have been completed and are paid for or will be paid upon such disbursement to Borrower (or the portion thereof as to which such request for disbursement has been submitted has been completed and is paid for (other than any retention amount which is not a part of such disbursement request) or will be paid upon such disbursement to Borrower). Any such disbursement of

51

more than $10,000 to pay (rather than reimburse) Approved Capital Expenditures may, at Lender's option, be made by joint check payable to Borrower and the payee of such Approved Capital Expenditures.

(b)        Nothing in this Section 3.5.2 shall (i) make Lender responsible for performing or completing any Capital Expenditures Work; (ii) require Lender to expend funds in addition to the Capital Expenditure Funds to complete any Capital Expenditures Work; (iii) obligate Lender to proceed with any Capital Expenditures Work; or (iv) obligate Lender to demand from Borrower additional sums to complete any Capital Expenditures Work.

(c)        Borrower shall permit Lender and Lender's agents and representatives (including Lender's engineer, architect or inspector) or third parties to enter onto the Property upon prior written notice during normal business hours (subject to the rights of Tenants under their Leases) to inspect the progress of any Capital Expenditures Work and all materials being used in connection therewith and to examine all plans and shop drawings relating to such Capital Expenditures Work, but not more than once in any quarter unless an Event of Default is continuing.  Borrower shall cause all contractors and subcontractors to cooperate with Lender or Lender's representatives or such other Persons described above in connection with inspections described in this Section 3.5.2(c)).

(d)        If a disbursement of Capital Expenditure Funds will exceed $250,000.00, Lender may require an inspection of the Property at Borrower's expense prior to making a disbursement of Capital Expenditure Funds in order to verify completion of the Capital Expenditures Work for which reimbursement is sought.  Lender may require that such inspection be conducted by an appropriate independent architect, engineer or other qualified professional selected by Lender and may require a certificate of completion by such architect, engineer or independent qualified professional, reasonably acceptable to Lender, prior to the disbursement of Capital Expenditure Funds.  Borrower shall pay the expense of the inspection as required hereunder, if such inspection is conducted by an independent third-party qualified professional.

(e)        In addition to any insurance required under the Loan Documents, Borrower shall provide or cause to be provided workmen's compensation insurance, builder's risk insurance, public liability insurance and other insurance to the extent required under applicable Legal Requirements in connection with the Capital Expenditure Work.  All such policies shall be in form and amount satisfactory to Lender.

### 3.6        Rollover Reserve Funds

### 3.6.1        Deposit of Rollover Reserve Funds.

(a)        Borrower shall deposit or cause to be deposited with or on behalf of Lender (i) on the Closing Date, the amount of Three Million Two Hundred Eight Thousand One Hundred Seventy and 20/100 Dollars ($3,208,170.20) (the "*Existing Approved Leasing Expenses Deposit*") on account of outstanding Approved Leasing Expenses with respect to the Leases set forth on **Schedule 7** (the "*Existing Approved Leasing Expenses*"), (ii) on the Closing Date, the amount of Two Million Five Hundred Thousand and No/100 Dollars ($2,500,000.00), for Approved Leasing Expenses that may be incurred following the date hereof and (iii) on each Payment Date, an amount equal to Sixty-Nine Thousand Three Hundred Thirty-Four and 38/100 Dollars ($69,334.38), for Approved Leasing Expenses that may be incurred following the date hereof, which amounts shall be transferred by or at the direction of Lender into a Subaccount established to hold such funds (the "*Rollover Subaccount*").  Amounts deposited from time to time into the Rollover Subaccount pursuant to this Section 3.6.1 are referred to herein as the "*Rollover Funds*".  Lender may from time to time, reassess its estimate of the required monthly amount necessary for

52

tenant improvements and leasing commissions, which reassessment shall be based on (x) unanticipated Tenant turnover at the Property or (y) a material increase in market tenant improvement or leasing commission packages since the Closing Date and upon thirty (30) days' notice to Borrower, Borrower shall be required to deposit with or on behalf of Lender each month such reassessed amount, which shall be transferred into the Rollover Subaccount.

(b) In addition to the required deposit set forth in subsection (a) above, the items required to deposited pursuant to Section 5.9.4 hereof shall be deposited into the Rollover Subaccount and held as Rollover Funds and shall be disbursed and released as set forth in Section 3.6.2 below.

3.6.2 **Release of Rollover Funds.** Provided no Event of Default shall have occurred and be continuing, Lender shall direct Servicer to disburse Rollover Funds to Borrower out of the Rollover Subaccount, within ten (10) days after the delivery by Borrower to Lender of a request therefor (but not more often than once per month), in increments of at least $10,000 (or a lesser amount if the total amount in the Rollover Subaccount is less than $10,000, in which case only one disbursement of the amount remaining in the account shall be made) provided that: (i) such disbursement is for an Approved Leasing Expense; (ii) the request for disbursement is accompanied by (A) an Officer's Certificate from Borrower (1) stating that the items to be funded by the requested disbursement are Approved Leasing Expenses, and a description thereof, (2) stating that any tenant improvements at the Property to be funded by the requested disbursement (or the relevant portion thereof as to which such request for funds relates) have been completed in a good and workmanlike manner and in accordance with all applicable Legal Requirements, (3) identifying such Person that supplied materials or labor in connection with the Approved Leasing Expenses to be funded by the requested disbursement, (4) stating that each such Person has been paid in full or will be paid in full upon such disbursement, or if such payment is a progress payment, that such payment represents full payment to such Person, less any applicable retention amount, for work completed through the date of the relevant invoice from such Person, (5) stating that the Approved Leasing Expenses (or the relevant portions thereof) to be funded from the disbursement in question have not been the subject of a previous disbursement, (6) stating that all previous disbursements of Rollover Funds have been used to pay the previously identified Approved Leasing Expenses, and (7) stating that all outstanding trade payables (other than those to be paid from the requested disbursement or those constituting Permitted Indebtedness) have been paid in full, (B) if applicable, a copy of any license, permit or other approval by any Governmental Authority required in connection with the tenant improvements and not previously delivered to Lender, (C) copies of appropriate lien waivers, conditional lien waivers or other evidence of payment satisfactory to Lender, (D) in connection with disbursements of Rollover Funds exceeding $50,000.00, at Lender's reasonable option, a title search for the Property indicating that the Property is free from all Liens, claims and other encumbrances not previously approved by Lender, (E) if reasonably requested by Lender, with respect to disbursements from the Rollover Account for tenant improvement costs, a current Tenant estoppel certificate in form and substance acceptable to Lender, and (F) such other evidence as Lender shall reasonably request to demonstrate that the Approved Leasing Expenses to be funded by the requested disbursement have been completed and are paid for or will be paid upon such disbursement to Borrower (or the portion thereof as to which such request for disbursement has been submitted has been completed and is paid for (other than any retention amount which is not a part of such disbursement request) or will be paid upon such disbursement to Borrower). Any such disbursement of more than $25,000 to pay (rather than reimburse) Approved Leasing Expenses may, at Lender's option, be made by joint check payable to Borrower and the payee of such Approved Leasing Expenses. Notwithstanding anything to the contrary herein, the Existing Approved Leasing Expenses Deposit shall be utilized to pay only Existing Approved Leasing Expenses and shall not be used to pay for any other Approved Leasing Expenses.

DM_US 183358854-7.105065.0051

**3.7     Operating Expense Subaccount**.     During a Cash Management Trigger Event Period, Borrower shall deposit or cause to be deposited with or on behalf of Lender on each Payment Date an amount sufficient to pay monthly Approved Operating Expenses at the Property in accordance with the Approved Annual Budget (together with additional funds, if any, for extraordinary expenses requested by Borrower and approved by Lender) (but without duplication for any expenses to be funded with amounts deposited to the other Subaccounts) which amounts shall be transferred by or at the direction of Lender into an Account established to hold such funds (the "*Operating Expense Subaccount*").  Amounts deposited from time to time into the Operating Expense Subaccount pursuant to this Section 3.7 are referred to herein as the "*Operating Expense Funds*".  Provided no Event of Default shall have occurred and be continuing, Lender shall, or shall direct Servicer to, within fifteen (15) days after delivery by Borrower to Lender of a request therefor (but not more often than once per month) disburse funds held in the Operating Expense Subaccount, in increments of at least $1,000, provided (i) such disbursement is for an Approved Operating Expense; and (ii) such disbursement is accompanied by (A) an Officer's Certificate certifying (w) that such funds will be used to pay Approved Operating Expenses and a description thereof, (x) that all outstanding trade payables (other than those to be paid from the requested disbursement or those constituting Permitted Indebtedness) have been paid in full, (y) that the same has not been the subject of a previous disbursement, and (z) that all previous disbursements have been or will be used to pay the previously identified Approved Operating Expenses, and (B) reasonably detailed documentation satisfactory to Lender as to the amount, necessity and purpose therefor.

**3.8     Casualty/Condemnation Subaccount.**     Borrower shall pay, or cause to be paid, to Lender all Net Proceeds or Awards due to any Casualty or Condemnation in accordance with Sections 7.2 and 7.3, which funds shall be transferred to a Subaccount (the "*Casualty/Condemnation Subaccount*") established to hold such funds.  Amounts deposited from time to time into the Casualty/Condemnation Account are referred to herein as the "*Casualty/Condemnation Funds*".  All Casualty/Condemnation Funds shall be disbursed in accordance with the provisions of Section 7.

**3.9     Security Deposits**.     Borrower shall keep all security deposits under Leases at a separately designated account.  Upon the occurrence of an Event of Default Borrower shall transfer the security deposits to a separately designated account under Borrower's control at the Clearing Bank so that the security deposits shall not be commingled with any other funds of Borrower (such account, the "*Security Deposit Account*").  Borrower shall, upon Lender's request, if permitted by applicable Legal Requirements, turn over to Lender the security deposits (and any interest theretofore earned thereon) under Leases, to be held by Lender in a Subaccount (the "*Security Deposit Subaccount*") subject to the terms of the Leases.  Security deposits held in the Security Deposit Subaccount will be released by Lender upon notice from Borrower together with such evidence as Lender may reasonably request that such security deposit is required to be returned to a Tenant pursuant to the terms of a Lease or may be applied as Rent pursuant to the rights of Borrower under the applicable Lease.  Any letter of credit or other instrument that Borrower receives in lieu of a cash security deposit under any Lease entered into after the date hereof shall (i) be maintained in full force and effect in the full amount unless replaced by a cash deposit as hereinabove described and (ii) if permitted pursuant to any Legal Requirements, name Lender as payee or mortgagee thereunder (or at Lender's option, be fully assignable to Lender).

**3.10     Cash Collateral Reserve Funds.**     During the continuance of a Cash Management Trigger Event Period, Borrower shall deposit or cause to be deposited with or on behalf of Lender all Excess Cash Flow, which amounts shall be transferred by the Deposit Bank into a Subaccount established to hold such funds (the "*Cash Collateral Reserve Subaccount*") and held as additional security for the Debt.  Amounts deposited from time to time into the Cash Collateral Reserve Subaccount pursuant to this Section 3.10 are referred to herein as the "*Cash Collateral Reserve Funds*".  Provided no Event of Default shall have

occurred and be continuing, any Cash Collateral Reserve Funds remaining in the Cash Collateral Reserve Subaccount upon the occurrence of a Cash Management Trigger Event Cure shall be deposited into the Deposit Account to be applied in accordance with <u>Section 3.12.1</u> or if the Mezzanine Loan is outstanding, such amounts shall be promptly disbursed to Mezzanine Lender to be disbursed or applied in accordance with the terms of the applicable Mezzanine Loan Documents.

      **3.11**    <u>**Grant of Security Interest; Application of Funds**</u>. As security for payment of the Debt and the performance by Borrower of all other terms, conditions and provisions of the Loan Documents, Borrower hereby pledges and assigns to Lender, and grants to Lender a security interest in, all of Borrower's right, title and interest in and to all Gross Revenue and in and to all payments to or monies held in the Clearing Account, the Deposit Account and all Subaccounts created pursuant to this Agreement (collectively, the "***Cash Management Accounts***"). Borrower hereby grants to Lender a continuing security interest in, and agrees to hold in trust for the benefit of Lender, all Gross Revenue in its possession prior to the (i) payment of such Gross Revenue to Lender or (ii) deposit of such Gross Revenue into the Deposit Account. Borrower shall not, without obtaining the prior written consent of Lender, further pledge, assign or grant any security interest in any Cash Management Account, or permit any Lien to attach thereto, or any levy to be made thereon, or any UCC Financing Statements, except those naming Lender as the secured party, to be filed with respect thereto. This Agreement is, among other things, intended by the parties to be a security agreement for purposes of the UCC. Borrower shall be entitled to receive on a semi-annual basis interest on any balance in the Deposit Account and any Subaccounts other than the Tax Subaccount and the Insurance Subaccount at a rate equal to the U.S. and Regional Composite National Bank Average Retail Savings Money Market CD Yield, from time to time. Upon repayment in full of the Debt, all remaining funds in the Subaccounts, if any, shall be promptly disbursed to Borrower or Mezzanine Lender in accordance with <u>Section 3.13</u> hereof.

      **3.12**    <u>**Property Cash Flow Allocation.**</u>

      **3.12.1**    <u>**Order of Priority of Funds in the Deposit Account.**</u> On each Payment Date during the Term, except during the continuance of an Event of Default, all funds deposited into the Deposit Account during the immediately preceding Interest Period shall be applied on such Payment Date in the following order of priority:

          (i)     First, to make the required payment of Tax Funds into the Tax Subaccount as required under <u>Section 3.3</u>;

          (ii)     then, to make the required payment of Insurance Funds into the Insurance Subaccount as required under <u>Section 3.4</u>;

          (iii)     then, to pay the monthly portion of all fees charged by the Deposit Bank in accordance with the Deposit Account Agreement, into a Subaccount established for such purpose,

          (iv)     then, to Lender to pay the Monthly Debt Service Payment Amount due on such Payment Date (plus, if applicable, interest at the Default Rate, late payment charges and all other amounts, other than those described under other clauses of this <u>Section 3.12.1</u>, then due to Lender under the Loan Documents), which payments shall be made into a Subaccount established for such purpose;

          (v)     then, to make the required payment of Capital Expenditure Funds into the Capital Expenditure Subaccount as required under <u>Section 3.5</u>;

(vi)     then, to make the required payment of Rollover Funds into the Rollover Reserve Subaccount as required under Section 3.6;

(vii)    then, during a Cash Management Trigger Event Period, to make payments for Approved Operating Expenses into the Operating Expense Subaccount as required under Section 3.7;

(viii)   then, as a distribution permitted under applicable law, payment to Mezzanine Lender of an amount equal to Mezzanine Loan Debt Service Payment Amount;

(ix)     [intentionally deleted];

(x)      then, following the commencement, and at all times during the continuance of a Cash Management Trigger Event, all amounts remaining in the Deposit Account after deposits for items (a) through (ix) above (the "***Excess Cash Flow***") into the Cash Collateral Reserve Subaccount as required under Section 3.12

(xi)     then, provided no Cash Management Trigger Event Period shall then be in effect, if Lender has received notice that a Mezzanine Loan Event of Default has occurred and is continuing, payment to Mezzanine Lender, as a distribution permitted under applicable law, of all Excess Cash Flow, and

(xii)    Lastly, provided no Cash Management Trigger Event Period shall then be in effect and Lender has not received notice that a Mezzanine Loan Event of Default has occurred and is continuing, payment to Borrower of all Excess Cash Flow.

**3.12.2   Failure to Make Payments.**  The failure of Borrower to make all of the payments required under clauses (i) through (viii) of Section 3.12.1 in full on each Payment Date shall constitute an Event of Default under this Agreement; provided, however, if adequate funds are available in the Deposit Account for such payments, and an Event of Default is not otherwise in existence, the failure by the Deposit Bank to allocate such funds into the appropriate Subaccounts shall not constitute an Event of Default.  The insufficiency of funds on deposit in the Deposit Account shall not relieve Borrower from the obligation to make any payments, as and when due pursuant to the Loan Documents.

**3.12.3   Application After Event of Default.**  Notwithstanding anything to the contrary contained in this Article 3, upon the occurrence and during the continuance of an Event of Default, Lender shall be under no obligation to release or disburse any of the funds on deposit in any of the Cash Management Accounts and may, at its option, apply any Rents and other Gross Revenue then in the possession of Lender, Servicer, Clearing Bank or Deposit Bank (including any funds on deposit in any Subaccount) to the payment of the Debt in such order, proportion and priority as Lender may determine in its sole and absolute discretion without seeking the appointment of a receiver and without adversely affecting the rights of Lender to foreclose the Lien of the Security Instrument.  Lender's right to withdraw and apply any of the foregoing funds shall be in addition to all other rights and remedies provided to Lender under the Loan Documents.

**3.13     Additional Provisions Regarding Cash Management.**

(a)      At such time as the Debt has been paid in full, Borrower and Lender hereby acknowledge and agree that any funds of Borrower possessed by or for the benefit of Lender, Servicer or the Deposit Bank (including any Reserve Funds and Gross Revenue) shall be disbursed within three (3) Business Days after the Debt has been paid in full to (i) Mezzanine Lender, as a distribution permitted

in accordance with applicable law, to be held and/or applied in accordance with the terms of the Mezzanine Loan Documents, if the Mezzanine Loan (or any portion thereof) is then outstanding, or (ii) to Borrower, if the Mezzanine Loan has been paid in full.

(b)     Notwithstanding anything to the contrary contained herein, in all instances in this Article 3 where the remaining balance of any Reserve Funds are to be returned to Borrower after all amounts have been disbursed from such Reserve Funds for the payment of all costs and expenses for which such Reserve Funds were deposited with Lender, any such remaining Reserve Funds shall instead be disbursed to Mezzanine Lender, as a distribution permitted in accordance with applicable law, if Lender has received notice that a Mezzanine Loan Event of Default has occurred and is continuing.

3.13.2   If Lender receives written notice from Mezzanine Lender that a Mezzanine Loan Event of Default has occurred, Lender may conclusively rely on such notice without any inquiry into the validity thereof.

### 3.14    Rent Abatement Reserve Funds.

3.14.1   **Deposit of Rent Abatement Reserve Funds.**  On the date hereof, Borrower shall deposit with Lender an amount equal to $5,363,918.02 (the "*Rent Abatement Reserve Funds*"), which represents 100% of the rent abatements provided to the Tenants set forth on Schedule 10 attached hereto.  The Rent Abatement Reserve funds shall be transferred by Lender to a Subaccount established to hold such funds (the "*Rent Abatement Reserve Subaccount*").

3.14.2   **Release of Rent Abatement Reserve Funds.** Provided no Event of Default shall have occurred and be continuing, on each Payment Date, Lender shall release from the Rent Abatement Reserve Subaccount the amount of Rent Abatement Reserve Funds for each Tenant as set on Schedule 10 until all such Rent Abatement Reserve Funds are fully disbursed.   Lender shall deposit any such released Rent Abatement Reserve Funds into the Deposit Account to be applied in accordance with Section 3.12 hereof.

## 4.     REPRESENTATIONS AND WARRANTIES.

Borrower represents and warrants to Lender as of the Closing Date that:

### 4.1    Organization; Special Purpose.

4.1.1     Borrower has been duly organized and is validly existing and in good standing under the laws of the state of its formation, with requisite power and authority, and all rights, licenses permits and authorizations, governmental or otherwise, necessary to own its properties and to transact the business in which it is now engaged.  Borrower is duly qualified and is in good standing in the jurisdiction in which the Property is located and in all jurisdictions in which the ownership or lease of its property or the conduct of its business requires such qualification.  Any consent, approval, authorization, order, registration or qualification of or with any Governmental Authority required for the execution, delivery and performance by Borrower of the Loan Documents has been obtained and is in full force and effect.

4.1.2     Borrower is a Special Purpose Entity.  Since Borrower's creation, as of the date hereof and until such time as the Debt shall be paid in full, Borrower has complied with, is in compliance with, and shall comply with the requirements set forth on Schedule 4 attached hereto

**4.2    Proceedings; Enforceability.**    Borrower has taken all necessary action to authorize the execution, delivery and performance of this Agreement and the other Loan Documents. This Agreement and the other Loan Documents have been duly executed and delivered by Borrower and constitute legal, valid and binding obligations of Borrower enforceable against Borrower in accordance with their respective terms, except as such enforcement may be limited by bankruptcy, insolvency, reorganization, moratorium or other similar laws affecting the enforcement of creditors' rights generally, and by general principles of equity (regardless of whether such enforceability is considered in a proceeding in equity or at law). The Loan Documents are not subject to, any right of rescission, set-off, counterclaim or defense by Borrower, or Guarantor, including the defense of usury, nor would the operation of any of the terms of the Loan Documents, or any right thereunder, render any Loan Document unenforceable, and none of Borrower or Guarantor have asserted any right of rescission, set-off, counterclaim or defense with respect thereto.

**4.3    No Conflicts.**    The execution, delivery and performance of this Agreement and the other Loan Documents by Borrower and the transactions contemplated hereunder and thereunder will not conflict with or result in a breach of any of the terms or provisions of, or constitute a default under, or result in the creation or imposition of any Lien (other than pursuant to the Loan Documents) upon any of the property of Borrower pursuant to the terms of, any agreement or instrument to which Borrower is a party or by which its property is subject, nor will such action result in any violation of the provisions of any statute or any order, rule or regulation of any Governmental Authority having jurisdiction over Borrower or any of its properties. Borrower's rights under the Licenses and the Management Agreement will not be adversely affected by the execution and delivery of this Agreement and the other the Loan Documents, Borrower's performance hereunder and thereunder, the recordation of the Security Instrument, or the exercise of any remedies by Lender.

**4.4    Litigation.**    There is no action, suit, investigation or other proceeding at law or in equity by or before any Governmental Authority now pending or, to Borrower's knowledge, threatened in writing against or affecting Borrower, the Manager, the Guarantor, Key Principal or the Property, which, if adversely determined, could be reasonably likely to materially adversely affect the condition or business of Borrower (including the ability of Borrower to carry out the transactions contemplated by this Agreement), Manager, Guarantor, Key Principal or the condition or ownership of the Property.

**4.5    Agreements.**    Borrower is not a party to any agreement or instrument or subject to any restriction that could reasonably be expected to materially and adversely affect Borrower or the Property, or Borrower's business, properties, or assets, operations or condition, financial or otherwise. Borrower is not in default with respect to any order or decree of any court or any order, regulation or demand of any Governmental Authority, which default could be reasonably likely to have consequences that would materially and adversely affect the condition (financial or other) or operations of Borrower or its properties or could be reasonably likely to have consequences that would adversely affect its performance hereunder. Borrower is not in default in any material respect in the performance, observance or fulfillment of any of the obligations, covenants or conditions contained in any Permitted Encumbrance or any other agreement or instrument to which it is a party or by which it or the Property is bound.

**4.6    Property; Title.**

(a)    Borrower has good, marketable and insurable fee simple title to the real property comprising the Property and good title to the balance of the Property owned by it, free and clear of all Liens whatsoever except the Permitted Encumbrances. The Security Instrument when properly recorded in the appropriate records, together with any UCC Financing Statements required to be filed in connection therewith, will create (i) a valid, perfected first priority lien on Borrower's interest in the Property and

(ii) valid and perfected first priority security interests in and to, and perfected collateral assignments of, all personalty (including the Leases), all in accordance with the terms thereof, in each case subject only to any applicable Permitted Encumbrances. There are no mechanics, materialman's or other similar Liens or claims for payment for work, labor or materials affecting the Property which are or may become a Lien prior to, or equal or coordinate with, the Liens created by the Loan Documents. None of the Permitted Encumbrances, (a) materially interfere with the benefits of the security intended to be provided by the Security Instrument and this Agreement, (b) materially and adversely affect the value of the Property, (c) impair the use or operations of the Property (as currently used), or (d) impair Borrower's ability to repay the Loan in a timely manner.

(b) All transfer taxes, deed stamps, intangible taxes or other amounts in the nature of transfer taxes required to be paid by any Person under applicable Legal Requirements in connection with the transfer of the Property to Borrower have been paid or are being paid simultaneously herewith. All mortgage, mortgage recording, stamp, intangible or other similar tax required to be paid by any Person under applicable Legal Requirements in connection with the execution, delivery, recordation, filing, registration, perfection or enforcement of any of the Loan Documents, including, without limitation, the Security Instrument, have been paid or are being paid simultaneously herewith.

(c) The Property is comprised of one or more parcels which constitute a separate tax lot and do not constitute a portion of any other tax lot that is not a part of the Property.

(d) Borrower has received no written notice that any Condemnation or other proceeding has been commenced and, to Borrower's best knowledge, no Condemnation or other proceeding is contemplated with respect to all or any portion of the Property or for the relocation of roadways providing access to the Property.

(e) All taxes and governmental assessments due and owing in respect of the Property have been paid, or an escrow of funds in an amount sufficient to cover such payments has been established hereunder or are insured against by the Title Insurance Policy. To the best of Borrower's knowledge, there are no pending or proposed special or other assessments for public improvements or otherwise affecting the Property, nor are there any contemplated improvements to the Property that may result in such special or other assessments.

**4.7**      **No Bankruptcy Filing**. No petition in bankruptcy or insolvency has ever been filed or is pending against Borrower, Guarantor, Key Principal  or any of their respective shareholders, partners, members or non-member managers that, directly or indirectly, own twenty percent (20%) or more of the legal, beneficial or economic interests in Borrower, Guarantor or Key Principal or are in Control of Borrower, Guarantor or Key Principal and none of Borrower, Guarantor or Key Principal or any of their respective shareholders, partners, members or non-member managers that, directly or indirectly, own twenty percent (20%) or more of the legal, beneficial or economic interests in Borrower, Guarantor or Key Principal or are in Control of Borrower, Guarantor or Key Principal, has ever made an assignment for the benefit of creditors or taken advantage of any insolvency laws. None of Borrower, Guarantor or Key Principal or any of their respective shareholders, partners, members or non-member managers that, directly or indirectly, own twenty percent (20%) or more of the legal, beneficial or economic interests in Borrower, Guarantor or Key Principal or are in Control of Borrower, Guarantor or Key Principal is contemplating either the filing of a petition under any federal, state, local or foreign bankruptcy or insolvency laws or the liquidation of all or a material portion of Borrower's, Guarantor's, or Key Principal's or such shareholder's, partner's, member's or non-member manager's assets or properties, and none of Borrower, Guarantor or Key Principal or any of their respective shareholders, partners, members or non-member managers that,

59

directly or indirectly, own twenty percent (20%) or more of the legal, beneficial or economic interests in Borrower, Guarantor or Key Principal or are in Control of Borrower, Guarantor or Key Principal, has any knowledge of any Person contemplating the filing of any such petition against Borrower, Guarantor or Key Principal or any of their respective shareholders, partners, members or non-member managers that, directly or indirectly, own twenty percent (20%) or more of the legal, beneficial or economic interests in Borrower, Guarantor or Key Principal or are in Control of Borrower, Guarantor or Key Principal.

      **4.8**    **Full and Accurate Disclosure; No Change in Facts**.  No statement of fact made by Borrower or any Affiliate of Borrower in this Agreement or in any of the other Loan Documents contains any untrue statement of a material fact or omits to state any material fact necessary to make statements contained herein or therein not misleading. There is no fact presently known to Borrower that has not been disclosed to Lender which adversely affects, nor, as far as Borrower can foresee, could reasonably be likely to adversely affect, the Property or the business, operations or condition (financial or otherwise) of Borrower or Guarantor. All financial data, including the statements of cash flow and income and operating expense, that have been delivered to Lender in connection with the Loan (i) are true, complete and correct in all material respects, (ii) accurately represent the financial condition of Borrower and the Property as of the date of such reports, and (iii) have been prepared in accordance with GAAP consistently applied or another accounting method consistently applied throughout the periods covered, except as disclosed therein. Borrower has no contingent liabilities, liabilities for taxes, unusual forward or long-term commitments, unrealized or anticipated losses from any unfavorable commitments or any liabilities or obligations not expressly permitted by this Agreement. Since the date of such financial statements, there has been no material adverse change in the financial condition, operations or business of Borrower or the Property from that set forth in said financial statements.

      **4.9**    **ERISA; No Plan Assets**.  As of the date hereof and throughout the Term (i) Borrower, Guarantor and the ERISA Affiliates do not sponsor, are not obligated to contribute to, and are not themselves an "employee benefit plan," as defined in Section 3(3) of ERISA or Section 4975 of the Code, (ii) none of the assets of Borrower or Guarantor constitutes or will constitute "plan assets" of one or more such plans within the meaning of 29 C.F.R. Section 2510.3-101 as modified in operation by Section 3(42) of ERISA, (iii) Borrower and Guarantor are not and will not be a "governmental plan" within the meaning of Section 3(32) of ERISA, and (iv) transactions by or with Borrower or Guarantor are not and will not be subject to state statutes regulating investment of, and fiduciary obligations with respect to, governmental plans. As of the date hereof, neither Borrower, nor any ERISA Affiliate maintains, sponsors or contributes to or has any obligations with respect to a "defined benefit plan" (within the meaning of Section 3(35) of ERISA) or a "multiemployer pension plan" (within the meaning of Section 3(37)(A) of ERISA). Borrower has not engaged in any transaction in connection with which it could be subject to either a material civil penalty assessed pursuant to the provisions of Section 502 of ERISA or a material tax imposed under the provisions of Section 4975 of the Code.

      **4.10**    **Compliance**.  Borrower and to Borrower's knowledge, the Property (including, but not limited to the Improvements) and the use thereof comply in all material respects with all applicable Legal Requirements, including parking, building, zoning and land use laws, ordinances, regulations and codes of any Governmental Authority. Borrower is not in default or violation of any order, writ, injunction, decree or demand of any Governmental Authority, the violation of which could reasonably be likely to materially adversely affect the condition (financial or otherwise) or business of Borrower. There has not been committed by Borrower or to Borrower's knowledge, any other Person in occupancy of or involved with the operation or use of the Property any act or omission which may give any Governmental Authority the right to cause Borrower to forfeit the Property or any part thereof or any monies paid in performance of Borrower's obligations under any of the Loan Documents. The Property is used exclusively for an office

building and other appurtenant and related uses. In the event that all or any part of the Improvements are destroyed or damaged, said Improvements can be legally reconstructed to their condition prior to such damage or destruction, and thereafter exist for the same use without violating any zoning or other ordinances applicable thereto and without the necessity of obtaining any variances or special permits. No legal proceedings are pending or, to the best of Borrower's knowledge, threatened with respect to the zoning of the Property. Neither the zoning nor any other right to construct, use or operate the Property is in any way dependent upon or related to any property other than the Property. To Borrower's knowledge, all certifications, permits, licenses and approvals, including certificates of completion and occupancy permits required for the legal use, occupancy and operation of the Property for its current use (collectively, the "*Licenses*"), have been obtained and are in full force and effect. The use being made of the Property is in conformity with the certificate of occupancy issued for the Property and all other restrictions, covenants and conditions affecting the Property.

**4.11**     **Contracts**.

(a)     Borrower has not entered into, and is not bound by, any Major Contract which continues in existence, except those previously disclosed in writing to Lender. To Borrower's knowledge, other than a Major Contract, there are no service, maintenance or repair contracts affecting the Property that are not terminable on one month's notice or less without cause and without penalty or premium. All service, maintenance or repair contracts affecting the Property and entered into by Borrower or Borrower's predecessor-in-interest have been entered into at arm's-length in the ordinary course of Borrower's business and provide for the payment of fees in amounts and upon terms comparable to existing market rates.

(b)     To Borrower's knowledge, each of the Major Contracts is in full force and effect, there are no monetary or other material defaults by Borrower thereunder and, to the knowledge of Borrower, there are no monetary or other material defaults thereunder by any other party thereto. None of Borrower, Manager or any other Person acting on Borrower's behalf has given or received any notice of default under any of the Major Contracts that remains uncured or in dispute.

(c)     To Borrower's knowledge, Borrower has delivered true, correct and complete copies of the Major Contracts (including all amendments and supplements thereto) to Lender.

(d)     No Major Contract has as a party an Affiliate of Borrower. All fees and other compensation for services previously performed under the Management Agreement have been paid in full.

**4.12**     **Federal Reserve Regulations**.   No part of the proceeds of the Loan will be used for the purpose of purchasing or acquiring any "margin stock" within the meaning of Regulation U of the Board of Governors of the Federal Reserve System or for any other purpose that would be inconsistent with such Regulation U or any other regulation of such Board of Governors, or for any purpose prohibited by Legal Requirements or any Loan Document.

**4.13**     **Easements; Utilities and Public Access**.   To Borrower's knowledge, all easements, cross easements, licenses, air rights and rights-of-way or other similar property interests, if any, necessary for the full utilization of the Improvements for their intended purposes have been obtained, are described in the Title Insurance Policy and are in full force and effect without default thereunder. The Property has rights of access to public ways and is served by water, sewer, sanitary sewer and storm drain facilities adequate to service the Property for its intended uses. All public utilities necessary or convenient to the full use and enjoyment of the Property are located in the public right-of-way abutting the Property, and all such utilities are connected so as to serve the Property without passing over other property absent a valid irrevocable

DM_US 183358854-7.105065.0051

easement. All roads necessary for the use of the Property for its current purpose have been completed and dedicated to public use and accepted by all Governmental Authorities.

**4.14** **Physical Condition**. Except as may be expressly set forth in the Physical Conditions Report, the Property, including all buildings, improvements, parking facilities, sidewalks, storm drainage systems, roofs, plumbing systems, HVAC systems, fire protection systems, electrical systems, equipment, elevators, exterior sidings and doors, landscaping, irrigation systems and all structural components, are in good condition, order and repair in all material respects; to Borrower's knowledge, there exists no structural or other material defects or damages in the Property, whether latent or otherwise, and Borrower has not received written notice from any insurance company or bonding company of any defects or inadequacies in the Property, or any part thereof, which would adversely affect the insurability of the same or cause the imposition of extraordinary premiums or charges thereon or any termination or threatened termination of any policy of insurance or bond.

**4.15** **Leases**. The rent roll attached hereto as Schedule 1 is true, complete and correct and the Property is not subject to any Leases other than the Leases described in Schedule 1. Borrower is the owner and lessor of landlord's interest in the Leases. To Borrower's knowledge, no Person has any possessory interest in the Property or right to occupy the same except under and pursuant to the provisions of the Leases. Except as set forth in the Leases delivered to the Lender on the rent roll attached hereto as Schedule 1 or in the estoppel certificates delivered to Lender in connection with the closing of the Loan, to Borrower's knowledge: (i) the Leases are in full force and effect and there are no defaults thereunder by either party and Borrower has not received any notice of termination with respect to any such Leases, (ii) the copies of the Leases delivered to Lender are true and complete, and there are no oral agreements with respect thereto, (iii) no Rent (excluding security deposits) has been paid more than one (1) month in advance of its due date, (iv) all work to be performed by Borrower under each Lease has been performed as required and has been accepted by the applicable Tenant, (v) any payments, free rent, partial rent, rebate of rent or other payments, credits, allowances or abatements required to be given by Borrower to any Tenant has already been received by such Tenant, (vi) the Tenants under the Leases have accepted possession of and are in occupancy of all of their respective demised Property and have commenced the payment of full, unabated rent under the Leases, (vii) Borrower has delivered to Lender a true, correct and complete list of all security deposits made by Tenants at the Property which have not been applied (including accrued interest thereon), all of which are held by Borrower in accordance with Section 3.8 hereof and the terms of the applicable Lease and applicable Legal Requirements, (viii) each Tenant under a Material Lease is free from bankruptcy or reorganization proceedings, (ix) no Tenant under any Lease (or any sublease) is an Affiliate of Borrower or Guarantor, (x) the Tenants under the Leases are open for business and paying full, unabated rent and no Tenant has requested to discontinue its business at its premises, (xi) there are no non-market brokerage fees or non-market commissions due and payable in connection with the leasing of space at the Property, and no such non-market fees or commissions will become due and payable in the future in connection with the Leases, including by reason of any extension of such Lease or expansion of the space leased thereunder, (xii) no Tenant under any Lease has any right or option for additional space in the Improvements, (xiii) no Tenant has assigned its Lease or sublet all or any portion of the premises demised thereby, no such Tenant holds its leased premises under assignment or sublease, nor does anyone except such Tenant and its employees occupy such leased premises, and (xiv) all existing Leases are subordinate to the Security Instrument and the Assignment of Leases and provide that the Tenant thereunder shall attorn to Lender and any purchaser at a foreclosure sale. No Tenant under any Lease has a right or option pursuant to such Lease or otherwise to purchase all or any part of the leased premises or the building of which the leased premises are a part. There has been no prior sale, transfer or assignment, hypothecation or pledge of any Lease or of the Rents received therein which is still in effect.

**4.16    Fraudulent Transfer**.    Borrower (a) has not entered into the transaction or any Loan Document with the actual intent to hinder, delay, or defraud any creditor and (b) received reasonably equivalent value in exchange for its obligations under the Loan Documents.  Giving effect to the Loan, the fair saleable value of Borrower's assets exceeds and will, immediately following the making of the Loan, exceed Borrower's total liabilities, including subordinated, unliquidated, disputed or contingent liabilities.  The fair saleable value of Borrower's assets is and immediately following the making of the Loan, will be greater than Borrower's probable liabilities, including the maximum amount of its contingent liabilities on its debts as such debts become absolute and matured.  Borrower's assets do not and, immediately following the execution and delivery of the Loan Documents will not, constitute unreasonably small capital to carry out its business as conducted or as proposed to be conducted.  Borrower does not intend to, and does not believe that it will, incur Indebtedness and liabilities (including contingent liabilities and other commitments) beyond its ability to pay such debts as they mature (taking into account the timing and amounts of cash to be received by Borrower and the amounts to be payable on or in respect of the obligations of Borrower).

**4.17    Organizational Chart**.    The organizational chart attached hereto as Schedule 3, relating to Borrower and certain Affiliates and other parties, is true, complete and correct on and as of the Closing Date.  No Person other than those Persons shown on Schedule 3 have any ownership interest in, or right of Control, directly or indirectly, in Borrower or, if an entity, Guarantor.

**4.18    Management Agreement**.    The Management Agreement is in full force and effect.  There is no default, breach or violation existing thereunder, and no event has occurred (other than payments due but not yet delinquent) that, with the passage of time or the giving of notice, or both, would constitute a default, breach or violation thereunder, by any party thereto.  The management fees and the terms and provisions of the Management Agreement, are subordinate to the Loan Documents.

**4.19    Hazardous Substances**.    (i) Except as disclosed in the environmental reports delivered to the Lender in connection with the Loan and to Borrower's knowledge, the Property is not in violation of any Legal Requirement pertaining to or imposing liability or standards of conduct concerning environmental regulation, contamination or clean-up, including the Comprehensive Environmental Response, Compensation and Liability Act, the Resource Conservation and Recovery Act, the Emergency Planning and Community Right-to-Know Act of 1986 (including, but not limited to, Subtitle I relating to underground storage tanks), the Hazardous Substances Transportation Act, the Solid Waste Disposal Act, the Clean Water Act, the Clean Air Act, the Toxic Substance Control Act, the Safe Drinking Water Act, the Occupational Safety and Health Act, the Federal Water Pollution Control Act, the Federal Insecticide, Fungicide and Rodenticide Act, the Endangered Species Act, the National Environmental Policy Act, the Rivers and Harbors Appropriation Act; any Legal Requirements relating to Toxic Mold or Lead Based Paint, any state super-lien and environmental clean-up statutes, any local law requiring related permits and licenses, any common law relating to Toxic Mold or other Hazardous Substances, and all amendments to and regulations in respect of the foregoing laws (collectively, "*Environmental Laws*"); (ii) except as disclosed in the environmental reports delivered to the Lender in connection with the Loan and to Borrower's knowledge, the Property is not subject to any private or governmental Lien or judicial or administrative notice or action or inquiry, investigation or claim relating to hazardous, toxic or dangerous substances, wastes, contaminants, and pollutants, including, without limitation, petroleum, petroleum products, crude oil and fractions thereof, Toxic Mold, or any other substances or materials which are included under or regulated by, or for which liability may arise pursuant to, Environmental Laws (collectively, "*Hazardous Substances*"); (iii) except as disclosed in the environmental reports delivered to the Lender in connection with the Loan and to Borrower's knowledge, to Borrower's knowledge, after due inquiry, no Hazardous Substances are or have been (including the period prior to Borrower's acquisition of

the Property), discharged, generated, treated, disposed of or stored on, incorporated in, or removed or transported from the Property other than in compliance with all Environmental Laws; (iv) except as disclosed in the environmental reports delivered to the Lender in connection with the Loan and to Borrower's knowledge, after due inquiry, no Hazardous Substances are present in, on or under any nearby real property which could migrate to or otherwise affect the Property; (v) except as disclosed in the environmental reports delivered to the Lender in connection with the Loan and to Borrower's knowledge, no underground storage tanks exist on the Property and the Property has never been used as a landfill; and (vi) there have been no environmental investigations, studies, audits, reviews or other analyses conducted by or on behalf of Borrower which have not been provided to Lender.

     **4.20**   **Organizational Status; Principal Place of Business.**   Borrower's exact legal name is: Jericho Plaza Portfolio LLC. Borrower is a limited liability company, and the jurisdiction in which Borrower is organized is Delaware. Borrower's Tax I.D. number is 87-3717802 and Borrower's Delaware Organizational I.D. number is 6418611. The principal place of business of Borrower is its primary address for notices as set forth in Section 6.1, and Borrower has no other place of business.

     **4.21**   **Boundaries.**   To Borrower's knowledge, the Survey for the Property delivered to Lender does not fail to reflect any material matter affecting the Property or the title thereto. All of the Improvements which were included in determining the appraised value of the Property lie wholly within the boundaries and building restriction lines of the Property, and no improvement on an adjoining property encroaches upon the Property, and no easement or other encumbrance affecting the Property encroaches upon any of the Improvements, except those set forth on the Survey and insured against by the Title Insurance Policy.

     **4.22**   **Flood Zone.**   None of the Improvements on the Property are located in an area identified by the Federal Emergency Management Agency as a special flood hazard area, or, if so located the flood insurance required pursuant to Section 7.1.1(b) hereof is in full force and effect with respect to the Property.

     **4.23**   **Purchase Options.**   Neither the Property nor any part thereof are subject to any purchase options, rights of first refusal, rights of first offer or other similar rights in favor of third parties.

     **4.24**   **Other Debt.**   There is no Indebtedness with respect to the Property or over excess cash flow or any residual interest therein, whether secured or unsecured, other than Permitted Encumbrances and Permitted Indebtedness.

     **4.25**   **Embargoed Person; Patriot Act Compliance.**

     (a)   None of the funds or assets of Borrower, or any Guarantor, as applicable, constitute property of, or are beneficially owned directly or, to Borrower's best knowledge, indirectly, by any Embargoed Person (as hereinafter defined) and no Embargoed Person has any direct interest, and to Borrower's best knowledge, as of the date hereof, based upon reasonable inquiry by Borrower, indirect interest, of any nature whatsoever in Borrower, or Guarantor, as applicable, with the result that the investment in Borrower, or Guarantor, as applicable (whether directly or indirectly), is prohibited by law or the Loan is in violation of law.

     (b)   None of Borrower, or Guarantor, nor any Person Controlling, Controlled by or under common Control with Borrower, or Guarantor is a "senior foreign political figure" or an "immediate family" member or "close associate" (as all such terms are defined below) of a senior foreign political figure within the meaning of the Patriot Act. For the purposes of this subsection (b), (i) "senior foreign political figure" means a senior official in the executive, legislative, administrative, military or judicial branches of

a foreign government (whether elected or not), a senior official of a major foreign political party or a senior executive of a foreign government-owned corporation, and such term also includes any corporation, business or other entity that has been formed by, or for the benefit of, a senior foreign political figure, (ii) "immediate family" of a senior foreign political figure includes the figure's parents, siblings, spouse, children and in-laws, and (iii) "close associate" of a senior foreign political figure means a person who is widely and publicly known to maintain an unusually close relationship with the senior foreign political figure, and includes a person who is in a position to conduct substantial domestic and international financial transactions on behalf of the senior foreign political figure.

4.26 **Illegal Activity**. Borrower has ascertained the identity of all persons and entities who have provided funds to capitalize Borrower and has conducted verification procedures which are sufficient to establish the identity and source of such funds. None of the funds of Borrower, or any Guarantor, as applicable, that have been or will be used to purchase the Property are derived from or are the proceeds of any unlawful activity, and to Borrower's knowledge, there are no illegal commercial activities or commercial activities relating to controlled substances at the Property (including, without limitation, any growing, distributing and/or dispensing of marijuana for commercial purposes, medical or otherwise for so long as the foregoing is a violation of a Legal Requirement of any applicable Governmental Authority).

4.27 **FIRPTA**. Borrower is not a "foreign person" within the meaning of Sections 1445 or 7701 of the Code.

4.28 **Investment Company Act**. Borrower is not (i) an "investment company" or a company "controlled" by an "investment company," within the meaning of the Investment Company Act of 1940, as amended; (ii) a "holding company" or a "subsidiary company" of a "holding company" or an "affiliate" of either a "holding company" or a "subsidiary company" within the meaning of the Public Utility Holding Company Act of 2005, as amended; or (iii) subject to any other federal or state law or regulation which purports to restrict or regulate its ability to borrow money.

4.29 **Bank Holding Company**. Borrower is not a "bank holding company" or a direct or indirect subsidiary of a "bank holding company" as defined in the Bank Holding Company Act of 1956, as amended, and Regulation Y thereunder of the Board of Governors of the Federal Reserve System.

4.30 **Operations Agreements**. To Borrower's knowledge, each Operations Agreement is in full force and effect and neither Borrower nor, to Borrower's knowledge, any other party to any Operations Agreement, is in default thereunder, and to the best of Borrower's knowledge, there are no conditions which, with the passage of time or the giving of notice, or both, would constitute a default thereunder. Except as described in the Title Insurance Policy, the REA has not been modified, amended or supplemented.

4.31 **Fiscal Year.** Each fiscal year of Borrower commences on January 1.

4.32 **O&M Program.** Borrower hereby represents and warrants that attached hereto as Schedule 9 is a true and complete copy of that certain Asbestos Operations & Maintenance Plan, dated December 13, 2021, prepared by EBI Consulting (the "***O&M Program***").

4.33 **Intentionally Deleted.** .

4.34 **Sanctionable Activity**.

(a) Neither Borrower, nor any of its Affiliates (including, without any limitation, Guarantor or any of Borrower's subsidiaries), nor any Persons acting on its or their behalf in connection with this Agreement (including its respective directors, officers or employees) is a Sanctioned Person.

(b) Neither Borrower nor Guarantor is engaged in, and in the past five years has not engaged in, any Sanctionable Activity.

(c) Borrower does not derive revenues or profits business involving any Sanctioned Persons or Sanctioned Countries.

All of the representations and warranties in this <u>Article 4</u> and elsewhere in this Agreement and the other Loan Documents (i) shall survive for so long as any portion of the Debt remains owing to Lender and (ii) shall be deemed to have been relied upon by Lender notwithstanding any investigation heretofore or hereafter made by Lender or on its behalf, provided, however, that the representations, warranties and covenants set forth in <u>Section 4.19</u> shall survive in perpetuity.

## 5. <u>COVENANTS</u>.

Until the end of the Term, Borrower hereby covenants and agrees with Lender that:

**5.1** <u>Existence</u>. Borrower and shall (i) do or cause to be done all things necessary to preserve, renew and keep in full force and effect its existence, rights, and franchises, (ii) continue to engage in the business presently conducted by it, (iii) obtain and maintain all Licenses, and (iv) qualify to do business and remain in good standing under the laws of each jurisdiction, in each case as and to the extent required for the ownership, maintenance, management and operation of the Property. There shall never be committed by Borrower, and Borrower shall never permit any other Person in occupancy of or involved with the operation or use of the Property to commit any act or omission affording any Governmental Authority the right of forfeiture against the Property or any part thereof or any monies paid in performance of Borrower's obligations under the Loan Documents. Borrower covenants and agrees not to commit, permit or suffer to exist any act or omission affording such right of forfeiture.

**5.2** <u>Taxes and Other Charges</u>. Subject to Borrower's right to contest the same in accordance with the terms hereof, Borrower shall pay (or cause to be paid) all Property Taxes and Other Charges now or hereafter levied, assessed or imposed as the same become due and payable, and deliver to Lender receipts for payment or other evidence satisfactory to Lender that the Property Taxes and Other Charges have been so paid no later than thirty (30) days before they would be delinquent if not paid (provided, however, that Borrower need not pay directly Property Taxes nor furnish such receipts for payment of Property Taxes to the extent that funds to pay for such Property Taxes have been deposited into the Tax Subaccount pursuant to <u>Section 3.3</u>). Subject to Borrower's right to contest the same in accordance with the terms hereof, Borrower shall not suffer, and shall promptly cause to be paid and discharged, any Lien or charge against the Property, and shall promptly pay for all utility services provided to the Property. After prior written notice to Lender, Borrower, at its own expense, may contest by appropriate legal proceeding, promptly initiated and conducted in good faith and with due diligence, the amount or validity or application of any Property Taxes or Other Charges, provided that (i) no Event of Default has occurred and is continuing, (ii) such proceeding shall suspend the collection of the Property Taxes or the Other Charges from the Property, (iii) such proceeding shall be permitted under and be conducted in accordance with the provisions of any other instrument to which Borrower or the Property is subject and shall not constitute a default thereunder and such proceeding shall be conducted in accordance with all applicable Legal Requirements, (iv) neither the Property nor any part thereof or interest therein will be in danger of being sold, forfeited, terminated, canceled or lost, (v) Borrower shall deposit with Lender cash or other security as may be

required in the proceeding, or as may otherwise be requested by Lender, to ensure the payment of any such Property Taxes or Other Charges, which shall not be less than one hundred ten percent (110%) of the Property Taxes or Other Charges being contested, (vi) Borrower shall promptly upon final determination thereof pay the amount of any such Property Taxes or Other Charges, together with all costs, interest and penalties which may be payable in connection therewith, (vii) failure to pay such Property Taxes or Other Charges will not subject Lender to any civil or criminal liability, (viii) such contest shall not affect the ownership, use or occupancy of the Property, and (ix) Borrower shall, upon written request of Lender, give Lender prompt notice of the status of such proceedings and/or confirmation of the continuing satisfaction of the conditions set forth in clauses (i) through (viii) of this Section 5.2. Lender may pay over any such cash or other security held by Lender to the claimant entitled thereto at any time when, in the judgment of Lender, the entitlement of such claimant is established or the Property (or any part thereof or interest therein) shall be in danger of being sold, forfeited, terminated cancelled or lost or there shall be any danger of the Lien of the Security Instrument being primed by any related Lien.

**5.3**     **Repairs; Maintenance and Compliance; Alterations**.

    **5.3.1**     **Repairs; Maintenance and Compliance**.  Borrower shall at all times maintain, preserve and protect all franchises and trade names, and preserve all the remainder of its property used or useful in the conduct of its business and shall cause the Property to be maintained in a good and safe condition and repair and shall not remove, demolish or alter the Improvements or Equipment (except for alterations performed in accordance with Section 5.3.2 and normal replacement of Equipment with Equipment of equivalent value and functionality).  Borrower shall promptly comply with all Legal Requirements and promptly cure properly any violation of a Legal Requirement.  Borrower shall promptly notify Lender in writing after Borrower first receives notice of any such non–compliance.  Borrower shall promptly repair, replace or rebuild any part of the Property that becomes damaged, worn or dilapidated and shall complete and pay for any Improvements at any time in the process of construction or repair.

    **5.3.2**     **Alterations**.

    (a)     Borrower may, without Lender's consent, perform alterations to the Improvements and Equipment which (i) do not constitute a Material Alteration, (ii) do not adversely affect Borrower's financial condition or the value or Net Operating Income of the Property (iii) are in the ordinary course of Borrower's business and (iv) are already approved by Lender pursuant to Lender's approval of a Material Lease.  Borrower shall not perform any Material Alteration without Lender's prior written consent, which consent shall not be unreasonably withheld, delayed or conditioned; provided, however, that Lender may, in its sole and absolute discretion, withhold consent to any alteration the cost of which is reasonably estimated to exceed $2,000,000.00 or which is likely to result in a decrease of Net Operating Income by three and one-half percent (3.5%) or more for a period of thirty (30) days or longer. Lender may, as a condition to giving its consent to a Material Alteration, require that Borrower deliver to Lender security for payment of the cost of such Material Alteration in an amount equal to one hundred fifteen percent (115%) of the cost of the Material Alteration as reasonably estimated by Lender.  Upon substantial completion of any Material Alteration, Borrower shall provide evidence reasonably satisfactory to Lender that (i) the Material Alteration was constructed in a good and workmanlike manner and in accordance with applicable Legal Requirements and substantially in accordance with plans and specifications approved by Lender (which approval shall not be unreasonably withheld or delayed), (ii) all contractors, subcontractors, materialmen and professionals who provided work, materials or services in connection with the Material

Alteration have been paid in full and have delivered unconditional releases of lien and (iii) all material Licenses and permits necessary for the use, operation and occupancy of the Material Alteration (other than those which depend on the performance of Tenant improvement work) have been issued. Borrower shall reimburse Lender within ten (10) Business Days of written demand therefor for all reasonable third-party out-of-pocket costs and expenses (including the reasonable fees of any architect, engineer or other professional engaged by Lender) incurred by Lender in reviewing plans and specifications or in making any determinations necessary to implement the provisions of this <u>Section 5.3.2</u>.

(b)     Notwithstanding anything to the contrary contained in this <u>Section 5.3.2</u>, provided no Event of Default is continuing, whenever Lender's approval or consent is required pursuant to the provisions of this <u>Section 5.3.2</u>, Lender's consent shall be deemed given if:

(i)     the first correspondence from Borrower to Lender requesting such approval or consent is in an envelope marked "PRIORITY" and contains a bold-faced, conspicuous (in a font size that is not less than fourteen (14) point) legend at the top of the first page thereof stating: "**FIRST NOTICE: THIS IS A REQUEST FOR APPROVAL UNDER THE LOAN BY NATIXIS REAL ESTATE CAPITAL LLC TO JERICHO PLAZA PORTFOLIO LLC. FAILURE TO RESPOND TO THIS REQUEST WITHIN TEN (10) BUSINESS DAYS MAY RESULT IN THE REQUEST FOR APPROVAL BEING DEEMED GIVEN**", and is accompanied by the information and documents required above, and any other information reasonably requested by Lender in writing prior to the expiration of such ten (10) Business Day period in order to adequately review the same has been delivered; and

(ii)     if Lender fails to respond or to deny such request for approval in writing within such ten (10) Business Day period, a second notice requesting approval is thereafter delivered to Lender from Borrower in an envelope marked "PRIORITY" containing a bold-faced, conspicuous (in a font size that is not less than fourteen (14) point) legend at the top of the first page thereof stating: "**SECOND AND FINAL NOTICE: THIS IS A REQUEST FOR CONSENT UNDER THE LOAN BY NATIXIS REAL ESTATE CAPITAL LLC TO JERICHO PLAZA PORTFOLIO LLC. IF YOU FAIL TO PROVIDE A SUBSTANTIVE RESPONSE (E.G., APPROVAL, DENIAL OR REQUEST FOR CLARIFICATION OR MORE INFORMATION) TO THIS REQUEST FOR APPROVAL IN WRITING WITHIN FIVE (5) BUSINESS DAYS, YOUR APPROVAL SHALL BE DEEMED GIVEN**" and Lender fails to provide a substantive response to such request for approval within such second five (5) Business Day period.

### 5.3.3     <u>Intentionally Deleted.</u>

**5.4     <u>Performance by Borrower; Compliance with Agreements</u>.**     Borrower shall in a timely manner observe, perform and fulfill in all material respects each and every term to be observed, performed or fulfilled by it pursuant to the terms of any agreement or instrument affecting or pertaining to the Property. Borrower shall in a timely manner observe, perform and fulfill each and every covenant term and provision of each Loan Document executed and delivered by, or applicable to, Borrower, and shall not enter into or otherwise suffer or permit any amendment, waiver, supplement, termination or other modification of any Loan Document executed and delivered by, or applicable to, Borrower without the prior consent of Lender.

**5.5     <u>Cooperate in Legal Proceedings.</u>**     Borrower shall give prompt notice to Lender of any litigation or governmental proceedings pending or threatened in writing against the Property, Borrower, Manager, Key Principal or any Guarantor which could be reasonably likely to materially affect the rights

of Lender under any Loan Document and shall cooperate fully with Lender with respect to, and permit Lender, at its option, to participate in, any such proceedings before any Governmental Authority.

5.6 **Further Assurances**. Borrower shall, at Borrower's sole cost and expense: (i) furnish to Lender all instruments, documents, boundary surveys, footing or foundation surveys, certificates, plans and specifications, appraisals, title and other insurance reports and agreements, and each and every other document, certificate, agreement and instrument required to be furnished by Borrower pursuant to the terms of the Loan Documents; (ii) cure any defects in the execution and delivery of the Loan Documents and execute and deliver, or cause to be executed and delivered, to Lender such documents, instruments, certificates, assignments and other writings, and do such other acts necessary or desirable, to correct any omissions in the Loan Documents, to evidence, preserve and/or protect the collateral at any time securing or intended to secure the Debt or for the better and more effective carrying out of the intents and purposes of the Loan Documents, as Lender may reasonably require from time to time; and (iii) upon Lender's request therefor given from time to time after the occurrence of any Event of Default, pay for (a) reports of UCC, federal tax lien, state tax lien, judgment and pending litigation searches with respect to Borrower and (b) searches of title to the Property, each such search to be conducted by search firms reasonably designated by Lender in each of the locations reasonably designated by Lender.

5.7 **Environmental Matters**.

5.7.1 **Hazardous Substances**. So long as Borrower owns or is in possession of the Property, Borrower shall (i) keep the Property free from Hazardous Substances and in compliance with all Environmental Laws, (ii) promptly notify Lender if Borrower shall become aware that (A) any Hazardous Substance is on or near the Property, (B) the Property is in direct or indirect violation of any Environmental Laws or (C) any condition on or near the Property could be reasonably likely to pose a threat to the health, safety or welfare of humans and (iii) remove such Hazardous Substances or cure such violations or remove such threats, as applicable, as required by law (or as shall be required by Lender in the case of removal which is not required by law, but in response to the opinion of a licensed hydrogeologist, licensed environmental engineer or other qualified environmental consulting firm engaged by Lender ("***Lender's Consultant***")), promptly after Borrower becomes aware of same, at Borrower's sole expense. Any removal, remediation or cure of any violation relating to Toxic Mold shall include, without limitation, all acts required to clean and disinfect any portions of the Property affected by Toxic Mold and to eliminate the source(s) of Toxic Mold in or on the Property, including providing any necessary moisture control systems at the Property. Nothing herein shall prevent Borrower from recovering such expenses from any other party that may be liable for such removal, remediation or cure.

5.7.2 **Environmental Monitoring**.

(a) Borrower shall give prompt written notice to Lender of (i) any proceeding or inquiry by any party (including any Governmental Authority) with respect to the presence of any Hazardous Substance on, under, from or about the Property, (ii) all claims made or threatened by any third party (including any Governmental Authority) against Borrower or the Property or any party occupying the Property relating to any loss or injury resulting from any Hazardous Substance, and (iii) Borrower's discovery of any occurrence or condition on any real property adjoining or in the vicinity of the Property that could cause the Property to be subject to any investigation or cleanup pursuant to any Environmental Law. Borrower shall permit Lender to join and participate in, as a party if it so elects, any legal or administrative proceedings or other actions initiated with respect to the Property in connection with any Environmental Law or Hazardous Substance, and Borrower shall pay all reasonable third-party out-of-pocket attorneys' fees and disbursements actually incurred by Lender in connection therewith.

(b)     Upon Lender's request, at any time and from time to time, if Lender in its good faith judgment determines that reasonable cause exists for the performance of such environmental inspection or audit, Borrower shall provide an inspection or audit of the Property prepared by a licensed hydrogeologist, licensed environmental engineer or qualified environmental consulting firm approved by Lender assessing the presence or absence of Hazardous Substances on, in or near the Property, and then the cost and expense of such audit or inspection shall be paid by Borrower. Such inspections and audit may include soil borings and ground water monitoring. If Borrower fails to provide any such inspection or audit within thirty (30) days after such request, Lender may order same, and Borrower hereby grants to Lender and its employees and agents access to the Property and a license to undertake such inspection or audit.

(c)     If any environmental site assessment report prepared in connection with such inspection or audit recommends that an operations and maintenance plan be implemented for any Hazardous Substance, whether such Hazardous Substance existed prior to the ownership of the Property by Borrower, or presently exists or is reasonably suspected of existing, Borrower shall cause such operations and maintenance plan to be prepared and implemented at its expense upon request of Lender. If any investigation, site monitoring, containment, cleanup, removal, restoration or other work of any kind is reasonably necessary under an applicable Environmental Law ("*Remedial Work*"), Borrower shall commence all such Remedial Work within thirty (30) days after written demand by Lender and thereafter diligently prosecute to completion all such Remedial Work within such period of time as may be required under applicable law. All Remedial Work shall be performed by licensed contractors approved in advance by Lender and under the supervision of a consulting engineer approved by Lender. All costs of such Remedial Work shall be paid by Borrower, including Lender's reasonable third-party out-of-pocket attorneys' fees and disbursements actually incurred in connection with the monitoring or review of such Remedial Work. If Borrower does not timely commence and diligently prosecute to completion the Remedial Work, Lender may (but shall not be obligated to) cause such Remedial Work to be performed at Borrower's expense. Notwithstanding the foregoing, Borrower shall not be required to commence such Remedial Work within the above specified time period: (x) if prevented from doing so by any Governmental Authority, (y) if commencing such Remedial Work within such time period would result in Borrower or such Remedial Work violating any Environmental Law, or (z) if Borrower, at its expense and after prior written notice to Lender, is contesting by appropriate legal, administrative or other proceedings, conducted in good faith and with due diligence, the need to perform Remedial Work. Borrower shall have the right to contest the need to perform such Remedial Work, provided that, (1) Borrower is permitted by the applicable Environmental Laws to delay performance of the Remedial Work pending such proceedings, (2) neither the Property nor any part thereof or interest therein will be sold, forfeited or lost if Borrower fails to promptly perform the Remedial Work being contested, and if Borrower fails to prevail in such contest, Borrower would thereafter have the opportunity to perform such Remedial Work, (3) Lender would not, by virtue of such permitted contest, be exposed to any risk of any civil liability for which Borrower has not furnished additional security as provided in clause (4) below, or to any risk of criminal liability, and neither the Property nor any interest therein would be subject to the imposition of any Lien for which Borrower has not furnished additional security as provided in clause (4) below, as a result of the failure to perform such Remedial Work and (4) Borrower shall have furnished to Lender additional security in respect of the Remedial Work being contested and the loss or damage that may result from Borrower's failure to prevail in such contest in such amount as may be reasonably requested by Lender but in no event less than one hundred ten percent (110%) of the cost of such Remedial Work as estimated by Lender or Lender's Consultant and any loss or damage that may result from Borrower's failure to prevail in such  contest.

(d)     Borrower shall not install or permit to be installed on the Property any underground storage tank.

**5.7.3** **O&M Program.** Borrower has, as of the date hereof, complied in all respects with the O&M Program and Borrower hereby covenants and agrees that, during the Term, including any extension or renewal thereof, Borrower shall comply in all respects with the terms and conditions of the O&M Program.

**5.8** **Title to the Property; Liens.** Borrower will warrant and defend (a) its title to the Property and every part thereof, subject only to Permitted Encumbrances, and (b) the validity and priority of all Liens granted or otherwise given to Lender under the Loan Documents, subject only to Permitted Encumbrances, in each case, against the claims of all Persons whomsoever. Without Lender's prior written consent, Borrower shall not create, incur, assume, permit or suffer to exist any Lien on all or any portion of the Property or any Lien on any direct or indirect legal or beneficial ownership interest in Borrower or, except Liens in favor of Lender and Permitted Encumbrances. Borrower shall reimburse Lender for any actual losses, reasonable third-party out-of-pocket costs, damages (excluding consequential, special and punitive damages except to the extent such damages are actually incurred by Lender as a result of third party claims) or expenses (including reasonable attorneys' fees and court costs) incurred by Lender if an interest in the Property, other than as permitted hereunder, is claimed by another Person.

**5.9** **Leases.**

**5.9.1** **Generally.** Upon request, Borrower shall promptly furnish Lender with executed copies of all Leases then in effect, copies of which have not previously been delivered to Lender, and a statement of all Tenant security or other deposits, but not more than quarterly. Within ten (10) Business Days after the execution of a Lease or any renewals, amendments or modification of a Lease, Borrower shall deliver to Lender a copy thereof, together with Borrower's certification that such Lease (or such renewal, amendment or modification) was entered into in accordance with the terms of this Agreement.

**5.9.2** **Approvals.**

(a) Any Leases and any renewals of Leases executed after the date hereof shall (i) provide for economic terms, including rental rates (and tenant improvement costs), comparable to existing local market rates for similar properties, (ii) be on commercially reasonable terms, (iii) have a term of not less than three (3) years (unless Lender approves in writing a shorter term) and not more than fifteen (15) years, including extensions and renewals (unless Lender approves in writing a longer term), (iv) provide that such Lease is subordinate to the Security Instrument and the Assignment of Leases and that the Tenant thereunder shall attorn to Lender and any purchaser at a foreclosure sale, (v) be to Tenants that are creditworthy, (vi) be written substantially in accordance with the standard form of Lease which shall have been approved by Lender (subject to any commercially reasonable changes made in the course of negotiations with the applicable Tenant), (vii) not be to an Affiliate of Borrower, Guarantor or Manager, (viii) provide that the beneficiary of any mortgage, deed of trust or deed to secure debt may at any time unilaterally record, in its sole and absolute discretion, a declaration that subordinates and has the effect of subordinating the lien of such mortgage, deed of trust or deed to secure debt to such Lease, and (ix) not contain any option to purchase, any right of first refusal to purchase, any right to terminate (except in the event of the destruction or condemnation of substantially all of the Property), any requirement for a non-disturbance or recognition agreement, or any other terms which would materially adversely affect Lender's rights under the Loan Documents.

(b) Notwithstanding anything contained in the forgoing clause (a), all Material Leases and all renewals, amendments and modifications with respect to such Material Leases and waivers thereunder executed after the date hereof shall be subject to Lender's prior written approval, which approval

shall not be unreasonably withheld, delayed or conditioned. Lender shall execute and deliver its standard form of subordination, non-disturbance and attornment agreement to Tenants under existing Leases and any future Material Lease approved (or deemed approved) by Lender promptly upon request, with such commercially reasonable changes as may be requested by such Tenants, and which are reasonably acceptable to Lender. Borrower shall pay Lender's reasonable third-party out-of-pocket costs and expenses in connection with any approval of a Material Lease and such subordination, non-disturbance and attornment agreement, including, without limitation, reasonable legal fees and expenses. Notwithstanding anything to the contrary in this <u>Section 5.9.2</u>, unless expressly agreed to in writing by Lender, any approval or deemed approval by Lender of a proposed Material Lease or proposed renewal, extension or modification of an existing Material Lease pursuant to this <u>Section 5.9.2</u> shall not be deemed to constitute an approval or deemed approval by Lender of any Approved Leasing Expenses payable in connection therewith for purposes of <u>Section 3.6.2</u>.

(c)    Borrower shall not permit or consent to any assignment or sublease of any Material Lease without Lender's prior written approval (other than any assignment or sublease expressly permitted under a Material Lease pursuant to a unilateral right of Tenant thereunder not requiring the consent of Borrower), which approval shall not be unreasonably withheld, delayed or conditioned.

(d)    Notwithstanding anything to the contrary contained in this <u>Section 5.9.2</u>, provided no Event of Default is continuing, whenever Lender's approval or consent is required pursuant to the provisions of this <u>Section 5.9.2</u>, Lender's consent shall be deemed given if:

(i)    the first correspondence from Borrower to Lender requesting such approval or consent is in an envelope marked "PRIORITY" and contains a bold-faced, conspicuous (in a font size that is not less than fourteen (14) point) legend at the top of the first page thereof stating: "**<u>FIRST NOTICE</u>:  THIS IS A REQUEST FOR APPROVAL UNDER THE LOAN BY NATIXIS REAL ESTATE CAPITAL LLC TO JERICHO PLAZA PORTFOLIO LLC.  FAILURE TO RESPOND TO THIS REQUEST WITHIN TEN (10) BUSINESS DAYS MAY RESULT IN THE REQUEST FOR APPROVAL BEING DEEMED GIVEN**", and is accompanied by the information and documents required above, and any other information reasonably requested by Lender in writing prior to the expiration of such ten (10) Business Day period in order to adequately review the same has been delivered; and

(ii)    if Lender fails to respond or to deny such request for approval in writing within such ten (10) Business Day period, a second notice requesting approval is thereafter delivered to Lender from Borrower in an envelope marked "PRIORITY" containing a bold-faced, conspicuous (in a font size that is not less than fourteen (14) point) legend at the top of the first page thereof stating: "**<u>SECOND AND FINAL NOTICE</u>:  THIS IS A REQUEST FOR CONSENT UNDER THE LOAN BY NATIXIS REAL ESTATE CAPITAL LLC TO JERICHO PLAZA PORTFOLIO LLC.  IF YOU FAIL TO PROVIDE A SUBSTANTIVE RESPONSE (E.G., APPROVAL, DENIAL OR REQUEST FOR CLARIFICATION OR MORE INFORMATION) TO THIS REQUEST FOR APPROVAL IN WRITING WITHIN FIVE (5) BUSINESS DAYS, YOUR APPROVAL SHALL BE DEEMED GIVEN**" and Lender fails to provide a substantive response to such request for approval within such second five (5) Business Day period.

5.9.3    <u>Additional Covenants with Respect to Leases</u>.  Borrower (i) shall observe and perform the obligations imposed upon the lessor under the Leases in a commercially reasonable manner; (ii) shall enforce the terms, covenants and conditions contained in the Leases upon the part of the Tenants thereunder to be observed or performed in a commercially reasonable manner; <u>provided</u>, <u>however</u>, Borrower shall not terminate or accept a surrender of (a) a Material Lease or (b) a Lease that is not a Material

Leases that is not terminated or surrendered in the ordinary course, in each case, without Lender's prior written approval, which approval shall not be unreasonably withheld, delayed or conditioned; (iii) shall not collect any of the Rents more than one month in advance (other than security deposits); (iv) shall not execute any assignment of lessor's interest in the Leases or the Rents (except as contemplated by the Loan Documents); (v) shall not alter, modify or change any Material Lease so as to change the amount of or payment date for rent, change the expiration date, grant any option for additional space or term, materially reduce the obligations of the Tenant or increase the obligations of the lessor; and (vi) shall promptly furnish to Lender any notice of default, abatement or offset of rent or termination of a Lease received by Borrower from any Tenant, and any notice of default, abatement or offset of rent, or termination of a Lease given by Borrower to any Tenant. Borrower further agrees to provide Lender with notice of a Tenant "going dark" under its Lease or a Tenant delivering notice of its intent to "go dark promptly after obtaining knowledge thereof. Notwithstanding anything to the contrary contained in this Section 5.9, provided no Event of Default shall have occurred and be continuing, Borrower shall have the right, without the consent or approval of Lender, to terminate or accept a surrender of any Lease that is not a Material Lease so long as such termination or surrender is (i) by reason of a Tenant default (ii) in a commercially reasonable manner to preserve and protect the Property, and in all instances Borrower deposits any Lease Termination Payments (other than the Valley National Termination Fee) with Lender in accordance with Section 3.6.1(b).

     **5.9.4**   **Additional Deposits**. The following items shall be deposited into the Rollover Subaccount and held as Rollover Funds and shall be disbursed and released as set forth in Section 3.6.2, and Borrower shall advise Lender at the time of receipt thereof of the nature of such receipt so that Lender shall have sufficient time to instruct Deposit Bank to deposit and hold such amounts in the Rollover Subaccount pursuant to this Agreement and the Deposit Account Agreement:

     (a)    All sums paid with respect to (A) a modification of any Lease or otherwise paid in connection with Borrower taking any action under any Lease (e.g., granting a consent) or waiving any provision thereof, (B) any settlement of claims of Borrower against third parties in connection with any Lease, (C) any default, rejection, termination, surrender or cancellation of any Lease (including in any Bankruptcy Action), lease buy-out or surrender payments from any Tenant (including any forfeited security deposit or payment relating to unamortized tenant improvements and/or leasing commissions) (collectively, "***Lease Termination Payments***"), and (D) any sum received from any Tenant to obtain a consent to an assignment or sublet or otherwise, or any holdover rents or use and occupancy fees from any Tenant or former Tenant (to the extent not being paid for use and occupancy or holdover rent); and

     (b)    All sums paid with respect to any other extraordinary event pursuant to which Borrower receives payments or income (in whatever form) derived from or generated by the use, ownership or operation of the Property not otherwise covered by this Agreement or the Deposit Account Agreement.

     **5.9.5**   **Security Deposits**. All security deposits of Tenants, whether held in cash or any other form, shall not be commingled with any other funds of Borrower and, if cash, shall be deposited by Borrower at a separately designated account under Borrower's control at the Clearing Bank and held in accordance with Section 3.9 hereof. Any bond or other instrument which Borrower is permitted to hold in lieu of cash security deposits under any applicable Legal Requirements (i) shall be maintained in full force and effect in the full amount of such deposits unless replaced by cash deposits as hereinabove described, (ii) shall be issued by an institution reasonably satisfactory to Lender, (iii) shall, if permitted pursuant to any Legal Requirements, name Lender as payee or mortgagee thereunder (or at Lender's option, be fully assignable to Lender), and (iv) shall in all respects comply with any applicable Legal Requirements and

otherwise be reasonably satisfactory to Lender. Borrower shall, upon request, provide Lender with evidence satisfactory to Lender of Borrower's compliance with the foregoing.

### 5.10 **Estoppel Statement**.

(a) After request by Lender, but no more than once in any twelve (12) month period unless an Event of Default is continuing, Borrower shall within ten (10) Business Days furnish Lender with a statement addressed to Lender, its successors and assigns, duly acknowledged and certified, setting forth (i) the Outstanding Principal Balance, (ii) the Interest Rate, (iii) the date installments of interest or Principal were last paid, (iv) any offsets or defenses to the payment of the Debt, if any, (v) that no Default or Event of Default exists under the Loan Documents, and (vi) that the Loan Documents are valid, legal and binding obligations and have not been modified or if modified, giving particulars of such modification. In addition, after request by Lender (but no more frequently than once in any year), Borrower shall furnish to Lender within ten (10) days, a certificate addressed to Lender, its successors and assigns reaffirming all representations and warranties of Borrower set forth in the Loan Documents as of the date requested by Lender or, to the extent of any changes to any such representations and warranties, so stating such changes.

(b) Borrower shall deliver to Lender, upon request, an estoppel certificate from each Tenant under any Lease in form and substance reasonably satisfactory to Lender (provided that Borrower shall only be required to use commercially reasonable efforts to obtain an estoppel certificate from any Tenant not required to provide an estoppel certificate under its Lease), provided that such estoppel certificate may be in the form required under such Lease, and provided, further, that, so long as no Event of Default is continuing, Borrower shall not be required to deliver such certificates more frequently than once in any twenty-four (24) month period.

(c) Borrower shall deliver to Lender, upon request, estoppel certificates from each party under any Operations Agreement, in form and substance reasonably satisfactory to Lender; provided that such estoppel certificate may be in the form required under such Operations Agreement, and provided, further, that, so long as no Event of Default is continuing, Borrower shall not be required to deliver such certificates more frequently than two times in any calendar year.

### 5.11 **Property Management.**

**5.11.1 Management Agreement**. Borrower hereby agrees that the fee paid to Manager in compensation for Manager's services conducted in connection with the management of the Property shall not exceed two and one-half percent (2.5%) of Gross Revenue. Borrower shall (i) pay all sums required to be paid by Borrower under the Management Agreement, (ii) cause Manager to manage the Property in accordance with the Management Agreement; (iii) diligently perform and observe all of the terms, covenants and conditions of the Management Agreement on the part of Borrower to be performed and observed; (iv) promptly notify Lender of any default under the Management Agreement of which it is aware; (v) promptly deliver to Lender a copy of each financial statement, business plan, capital expenditure plan, and property improvement plan and any other estimate, report or material notice received by Borrower under the Management Agreement; and (vi) promptly enforce the performance and observance of all of the covenants required to be performed and observed by Manager under the Management Agreement. If Borrower shall default in the performance or observance of any material term, covenant or condition of the Management Agreement on the part of Borrower to be performed or observed, then, without limiting Lender's other rights or remedies under this Agreement or the other Loan Documents, and without waiving or releasing Borrower from any of its obligations hereunder or under the Management Agreement, Lender shall have the right, but shall be under no obligation, to pay any sums and to perform any act or take any

action as may be appropriate to cause all the terms, covenants and conditions of the Management Agreement on the part of Borrower to be performed or observed to be promptly performed or observed on behalf of Borrower, to the end that the rights of Borrower in, to and under the Management Agreement, shall be kept unimpaired and free from default. Lender and any Person designated by Lender shall have, and are hereby granted, the right to enter upon the Property at any time and from time to time for the purpose of taking any such action. If Manager shall deliver to Lender a copy of any notice sent to Borrower of default under the Management Agreement such notice shall constitute full protection to Lender for any action taken or omitted to be taken by Lender in good faith, in reliance thereon. Any sums expended by Lender pursuant to this paragraph shall bear interest at the Default Rate from the date such cost is incurred to the date of payment to Lender, shall be deemed to constitute a portion of the Debt, shall be secured by the Lien of the Security Instrument and the other Loan Documents and shall be due and payable within ten (10) Business Days of written demand by Lender therefor.

**5.11.2 Prohibition Against Termination of Management Agreement.** Borrower shall not, without prior written consent of Lender, (a) surrender, terminate, cancel, modify, extend or renew the Management Agreement or otherwise replace the Manager or enter into any other management agreement (other than a renewal or extension provided for in the Management Agreement); provided, that so long as no Event of Default shall have occurred and be continuing or would occur as a result of such replacement, Borrower may replace Manager with a Qualified Manager pursuant to a Replacement Management Agreement; (b) enter into any new or other agreement relating to the management or operation of the Property with Manager or any other Person, (c) consent to the assignment by Manager of its interest under the Management Agreement, (d) permit or suffer any Transfer of the ownership, management or Control of an Affiliated Manager to occur, or (e) waive or release any of its rights and remedies under the Management Agreement in any material respect.

**5.11.3 Termination of Manager.** Lender shall have the right to require Borrower to replace Manager with a Qualified Manager chosen by Borrower which is not an Affiliate of Borrower, or any Guarantor to manage the Property pursuant to a Replacement Management Agreement upon the occurrence of any one or more of the following events: (a) at any time following the occurrence of an Event of Default, (b) if at any time the Debt Service Coverage Ratio falls below 1.37 to 1:00, for any two (2) consecutive calendar quarters, provided, however Borrower may repay a portion of the Outstanding Principal Balance to a level such that the Debt Service Coverage Ratio of the Outstanding Principal Balance is restored to a level of not less than 1.37 to 1:00, (c) if Manager shall be in default under the Management Agreement beyond any applicable notice and cure period, (d) if Manager shall become insolvent or a debtor in any Bankruptcy Action, or (e) if at any time Manager has engaged in gross negligence, fraud or willful misconduct.

**5.11.4 Expiration or Termination of Management Agreement.** In the event that the Management Agreement expires or is surrendered, terminated or canceled (without limiting any obligation of Borrower to obtain Lender's consent to any surrender, termination, cancellation, modification, renewal or extension of the Management Agreement in accordance with the terms and provisions of this Agreement), Borrower shall enter into a Replacement Management Agreement with a Qualified Manager contemporaneously with such expiration, surrender, termination or cancellation.

**5.11.5 Assignment of Management Agreement.** If at any time Lender consents to the appointment of a new manager and/or the execution of a management agreement under this Agreement, such manager and Borrower shall, as a condition of Lender's consent, execute an assignment of management agreement and subordination of management fees substantially in the form then used by Lender (or in such other form and substance reasonably satisfactory to Lender).

**5.11.6** **Actions Following Event of Default**.  Upon the occurrence and during the continuance of an Event of Default, Borrower shall not exercise any rights, make any decisions, grant any approvals or otherwise take any action under the Management Agreement without the prior written consent of Lender, which consent shall not be unreasonably withheld, delayed or conditioned.

**5.12** **Special Purpose Entity**.  Without in any way limiting the provisions of this Article 5 Borrower shall at all times be a Special Purpose Entity. Borrower shall not directly or indirectly make any change, amendment or modification to its organizational documents, or otherwise take any action which could result in Borrower not being a Special Purpose Entity  Borrower covenants and agrees that Borrower shall provide Lender with thirty (30) days' prior written notice prior to the removal of an Independent Director or Independent Manager, as applicable, of any Borrower.

**5.13** **Assumption in Insolvency Opinion**.  Borrower shall conduct its business so that the assumptions (with respect to each Person) made in any Insolvency Opinion delivered by Borrower's counsel in connection with the Loan, shall be true and correct in all material respects.

**5.14** **Change In Business and Operation of Property**.  Borrower shall not purchase or own any real property other than the Property and shall not enter into any line of business other than the ownership and operation of the Property, or make any material change in the scope or nature of its business objectives, purposes or operations, or undertake or participate in activities other than the continuance of its present business or otherwise cease to operate the Property as an office property or terminate such business for any reason whatsoever (other than temporary cessation in connection with renovations to the Property).

**5.15** **Principal Place of Business**.  Borrower shall not change its principal place of business from the address set forth on the first page of this Agreement without first giving Lender at least thirty (30) days' prior written notice.

**5.16** **Change of Name, Identity or Structure**.  Borrower shall not change Borrower's name, identity (including its trade name or names) or, Borrower's corporate, partnership or other structure without notifying Lender of such change in writing at least thirty (30) days prior to the effective date of such change and, in the case of a change in Borrower's structure, without first obtaining the prior written consent of Lender.  Prior to or contemporaneously with the effective date of any such change, Borrower shall take all action required by Lender, including, without limitation, executing (if necessary) and delivering to Lender any financing statement or financing statement change in order to establish or maintain the validity, perfection and priority of the lien and security interest granted herein and in the other Loan Documents. Borrower shall promptly notify Lender in writing of any change in its organizational identification number. If Borrower does not now have an organizational identification number and later obtains one, Borrower shall promptly notify Lender in writing of such organizational identification number.  At the request of Lender, Borrower shall execute a certificate in form satisfactory to Lender listing the trade names under which Borrower intends to operate the Property, and representing and warranting that Borrower does business under no other trade name with respect to the Property.

**5.17** **Certain Prohibited Actions**.  Borrower shall not directly or indirectly (i) cancel or otherwise forgive or release any claim or debt (other than the termination of Leases in accordance herewith) owed to Borrower by any Person, except for adequate consideration and in the ordinary course of Borrower's business in its reasonable judgment; or (ii) Transfer any License required for the operation of the Property.

**5.18** **Due on Sale and Encumbrance; Change of Control; Transfers of Interests**.  Except to the extent permitted pursuant to Article 8 hereof, neither Borrower nor Guarantor, nor any other Person

76

having a direct or indirect ownership or beneficial interest in Borrower shall, without the prior written consent of Lender (a) sell, transfer, convey, mortgage, grant, bargain, encumber, pledge, assign, alienate, lease (except to Tenants under Leases that are not in violation of <u>Section 5.9</u> hereof, grant any option with respect to or grant any other interest in the Property or any part thereof or interest therein, including any legal, beneficial, economic or voting interest in Borrower or Guarantor, whether directly or indirectly, voluntarily or involuntarily, by operation of law or otherwise, (b) enter into or subject the Property to a PACE Loan, or (c) permit or suffer any change in Control of Borrower or Guarantor to occur (each of <u>clauses (a)</u>, <u>(b)</u> and <u>(c)</u> above, a "**Transfer**").  A Transfer within the meaning of this <u>Section 5.18</u> shall be deemed to include (i) an installment sales agreement wherein Borrower agrees to sell the Property or any part thereof or interest therein (including the sale of any interest in Borrower or Guarantor) for a price to be paid in installments; (ii) an agreement by Borrower for the leasing of all or a substantial part of the Property for any purpose other than the actual occupancy by a space tenant thereunder or a sale, assignment or other transfer of, or the grant of a security interest in, Borrower's right, title and interest in and to any Leases or any Rents; (iii) if Guarantor is a corporation, the voluntary or involuntary sale, conveyance or transfer of such corporation's stock (or the stock of any corporation directly or indirectly Controlling such corporation by operation of law or otherwise) or the creation or issuance of new stock such that such corporation's stock shall be vested in a party or parties who are not now stockholders; (iv) if Borrower or Guarantor is a limited or general partnership, joint venture or limited liability company, the change, removal, resignation or addition of a general partner, managing partner, limited partner, joint venturer, member or non-member manager, the voluntary or involuntary sale, conveyance or transfer of the partnership interest of any general partner, managing partner or limited partner, the creation or issuance of new partnership interests, the voluntary or involuntary sale, conveyance or transfer of the interest of any joint venturer, member or non-member manager or the creation or issuance of new membership interests or interests in any non-member manager; (v) if Borrower or Guarantor is a limited liability company, the division into two (2) or more separate limited liability companies (or series thereof) in accordance with Chapters 18-217 and/or 18-215 of the Delaware Limited Liability Company Law (or any comparable provisions of any other state law governing the formation of Borrower), or such Guarantor and/or, in connection therewith or as a result thereof, allocating or assigning any of Borrower's or such Guarantor's assets, liabilities, rights and/or obligations between or among the resulting companies or division company (or any respective series thereof); (vi) if Borrower or any Guarantor is a trust or nominee trust, the voluntary or involuntary sale, conveyance or transfer of the legal or beneficial interest in such trust or nominee trust or the creation or issuance of new legal or beneficial interests; (vii) any action or occurrence which results in Key Principal no longer Controlling Borrower or any Guarantor, (viii) [intentionally deleted]; and (ix) any pledge, hypothecation, assignment, transfer or other encumbrance of any direct or indirect ownership interest in Borrower or Guarantor; *provided, however*, the following transfers shall not be deemed to be a Transfer in violation of this <u>Section 5.18</u>: (y) the pledge by Mezzanine Borrower of its direct and/or indirect interest in Borrower (but not of any direct interest in the Property) to Mezzanine Lender pursuant to the Mezzanine Loan Documents as security for the Mezzanine Loan, and (z) a transfer of interests in Borrower in connection with the exercise by Mezzanine Lender of its rights and remedies under the Mezzanine Loan Documents, including, without limitation, by foreclosure, or assignment in lieu of foreclosure, made in accordance with the terms of the Intercreditor Agreement.

### 5.19    Costs and Expenses.

(a)    Borrower shall pay or, if Borrower fails to pay, reimburse Lender upon receipt of notice from Lender for all reasonable third-party out-of-pocket costs and expenses (including reasonable attorneys' fees and disbursements) incurred by Lender in connection with the Loan, including (i) the preparation, negotiation, execution and delivery of the Loan Documents and the consummation of the transactions contemplated thereby and all the costs of furnishing all opinions by counsel for Borrower;

77

(ii) Borrower's agreements and covenants contained in the Loan Documents on its part to be performed or complied with after the Closing Date, including, without limitation, confirming compliance with environmental and insurance requirements; (iii) the negotiation, preparation, execution, delivery and administration of any consents, amendments, waivers or other modifications to this Agreement and the other Loan Documents and any other documents or matters requested by Lender, Borrower or **any** Guarantor; (iv) filing and recording of any Loan Documents; (v) title insurance, surveys, inspections and appraisals; (vi) the creation, perfection or protection of Lender's Liens on the Property and the Cash Management Accounts (including fees and expenses for title and lien searches, intangibles taxes, personal property taxes, mortgage recording taxes, due diligence expenses, travel expenses, accounting firm fees, costs of appraisals, environmental reports and Lender's Consultant, surveys and engineering reports); (vii) enforcing or preserving any rights in response to third party claims or the prosecuting or defending of any action or proceeding or other litigation, in each case against, under or affecting Borrower, the Loan Documents, the Property, or any other security given for the Loan; (viii) fees charged by Servicer (except to the extent expressly set forth in <u>Section 11.3</u>) or the Rating Agencies in connection with the Loan or any modification thereof; (ix) enforcing any obligations of or collecting any payments due from Borrower under this Agreement, the other Loan Documents or with respect to the Property or in connection with any refinancing or restructuring of the Loan in the nature of a "work-out", or any Bankruptcy Action and (x) the fees and expenses of any special servicer retained in respect of the Loan. All amounts due and payable to Lender hereunder (including, but not limited to, disbursements, advances and reasonable third-party out-of-pocket legal expenses incurred in connection therewith), shall be payable within ten (10) Business Days written demand, secured by the Loan Documents and interest thereon shall accrue at the Default Rate from the date incurred.

(b)     Borrower shall pay or, if Borrower fails to pay, to reimburse Lender for, any fees and expenses incurred by any Rating Agency in connection with any Rating Agency review of the Loan or any consent, approval, waiver or confirmation obtained from such Rating Agency pursuant to the terms and conditions of the Loan Documents, and Lender shall be entitled to require payment of such fees and expenses as a condition precedent to obtaining any such consent, approval, waiver or confirmation.

(c)     Any costs and expenses due and payable by Borrower hereunder which are not paid by Borrower within ten (10) Business Days after written demand may be paid, at Lender's election in its sole discretion, from any amounts in the Deposit Account, with notice thereof to Borrower. The obligations and liabilities of Borrower under this <u>Section 5.19</u> shall (i) become part of the Debt, (ii) be secured by the Loan Documents and (iii) survive the Term and the exercise by Lender of any of its rights or remedies under the Loan Documents, including the acquisition of the Property by foreclosure or a conveyance in lieu of foreclosure.

**5.20     Indemnity**.  Borrower shall defend, indemnify and hold harmless Lender and each of its Affiliates and their respective successors and assigns, including the directors, officers, partners, members, shareholders, participants, employees, professionals and agents of any of the foregoing (including any Servicer and also including any Person and any other lender(s) that may, from time to time, join in the Loan pursuant to the terms of any co-lender agreement executed between such administrative agent, Lender and, if applicable, such other lender(s)) and each other Person, if any, who Controls Lender, its Affiliates or any of the foregoing (each, an "***Indemnified Party***"), from and against any and all liabilities, obligations, actual losses, damages (excluding consequential, special and punitive damages except to the extent such damages are actually incurred by Lender as a result of third party claims), penalties, actions, judgments, suits, claims, reasonable third-party out-of-pocket costs, expenses and disbursements of any kind or nature whatsoever (including the reasonable fees and disbursements of counsel for an Indemnified Party in connection with any investigative, administrative or judicial proceeding commenced or threatened, whether or not Lender

78

shall be designated a party thereto, court costs and costs of appeal at all appellate levels, investigation and laboratory fees, consultant fees and litigation expenses), that may be imposed on, incurred by, or asserted against any Indemnified Party (collectively, the "*Indemnified Liabilities*") in any manner, relating to or arising out of: (i) any default or breach by Borrower of its obligations under, or any misrepresentation contained in, this Agreement or the other Loan Documents; (ii) the use or intended use of the proceeds of the Loan; (iii) any materials or information provided by or on behalf of Borrower, or contained in any documentation approved by Borrower; (iv) the origination of the Loan or ownership of the Security Instrument or any of the other Loan Documents, or the Property or any interest therein, or receipt of any Rents; (v) any accident, injury to or death of persons or loss of or damage to property occurring in, on or about the Property or on the adjoining sidewalks, curbs, adjacent property or adjacent parking areas, streets or ways; (vi) any use, nonuse or condition in, on or about the Property or on adjoining sidewalks, curbs, adjacent property or adjacent parking areas, streets or ways; (vii) performance of any labor or services or the furnishing of any materials or other property in respect of the Property; (viii) the presence, disposal, escape, seepage, leakage, spillage, discharge, emission, release, or threatened release of any Hazardous Substance on, from or affecting the Property; (ix) any personal injury (including wrongful death) or property damage (real or personal) arising out of or related to such Hazardous Substance; (x) any lawsuit brought or threatened, settlement reached, or government order relating to such Hazardous Substance; (xi) any violation of the Environmental Laws which is based upon or in any way related to such Hazardous Substance, including the costs and expenses of any Remedial Work; (xii) any failure of the Property to comply with any Legal Requirement; (xiii) any claim by brokers, finders or similar persons claiming to be entitled to a commission in connection with any Lease or other transaction involving the Property or any part thereof, or any liability asserted against Lender with respect thereto; and (xiv) the claims of any lessee of any portion of the Property or any Person acting through or under any lessee or otherwise arising under or as a consequence of any Lease; provided, however, that Borrower shall not have any obligation to any Indemnified Party hereunder to the extent that such Indemnified Liabilities arise from the gross negligence, illegal acts, fraud or willful misconduct of the Indemnified Party, as determined by a final non-appealable judgment of a court of competent jurisdiction. Any amounts payable to any Indemnified Party by reason of the application of this Section 5.20 shall be payable on demand and shall bear interest at the Default Rate from the date loss or damage is sustained by any Indemnified Party until paid. To the extent that the undertaking to indemnify, defend and hold harmless set forth herein may be unenforceable because it violates any law or public policy, Borrower shall pay the maximum portion that it is permitted to pay and satisfy under applicable law to the payment and satisfaction of all Indemnified Liabilities incurred by the Indemnified Party. The obligations and liabilities of Borrower under this Section 5.20 shall survive the Term and the exercise by Lender of any of its rights or remedies under the Loan Documents, including the acquisition of the Property by foreclosure or a conveyance in lieu of foreclosure.

**5.21** **Embargoed Person**.

(a) Borrower will comply with the Patriot Act and all applicable requirements of any Governmental Authority having jurisdiction over Borrower and/or the Property, including those relating to money laundering and terrorism. Lender shall have the right to audit Borrower's compliance with the Patriot Act and all applicable requirements of any Governmental Authority having jurisdiction over Borrower and/or the Property, including those relating to money laundering and terrorism. In the event that Borrower fails to comply with the Patriot Act or any such requirements of any Governmental Authority, then Lender may, at its option, cause Borrower to comply therewith and any and all costs and expenses incurred by Lender in connection therewith shall be secured by the Security Instrument and the other Loan Documents and shall be immediately due and payable

(b)     At all times, throughout the Term, including after giving effect to any Transfers permitted pursuant to the Loan Documents, (i) none of the funds or other assets of Borrower, or any Guarantor shall constitute property of, or shall be beneficially owned, directly or indirectly, by any Person subject to any Sanctions or subject to any trade restrictions under United States law, including, but not limited to, the International Emergency Economic Powers Act, 50 U.S.C. §§ 1701 *et seq.*, The Trading with the Enemy Act, 50 U.S.C. App. 1 *et seq.*, the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act (PATRIOT Act) of 2001 and any Executive Orders or regulations promulgated thereunder, each as may be amended from time to time, with the result that the investment in Borrower, or **any** Guarantor, as applicable (whether directly or indirectly), would be prohibited by law (each, an "***Embargoed Person***"), or the Loan made by Lender would be in violation of law, (ii) no Embargoed Person shall have any interest of any nature whatsoever in Borrower, or **any** Guarantor, as applicable, with the result that the investment in Borrower, or such **any** Guarantor, as applicable (whether directly or indirectly), would be prohibited by law or the Loan would be in violation of law, and (iii) none of the funds of Borrower or **any** Guarantor, as applicable, shall be derived from any unlawful activity with the result that the investment in Borrower, or such Guarantor, as applicable (whether directly or indirectly), would be prohibited by law or the Loan would be in violation of law. Borrower has ascertained the identity of all persons and entities who have provided funds to capitalize Borrower and has conducted verification procedures which are sufficient to establish the identity and source of such funds

(c)     Neither Borrower nor, to Borrower's knowledge, any owner of a direct or indirect interest in Borrower (i) is subject to any Sanctions or listed on any Government Lists, (ii) is a person who has been determined by competent authority to be subject to the prohibitions contained in Presidential Executive Order No. 13224 (Sept. 23, 2001) or any other similar prohibitions contained in the rules and regulations of the Office of Foreign Assets Control ("***OFAC***") or in any enabling legislation or other Presidential Executive Orders in respect thereof, (iii) has been previously indicted for or convicted of any felony involving a crime or crimes of moral turpitude or for any Patriot Act Offense, or (iv) is currently under investigation by any Governmental Authority for alleged criminal activity. For purposes hereof, the term "***Patriot Act Offense***" means any violation of the criminal laws of the United States of America or of any of the several states, or that would be a criminal violation if committed within the jurisdiction of the United States of America or any of the several states, relating to terrorism or the laundering of monetary instruments, including any offense under (A) the criminal laws against terrorism; (B) the criminal laws against money laundering, (C) the Bank Secrecy Act, as amended, (D) the Money Laundering Control Act of 1986, as amended, or (E) the Patriot Act. "***Patriot Act Offense***" also includes the crimes of conspiracy to commit, or aiding and abetting another to commit, a Patriot Act Offense. For purposes hereof, the term "***Government Lists***" means (1) the Specially Designated Nationals and Blocked Persons Lists maintained by OFAC, (2) U.S. Department of the Treasury's FINCEN list, (3) any other list of terrorists, terrorist organizations or narcotics traffickers maintained pursuant to any of the Rules and Regulations of OFAC that Lender notified Borrower in writing is now included in "Government Lists", or (4) any similar lists maintained by the United States Department of State, the United States Department of Commerce or any other Government Authority or pursuant to any Executive Order of the President of the United States of America that Lender notified Borrower in writing is now included in "Government Lists".

(d)     At all times throughout the Term of the Loan, none of any of Borrower, Borrower Representative or Guarantor, nor any Person Controlling, Controlled by or under common Control with any of Borrower, Borrower Representative or Guarantor, nor any Person having a beneficial interest in, or for whom any of Borrower, Borrower Representative or Guarantor is acting as agent or nominee in connection with the investment, is (a) a country, territory, person or entity named on an OFAC or FINCEN list, or is a Person that resides in or has a place of business in a country or territory named on such lists; (b) a Person residing in, or organized or chartered under the laws of a jurisdiction identified as non–cooperative by the

80

Financial Action Task Force ("**FATF**"); or (c) a Person whose funds originate from or will be routed through , an account maintained at a foreign shell bank or "offshore bank."

### 5.22   Major Contract; Operations Agreement.

(a)     Borrower shall obtain Lender's prior written approval of any and all Major Contracts affecting the Property, which approval shall not be unreasonably withheld, delayed or conditioned.  Borrower shall promptly (i) diligently perform and observe all of the terms, covenants and conditions to be performed and observed by it under each Major Contract to which it is a party, and do all things reasonably necessary to preserve and keep unimpaired its rights thereunder, (ii) notify Lender of any notice of default given by any party under any Major Contract and deliver to Lender a true copy of each such notice, and (iii) enforce the performance and observance of all of the terms, covenants and conditions required to be performed and/or observed by the other party to each Major Contract and to which Borrower is a party in a commercially reasonable manner.  Borrower will not amend, modify or terminate any Major Contract without the prior written consent of Lender, which consent shall not be unreasonably withheld, delayed or conditioned.

(b)     Borrower shall promptly (i) diligently perform and observe all of the terms, covenants and conditions to be performed and observed by it under each Operations Agreement to which it is a party, and do all things reasonably necessary to preserve and keep unimpaired its rights thereunder, (ii) notify Lender of any notice of default given by any party under any Operations Agreement and deliver to Lender a true copy of each such notice, and (iii) enforce the performance and observance of all of the terms, covenants and conditions required to be performed and/or observed by the other party to each REA and to which Borrower is a party in a commercially reasonable manner.  Borrower will not amend, modify or terminate any of the Operations Agreements without the prior written consent of Lender, which consent shall not be unreasonably withheld, delayed or conditioned.

### 5.23   ERISA.

(a)     Borrower shall not engage in any transaction which would cause any obligation, or action taken or to be taken, hereunder (or the exercise by Lender or any assignee of any of its rights under the Note, this Agreement or the other Loan Documents) to be a non-exempt (under a statutory or administrative class exemption) prohibited transaction under ERISA or Section 4975 of the Code.

(b)     Borrower shall not maintain, sponsor, contribute to or become obligated to contribute to, or suffer or permit any ERISA Affiliate of Borrower to, maintain, sponsor, contribute to or become obligated to contribute to, any Plan or any Welfare Plan or permit the assets of Borrower to become "plan assets," within the meaning of 29 C.F.R. 2510.3-101, as modified in application by Section 3(42) of ERISA.

(c)     Borrower shall deliver to Lender such certifications or other evidence from time to time throughout the Term, as requested by Lender in its sole discretion, that (A) Borrower and Guarantor are not and do not maintain an "employee benefit plan" as defined in Section 3(32) of ERISA, which is subject to Title I of ERISA, or a "governmental plan" within the meaning of Section 3(32) of ERISA; (B) Borrower and Guarantor are not subject to state statutes regulating investments and fiduciary obligations with respect to governmental plans; and (C) the assets of Borrower and Guarantor do not constitute "plan assets" within the meaning of 29 C.F.R §2510.3-101 as modified in application by Section 3(42) of ERISA of any "benefit plan investor" as defined in Section 3(42) of ERISA.

### 5.24   Intentionally Deleted.

**5.25** **Intentionally Deleted**.

**5.26** **Intentionally Deleted**.

**5.27** **Intentionally Deleted**.

**5.28** **Anti-Corruption**.

(a)     Neither the Borrower, nor any of its directors, partners, members, shareholders, participants, officers, employees or agents, or, to the best knowledge of the Borrower, any of its Affiliates, their directors, partners, members, shareholders, participants, officers, employees or agents have been engaged in an activity or has (have) taken actions that would violate any Anti-Corruption Rules applicable in any of the jurisdictions in which the Borrower and its Affiliates are operating.

(b)     Moreover, the Borrower has taken and shall take at any time all measures it deems appropriate to prevent the risk of corruption, influence peddling, and bribery by itself, its officers, employees or agents as well as its Affiliates, their directors, partners, members, shareholders, participants, officers, employees or agents.

(c)     To the knowledge of the Borrower, none of the above-mentioned legal entities or individuals is subject to any action, proceedings, investigation or inquiry under any Anti-Corruption Rules applicable to it. This representation shall be deemed made for the entire term of this Agreement.

**5.29** **Sanctionable Activity**.

(a)     Borrower shall not permit or authorize any Person to, directly or indirectly, use, lend, make payments of, contribute or otherwise make available, all or any part of the proceeds of any loan or other transaction(s) contemplated by this Agreement (i) in violation of any applicable Anti-Corruption Rules or (ii) to fund or facilitate any activities or business of, with, in or related to any Sanctioned Person or any Sanctioned Country, or in any other manner, in each case as will result in a violation of any Sanctions by, or would constitute Sanctionable Activity by, any Person participating in the transactions contemplated by this agreement.

(b)     Borrower shall ensure that no Sanctioned Person will have any direct or indirect interest in any funds repaid or remitted by Borrower in connection with the Loan resulting in a violation of Sanctions by or a restriction on the use of such funds with respect to any Person.

(c)     Borrower shall maintain policies and procedures reasonably designed to ensure compliance with Sanctions and with the obligations under this Section 5.29.

(d)     Borrower shall supply to Lender details of any claim, action, suit, proceedings or investigation against Borrower with respect to any Sanctions (on becoming aware of them, and to the extent permitted by law).

**6.** **NOTICES AND REPORTING**.

**6.1** **Notices**.

(a)     All notices, demands, consents, approvals, requests and other communications required or permitted hereunder or under any of the other Loan Document (any of the foregoing, a "**Notice**")

82

required, permitted or desired to be given hereunder shall be in writing and shall be sent by registered or certified mail, postage prepaid, return receipt requested, or delivered by hand or by reputable overnight courier addressed to the party to be so notified at its address hereinafter set forth, or to such other address as such party may hereafter specify in accordance with the provisions of this Section 6.1. Any Notice shall be deemed to have been received: (i) three (3) days after the date such Notice is mailed, if sent by registered or certified mail, (ii) on the date of delivery by hand, if delivered during business hours on a Business Day (otherwise on the next Business Day), and (iii) on the next Business Day, if sent by an overnight commercial courier, in each case addressed to the parties as follows:

| | |
|---|---|
| If to Lenders: | Natixis Real Estate Capital LLC |
| | 1251 Avenue of the Americas |
| | New York, New York 10020 |
| | Attention: Real Estate Administration |
| | Email: |
| | USCIBSnDAssetManagementTeam@natixis.com |
| | |
| with a copy to: | McDermott Will & Emery LLP |
| | One Vanderbilt Avenue |
| | New York, New York 10017 |
| | Attention: Scott A. Weinberg, Esq. |
| | Email:  sweinberg@mwe.com |
| | |
| If to Borrower: | Jericho Plaza Portfolio LLC |
| | 101 Hudson Street, Suite 1703 |
| | Jersey City, New Jersey 07302 |
| | Attention: Menachem Meisner |
| | Email:  mark@birchgroupllc.com |
| | |
| with a copy to: | Cole Schotz P.C. |
| | Court Plaza North |
| | 25 Main Street |
| | Hackensack, NJ 07601 |
| | Attention:  Richard W. Abramson, Esq. |
| | Email:  rabramson@coleschotz.com |

(b)     Any party may change the address to which any such Notice is to be delivered, by furnishing ten (10) days' written notice of such change to the other parties in accordance with the provisions of this Section 6.1. Notices shall be deemed to have been given on the date as set forth above, even if there is an inability to actually deliver any such Notice because of a changed address of which no Notice was given, or there is a rejection or refusal to accept any Notice offered for delivery. Notice for any party may be given by its respective counsel. Additionally, Notice from Lender may also be given by Servicer and Lender hereby acknowledges and agrees that Borrower shall be entitled to rely on any Notice given by Servicer as if it had been sent by Lender.

6.2     **Borrower Notices and Deliveries**.    Borrower shall (a) give prompt written notice to Lender of: (i) any litigation, governmental proceedings or claims or investigations pending or threatened against Borrower which could be reasonably likely to materially adversely affect Borrower's or condition

(financial or otherwise) or business or the Property; (ii) any material adverse change in Borrower's condition, financial or otherwise, or of the occurrence of any Default or Event of Default of which Borrower has knowledge; and (b) furnish and provide to Lender: (i) any Securities and Exchange Commission or other public filings, if any, of Borrower, Manager, or any Affiliate of any of the foregoing within two (2) Business Days of such filing and (ii) all instruments, documents, boundary surveys, footing or foundation surveys, certificates, plans and specifications, appraisals, title and other insurance reports and agreements, reasonably requested, from time to time, by Lender.

### 6.3    Financial Reporting.

6.3.1    **Bookkeeping**.  Borrower shall keep and maintain or shall cause to be kept and maintained on a calendar year basis proper and accurate books, records and accounts, in accordance with GAAP or another accounting method consistently applied, and, to the extent required under Section 9.1 hereof, the requirements of Regulation AB, reflecting the financial affairs of Borrower.  Lender shall have the right from time to time during normal business hours upon reasonable written notice to Borrower to examine such books, records and accounts at the office of Borrower or other Person maintaining such books and records and to make such copies or extracts thereof as Lender shall desire, but not more than once in any twelve (12) month period unless an Event of Default is continuing.  After an Event of Default, Borrower shall pay any reasonable third-party out-of-pocket costs incurred by Lender to examine such books, records and accounts, as Lender shall determine to be necessary or appropriate in the protection of Lender's interest.

6.3.2    **Annual Reports**.  Borrower shall furnish to Lender annually within ninety (90) days following the end of each Fiscal Year, a complete copy of Borrower's annual financial statements audited by a "big four" accounting firm or any other independent certified public accountant reasonably acceptable to Lender in form and content reasonably acceptable to Lender, prepared in accordance with GAAP or another accounting method consistently applied, and containing balance sheets and statements of profit and loss for Borrower and the Property in such detail as Lender may reasonably request.  Each such statement (x) shall be in form and substance reasonably satisfactory to Lender, (y) shall set forth the financial condition and the income and expenses for the Property for the immediately preceding calendar year, including statements of annual Net Operating Income as well as (1) a list of Tenants, if any, occupying more than twenty percent of the rentable space of the Property, (2) a breakdown showing (a) the year in which each Lease then in effect expires, (b) the percentage of rentable space covered by such Lease, (c) the percentage of base rent with respect to which Leases shall expire in each such year, expressed both on a per year and a cumulative basis and (z) shall be accompanied by an Officer's Certificate certifying (1) that such statement is true, correct, complete and accurate in all material respects and presents fairly the financial condition of the Property and has been prepared in accordance with GAAP, or any other accounting method consistently applied, (2) that as of the date of each Officer's Certificate, no litigation exists involving Borrower or the Property in which the amount involved is $500,000 (in the aggregate) or more or in which all or substantially all of the potential liability is not covered by insurance, or, if so, specifying such litigation and the actions being taking in relation thereto and (3) whether there exists a Default or Event of Default, and if such Default or Event of Default exists, the nature thereof, the period of time it has existed and the action then being taken to remedy the same.

### 6.3.3    Quarterly Reports.

(a)    Borrower shall furnish Lender within forty five (45) days following the end of each fiscal quarter, throughout the Term, the following items, accompanied by an Officer's Certificate certifying (i) that such items attached to such certificate are true, correct, accurate and complete and fairly present the financial condition and results of the operations of Borrower and the Property, (ii) that as of the date of each

Officer's Certificate, no litigation exists involving Borrower or the Property in which the amount involved is $500,000 (in the aggregate) or more or in which all or substantially all of the potential liability is not covered by insurance, or, if so, specifying such litigation and the actions being taking in relation thereto and (ii) whether to the best of Borrower's knowledge there exists an event or circumstance which constitutes a Default or Event of Default by Borrower under the Loan Documents and if such Default or Event of Default exists, the nature thereof, the period of time it has existed and the action then being taken to remedy the same:

        (i)      quarterly and year-to-date statements of income and expense and cash flow for such quarter with respect to the Property, with a balance sheet for such quarter for Borrower, prepared in accordance GAAP or another accounting method consistently applied;

        (ii)     a comparison of the budgeted income and expenses as set forth in the Approved Annual Budget and the actual income and expenses for such quarter and year to date for the Property, together with a detailed explanation of any variances of more than five percent (5%) between budgeted and actual amounts for such quarter and year to date;

        (iii)    a statement of the actual Capital Expenditures made by Borrower during each calendar quarter as of the last day of such calendar quarter

        (iv)    a current rent roll for the Property identifying the leased premises, names of all tenants, units leased, monthly rental and all other charges payable under each Lease, date to which paid, term of Lease, date of occupancy, date of expiration, material special provisions, concessions or inducements granted to Tenants, and a year-by-year schedule showing by percentage the rentable area of the Improvements and the total base rent attributable to Leases expiring each year) and an aged delinquency report for the Property.

      **6.3.4**    **Monthly Reports**.  Borrower shall furnish Lender on or before the thirtieth (30th) day following the end of each calendar month the following items, accompanied by an Officer's Certificate certifying (i) that such items attached to such certificate are true, correct, accurate and complete and fairly present the financial condition and results of the operations of Borrower and the Property whether to the best of Borrower's knowledge there exists an event or circumstance which constitutes a Default or Event of Default by Borrower under the Loan Documents and if such Default or Event of Default exists, the nature thereof, the period of time it has existed and the action then being taken to remedy the same, and (ii) that as of the date of each Officer's Certificate, no litigation exists involving Borrower or the Property in which the amount involved is $500,000 (in the aggregate) or more or in which all or substantially all of the potential liability is not covered by insurance, or, if so, specifying such litigation and the actions being taking in relation thereto and (ii) whether to the best of Borrower's knowledge there exists an event or circumstance which constitutes a Default or Event of Default by Borrower under the Loan Documents and if such Default or Event of Default exists, the nature thereof, the period of time it has existed and the action then being taken to remedy the same:

        (i)      monthly (quarterly after the final Secondary Market Transaction so long as no Cash Management Trigger Event Period is continuing) and year-to-date statements of income and expense and cash flow for such month with respect to the Property, with a balance sheet for such month for Borrower, prepared in accordance with GAAP;

        (ii)     monthly (quarterly after the final Secondary Market Transaction so long as no Cash Management Trigger Event Period is continuing) a comparison of the budgeted income and expenses as set forth in the Approved Annual Budget and the actual income and expenses for such month

and year to date for the Property, together with a detailed explanation of any variances of more than five percent (5%) between budgeted and actual amounts for such month and year to date;

(iii)     monthly (quarterly after the final Secondary Market Transaction so long as no Cash Management Trigger Event Period is continuing) a current rent roll for the Property identifying the leased premises, names of all tenants, units leased, monthly rental and all other charges payable under each Lease, date to which paid, term of Lease, date of occupancy, date of expiration, material special provisions, concessions or inducements granted to Tenants, and a year-by-year schedule showing by percentage the rentable area of the Improvements and the total base rent attributable to Leases expiring each year) and an aged delinquency report for the Property; and

(iv)     any notice received from a Tenant threatening non-payment of Rent or other default, alleging or acknowledging a default by landlord, requesting a termination of a Lease or a material modification of any Lease or notifying Borrower of the exercise or non-exercise of any option provided for in such Tenant's Lease, or any other similar material correspondence received by Borrower from Tenants during the subject month.

6.3.5     **Other Reports**.  Borrower shall furnish to Lender, within fifteen (15) Business Days of written request therefor, such further detailed information with respect to the operation of the Property and the financial affairs of Borrower, or Manager as may be reasonably requested by Lender or any applicable Rating Agency.

6.3.6     **Annual Budget**.  Borrower shall submit to Lender by November 1 of each year during the Term the Annual Budget for the succeeding Fiscal Year, and, promptly after preparation thereof, any revisions to such Annual Budget.  Lender shall have the right to approve each Annual Budget (which approval shall not be unreasonably withheld so long as no Event of Default is continuing).  Annual Budgets approved by Lender shall hereinafter be referred to as an "*Approved Annual Budget*".  If Lender has not approved an Annual Budget for the applicable year, the prior Approved Annual Budget shall apply for all purposes hereunder (with such adjustments as reasonably determined by Lender to reflect actual increases in Property Taxes, Insurance Premiums and utilities expenses).  Neither Borrower nor Manager shall change or modify the Annual Budget without the prior written consent of Lender, which consent shall not be unreasonably withheld, delayed or conditioned so long as no Event of Default is continuing.  It is hereby acknowledged and agreed that the 2022 Annual Budget approved by Lender in connection with the closing of the Loan is attached hereto as Exhibit A and shall, for purposes hereof, be deemed to constitute an Approved Annual Budget).  Notwithstanding anything to the contrary herein, regardless of whether Lender has any right to approve the Annual Budget, Lender shall have the right, on sixty (60) days' notice to Borrower, to review and request changes to the Annual Budget, which changes Borrower shall make to such Annual Budget within such sixty (60) day time period.

6.3.7     **Breach**.  If Borrower fails to provide to Lender or its designee any of the financial statements, certificates, reports or information (the "*Required Records*") required by this Section 6.3 within thirty (30) days after the date upon which such Required Record is due, Borrower shall pay to Lender, at Lender's option and in its discretion, an amount equal to $5,000 for each Required Record that is not delivered; provided Lender has given Borrower at least fifteen (15) days prior notice of such failure.  In addition, thirty (30) days after Borrower's failure to deliver any Required Records, Lender shall have the option, upon fifteen (15) days' notice to Borrower to gain access to Borrower's books and records and prepare or have prepared at Borrower's expense, any Required Records not delivered by Borrower.

# 7.     **INSURANCE; CASUALTY; AND CONDEMNATION**.

**7.1** **Insurance.**

**7.1.1** **Coverage**. Borrower, at its sole cost, for the mutual benefit of Borrower and Lender, shall obtain and maintain during the Term the following policies of insurance:

(a)      Property insurance insuring against loss or damage customarily included under so called "all risk" or "special form" policies including fire, lightning, flood (if applicable), earthquake (if applicable), windstorm/hail, named storm, vandalism, and malicious mischief, boiler and machinery and coverage for damage or destruction caused by "War", if available, and the acts of terrorists, both foreign and domestic (or such policies shall have no exclusion from coverage with respect thereto) and such other insurable hazards as, under good insurance practices, from time to time are insured against for other property and buildings similar to the Property in nature, use, location, height, and type of construction. Such insurance policy shall also provide coverage for Ordinance or Law, coverage for loss to the undamaged portion of the Improvements, demolition and increased cost of construction (which insurance for demolition and increased cost of construction may contain a sub–limit satisfactory to Lender). Each such insurance policy shall (i) be in an amount equal to the greater of (A) one hundred percent (100%) of the then replacement cost of the Improvements without deduction for physical depreciation, and (B) such amount as is necessary so that the insurer would not deem Borrower a co–insurer under such policies, (ii) have deductibles no greater than $50,000 per occurrence, (iii) be paid annually in advance, (iv) contain either no coinsurance or, if coinsurance, contain an agreed amount endorsement, and (v) contain a replacement cost endorsement with a waiver of depreciation, and shall cover, without limitation, all Tenant improvements and betterments that Borrower is required to insure pursuant to any Lease on a replacement cost basis. If any policy is written as part of a blanket, Borrower will provide Lender with a complete schedule of locations and values for properties associated with the blanket policy. Lender shall be named Mortgagee and Lender's Loss Payable/Loss Payee on a Standard Mortgagee Endorsement and a Standard Lender's Loss Payable/Loss Payee Endorsement.

(b)      Flood insurance if any part of the Improvements on the Property are located in an area identified by the Federal Emergency Management Agency as an area having special flood hazards, in an amount at least equal to the lesser of: (i) the greater of (A) the then full replacement cost of the Property without deduction for physical depreciation and (B) the Outstanding Principal Balance and (ii) the maximum amount of building and/or contents insurance available under the National Flood Insurance Act of 1968, the Flood Disaster Protection Act of 1973, the National Flood Insurance Reform Act of 1994, the Flood Insurance Reform Act of 2004, or the Biggert-Waters Flood Insurance Reform Act of 2012, as each may be amended, or through private flood insurance carriers with coverage in compliance with statutory requirements; provided, however, that Lender shall be entitled to require flood insurance in amounts greater than the foregoing, in its discretion. If flood insurance is required, the maximum deductible allowable on the primary layer of coverage shall be $10,000.

(c)      Commercial liability insurance, including terrorism, to be written on an occurrence basis with no deductible or self-insured retention, including (i) "Commercial General Liability Insurance", (ii) "Owned", "Hired" and "Non Owned Auto Liability" (if applicable); and (iii) umbrella/excess liability coverage for personal injury, bodily injury, death, accident and property damage, such insurance providing in combination not less than $1,000,000 per occurrence, not less than $2,000,000 in the annual aggregate and not less than $50,000,000.00 excess liability/umbrella. The policies described in this subsection shall also include coverage for elevators, escalators, independent contractors, "Contractual Liability" (covering, to the maximum extent permitted by law, Borrower's obligation to indemnify Lender as required under this Agreement and the other Loan Documents), "Products" and "Completed Operations Liability" coverage..

(d)     Rental loss or business interruption insurance including terrorism (i) with loss payable to Lender and with Lender being named as "Lender's Loss Payable", (ii) covering all risks required to be covered by the insurance provided for in subsections (a) and (b) above and in subsections (e) and (h) below, (iii) in an amount equal to one hundred percent (100%) of the projected Rents from the Property during the period of restoration commencing at the time of loss for such length of time as it takes to repair or replace with the exercise of due diligence and dispatch and continuing for not less than eighteen (18) months; and (iv) containing an extended period of indemnity endorsement of not less than six (6) months which provides that after the physical loss to the Property has been repaired, the continued loss of income will be insured until such income either returns to the same level it was at prior to the loss, or the expiration of twenty-four (24) months from the date that the Property is damaged, whichever first occurs, and notwithstanding that the policy may expire prior to the end of such period.  The amount of such business income/loss of rents insurance shall be determined prior to the date hereof and at least once each year thereafter or at Lender's discretion based on Borrower's reasonable estimate of the gross income (less non-continuing expenses) from the Property for the succeeding  twenty-four (24) month period.  All proceeds payable to Lender pursuant to this subsection shall be held by Lender and shall be applied to the obligations secured by the Loan Documents from time to time due and payable hereunder and under the Note; provided, however, that nothing herein contained shall be deemed to relieve Borrower of its obligations to pay the obligations secured by the Loan Documents on the respective dates of payment provided for in the Note and the other Loan Documents except to the extent such amounts are actually paid out of the proceeds of such business income insurance.

(e)     To the extent such Equipment exists on the Property, comprehensive boiler and machinery insurance covering all mechanical and electrical equipment against physical damage, rent loss and improvements loss and covering, without limitation, all Tenant improvements and betterments that Borrower is required to insure pursuant to the lease on a replacement cost basis or such other amount as approved by Lender and with deductibles acceptable to Lender in its discretion.

(f)     If applicable, worker's compensation insurance with respect to any employees of Borrower, as required by any Legal Requirement.

(g)     During any period of repair or restoration, builder's "all-risk" insurance on a "Completed Value Basis" in an amount equal to not less than the full, completed insurable value of the Property, against such risks (including fire and extended coverage and collapse of the Improvements to agreed limits) as Lender may request, in form and substance acceptable to Lender, and consistent with the insurance requirements set forth in Section 7.1.1(a).

(h)     If "acts of terrorism" or other similar acts or events or "fire following" such acts or events are hereafter excluded from Borrower's comprehensive All Risk/Special Form insurance policy or policies required under Sections 7.1.1 (a), (c), and (d) above, Borrower shall obtain an endorsement to such policy or policies, or a separate policy from an insurance provider which satisfies the requirements of Section 7.1.2, insuring against all such excluded acts or events and "fire following" such acts or events on terms consistent with Sections 7.1.1 (a), (c), and (d) ("Terrorism Insurance") in an amount not less than the sum of one hundred percent (100%) of the "Full Replacement Cost" and the business income/loss of rents insurance required in Section 7.1.1 (d) above) and liability insurance required in Section 7.1.1 (c) above; provided that such endorsement or policy shall be in form and substance satisfactory to Lender. Notwithstanding the foregoing, for so long as the Terrorism Risk Insurance Act of 2002, as extended and modified by the Terrorism Risk Insurance Program Reauthorization Act of 2015, as extended and modified by the Terrorism Risk Insurance Program Reauthorization Act of 2019 ("TRIPRA") is in effect (including any extensions thereof or if another federal governmental program is in effect relating to "acts of terrorism"

which provides substantially similar protections as TRIPRA), Lender shall accept terrorism insurance which covers against "covered acts" as defined by TRIPRA (or such other program) as full compliance with this Section 7.1.1(h) as it relates to the risks that are required to be covered hereunder but only in the event that TRIPRA (or such other program) continues to cover both domestic and foreign acts of terrorism; and

(i)     Such other insurance or higher limits on the Property or on any replacements or substitutions thereof or additions thereto as may from time to time be required by Lender against other insurable hazards or casualties which at the time are commonly insured against in the case of property similarly situated including, without limitation, down zoning, sinkhole, mine subsidence and environmental insurance, due regard being given to the height and type of buildings, their construction, location, use and occupancy.

(j)     Any blanket insurance Policy shall be subject to Lender approval and shall otherwise provide the same protection as would a separate Policy insuring only the Property in compliance with the provisions of this Section 7.1.1. Lender shall also be provided with a schedule of locations and values for properties associated with any blanket policy.

(k)     All Policies of insurance provided for or contemplated by Section 7.1.1 shall name Borrower as a named insured and, with respect to liability policies, shall name Lender and its successors and/or assigns as the additional insured, as its interests may appear, and in the case of property policies, including, without limitation, all risk/special form, business income/loss of rents, business personal property, boiler and machinery, flood, earthquake and terrorism insurance, shall contain a standard non-contributing mortgagee clause and Lender's Loss Payable endorsement in favor of Lender providing that the loss thereunder shall be payable to Lender. All policies shall include a Waiver of Subrogation in favor of the Lender. Borrower shall not procure or permit any of its constituent entities to procure any other insurance coverage which would be on the same level of payment as the Policies or would adversely impact in any way the ability of Lender or Borrower to collect any proceeds under any of the Policies.

7.1.2   **Policies**. Unless otherwise approved by Lender in writing in advance of placement, all policies of insurance (collectively, the "*Policies*", or in the singular, a "*Policy*") required pursuant to Section 7.1.1 shall (i) be issued by companies approved by Lender and licensed and/or authorized to do business in the State, with a claims paying ability rating of "A" or better by S&P (and the equivalent by any other Rating Agency, if rated by such other Rating Agency) and a rating of "A:X" or better in the current Best's Insurance Reports; (ii) name Lender and its successors or assigns as their interests may appear as the Mortgagee and Lender's Loss Payable/Loss Payee (in the case of property and rent loss or business interruption insurance and business personal property, if applicable) and an additional insured (in the case of liability insurance); (iii) contain (in the case of property insurance) a Non-Contributory Standard Mortgagee Clause and a Lender's Loss Payable/Loss Payee Endorsement, or their equivalents, naming Lender as the Person to which all payments made by such insurance company shall be paid; (iv) contain provisions permitting Borrower to waive its right of subrogation against Lender; (v) be assigned, if available, and the originals thereof delivered to Lender; (vi) contain such provisions as Lender deems reasonably necessary or desirable to protect its interest, including (A) endorsements providing that neither Borrower, Lender nor any other party shall be a co–insurer under the Policies, (B) that Lender shall receive at least thirty (30) days' prior written notice of cancellation of any of the Property Policies, at least ten (10) days' prior written notice of cancellation for nonpayment of premium. With respect to the Policies limited to liability insurance, if obtainable by Borrower using commercially reasonable efforts, contain clauses or endorsements to the effect that the Policy shall not be canceled without at least thirty (30) days' written notice to the Lender, except ten (10) days' notice for non-payment of premium. If issuer will not

or cannot provide the notices required by this clause (ii), Borrower shall be obligated to provide such notice to Lender. With respect to all Policies, if available to Borrower using commercially reasonable efforts, certain clauses or endorsements to the effect that such Policy shall not be materially changed without at least thirty (30) days' prior notice to Lender. If issuer will not or cannot provide the notice required in this clause (iii), Borrower shall be obligated to provide such notice to Lender, (C) an agreement whereby the insurer waives any right to claim any premiums and commissions against Lender, provided that the policy need not waive the requirement that the premium be paid in order for a claim to be paid to the insured, and (D) providing that Lender is permitted to make payments to effect the continuation of such Policy upon notice of cancellation due to non–payment of premiums; (vii) in the event any insurance policy (except for general public and other liability and workers compensation insurance) shall contain breach of warranty provisions, such policy shall provide that with respect to the interest of Lender, such insurance policy shall not be invalidated by and shall insure Lender regardless of (A) any act, failure to act or negligence of or violation of warranties, declarations or conditions contained in such policy by any named insured, (B) the occupancy or use of the premises for purposes more hazardous than permitted by the terms thereof, or (C) any foreclosure or other action or proceeding taken by Lender pursuant to any provision of the Loan Documents; and (viii) be satisfactory in form and substance to Lender and approved by Lender as to amounts, form, risk coverage, deductibles, loss payees and insureds. Borrower shall pay the premiums for such Policies (the "*Insurance Premiums*") as the same become due and payable and furnish to Lender evidence of the renewal of each of the Policies together with (unless such Insurance Premiums have been paid by Lender pursuant to Section 3.4) receipts for or other evidence of the payment of the Insurance Premiums reasonably satisfactory to Lender. If Borrower does not furnish such evidence and receipts at least ten (10) days prior to the expiration of any expiring Policy, then Lender may, but shall not be obligated to, procure such insurance and pay the Insurance Premiums therefor, and Borrower shall reimburse Lender for the cost of such Insurance Premiums promptly on written demand, with interest accruing at the Default Rate. Borrower shall deliver to Lender a certified copy of each Policy within thirty (30) days after its effective date. Within thirty (30) days after written request by Lender, Borrower shall obtain such increases in the amounts of coverage required hereunder as may be reasonably requested by Lender, taking into consideration changes in the value of money over time, changes in liability laws, changes in prudent customs and practices and the like.

**7.2**      **Casualty and Condemnation.**

    **7.2.1**      **Casualty**. If the Property is damaged or destroyed, in whole or in part, by fire or other casualty (a "*Casualty*"), Borrower shall give prompt notice of such Casualty to Lender and shall promptly commence and diligently prosecute to completion the repair and restoration of the Property as nearly as possible to the condition the Property was in immediately prior to such Casualty (a "*Restoration*") and otherwise in accordance with Section 7.3, regardless of whether Insurance Proceeds are available or made available, it being understood, however, that Borrower shall not be obligated to restore the Property to its exact condition immediately prior to such Casualty, provided that the Property is restored, to the extent practicable, to be of at least equal value and of substantially the same character as prior to the Casualty. Borrower shall pay all costs of such Restoration whether or not such costs are covered by insurance. Lender may, but shall not be obligated to, submit proof of loss if not submitted promptly by Borrower. In the event of a Casualty where the loss does not exceed the Restoration Threshold, Borrower may settle and adjust such claim; provided that (a) no Event of Default has occurred and is continuing, and (b) such adjustment is carried out in a commercially reasonable and timely manner. In the event of a Casualty where the loss exceeds the Restoration Threshold or if an Event of Default then exists, Lender shall have the right to prosecute, settle and adjust such claim at Borrower's cost and without Borrower's consent. Notwithstanding any Casualty, Borrower shall continue to pay the Debt at the time and in the manner provided for its payment in the Note and in this Agreement.

7.2.2  **Condemnation**.  Borrower shall promptly give Lender notice of the actual or threatened commencement of any condemnation or eminent domain proceeding affecting all or any part of the Property by any Governmental Authority (a "*Condemnation*") and shall deliver to Lender a copy of any and all papers served in connection with such proceedings.  Provided no Event of Default has occurred and is continuing, in the event of a Condemnation where the amount of the taking does not exceed the Restoration Threshold, Lender shall have the right to prosecute, settle and adjust such Condemnation at Borrower's cost and without Borrower's consent.  Notwithstanding any Condemnation, Borrower shall continue to pay the Debt at the time and in the manner provided for its payment in the Note and in this Agreement.  Lender shall not be limited to the interest paid on the Award by any Governmental Authority but shall be entitled to receive out of the Award interest at the rate or rates provided herein or in the Note.  If the Property or any portion thereof is taken by any Governmental Authority, Borrower shall promptly commence and diligently prosecute the Restoration of the Property, regardless of whether an Award is available or made available, and otherwise comply with the provisions of Section 7.3.  If the Property is sold, through foreclosure or otherwise, prior to the receipt by Lender of the Award, Lender shall have the right, whether or not a deficiency judgment on the Note shall have been sought, recovered or denied, to receive the Award, or a portion thereof sufficient to pay the Debt.

7.2.3  **Casualty Proceeds.**

(a)  Subject to Section 7.2.3(b), payments received on account of the business or rental interruption or other loss of income insurance specified in Section 7.1.1(d) above shall be deposited directly into the Casualty/Condemnation Subaccount.  Provided that no Event of Default shall have occurred and be continuing, proceeds received by Lender on account of business or rental interruption or other loss of income insurance specified in Section 7.1.1(d) above shall be deposited by Lender into the Deposit Account (in installments relating to the relevant period) to the extent such proceeds (or a portion thereof) reflect a replacement for lost Rents for the relevant period, as determined by Lender in good faith, and such proceeds shall be applied by Lender in accordance with Section 3.12.1 hereof.  All other such proceeds not reflecting a replacement for lost Rents shall be held by Lender and disbursed in accordance with Section 7.3 hereof.

(b)  Notwithstanding anything to the contrary contained herein, if in connection with a Casualty any insurance carrier makes a payment under a property insurance Policy that Borrower proposes be treated as business or rental interruption insurance, then, notwithstanding any designation (or lack of designation) by the insurance carrier as to the purpose of such payment, as between Lender and Borrower, such payment shall not be treated as business or rental interruption Insurance Proceeds unless Borrower has demonstrated to Lender's satisfaction that the remaining Net Proceeds that will be received from the property insurance carriers are sufficient to pay one hundred percent (100%) of the cost of fully restoring the Improvements (plus an amount for contingencies as reasonably determined by Lender) or, if such Net Proceeds are to be applied repay the Loan in accordance with the terms hereof, that such remaining Net Proceeds will be sufficient to pay off the Loan in full.

7.3  **Delivery of Net Proceeds.**

7.3.1  **Minor Casualty or Condemnation.**  If a Casualty or Condemnation has occurred to the Property and the Net Proceeds shall be less than the Restoration Threshold and the costs of completing the Restoration shall be less than the Restoration Threshold, and provided no Event of Default shall have occurred and be continuing, and that the condition in Section 2.6 hereof has been satisfied, the Net Proceeds will be disbursed by Lender to Borrower.  Promptly after receipt of the Net Proceeds, Borrower shall commence and satisfactorily complete with due diligence the Restoration in accordance with the terms of this Agreement.  If any Net Proceeds are received by Borrower and may be retained by Borrower pursuant

91

to the terms hereof, such Net Proceeds shall, until completion of the Restoration, be held for the benefit of Lender and shall be segregated from other funds of Borrower to be used to pay for the cost of Restoration in accordance with the terms hereof.

### 7.3.2 Major Casualty or Condemnation.

(a)     If a Casualty or Condemnation has occurred to the Property and the Net Proceeds are equal to or greater than the Restoration Threshold or the costs of completing the Restoration is equal to or greater than the Restoration Threshold, Lender shall make the Net Proceeds available for the Restoration, provided that each of the following conditions precedent are satisfied:

(i)     no Event of Default shall have occurred and be continuing;

(ii)     (A) in the event the Net Proceeds consists of Insurance Proceeds received in connection with a Casualty, then (1) less than twenty percent (20%) of the total floor area of the Improvements at the Property has been damaged, destroyed or rendered unusable as a result of such Casualty and (2) Legal Requirements permit the restoration of the damaged, destroyed or unusable Improvements at the Property to the same configuration and occupancy that existed immediately preceding such Casualty or (B) in the event the Net Proceeds are an Award received in connection with a Condemnation, (i) no material portion of the Property subject to such Condemnation would reasonably be expected to materially impair the use or operation of the Property from the use or operation prior to the occurrence of such Condemnation, (ii) less than ten percent (10%) of the land constituting the Property is taken and such land is located along the perimeter or periphery of the Property, and (iii) no portion of the Improvements is the subject of such Condemnation;

(iii)     Leases requiring payment of annual rent equal to eighty percent (80%) of the Gross Revenue received by Borrower during the twelve (12) month period immediately preceding the Casualty or Condemnation and all Material Leases shall remain in full force and effect during and after the completion of the Restoration without abatement of rent beyond the time required for Restoration, notwithstanding the occurrence of such Casualty or Condemnation;

(iv)     the Management Agreement and the REA shall remain in full force and effect during and after completion of the Restoration, notwithstanding the occurrence of such Casualty or Condemnation;

(v)     Borrower shall commence the Restoration as soon as reasonably practicable (but in no event later than sixty (60) days after such Casualty or Condemnation, whichever the case may be, occurs) and shall diligently pursue the same to satisfactory completion;

(vi)     Lender shall be satisfied that any operating deficits and all payments of principal and interest under the Note will be paid during the period required for Restoration from (A) the Net Proceeds, or (B) other funds of Borrower;

(vii)     Lender shall be satisfied that the Restoration will be completed on or before the earliest to occur of (A) eighteen (18) months from the date of the such Casualty or Condemnation, (B) the date three (3) months prior to the Stated Maturity Date, (C) the earliest date required for such completion under the terms of any Material Lease, (D) such time as may be required under applicable Legal Requirements in order to repair and restore the Property to the condition it was in immediately prior to such Casualty or Condemnation, as applicable, or (E) the expiration of the rental loss and/or business income

92

interruption insurance coverage referred to in <u>Section 7.1.1(d)</u>, without giving effect to any extended period of indemnity endorsement in respect of such coverage;

(viii) the Property and the use thereof after the Restoration will be in compliance with and permitted under all applicable Legal Requirements;

(ix) the Restoration shall be done and completed by Borrower in an expeditious and diligent fashion and in compliance with all applicable Legal Requirements;

(x) such Casualty or Condemnation, as applicable, does not result in the loss of access to the Property or the related Improvements;

(xi) Borrower shall deliver to Lender a signed, detailed budget approved in writing by Borrower's architect or engineer stating the entire cost of completing the Restoration, which budget shall reasonably be acceptable to Lender

(xii) Borrower shall deliver to Lender a fixed price or guarantee maximum cost construction contract for Restoration reasonably satisfactory to Lender;

(xiii) the Net Proceeds, together with any cash or cash equivalent deposited by Borrower with Lender are sufficient in Lender's reasonable discretion to cover the cost of the Restoration;

(xiv) the Debt Service Coverage Ratio, after giving effect to the Restoration, shall not be less than 1.96 to 1.00;

(xv) the Loan-to-Value Ratio, after giving effect to the Restoration, shall not be greater than sixty-eight and one-tenth of one percent (68.1%);

(xvi) Lender shall be satisfied that the aggregate cost of the Restoration shall not exceed twenty-five percent (25%) of the maximum Loan amount

(xvii) the condition set forth in <u>Section 2.6</u> hereof shall have been satisfied.

(b) The Net Proceeds shall be paid directly to Lender for deposit into the Casualty/Condemnation Account and, until disbursed in accordance with the provisions of this <u>Section 7.3.2(b)</u>, shall constitute additional security for the Debt. The Net Proceeds shall be disbursed by Lender to, or as directed by, Borrower from time to time during the course of the Restoration, upon receipt of evidence reasonably satisfactory to Lender that (i) all requirements set forth in <u>Section 7.3.2(a)</u> have been satisfied, (ii) all materials installed and work and labor performed (except to the extent that they are to be paid for out of the requested disbursement) in connection with the Restoration have been paid for in full, and (iii) there exist no notices of pendency, stop orders, mechanics' or materialman's liens or notices of intention to file same, or any other liens or encumbrances of any nature whatsoever on the Property arising out of the Restoration which have not either been fully bonded to the satisfaction of Lender and discharged of record or in the alternative fully insured to the satisfaction of Lender by the title company issuing the Title Insurance Policy.

(c) All plans and specifications required in connection with the Restoration shall be subject to the prior written approval of Lender and an independent architect, engineer or other professionals reasonably selected by Lender (the "***Casualty Consultant***"). The plans and specifications shall require that the Restoration be completed in a first-class workmanlike manner at least equivalent to the quality and

character of the original work in the Improvements (provided, however, that in the case of a partial Condemnation, the Restoration shall be done to the extent reasonably practicable after taking into account the consequences of such partial Condemnation), so that upon completion thereof, the Property shall be at least equal in value and general utility to the Property prior to the Casualty or Condemnation, as applicable; it being understood, however, that Borrower shall not be obligated to restore the Property to the precise condition of the Property prior to such Casualty or Condemnation, as applicable, provided the Property is restored, to the extent practicable, to be of at least equal value and of substantially the same character as prior to the Casualty or Condemnation, as applicable. Borrower shall restore all Improvements such that when they are fully restored and/or repaired, such Improvements and their contemplated use fully comply with all applicable material Legal Requirements. The identity of the contractors, subcontractors and materialmen engaged in the Restoration, as well as the contracts under which they have been engaged, shall be subject to the approval of Lender and the Casualty Consultant, which approval shall not be unreasonably withheld, delayed or conditioned. All reasonable third-party out-of-pocket costs and expenses actually incurred by Lender in connection with recovering, holding and advancing the Net Proceeds for the Restoration, including reasonable attorneys' fees and disbursements and the Casualty Consultant's fees and disbursements, shall be paid by Borrower.

(d)     In no event shall Lender be obligated to make disbursements of the Net Proceeds in excess of an amount equal to the costs actually incurred from time to time for work in place as part of the Restoration, as certified by the Casualty Consultant, less the Casualty Retainage. The term "*Casualty Retainage*" shall mean, as to each contractor, subcontractor or materialman engaged in the Restoration, an amount equal to ten percent (10%) of the costs actually incurred for work in place as part of the Restoration, as certified by the Casualty Consultant, until the Restoration has been completed. The Casualty Retainage shall in no event, and notwithstanding anything to the contrary set forth above in this Section 7.3.2(d), be less than the amount actually held back by Borrower from contractors, subcontractors and materialmen engaged in the Restoration. The Casualty Retainage shall not be released until the Casualty Consultant certifies to Lender that the Restoration has been completed (excluding punchlist items) in accordance with the provisions of this Article 7 and that all approvals necessary for the re-occupancy and use of the Property have been obtained from all appropriate Governmental Authorities, and Lender receives evidence satisfactory to Lender that the costs of the Restoration have been paid in full or will be paid in full out of the Casualty Retainage; provided, however, that Lender shall release the portion of the Casualty Retainage being held with respect to any contractor, subcontractor or materialman engaged in the Restoration as of the date upon which (i) the Casualty Consultant certifies to Lender that such contractor, subcontractor or materialman has reasonably satisfactorily completed all work and has supplied all materials in accordance with the provisions of such contractor's, subcontractor's or materialman's contract, (ii) the contractor, subcontractor or materialman delivers the lien waivers and evidence of payment in full of all sums due to the contractor, subcontractor or materialman as may be reasonably requested by Lender or by the title company issuing the Title Insurance Policy, and (iii) Lender receives an endorsement to the Title Insurance Policy insuring the continued priority of the Lien of the Security Instrument and evidence of payment of any premium payable for such endorsement. If required by Lender, the release of any such portion of the Casualty Retainage shall be approved by the surety company, if any, which has issued a payment or performance bond with respect to the contractor, subcontractor or materialman.

(e)     Lender shall not be obligated to make disbursements of the Net Proceeds more frequently than once every calendar month.

(f)     If at any time the Net Proceeds or the undisbursed balance thereof shall not, in the opinion of Lender in consultation with the Casualty Consultant, be sufficient to pay in full the balance of the costs which are estimated by the Casualty Consultant to be incurred in connection with the completion

of the Restoration, Borrower shall deposit the deficiency (the "*Net Proceeds Deficiency*") with Lender (for deposit into the Casualty/Condemnation Subaccount) before any further disbursement of the Net Proceeds shall be made. The Net Proceeds Deficiency deposited with Lender shall be deposited by Lender into the Casualty/Condemnation Subaccount and shall be disbursed for costs actually incurred in connection with the Restoration on the same conditions applicable to the disbursement of the Net Proceeds, and until so disbursed pursuant to this Section 7.3 shall constitute additional security for the Debt.

(g)        Provided no Event of Default shall have occurred and be continuing, the excess, if any, of the Net Proceeds and the remaining balance, if any, of the Net Proceeds Deficiency deposited with Lender after the Casualty Consultant certifies to Lender that the Restoration has been completed in accordance with the provisions of this Section 7.3.2, and the receipt by Lender of evidence reasonably satisfactory to Lender that all costs incurred in connection with the Restoration have been paid in full, shall be deposited into the Deposit Account to be applied in accordance with Section 3.12.1, (i) if Lender has received notice that a Mezzanine Loan Event of Default has occurred and is continuing, to Mezzanine Lender, as a distribution permitted under applicable law, or (ii) provided Lender has not received notice that a Mezzanine Loan Event of Default has occurred and is continuing, to Borrower, unless, in either case, a Cash Management Trigger Event Period shall be continuing, in which event such excess shall be deposited into the Deposit Account to be applied in accordance with Section 3.12.1; provided, however, the amount of such excess so deposited in the case of a Condemnation shall not exceed the amount of Net Proceeds Deficiency deposited by Borrower with the balance being applied to the Debt in the manner provided for in Section 7.3.2(h).

(h)        All Net Proceeds not required (i) to be made available for the Restoration or (ii) to be returned to Borrower or Mezzanine Lender as excess Net Proceeds pursuant to Section 7.3.2(g) may be retained and applied by Lender toward the payment of the Debt, whether or not then due and payable, in such order, priority and proportions as Lender in its sole discretion shall deem proper.

**7.3.3        Prepayment upon Casualty or Partial Condemnation**. Notwithstanding the foregoing provisions in this Article 7, if the Loan or any portion thereof is included in a REMIC Trust and any portion of the Property is sought to be released from the Lien of the Security Instrument in connection with a Casualty or Condemnation, Borrower shall have complied with Section 2.6 hereof.

**8.        PERMITTED TRANSFERS**.

**8.1        Permitted Transfers.**        Notwithstanding anything to the contrary contained in Section 5.18, the following Transfers (each, a "*Permitted Transfer*") shall be permitted hereunder:

(a)        a Lease entered into in accordance with the Loan Documents;

(b)        a Permitted Encumbrance;

(c)        the sale, transfer or issuance of publicly traded shares on a nationally or internationally recognized stock exchange in any indirect equity owner of Borrower;

(d)        one or a series of Transfers of the indirect ownership interests in Borrower provided that (i) no Default or Event of Default shall have occurred and be continuing or would occur as a result of such Transfer, (ii) such Transfer shall not (y) cause the transferee (other than Key Principal) together with its Affiliates to increase its indirect interest in Borrower to an amount in that exceeds 49%, or (z) cause a change in Management Control of Borrower or, if an entity, Guarantor, (ii) the Property shall continue to be managed by a Manager pursuant to the Management Agreement or another Qualified

Manager pursuant to a Replacement Management Agreement, (iii) after giving effect to such Transfer, Key Principal shall continue to own, (A) indirectly, at least fifteen percent (15%) of all legal, beneficial and economic interests in Borrower and (B) directly, at least fifty percent (50%) of all legal, beneficial and economic interests in Jericho Plaza GP (for the avoidance of doubt, subject to Section 8.1(f) below, Key Principal shall not be prohibited from Transferring all of Key Principal's direct ownership interests in Jericho Plaza Members LLC, a Delaware limited liability company, in accordance with the terms hereof), (iv) after giving effect to such Transfer, Jericho Plaza GP shall continue to own, indirectly, at least thirty percent (30%) of all legal, beneficial and economic interests in Borrower, (v) Borrower shall give Lender notice of such Transfer together with copies of all instruments effecting such Transfer and the organizational documents of the transferee and its constituent parties reasonably required by Lender not less than thirty (30) days prior to the date of such Transfer, and (vi) such Transfer shall be permitted under the REA and/or Borrower shall obtain any consents required from the REA counterparty in connection with such Transfer and deliver the same to Lender;

(e)     a Transfer of any indirect ownership interests in any Borrower, or if an entity, Guarantor that occurs by devise or bequest, by operation of law upon the death or incapacity of a natural person that was the holder of such interest to an Immediate Family Member of such interest holder or by establishment of a trust for the benefit of an Immediate Family Member of such interest holder, provided that (i) no Default or Event of Default shall have occurred and be continuing or would occur as a result of such Transfer, (ii) no such Transfer shall result in a change of the day-to-day operations of the Property and the Property shall continue to be managed by a Manager pursuant to the Management Agreement or another Qualified Manager pursuant to a Replacement Management Agreement, (iii) Borrower shall give Lender notice of such Transfer together with copies of all instruments effecting such Transfer and the organizational documents of the transferee and its constituent parties reasonably required by Lender not more than thirty (30) days after the date of any Transfer triggered by the death or incapacity of an individual and, otherwise, not less than thirty (30) days prior to the date of such Transfer, (iv) the legal and financial structure of Borrower and its members or partners, as applicable, and the single purpose nature and bankruptcy remoteness of Borrower and its members or partners, as applicable, after such Transfer, shall satisfy Lender's then-current applicable underwriting criteria and requirements, (v) such Transfer shall be permitted the REA and/or Borrower shall obtain any consents required from the REA counterparty in connection with such Transfer and deliver the same to Lender, and (vi) if any such Transfer would result in a change in Management Control of Borrower or if an entity, Guarantor, such Transfer is approved by Lender and, if any such Transfer occurs after a Securitization, Borrower, shall deliver to Lender a Rating Comfort Letter in respect of such Transfer, in each case within sixty (60) days after the date of any Transfer triggered by the death or incapacity of an individual and, otherwise, prior to the date of such Transfer

(f)     Notwithstanding anything in this Section 8.1 to the contrary, and without limiting any of the foregoing requirements of this Section 8.1, if after giving effect to any Transfer set forth in Section 8.1(d) or (e), (i) ten percent (10%) or more in the aggregate of the indirect ownership interests in Borrower or if an entity, Guarantor would be owned by a Person (together with its Affiliates) which did not own ten percent (10%) or more of the indirect ownership interests in Borrower or if an entity, Guarantor, as applicable, on the Closing Date or as a result of other Transfers previously made in accordance with the terms and provisions of this Agreement, then, as a condition to any such Transfer being permitted hereunder, such Person (together with its Affiliates) shall satisfy the Lender Transfer Requirements prior to the date of such Transfer or, in the case of a Transfer triggered by the death or incapacity of an individual, within thirty (30) days after the date of such Transfer, and/or (ii) forty-nine percent (49%) or more in the aggregate of the indirect ownership interests in Borrower or if an entity, Guarantor would be owned by a Person (together with its Affiliates), other than Key Principal, which did not own forty-nine percent (49%) or more of the indirect ownership interests in Borrower or if an entity, Guarantor, as applicable, on the

96

Closing Date or as a result of other Transfers previously made in accordance with the terms and provisions of this Agreement, then, as a condition to any such Transfer being permitted hereunder, Borrower shall deliver to Lender (x) a Rating Comfort Letter and (y) if an Insolvency Opinion has previously been delivered in connection with the Loan, a new Insolvency Opinion, in each case prior to the date of such Transfer or, in the case of a Transfer triggered by the death or incapacity of an individual, within thirty (30) days after the date of such Transfer.

8.2 **Replacement Guarantor.** To the extent that any Guarantor is a natural person, the death or incapacity of such Guarantor shall be an Event of Default hereunder unless such Guarantor is replaced in accordance with this Section 8.2. Borrower shall be permitted to substitute a replacement guarantor (a "*Substitution*") and no Event of Default shall be deemed to have occurred hereunder, provided that each of the following terms and conditions are satisfied: (a) no Default or Event of Default shall have occurred and be continuing or would occur as a result of such Substitution; (b) within thirty (30) days after the occurrence of such death or incapacity, Borrower delivers to Lender notice of its intent to substitute such Guarantor and, concurrently therewith, gives Lender all such information concerning the proposed substitute guarantor as Lender may reasonably require, including, without limitation, certified financial statements detailing assets and liabilities; (c) the replacement guarantor is a Satisfactory Replacement Guarantor; (d) within fifteen (15) days after delivery of the written notice described in the preceding clause (b), such Satisfactory Replacement Guarantor (i) assumes the obligations of Guarantor under the Guaranty for events or conditions occurring prior to, as of and after the Substitution or (ii) executes and delivers to Lender a replacement guaranty in each case in form and substance the same as the Guaranty, and otherwise reasonably acceptable to Lender, for events or conditions occurring prior to, as of and after the Substitution; (e) concurrently with such assumption or execution and delivery (i) such Satisfactory Replacement Guarantor delivers to Lender a spousal consent in form and substance acceptable to Lender, as and to the extent applicable, and (ii) each of Borrower, the remaining Guarantor and/or such Satisfactory Replacement Guarantor, as applicable, affirms each of their respective obligations under the Loan Documents; (f) Borrower delivers to Lender a Rating Comfort Letter with respect to such Substitution; (g) if required by Lender or the Rating Agencies, Borrower delivers to Lender an opinion from counsel, and in form and substance, in each case reasonably acceptable to Lender and acceptable to the Rating Agencies in their sole discretion stating, among other things, (i) that the Guaranty (or the replacement guaranty, as the case may be) are enforceable against such Satisfactory Replacement Guarantor in accordance with their terms and (ii) that any REMIC Trust formed in connection with a securitization of the Loan will not fail to maintain its status as a "real estate mortgage investment conduit" within the meaning of Section 860D of the Code or be subject to tax as a result of such Substitution; and (h) if required by Lender or the Rating Agencies and an Insolvency Opinion has previously been delivered in connection with the Loan, Borrower delivers to Lender a new Insolvency Opinion. No such death or replacement of a Guarantor shall hinder, impair, limit, terminate or effectuate a novation of the obligations or liabilities of any other Guarantor under any of the Loan Documents.

8.3 **Costs and Expenses.** Borrower shall pay all reasonable third-party out-of-pocket costs and expenses of Lender in connection with any Transfer, assumption, including, without limitation, the cost of any Rating Comfort Letter and all reasonable fees and expenses of Lender's counsel, and the cost of any required counsel opinions, including, without limitation, Insolvency Opinions and opinions related to REMIC Trusts or other securitization or tax issues.

8.4 **Compliance with other Covenants.** The foregoing provisions of this Article 8 shall not be deemed to waive, qualify or otherwise limit Borrower's obligation to comply (or cause the compliance with) the other covenants set forth in this Agreement and the other Loan Documents (including, without limitation, those covenants relating to OFAC and ERISA matters).

9. **SECONDARY MARKET PROVISIONS**.

   9.1 **Transfer of Loan**.

   (a) Lender may, at any time (i) sell, transfer or assign the Loan, the Loan Documents and any or all servicing rights with respect thereto, (ii) grant participations therein or (iii) issue mortgage pass-through certificates or other securities evidencing a direct or indirect beneficial interest in a rated or unrated public offering or private placement (the "*Securities*") secured by or evidencing a direct or indirect ownership interest in the Note and the Security Instrument (each such sale, assignment, participation or securitization, a "*Secondary Market Transaction*", and the transactions referred to in clause (iii) shall hereinafter be referred to as a "*Securitization*")). Lender may forward to each purchaser, transferee, assignee, servicer, participant, investor in such Securities or any NRSRO (all of the foregoing entities collectively referred to as the "*Investor*") and each prospective Investor, all documents and information which Lender now has or may hereafter acquire relating to the Loan and to Borrower, and Guarantor and the Property, whether furnished by Borrower, Guarantor or otherwise, as Lender determines necessary or appropriate. The Borrower agrees that each participant shall be entitled to the benefits of Sections 2.3.5 and 2.3.6 (subject to the requirements and limitations therein, including the requirements under Section 2.3.5(e) (it being understood that the documentation required under Section 2.3.5(e) shall be delivered to the participating Lender)) to the same extent as if it were a Lender and had acquired its interest by assignment pursuant to this Section; provided that such participant (A) agrees to be subject to the provisions of Section 2.2.6(b) as if it were an assignee under this Section; and (B) shall not be entitled to receive any greater payment under Sections 2.3.5 or 2.3.6, with respect to any participation, than its participating Lender would have been entitled to receive, except to the extent such entitlement to receive a greater payment results from a change in law that occurs after the Participant acquired the applicable participation. Each Lender that sells a participation agrees, at the Borrower's request and expense, to use reasonable efforts to cooperate with the Borrower to effectuate the provisions of Section 2.2.6(b) with respect to any participant. Notwithstanding anything to the contrary contained herein, each Lender shall have the right at any time and at its sole cost and expense, without the consent of or notice to any other Lender, Agent, Borrower or any other Person, to grant a security interest in all or any portion of Lender's interest in the Note or the Loan to any Person to support obligations issued by Lender (including, without limitation, to the bondholders (as a collective whole) (or their nominee, collateral agent or security trustee)) under, or the trustee, collateral trustee, administrator or receiver (or their respective nominees, collateral agents or collateral trustees) of a mortgage pool securing covered mortgage bonds issued by Lender under German Pfandbrief legislation, as such legislation may be amended and in effect from time to time, or any substitute or successor legislation (a "*Covered Bond Pool Pledge*"). Lender shall not be required to notify Borrower, Agent or any other Lender of any Covered Bond Pool Pledge. Borrower agrees to execute (and to cause Guarantor to execute), within fifteen (15) Business Days after request therefor is made by Lender, any documents or any amendments, amendments and restatements and/or modifications to any Loan Documents and/or additional documents (including, without limitation, amended, amended and restated, modified and/or additional promissory notes) and/or estoppel certificates reasonably requested by such Lender in order to make the Loan Documents eligible under German Pfandbrief legislation; provided, however, that neither Borrower nor Guarantor shall be required to enter into any such documents and amendments which would increase either such party's affirmative obligations or decrease either such party's rights under the Loan Documents or adversely affect the economic or other material terms of the Loan.

   (b) If requested by Lender, Borrower shall assist Lender in satisfying the market standards to which Lender customarily adheres or which may be reasonably required in the marketplace or by the Rating Agencies or applicable Legal Requirements in connection with any Secondary Market Transactions, including to:

98

(i)  (A) provide updated financial and other information with respect to the Property, the business operated at the Property, Borrower, Guarantor or Manager, (B) provide updated budgets and rent rolls (including itemized percentage of floor area occupied and percentage of aggregate base rent for each Tenant) relating to the Property, and (C) provide updated appraisals, market studies, environmental reviews (Phase I's and, if appropriate, Phase II's), property condition reports and other due diligence investigations of the Property (the information referred to in clauses (A), (B) and (C) shall hereinafter be referred to collectively as "***Updated Information***"), together, if customary, with appropriate verification of the Updated Information through letters of auditors, certificates of third party service providers or opinions of counsel acceptable to Lender and the Rating Agencies;

(ii)  provide opinions of counsel, which may be relied upon by Lender and the NRSROs, and their respective counsel, agents and representatives, as to bankruptcy non-consolidation, fraudulent conveyance and true sale, or any other opinion customary in Secondary Market Transactions or required by the Rating Agencies with respect to the Property, Borrower, Guarantor and any Affiliate of Borrower or Guarantor, which counsel and opinions shall be satisfactory to Lender and the Rating Agencies;

(iii)  provide updated (as of the closing date of any Secondary Market Transaction) representations and warranties made in the Loan Documents and such additional representations and warranties as Lender or the Rating Agencies may require;

(iv)  subject to Section 9.4 hereof, execute modifications and amendments to the Loan Documents and Borrower's organizational documents as Lender or the Rating Agencies may require, including, without limitation, the addition of one or more Independent Directors pursuant to the terms and provisions of Schedule 4 attached hereto;

(v)  provide access to, and conduct tours of, the Property upon reasonable advance notice and subject to the rights of Tenants; and

(vi)  provide certifications or other evidence of reliance acceptable to Lender and the Rating Agencies with respect to third party reports and other information obtained in connection with the origination of the Loan or any Updated Information.

(c)  If, at the time a Disclosure Document (as hereinafter defined) is being prepared for a Secondary Market Transaction, Lender expects that Borrower alone or Borrower and one or more Affiliates of Borrower (including Guarantor or other Person that is directly or indirectly committed by contract or otherwise to make payments on all or a part of the Loan) collectively, or the Property alone or the Property and any Related Property, collectively, will be a Significant Obligor, the Borrower shall furnish to Lender upon prior written request the following financial information:

(i)  if Lender expects that the principal amount of the Loan together with any Related Loans, as of the cut-off date for such Secondary Market Transaction, may equal or exceed ten percent (10%) (but less than twenty percent (20%)) of the aggregate principal amount of all mortgage loans included or expected to be included in the Secondary Market Transaction, net operating income for the Property and any Related Property for the most recent Fiscal Year and interim period as required under Item 1112(b)(1) of Regulation AB (or, if the Loan is not treated as a non-recourse loan under Instruction 3 for Item 1101(k) of Regulation AB, selected financial data meeting the requirements and covering the time periods specified in Item 301 of Regulation S-K and Item 1112(b)(1) of Regulation AB); or

DM_US 183358854-7.105065.0051

(ii)     if Lender expects that the principal amount of the Loan together with any Related Loans, as of the cut-off date for such Secondary Market Transaction, may equal or exceed twenty percent (20%) of the aggregate principal amount of all mortgage loans included or expected to be included in the Secondary Market Transaction, the financial statements required under Item 1112(b)(2) of Regulation AB (which includes, but may not be limited to, a balance sheet with respect to the entity that Lender determines to be a Significant Obligor for the two most recent Fiscal Years and applicable interim periods, meeting the requirements of Rule 3-01 of Regulation S-X (17 C.F.R. Part 210), and statements of income and statements of cash flows with respect to the Property for the three most recent Fiscal Years and applicable interim periods, meeting the requirements of Rule 3-02 of Regulation S-X (or if Lender determines that the Property is the Significant Obligor and the Property (other than properties that are hotels, nursing homes, or other properties that would be deemed to constitute a business and not real estate under Regulation S-X or other legal requirements) was acquired from an unaffiliated third party and the other conditions set forth in Rule 3-14 of Regulation S-X have been met, the financial statements required by Rule 3-14 of Regulation S-X)).

(d)     Further, if requested by Lender, Borrower shall, promptly upon Lender's request, furnish to Lender financial data or financial statements meeting the requirements of Item 1112(b)(1) or (2) of Regulation AB, as specified by Lender, for any Tenant of the Property if, in connection with a Secondary Market Transaction, Lender expects there to be, as of the cutoff date for such Secondary Market Transaction, a concentration with respect to such Tenant or group of Affiliated Tenants within all of the mortgage loans included or expected to be included in the Secondary Market Transaction such that such Tenant or group of Affiliated Tenants would constitute a Significant Obligor. Borrower shall furnish to Lender, in connection with the preparation of the Disclosure Documents and on an ongoing basis, financial data and/or financial statements with respect to such Tenants meeting the requirements of Item 1112(b)(1) or (2) of Regulation AB, as specified by Lender, but only for so long as such entity or entities are a Significant Obligor and either (x) filings pursuant to the Exchange Act in connection with or relating to the Secondary Market Transaction (an "***Exchange Act Filing***") are required to be made under applicable Legal Requirements or (y) comparable information is required to otherwise be "available" to holders of the Securities under Regulation AB or applicable Legal Requirements.

(e)     If Lender determines that Borrower alone or Borrower and one or more Affiliates of Borrower collectively, or the Property alone or the Property and any Related Property, collectively, are a Significant Obligor, then Borrower shall furnish to Lender, on an ongoing basis, selected financial data or financial statements meeting the requirements of Item 1112(b)(1) or (2) of Regulation AB, as specified by Lender, but only for so long as such entity or entities are a Significant Obligor and either (x) Exchange Act Filings are required to be made under applicable Legal Requirements or (y) comparable information is required to otherwise be "available" to holders of the Securities under Regulation AB or applicable Legal Requirements.

(f)     Any financial data or financial statements provided pursuant to this <u>Section 9.1</u> shall be furnished to Lender within the following time periods:

(i)     with respect to information requested in connection with the preparation of Disclosure Documents for a Secondary Market Transaction, within ten (10) Business Days after notice from Lender; and

(ii)     with respect to ongoing information required under <u>Section 9.1(d)</u> and <u>(e)</u> above, (A) not later than thirty (30) days after the end of each fiscal quarter of Borrower and (B) not later than seventy-five (75) days after the end of each Fiscal Year of Borrower.

DM_US 183358854-7.105065.0051

(g)     If requested by Lender, Borrower shall provide Lender, promptly, and in any event within three (3) Business Days following Lender's request therefor, with any other or additional financial statements, or financial, statistical or operating information, as Lender shall reasonably determine to be required pursuant to Regulation S-K or Regulation S-X, as applicable, Regulation AB, or any amendment, modification or replacement thereto or other Legal Requirements relating to a Secondary Market Transaction or as shall otherwise be reasonably requested by the Lender.

(h)     If requested by Lender, whether in connection with a Secondary Market Transaction or at any time thereafter during which the Loan and any Related Loans are included in a Secondary Market Transaction, the Borrower shall provide Lender, promptly upon request, a list of Tenants (including all affiliates of such Tenants) that in the aggregate (1) occupy 10% or more (but less than 20%) of the total floor area of the improvements or represent 10% or more (but less than 20%) of aggregate base rent, and (2) occupy 20% or more of the total floor area of the Improvements or represent 20% or more of aggregate base.

(i)     All financial statements provided by Borrower pursuant to Section 9.1(c), (d), (e) or (f) shall be prepared in accordance with GAAP and shall meet the requirements of Regulation S-K or Regulation S-X, as applicable, Regulation AB, and other applicable Legal Requirements.  All financial statements relating to a Fiscal Year shall be audited by Independent accountants in accordance with generally accepted auditing standards, Regulation S-X or Regulation S-K, as applicable, Regulation AB, and all other applicable Legal Requirements, shall be accompanied by the manually executed report of the Independent accountants thereon, which report shall meet the requirements of Regulation S-K or Regulation S-X, as applicable, Regulation AB, and all other applicable Legal Requirements, and shall be further accompanied by a manually executed written consent of the Independent accountants, in form and substance acceptable to Lender, to the inclusion of such financial statements in any Disclosure Document and any Exchange Act Filing and to the use of the name of such Independent accountants and the reference to such Independent accountants as "experts" in any Disclosure Document and Exchange Act Filing (or comparable information is required to otherwise be available to holders of the Securities under Regulation AB or applicable Legal Requirements), all of which shall be provided at the same time as the related financial statements are required to be provided.  All other financial statements shall be certified by the chief financial officer of Borrower, which certification shall state that such financial statements meet the requirements set forth in the first sentence of this paragraph.

**9.2     Use of Information**.    Borrower understands that information provided to Lender by Borrower and its agents, counsel and representatives may be included in preliminary and final disclosure documents in connection with the Secondary Market Transaction, including an offering circular, a prospectus, prospectus supplement, private placement memorandum or other offering document (each, a "***Disclosure Document***") and may also be included in filings with the Securities and Exchange Commission pursuant to the Securities Act of 1933, as amended (the "***Securities Act***"), or the Securities and Exchange Act of 1934, as amended (the "***Exchange Act***"), and may be made available to investors or prospective investors in the Securities, investment banking firms, NRSROs, accounting firms, law firms and other third-party advisory and service providers relating to the Secondary Market Transaction.  Borrower also understands that the findings and conclusions of any third-party due diligence report obtained by the Lender, the Issuer (as hereinafter defined) or the placement agent or underwriter of the Secondary Market Transaction may be made publicly available if required, and in the manner prescribed, by Section 15E(s)(4)(A) of the Exchange Act and any rules promulgated thereunder.

**9.3    Borrower Indemnity**.

(a)    Borrower hereby agrees to indemnify Lender (for purposes of this Section 9.3, Lender shall at all times include NATIXIS and any successor or assign of Lender, together their respective officers and directors) and each Person who controls Lender within the meaning of Section 15 of the Securities Act or Section 20 of the Exchange Act (collectively, the "*Lender Group*"), the issuer of the Securities (the "*Issuer*" and for purposes of this Section 9.3, Issuer shall include its officers, director and each Person who controls the Issuer within the meaning of Section 15 of the Securities Act or Section 20 of the Exchange Act), and any placement agent or underwriter with respect to the Secondary Market Transaction, each of their respective officers and directors and each Person who controls the placement agent or underwriter within the meaning of Section 15 of the Securities Act or Section 20 of the Exchange Act (collectively, the "*Underwriter Group*") for any actual losses, claims, damages (excluding consequential, special and punitive damages except to the extent such damages are actually incurred by Lender as a result of third party claims) or liabilities (collectively, the "*Liabilities*") to which the Lender Group, the Issuer or the Underwriter Group may become subject insofar as the Liabilities arise out of, or are based upon, (i) any untrue statement or alleged untrue statement of any material fact contained in the information provided to Lender by Borrower and its agents, counsel and representatives, (ii) the omission or alleged omission to state therein a material fact required to be stated in such information or necessary in order to make the statements in such information, in light of the circumstances under which they were made, not misleading, or (iii) a breach of the representations and warranties made by Borrower in Section 4.8 of this Agreement (Full and Accurate Disclosure).  Borrower also agrees to reimburse the Lender Group, the Issuer and/or the Underwriter Group for any third-party legal or other expenses reasonably incurred by the Lender Group, the Issuer and/or the Underwriter Group in connection with investigating or defending the Liabilities.  Borrower's liability under this paragraph will be limited to Liabilities that arise out of, or are based upon, an untrue statement or omission made in reliance upon, and in conformity with, information furnished to Lender by or on behalf of Borrower in connection with the preparation of the Disclosure Document or in connection with the underwriting or closing of the Loan, including financial statements of Borrower, operating statements and rent rolls with respect to the Property.  This indemnification provision will be in addition to any liability which Borrower may otherwise have.

(b)    Borrower hereby agrees to provide, in connection with any Securitization, an indemnification agreement (A) certifying that (i) Borrower has, at Lender's request in connection with such Securitization, reviewed the following sections of the Disclosure Documents (collectively with the Provided Information, the "*Covered Disclosure Information*"): "Summary of Offering Circular" and "Risk Factors" (solely to the extent the "Summary of Offering Circular" and "Risk Factors" relate to Borrower, Guarantor, Key Principals, Manager (if Manager is an Affiliate of Borrower), the Management Agreement, the Loan Documents and any mezzanine loan documents and the Property (including any tenants) and other collateral for the Loan), "Description of the Mortgage," "Description of the Mortgage Loan and Mortgaged Property," "Description of the Borrower," "Description of the Property Manager" (if Manager is an Affiliate of Borrower), "Description of the Management Agreement," "Description of the Mezzanine Loan" (if any), "Use of Proceeds," and analogous or additional sections of the Disclosure Documents identified by Lender to Borrower (I) solely to the extent each of the foregoing relate to Borrower, Guarantor, Key Principals, Manager (if Manager is an Affiliate of Borrower), the Management Agreement, the Loan and the Loan Documents, any mezzanine loan and related mezzanine loan documents and the Property (including any tenants) and other collateral for the Loan, and (II) excluding (w) any underwritten financial information (except to the extent such underwritten financial information is included in the Provided Information), (x) any information (including financial information or forecasted information) that is solely obtained from any third party report commissioned by Lender, including, without limitation appraisals, property condition reports or environmental reports, (y) any electronic media (except those portions of the Disclosure

Documents entitled "Annex A" that are not otherwise excluded pursuant to this clause (A)) and (z) any financial projections or reforecasts relating to the performance of the Property and the other collateral for the Loan (except to the extent such projections or reforecasts are included in the Provided Information and (ii) the Covered Disclosure Information does not contain any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, and (B) jointly and severally indemnifying the Lender Group, the Issuer, and any Underwriter Group for any Liabilities to which Lender, the Lender Group, the Issuer or the Underwriter Group may become subject insofar as the Liabilities arise out of, or are based upon, (i) any untrue statement or alleged untrue statement of any material fact contained in the Covered Disclosure Information, (ii) the omission or alleged omission to state therein a material fact required to be stated in the Covered Disclosure Information or necessary in order to make the statements in such information, in light of the circumstances under which they were made, not misleading, or (iii) a breach of the representations and warranties made by Borrower in <u>Section 4.8</u> of this Agreement (Full and Accurate Disclosure). Borrower also agrees to reimburse Lender, the Lender Group, the Issuer and/or the Underwriter Group for any legal or other expenses reasonably incurred by Lender, the Lender Group, the Issuer and/or the Underwriter Group in connection with investigating or defending the Liabilities. Borrower's liability under this paragraph will be limited to Liabilities that arise out of, or are based upon, an untrue statement or omission made in reliance upon, and in conformity with, information furnished to Lender by or on behalf of Borrower in connection with the preparation of the Disclosure Document or in connection with the underwriting or closing of the Loan, including financial statements of Borrower, operating statements and rent rolls with respect to the Property. This indemnification provision will be in addition to any liability which Borrower may otherwise have. Moreover, the indemnification and reimbursement obligations provided for in this <u>Section 9.3(b)</u> shall be effective, valid and binding obligations of Borrower, whether or not an indemnification agreement described in <u>clause (A)</u> of the first sentence of this <u>Section 9.3(b)</u> is provided.

(c)    In connection with any Exchange Act Filing or other reports containing comparable information that is required to be made "available" to holders of the Securities under Regulation AB or applicable Legal Requirements, Borrower agrees to (i) indemnify the Lender Group, the Issuer and the Underwriter Group for Liabilities to which the Lender Group, the Issuer and/or the Underwriter Group may become subject insofar as the Liabilities arise out of, or are based upon, an alleged untrue statement or alleged omission or an untrue statement or omission made in reliance upon, and in conformity with, information furnished to Lender by or on behalf of Borrower in connection with the preparation of the Disclosure Document or in connection with the underwriting or closing of the Loan, including financial statements of Borrower, operating statements and rent rolls with respect to the Property, and (ii) reimburse the Lender Group, the Issuer and/or the Underwriter Group for any third-party legal or other expenses reasonably incurred by the Lender Group, the Issuer and/or the Underwriter Group in connection with defending or investigating the Liabilities.

(d)    Promptly after receipt by an indemnified party under this <u>Section 9.3</u> of notice of the commencement of any action, such indemnified party will, if a claim in respect thereof is to be made against the indemnifying party under this <u>Section 9.3</u>, notify the indemnifying party in writing of the commencement thereof, but the omission to so notify the indemnifying party will not relieve the indemnifying party from any liability which the indemnifying party may have to any indemnified party hereunder except to the extent that failure to notify causes prejudice to the indemnifying party. In the event that any action is brought against any indemnified party, and it notifies the indemnifying party of the commencement thereof, the indemnifying party will be entitled, jointly with any other indemnifying party, to participate therein and, to the extent that it (or they) may elect by written notice delivered to the indemnified party promptly after receiving the aforesaid notice from such indemnified party, to assume the

defense thereof with counsel satisfactory to such indemnified party. After notice from the indemnifying party to such indemnified party under this Section 9.3, such indemnified party shall pay for any legal or other expenses subsequently incurred by such indemnified party in connection with the defense thereof other than reasonable costs of investigation; provided, however, if the defendants in any such action include both the indemnified party and the indemnifying party and the indemnified party shall have reasonably concluded that there are any legal defenses available to it and/or other indemnified parties that are different from or additional to those available to the indemnifying party, the indemnified party or parties shall have the right to select separate counsel to assert such legal defenses and to otherwise participate in the defense of such action on behalf of such indemnified party at the cost of the indemnifying party. The indemnifying party shall not be liable for the expenses of more than one separate counsel unless an indemnified party shall have reasonably concluded that there may be legal defenses available to it that are different from or additional to those available to the indemnifying party. Without the prior written consent of Lender (which consent shall not be unreasonably withheld or delayed), no indemnifying party shall settle or compromise or consent to the entry of any judgment in any pending or threatened claim, action, suit or proceeding in respect of which indemnification may be sought hereunder (whether or not any indemnified party is an actual or potential party to such claim, action, suit or proceeding) unless the indemnifying party shall have given Lender reasonable prior written notice thereof and shall have obtained an unconditional release of each indemnified party hereunder from all liability arising out of such claim, action, suit or proceedings.

(e) In order to provide for just and equitable contribution in circumstances in which the indemnity agreement provided for in Section 9.3(a) , (b) or (c) is for any reason held to be unenforceable as to an indemnified party in respect of any Liabilities (or action in respect thereof) referred to therein which would otherwise be indemnifiable under Section 9.3(a), (b) or (c) the indemnifying party shall contribute to the amount paid or payable by the indemnified party as a result of such Liabilities (or action in respect thereof); provided, however, that no Person guilty of fraudulent misrepresentation (within the meaning of Section 11(f) of the Securities Act) shall be entitled to contribution from any Person who was not guilty of such fraudulent misrepresentation. In determining the amount of contribution to which the respective parties are entitled, the following factors shall be considered: (i) the Issuer's and Borrower's relative knowledge and access to information concerning the matter with respect to which the claim was asserted; (ii) the opportunity to correct and prevent any statement or omission; and (iii) any other equitable considerations appropriate in the circumstances. Lender and Borrower hereby agree that it would not be equitable if the amount of such contribution were determined by pro rata or per capita allocation.

(f) The liabilities and obligations of both Borrower and Lender under this Section 9.3 shall survive the termination of this Agreement and the satisfaction and discharge of the Debt.

**9.4** **Restructuring or Componentization of Loan**.

(a) Lender, without in any way limiting Lender's other rights hereunder, in its sole and absolute discretion, shall have the right, at any time and from time-to-time (whether prior to or after any sale, participation or Securitization of all or any portion of the Loan), to require Borrower to make structural and other changes to the Loan, including to: (x) execute and deliver "component" notes, replace the original Note or modify the original Note to reflect multiple components of the Loan and such new notes or modified note (which may include I/O Notes) may have different interest rates and amortization schedules and/or (y) modify the Loan in order to create one or more senior and subordinate notes (i.e., an A/B or A/B/C, etc. structure) or pari-passu notes and/or one or more additional components (including pari-passu components) of the Note or Notes, further bifurcate the Loan into additional components, reduce the number of components of the Note or Notes, revise the interest rate for each component and/or Note(s), reallocate the principal balances of the Notes and/or the components, increase or decrease the monthly debt

service payments for each component and/or such Notes or eliminate the component structure and/or the multiple note structure of the Loan (including the elimination of the related allocations of interest payments) and provide for the repayment of each of the Notes and/or components in such order of priority as may be designated by Lender (which may be sequential), which Notes or components may have different interest rates, principal amounts, payment priorities and maturities, and/or restructure a portion of the Loan into one or more mezzanine loans (each, a "*New Mezzanine Loan*") to the owners of the direct and/or indirect equity interests in Borrower, secured by a pledge of such equity interests, establish different interest rates and debt service payments for the Loan and each New Mezzanine Loan and provide for the repayment of the Loan and each New Mezzanine Loan in such order of priority as may be designated by Lender, and/or consolidate one or more (including all) of such New Mezzanine Loans into the Loan or into other New Mezzanine Loan(s) and eliminate any New Mezzanine Loan structure.

(b)        In the case of a restructuring under Section 9.4(a), (i) the total amounts of (x) the Loan and the Note or Notes (and all such components thereof) or (y) the total amounts of the Loan and the New Mezzanine Loan (and all such components thereof), as applicable, immediately after such restructuring shall equal the amount of the Loan immediately prior to such restructuring, (ii) except in the case of an Event of Default under the Loan or the New Mezzanine Loan or any voluntary or involuntary prepayment of all or any portion of the Loan and/or any New Mezzanine Loan (including, but not limited to a full or partial prepayment of the Loan and/or any New Mezzanine Loan(s) in connection with a casualty or condemnation), the weighted average interest rate of the Loan and the New Mezzanine Loan, if any, immediately after such restructuring shall, in the aggregate, be no greater than the weighted average interest rate which was applicable to the Loan immediately prior to the restructuring, and (iii) except in the case of an Event of Default under the Loan or the New Mezzanine Loan or any voluntary or involuntary prepayment of the Loan and/or any New Mezzanine Loan (including, but not limited to a full or partial prepayment of the Loan and/or any New Mezzanine Loan(s) in connection with a casualty or condemnation), the total aggregate amount of monthly debt service payments on the Loan and the New Mezzanine Loan immediately after such restructuring shall be equal to the total aggregate amount of monthly debt service payments that would have been due under the Loan had the restructuring not occurred.

(c)        Upon written notice from Lender to Borrower (a "*Componentization Notice*"), the Note or Notes will be deemed to be subdivided into multiple components (which may be structured as pari-passu or A/B/C etc. components). Each Note component shall have a notional balance and interest rate as specified in the Componentization Notice. Any voluntary or involuntary prepayment of the principal of a Note shall be applied as set forth in the Componentization Notice (which may be sequential). During the continuance of any Event of Default, any payment of principal from whatever source may be applied by Lender among the components in Lender's sole discretion. The components need not be represented by separate physical Notes, but if requested by Lender in writing, each component shall be represented by a separate physical Note, in which case the applicable Borrowers shall execute and return to Lender such replacement Note, in the same form as the Note executed and delivered on the Closing Date.

(d)        In the case of a componentization under Section 9.4(c), (i) the total principal amount of all components of the Loan immediately after such componentization shall equal the principal amount of the Loan immediately prior to such componentization, (ii) the weighted average interest rate of the components immediately after such componentization shall, in the aggregate, be no greater than the interest rate that was applicable to the Loan immediately prior to the componentization, and (iii) the total aggregate amount of monthly debt service payments on the Loan immediately after such componentization shall be equal to the total aggregate amount of monthly debt service payments that would have been due under the Loan had the componentization not occurred.

(e)     Borrower shall reasonably cooperate with all reasonable requests of Lender in order to restructure the Loan (including the creation of any or all components and/or Notes thereof) and create or restructure the New Mezzanine Loan as provided in this Section 9.4 and shall (A) modify the Loan Documents including the Deposit Agreement to reflect the newly created components and/or mezzanine loan and execute and deliver such documents including, (x) in the case of the delivery of new Notes or components thereof, new Notes and note splitter agreements, and (y) in the case of the New Mezzanine Loan, a mezzanine note, a mezzanine loan agreement, a pledge and security agreement (including a pledge of 100% of the ownership and economic interests in Borrower) and a mezzanine deposit account agreement, (B) cause Borrower's counsel to deliver such legal opinions and (C) create such newly formed bankruptcy remote borrower under the New Mezzanine Loan as, in the case of each of (A), (B) and (C) above, shall be reasonably required by Lender and required by any Rating Agency in connection therewith, all in form and substance reasonably satisfactory to Lender and satisfactory to any such Rating Agency, including the severance of this Agreement, the Security Instrument and other Loan Documents if requested.

(f)     Borrower covenants and agrees that any such reallocation (as described above) will be in compliance with the representation, warranty or covenant set forth in Sections 4.1.2 or 5.12 hereof and in the definition of Special Purpose Entity set forth in Schedule 4.

(g)     Notwithstanding the foregoing, Borrower hereby acknowledges that, (i) in the event that Borrower shall make a prepayment of the Loan without making a simultaneous pro-rata prepayment of the New Mezzanine Loan, such voluntary prepayment will result in "rate creep" when taking into account the blended interest rate between the Loan and the New Mezzanine Loan and (ii) any prepayments of the Loan (including prepayments made as a result of the application of Net Proceeds and/or Awards and prepayments made during the continuance of an Event of Default) and any other payments made in reduction of the Outstanding Principal Balance (including the payment of the monthly debt service payments) may result in "rate creep" when taking into account the blended interest rate between the components of the Loan.

(h)     Lender, without in any way limiting Lender's other rights hereunder, in its sole and absolute discretion, shall have the right, at any time and from time-to-time (whether prior to or after any sale, participation or Securitization of all or any portion of the Loan), to require Borrower to (A) reallocate principal balances, (B) increase or decrease the interest payments, (C) revise interest rates, and/or (D) provide for the repayments between the Loan (including any or all components and/or Notes thereof) and any New Mezzanine Loan in such order and priority as may be designated by Lender, including, but not limited to, reallocating the entire principal balance of any New Mezzanine Loan to the Loan (or any one or more of the components and/or Notes thereof) or to another New Mezzanine Loan and terminating such New Mezzanine Loan; provided, however, that in any such case of a restructuring under this Section 9.4(h), (i) the total amount of the Loan and the New Mezzanine Loan(s) immediately after such reallocation shall equal the total amount of the Loan and the New Mezzanine Loan(s) immediately prior to the reallocation, (ii) except in the case of an Event of Default under the Loan and/or any New Mezzanine Loan or any voluntary or involuntary prepayment of the Loan and/or any New Mezzanine Loan (including, but not limited to a full or partial prepayment of the Loan and/or the New Mezzanine Loan(s) in connection with a casualty or condemnation), the weighted average interest rate of the Loan and the New Mezzanine Loan(s) shall, in the aggregate, equal the weighted average interest rate which was applicable to the Loan and the New Mezzanine Loan(s), in the aggregate, immediately prior to the reallocation and (iii) except in the case of an Event of Default under the Loan and/or any New Mezzanine Loan or any voluntary or involuntary prepayment of the Loan and/or any New Mezzanine Loan (including, but not limited to a full or partial prepayment of the Loan and/or any New Mezzanine Loan in connection with a casualty or condemnation), the aggregate of the debt service payments on the Loan and the New Mezzanine Loan(s)

DM_US 183358854-7.105065.0051

immediately after such reallocation shall equal the aggregate of the debt service payments that would have been due had such allocation not occurred. If, as a result of a reallocation, the principal amount of the Loan is decreased, then (A) the Borrower shall take all actions as are reasonably necessary to effect the "resizing" of the New Mezzanine Loan(s) and the Loan, (B) the Borrower shall cause the New Mezzanine Borrower to comply with its agreements to effect a "resizing", and (C) Lender shall on the date of the "resizing" of the Loan lend to the New Mezzanine Borrower (by way of a reallocation of the principal amount of the Loan and the New Mezzanine Loan(s)) such additional amount equal to the amount of the principal reduction of the Loan provided that Borrower and New Mezzanine Borrower execute and deliver any and all amendments or modifications to the Loan Documents and the New Mezzanine Loan Documents reasonably required by Lender. If, as a result of a reallocation, the principal amount of the Loan is increased, then (I) Borrower shall take all actions as are reasonably necessary to effect the "resizing" of the Loan and the New Mezzanine Loan(s), (II) Borrower shall cause the New Mezzanine Borrower to comply with its agreements to effect a "resizing" and (III) Lender shall on the date of the "resizing" of the Loan lend to the Borrower (by way of a reallocation of the principal amount of the Loan and the New Mezzanine Loan(s)) an additional amount equal to the amount of principal reduction of the New Mezzanine Loan(s), provided that Borrower and New Mezzanine Borrower execute and deliver any and all modifications to the Loan Documents and the New Mezzanine Loan Documents reasonably required by Lender. In connection with the foregoing, Borrower agrees to execute and deliver such documents, amendments and other agreements reasonably required by New Mezzanine Lender(s) and/or Lender in order to effectuate the provisions of this Section 9.4(h), including, without limitation, an amendment to this Agreement, the Note, the Security Instrument and the other Loan Documents and, if the principal amount of the Loan is increased, an endorsement to the Title Policy reflecting an increase in the insured amount thereunder. Any such reallocation of loan amounts between the Loan and any New Mezzanine Loan, as set forth above, shall be deemed to be, and shall be recorded on the books and records of the Borrower and the New Mezzanine Borrower as an additional loan to the party whose obligations have increased, followed by a capital contribution or distribution, as applicable, to the party whose obligations have decreased, and any such reallocation shall be conducted in accordance with and compliance with the separateness provisions set forth in Sections 4.1.2 and 5.12 hereof and in the definition of Special Purpose Entity set forth in Schedule 4, with the similar provisions contained in the New Mezzanine Loan Documents, and in each party's organizational documents. Furthermore, Borrower agrees to cause Borrower's counsel to deliver such legal opinions as shall be reasonably required by Lender and required by any Rating Agency in connection with the modifications contemplated by this Section 9.4(h), all in form and substance reasonably satisfactory to Lender and satisfactory to any such Rating Agency. In the event Borrower fails to execute and deliver such documents to Lender within ten (10) Business Days following such request by Lender, Borrower hereby absolutely and irrevocably appoints Lender as its true and lawful attorney, coupled with an interest, in its name and stead to make and execute all documents necessary or desirable to effect such transactions, Borrower ratifying all that such attorney shall do by virtue thereof. It shall be an Event of Default if Borrower fails to comply with any of the terms, covenants or conditions of this Section 9.4(h) after the expiration of ten (10) Business Days after notice thereof. Borrower covenants and agrees that any such reallocation (as described above) will be in compliance with the representations and warranties set forth Sections 4.1.2 and 5.12 hereof and in the definition of Special Purpose Entity set forth in Schedule 4. Notwithstanding the foregoing, Borrower hereby acknowledges that (i) in the event that Borrower shall make a prepayment of the Loan without making a simultaneous pro-rata prepayment of any New Mezzanine Loan(s), such prepayment will result in "rate creep" when taking into account the blended interest rate between the Loan, and the New Mezzanine Loan(s) and (ii) any prepayments of the Debt (including prepayments made as a result of the application of Net Proceeds and/or Awards and prepayments made during the continuance of an Event of Default) and any other payments made in reduction of the Outstanding Principal Balance (including the payment of the monthly debt service payments) may result in "rate creep".

(i)     In the event Borrower fails to execute and deliver any documents as and when required under this Section 9.4 to Lender within ten (10) Business Days following a request therefor by Lender, Borrower hereby absolutely and irrevocably appoints Lender as its true and lawful attorney, coupled with an interest, in its name and stead to make and execute all documents necessary or desirable to effect such transactions, Borrower ratifying all that such attorney shall do by virtue thereof. It shall be an Event of Default if Borrower fails to comply with any of the terms, covenants or conditions of this Section 9.4 after the expiration of ten (10) Business Days after notice thereof.

**9.5     Costs and Expenses**.     All costs and expenses incurred by Borrower, any Guarantor, Manager and their respective Affiliates and Lender in connection with the restructuring of the Loan as contemplated by <u>Section 9.4</u> or in connection with a Secondary Market Transaction (including, without limitation, the fees and expenses of any Rating Agency) shall be paid by Borrower.

# 10.     DEFAULTS.

**10.1     Events of Default.**     Each of the following events shall constitute an event of default hereunder (an "***Event of Default***"):

(a)     if (A) the Debt not paid in full on the Maturity Date, (B) any regularly scheduled monthly payment of interest, and, if applicable, principal due under the Note is not paid in full on the applicable Payment Date, (C) any prepayment of principal due under this Agreement or the Note is not paid when due, (D) the Spread Maintenance Premium is not paid when due, or (E) any deposit of Reserve Funds is not made on the required deposit date therefor;

(b)     if any other amount payable pursuant to this Agreement, the Note or any other Loan Document (other than as set forth in the foregoing <u>clause (a)</u>) is not paid in full when due and payable in accordance with the provisions of the applicable Loan Document, with such failure continuing for ten (10) Business Days after Lender delivers written notice thereof to Borrower;

(c)     if any of the Taxes or Other Charges are not paid when due (provided that it shall not be an Event of Default if such past due Taxes are Property Taxes and there are sufficient funds in the Tax Subaccount to pay such amounts when due, no other Event of Default is then continuing and Lender fails to make such payment in violation of this Agreement);

(d)     if the Policies are not (A) kept in full force and effect, or (B) delivered to Lender, each in accordance with the terms and conditions hereof; provided, however, with respect to <u>clause (B)</u>, only if such failure continues for ten (10) Business Days after notice from Lender;

(e)     a Transfer other than a Permitted Transfer occurs; provided, however, that if the breach of the foregoing is due solely to the failure by Borrower to provide certain notices to Lender and such failure is susceptible of cure, Borrower shall have an additional thirty (30) days after the occurrence of such breach to provide such notices to Lender;

(f)     if any certification, representation or warranty made by Borrower or Guarantor herein or in any other Loan Document, or in any report, certificate, financial statement or other instrument, agreement or document furnished to Lender shall have been false or misleading in any material respect as of the date the certification, representation or warranty was made; provided, however, that if such false or misleading representation or warranty was not an intentional misrepresentation or warranty and is susceptible of being cured, so long as such misrepresentation does not have a material adverse effect on the Property, the use operation or value of the Property or any portion thereof (or the business and operations

108

thereon), or the business operations and/or the financial condition of Borrower, Borrower shall have the right to cure the underlying facts or circumstances that cause the applicable representation or warranty to have been false or misleading (as opposed to merely providing notice to Lender of such facts or circumstances) within ten (10) days after the earlier of (A) written notice from Lender, and (B) Borrower obtaining knowledge that such information was false or misleading; provided, however, that if the condition causing the representation or warranty to be false is susceptible of cure but cannot reasonably be cured within such ten (10) day period and Borrower shall have commenced to cure such condition within such ten (10) day period and thereafter diligently proceeds to cure the same, then such ten (10) day period shall be extended for such an additional period as is reasonably necessary for Borrower to cure such condition, such additional period not to exceed thirty (30) days;

(g)     if Borrower, or Guarantor shall (i) make an assignment for the benefit of creditors or (ii) generally not be paying its debts as they become due;

(h)     if a receiver, liquidator or trustee shall be appointed for Borrower, or Guarantor; or Borrower, or Guarantor shall be adjudicated a bankrupt or insolvent; or any petition for bankruptcy, reorganization or arrangement pursuant to federal bankruptcy law, or any similar federal, state, local or foreign law, shall be filed by or against, consented to, or acquiesced in by, Borrower, or Guarantor, as the case may be; or if any proceeding for the dissolution or liquidation of Borrower, or Guarantor shall be instituted; provided, however, if such appointment, adjudication, petition or proceeding was involuntary and not consented to by Borrower, or Guarantor, as the case may be, only upon the same not being discharged, stayed or dismissed within ninety (90) days following its filing;

(i)     if Borrower attempts to assign its rights or delegate its duties under this Agreement or any of the other Loan Documents or any interest herein or therein in contravention of the Loan Documents;

(j)     if, without Lender's prior written consent (as provided in <u>Section 5.11.2(a)</u>. of this Agreement), (A) the Management Agreement is surrendered, terminated, canceled, modified, renewed, extended or otherwise allowed to expire (other than, in the case of a renewal or extension, a renewal or extension provided for in the Management Agreement), unless in the case of an expiration or a termination or cancellation by Manager (other than any such termination or cancellation by an Affiliate Manager or that Borrower, Guarantor, any Affiliate of Borrower or Guarantor or any of their respective agents or representatives has consented to, solicited, requested or otherwise colluded with Manager with respect to), Borrower, contemporaneously with such expiration, termination or cancellation, enters into a Replacement Management Agreement with a Qualified Manager in accordance with the applicable terms and conditions of this Agreement, (B) the ownership, management or Control of an Affiliated Manager is Transferred other than in accordance with the terms hereof, (C) Borrower defaults under the Management Agreement beyond the expiration of any applicable notice and/or cure periods thereunder, which default permits Manager to terminate or cancel the Management Agreement or (D) Borrower waives or releases any of its right or remedies under the Management Agreement in any material respect;

(k)     if Borrower ceases to continuously operate the Property or any material portion thereof as an office building for any reason whatsoever (other than the temporary cessation in connection with any repair or renovation thereof undertaken with the prior written consent of Lender or due to any governmental restrictions generally applicable to businesses in the area of the Property and not specific to the Property only);

(l)     a breach of the covenant contained in <u>Sections 5.15</u>;

(m)     except as expressly permitted herein, the actual or threatened alteration, improvement, demolition or removal of any of the Improvements without the prior written consent of Lender or the intentional physical waste of any portion of the Property;

(n)     if Borrower breaches any representation, warranty or covenant contained in Sections 4.1.2 or 5.12 hereof or on Schedule 4 attached hereto; provided, however, that any such breach shall not constitute an Event of Default if (i) such breach was inadvertent, immaterial and non-recurring, (ii) such breach is curable, and Borrower shall promptly cure such breach within ten (10) Business Days after becoming aware of the occurrence of such breach and (iii) within thirty (30) days after Borrower becomes aware of such breach, a substantive non-consolidation opinion to the effect that such breach shall not in any material way impair, negate or amend any opinions delivered in any existing non-consolidation opinion, which opinion and counsel delivering such opinion shall be acceptable to Lender in Lender's sole discretion;

(o)     if Borrower shall be in default under any mortgage or security agreement covering any part of the Property whether it be superior, *pari passu* or junior in Lien to the Security Instrument;

(p)     subject to Borrower's right to contest set forth in Section 5.2 of this Agreement or to bond same in accordance with Legal Requirements, if the Property becomes subject to any mechanic's, materialman's or other Lien except a Permitted Encumbrance or a Lien for Property Taxes not then due and payable;

(q)     if Borrower fails to replace Guarantor with a Satisfactory Replacement Guarantor upon the death or incapacity of Guarantor in accordance with the terms and provisions of Section 8.2 hereof;

(r)     if Borrower or any Person owning a direct or indirect ownership interest in Borrower shall be convicted of a Patriot Act Offense by a court of competent jurisdiction;

(s)     if Borrower fails to obtain or maintain an Interest Rate Protection Agreement, the Converted Interest Rate Protection Agreement, or the Substitute Interest Rate Protection Agreement, as applicable, in accordance with Section 2.7 and/or Section 2.9 hereof;

(t)     intentionally deleted;

(u)     if there shall be a default under any of the other Loan Documents beyond any applicable notice and/or cure periods contained in such Loan Documents, whether as to Borrower, Guarantor, Manager, the Property or any other Person (other than Lender), or if any other such event shall occur or condition shall exist, and the effect of such event or condition is to accelerate the maturity of any portion of the Debt or to permit Lender to accelerate the maturity of all or any portion of the Debt;

(v)     if any of the assumptions contained in the Insolvency Opinion, is or shall become untrue in any material respect;

(w)     if Borrower fails to comply fully, completely and timely with the covenants and agreements set forth in Article 9;

(x)     [intentionally deleted];

(y)     any breach of the provisions in this Agreement relating to Anti-Corruption Rules or Sanctions; or

110

(z)     if there shall continue to be a Default under any of the other terms, covenants or conditions of this Agreement or any other Loan Document not otherwise specified in subclauses (a) to (y) above, and such Default shall continue for ten (10) Business Days after notice to Borrower (or Guarantor, if applicable) from Lender, in the case of any such Default which can be cured by the payment of a sum of money, or for thirty (30) days after notice to Borrower from Lender in the case of any other such Default; provided, however, that if such non-monetary Default is susceptible of cure but cannot reasonably be cured within such thirty (30) day period, and provided further that Borrower (or Guarantor, if applicable) shall have commenced to cure such default within such thirty (30) day period and thereafter diligently and expeditiously proceeds to cure the same, such thirty (30) day period shall be extended for an additional period of time as is reasonably necessary for Borrower (or Guarantor, if applicable) in the exercise of due diligence to cure such default, such additional period not to exceed ninety (90) days.

**10.2    Remedies.**

**10.2.1   Acceleration.**  Upon the occurrence and during the continuance of an Event of Default (other than an Event of Default described in subsection (g), (h) or (i) of Section 10.1) and at any time and from time to time thereafter, Lender may, in addition to any other rights or remedies available to Lender pursuant to this Agreement and the other Loan Documents or at law or in equity, take such action, without notice or demand (and Borrower hereby expressly waives any such notice or demand), that Lender deems advisable to protect and enforce its rights against Borrower and in and to the Property; including declaring the Debt to be immediately due and payable (including unpaid interest), interest at the Default Rate, Late Payment Charges, Spread Maintenance Premium, and any other amounts owing by Borrower), and Lender may enforce or avail itself of any or all rights or remedies provided in the Loan Documents against Borrower and the Property, including all rights or remedies available at law or in equity; and upon any Event of Default described in subsection (g), (h) or (i) of Section 10.1, the Debt (including unpaid interest, interest at the Default Rate, Late Payment Charges, Spread Maintenance Premium, and any other amounts owing by Borrower) shall immediately and automatically become due and payable in full, without notice or demand, and Borrower hereby expressly waives any such notice or demand, anything contained herein or in any other Loan Document to the contrary notwithstanding.

**10.2.2   Remedies Cumulative.**  During the continuance of an Event of Default, all or any one or more of the rights, powers, privileges and other remedies available to Lender against Borrower under this Agreement or the other Loan Documents executed and delivered by, or applicable to, Borrower or at law or in equity may be exercised by Lender at any time and from time to time, whether or not all or any of the Debt shall be declared, or be automatically, due and payable, and whether or not Lender shall have commenced any foreclosure proceeding or other action for the enforcement of its rights and remedies under any of the Loan Documents with respect to the Property.  The rights, powers and remedies of Lender under this Agreement shall be cumulative and not exclusive of any other right, power or remedy which Lender may have against Borrower pursuant to this Agreement or the other Loan Documents, or existing at law or in equity or otherwise.  Lenders' rights, powers and remedies may be pursued independently, singly, successively, together or otherwise, at such time and in such order as Lender may determine in its sole discretion, to the fullest extent permitted by law, without impairing or otherwise affecting the other rights and remedies of Lender permitted by law or contract or as set forth herein or in the other Loan Documents or by equity. Without limiting the generality of the foregoing, Borrower agrees that if an Event of Default is continuing, (i) to the extent permitted by applicable law, Lender is not subject to any "one action" or "election of remedies" law or rule, and (ii) all Liens and other rights, remedies or privileges provided to Lender shall remain in full force and effect until Lender has exhausted all of its remedies against the Property and the Security Instrument has been foreclosed, the Property has been sold or otherwise realized upon in satisfaction of the Debt or the Debt has been paid in full.  To the extent permitted by applicable

111

law, nothing contained in any Loan Document shall be construed as requiring Lender to resort to any portion of the Property for the satisfaction of any of the Debt in preference or priority to any other portion, and Lender may seek satisfaction out of the entire Property or any part thereof, in its discretion.

### 10.2.3 Severance.

(a)     During the continuance of an Event of Default, Lender shall have the right from time to time to partially foreclose the Security Instrument in any manner and for any amounts secured by the Security Instrument then due and payable as determined by Lender in its sole discretion, including the following circumstances:  (i) in the event Borrower defaults beyond any applicable grace period in the payment of one or more scheduled payments of principal and interest, Lender may foreclose the Security Instrument to recover such delinquent payments, or (ii) in the event Lender elects to accelerate less than the entire Outstanding Principal Balance of the Loan, Lender may foreclose the Security Instrument to recover so much of the principal balance of the Loan as Lender may accelerate and such other sums secured by the Security Instrument as Lender may elect.  Notwithstanding one or more partial foreclosures, the Property shall remain subject to the Security Instrument to secure payment of the sums secured by the Security Instrument and not previously recovered.

(b)     During the continuance of an Event of Default, Lender shall have the right from time to time to sever the Note and the other Loan Documents into one or more separate notes, mortgages and other security documents (and, in connection therewith, to bifurcate or otherwise modify the nature of the collateral that secures such notes) in such denominations as Lender shall determine in its sole discretion for purposes of evidencing and enforcing its rights and remedies.  Borrower shall execute and deliver to Lender from time to time, promptly after the request of Lender, a severance agreement and such other documents as Lender shall request in order to effect the severance described in the preceding sentence, all in form and substance reasonably satisfactory to Lender.  Borrower hereby absolutely and irrevocably appoints Lender as its true and lawful attorney, coupled with an interest, in its name and stead to make and execute all documents necessary or desirable to effect the aforesaid severance, Borrower ratifying all that its said attorney shall do by virtue thereof.

(c)     During the continuance of an Event of Default, any amounts recovered from the Property or any other collateral for the Loan after an Event of Default may be applied by Lender toward the payment of any interest and/or principal of the Loan and/or any other amounts due under the Loan Documents, including the Spread Maintenance Premium in such order, priority and proportions as Lender in its sole discretion shall determine.

### 10.2.4 Delay.  No delay or omission to exercise any remedy, right or power accruing upon an Event of Default, or the granting of any indulgence or compromise by Lender shall impair any such remedy, right or power hereunder or be construed as a waiver thereof, but any such remedy, right or power may be exercised from time to time and as often as may be deemed expedient.  A waiver of one Default or Event of Default shall not be construed to be a waiver of any subsequent Default or Event of Default or to impair any remedy, right or power consequent thereon.  Notwithstanding any other provision of this Agreement, Lender reserves the right to seek a deficiency judgment or preserve a deficiency claim in connection with the foreclosure of the Security Instrument to the extent necessary to foreclose on all or any portion of the Property, the Rents, the Cash Management Accounts or any other collateral.

### 10.2.5 Lender's Right to Perform.  If Borrower fails to perform any covenant or obligation contained herein and such failure shall continue for a period of fifteen (15) Business Days after Borrower's receipt of written notice thereof from Lender, without in any way limiting Lender's right to

112

exercise any of its rights, powers or remedies as provided hereunder, or under any of the other Loan Documents, Lender may, but shall have no obligation to, perform, or cause performance of, such covenant or obligation, and all costs, expenses, liabilities, penalties and fines of Lender incurred or paid in connection therewith shall be payable by Borrower to Lender upon demand and if not paid shall be added to the Debt (and to the extent permitted under applicable laws, secured by the Security Instrument and other Loan Documents). Notwithstanding the foregoing, Lender shall have no obligation to send notice to Borrower of any such failure.

## 11. <u>MISCELLANEOUS</u>.

**11.1** <u>Exculpation</u>. Subject to the qualifications below, Lender shall not enforce the liability and obligation of Borrower to perform and observe the obligations contained in the Note, this Agreement, the Security Instrument and the other Loan Documents by any action or proceeding wherein a money judgment shall be sought against Borrower, except that Lender may bring a foreclosure action, an action for specific performance or any other appropriate action or proceeding to enable Lender to enforce and realize upon its interest and rights under the Note, this Agreement, the Security Instrument and the other Loan Documents, or in the Property, the Gross Revenue or any other collateral given to Lender pursuant to the Loan Documents; provided, however, that, except as specifically provided herein, any judgment in any such action or proceeding shall be enforceable against Borrower only to the extent of Borrower's interest in the Property, in the Gross Revenues and in any other collateral given to Lender, and Lender by accepting the Note, this Agreement, the Security Instrument and the other Loan Documents, shall not sue for, seek or demand any deficiency judgment against Borrower in any such action or proceeding under or by reason of or under or in connection with the Note, this Agreement, the Security Instrument and the other Loan Documents. The provisions of this <u>Section 11.1</u> shall not, however, (i) constitute a waiver, release or impairment of any obligation evidenced or secured by any of the Loan Documents; (ii) impair the right of Lender to name Borrower as a party defendant in any action or suit for foreclosure and sale under the Security Instrument; (iii) affect the validity or enforceability of any of the Loan Documents or any guaranty made in connection with the Loan or any of the rights and remedies of Lender thereunder; (iv) impair the right of Lender to obtain the appointment of a receiver; (v) impair the enforcement of the Assignment of Leases; (vi) constitute a prohibition against Lender to seek a deficiency judgment against Borrower in order to fully realize the security granted by the Security Instrument or to commence any other appropriate action or proceeding in order for Lender to exercise its remedies against the Property, (vii) constitute a waiver of the right of Lender to enforce the liability and obligation of Borrower, by money judgment or otherwise, to the extent of any loss, damage, reasonable third-party out-of-pocket cost, expense, liability, claim or other obligation actually incurred by Lender (including attorneys' fees and costs reasonably incurred) arising out of or in connection with the following (all such liability and obligation of Borrower for any or all of the following being referred to herein as "***Borrower's Recourse Liabilities***"):

(a)       in connection with the Loan or the Property (including, without limitation, any Lease), Borrower, any Guarantor, any Key Principal, any Affiliate of Borrower or any Guarantor or any Key Principal or any of their respective agents or representatives, engages in any action constituting fraud, willful or material misrepresentation, gross negligence or willful misconduct;

(b)       the breach of any representation, warranty, covenant or indemnification in any Loan Document concerning Environmental Laws or Hazardous Substances, including <u>Sections 4.19</u> and <u>5.7</u>, and <u>clauses (viii)</u> through <u>(xi)</u> of <u>Section 5.20</u>;

DM_US 183358854-7.105065.0051

(c)  any intentional physical waste of the Property or, after the occurrence and during the continuance of an Event of Default, the removal or disposal of any portion of the Property that is not promptly replaced with items of similar or greater value and utility;

(d)  the misapplication, misappropriation or conversion by Borrower of (w) any Insurance Proceeds paid by reason of any loss, damage or destruction to the Property, (x) any Award or other amounts received in connection with a Condemnation, or (y) any Gross Revenue (including any Rents, security deposits, advance deposits or any other deposits and Lease Termination Payments (other than the Valley National Termination Fee)), and (z) any, refund of Taxes or amounts in any Subaccount (including any distributions or payments to members/partners/shareholders of Borrower during a period which Lender did not receive the full amounts required to be paid to Lender under the Loan Documents);

(e)  failure to pay charges (including charges for labor or materials) that can create Liens on any portion of the Property to the extent such Liens are not bonded over or discharged in accordance with the terms of the Loan Documents; unless either (w) such charges are the subject of a bona fide dispute in which Borrower is contesting the amount or validity thereof, in accordance with the Loan Documents, (x) funds to pay the same were held in the Subaccounts, and Borrower satisfied the terms and conditions required for release of such funds in accordance with the Loan Documents, but Lender failed to release such funds as required pursuant to the Loan Documents, or (y) there is insufficient cash flow from the Property to pay the same;

(f)  the failure to (A) pay Taxes (provided that Borrower shall not be liable to the extent (x) such unpaid Taxes are Property Taxes and there are sufficient funds in the Tax Subaccount to pay such amounts when due, no other Event of Default is then continuing and Lender failed to make such payment in violation of this Agreement or (y) the Property did not generate sufficient revenue to pay same) or (B) obtain and maintain the fully paid for Policies in accordance with Section 7.1 hereof (provided that Borrower shall not be liable to the extent (x) funds to pay for Insurance Premium are available in the Insurance Subaccount and Lender failed to pay the same in violation of this Agreement or (y) the Property did not generate sufficient revenue to pay same);

(g)  any security deposits, advance deposits or any other deposits collected with respect to the Property which are not delivered to Lender upon a foreclosure of the Security Instrument or action in lieu thereof, except to the extent any such security deposits were applied in accordance with the terms and provisions of the applicable Leases prior to the occurrence of the Event of Default that gave rise to such foreclosure or action in lieu thereof;

(h)  the commission of a felony criminal act by Borrower, or any Guarantor;

(i)  intentionally deleted;

(j)  the failure by Borrower or any Guarantor to cooperate with Lender's execution of a Secondary Market Transaction pursuant to the terms and provisions of Section 9.1 hereof or to comply with the terms of Section 9.4 hereof;

(k)  the failure by Borrower to satisfy in full its indemnification obligations pursuant to and in accordance with the terms and provisions of Section 9.3 hereof;

(l)  Borrower's failure to maintain the Interest Rate Protection Agreement, the Converted Interested Rate Protection Agreement or the Substitute Interest Rate Protection Agreement, as applicable, in accordance with the terms and provisions of this Agreement;

114

(m)     the amendment, modification, termination, cancellation or acceptance of a surrender of any Material Lease, or the waiver of any of the terms or provisions of any Material Lease, in each case without Lender's prior written consent; or

(n)     except as set forth in clause (2) below, the Borrower fails to comply with any representation, warranty or covenant set forth in Sections 4.1.2, 5.12 and Schedule 4 attached hereto or a breach of any of the representations set forth in the "Recycled SPE Certificate" delivered to Lender in connection with the Loan.

Notwithstanding anything to the contrary in this Agreement or any of the Loan Documents, (A) Lender shall not be deemed to have waived any right which Lender may have under Section 506(a), 506(b), 1111(b) or any other provisions of the Bankruptcy Code to file a claim for the full amount of the Debt or to require that all collateral shall continue to secure all of the Debt in accordance with the Loan Documents, and (B) Lender's agreement not to pursue personal liability of Borrower as set forth above SHALL BECOME NULL AND VOID and shall be of no further force and effect, and the Debt shall be fully recourse to Borrower in the event that any of the following occurs (each, a "***Springing Recourse Event***"):

(1)     Borrower fails to obtain Lender's prior written consent to any Transfer (including, without limitation, any change in Management Control) except to the extent expressly permitted by the Loan Documents;

(2)     Borrower fails to comply with any representation, warranty or covenant set forth in Sections 4.1.2, 5.12 and Schedule 4 attached hereto and the estate of Borrower shall be substantively consolidated with the estate of another Person;

(3)     Borrower files a voluntary petition under the Bankruptcy Code or any other federal, state, local or foreign bankruptcy or insolvency law;

(4)     Borrower fails to obtain Lender's prior written consent to any Indebtedness or any voluntary Lien encumbering the Property or any portion thereof or interest therein (other than the Mezzanine Loan), except to the extent expressly permitted by the Loan Documents;

(5)     an Affiliate, officer, director or representative which Controls, directly or indirectly, Borrower files, or joins in the filing of, an involuntary petition against Borrower under the Bankruptcy Code or any other federal, state, local or foreign bankruptcy or insolvency law, solicits or causes to be solicited petitioning creditors for any involuntary petition against Borrower from any Person or colludes with or otherwise assists such Person;

(6)     Borrower files an answer consenting to, or otherwise acquiescing in, or joining in, any involuntary petition filed against it, by any other Person under the Bankruptcy Code or any other federal, state, local or foreign bankruptcy or insolvency law, solicits or causes to be solicited petitioning creditors for any involuntary petition against Borrower from any Person or colludes with or otherwise assists such Person;

(7)     any Affiliate, officer, director or representative which Controls Borrower consents to, or acquiesces in, or joins in, an application for the appointment of a custodian, receiver, trustee or examiner for Borrower or any portion of the Property;

(8)     Borrower makes an assignment for the benefit of creditors, or admits, in writing or in any legal proceeding, its insolvency or inability to pay its debts as they become due; or

(9)     Borrower, any Guarantor (or any Person comprising Borrower or any Guarantor), or any Affiliate of any of the foregoing, in connection with any enforcement action or exercise or assertion of any right or remedy by or on behalf of Lender under or in connection with the Note, the Security Instrument, the Guaranty or any other Loan Document, seeks a defense, judicial intervention or injunctive or other equitable relief of any kind or asserts in a pleading filed in connection with a judicial proceeding any defense against Lender or any right in connection with any security for the Loan, which is frivolous, brought in bad faith, without merit (in the case of a defense) or unwarranted (in the case of a request for judicial intervention or injunctive or other equitable relief) as determined by the applicable court after all final appeals.

**11.2     Brokers and Financial Advisors**.

(a)     Borrower hereby represents that, except for JLL ("**Broker**"), it has dealt with no financial advisors, brokers, underwriters, placement agents, agents or finders in connection with the transactions contemplated by this Agreement.  Borrower shall indemnify, defend and hold Lender harmless from and against any and all claims, liabilities, reasonable third-party out-of-pocket costs and expenses of any kind (including Lender's attorneys' fees and expenses) in any way relating to or arising from a claim by any Person (other than Broker) that such Person acted on behalf of Borrower or Lender in connection with the transactions contemplated herein.  The provisions of this Section 11.2 shall survive the expiration and termination of this Agreement and the payment of the Debt and performance of the other obligations under the Loan Documents.

(b)     Lender may pay compensation, fees, commissions or other payments to Broker or any other Person relating to the origination, sale and/or Securitization of the Loan, in addition to any other compensation, fees, commissions or other payments which may be paid by Borrower or any other party directly to Broker.  Borrower hereby acknowledges and agrees that (i) the payment of any such compensation, fees, commissions or other payments are in addition to any other compensation, fees, commissions or other payments which may be paid by Borrower or any other party directly to Broker, and (ii) the payment of any such compensation, fees, commissions or other payments may create a potential conflict of interest for Broker in its relationship with Borrower.  Borrower acknowledges that (A) it has had an opportunity to discuss the specifics of any compensation, fees, commissions or other payments with Broker to the extent Borrower deemed necessary and Borrower has independently determined to proceed with the Loan and (B) consents to any such arrangement and the payment by Lender to Broker, or to any other Person, of any such compensation, fees, commissions or other payments**.**

**11.3     Retention of Servicer**.

(a)     At the option of Lender, the Loan may be serviced by a master servicer, primary servicer, special servicer and/or trustee (any such master servicer, primary servicer, special servicer and trustee, together with its agents, designees or nominees, collectively, "**Servicer**") selected by Lender and Lender may delegate all or any portion of its responsibilities under the Loan Documents to the Servicer pursuant to a pooling and servicing agreement, servicing agreement, special servicing agreement and/or other agreement providing for the servicing of one or more mortgage loans (collectively, the "**Servicing Agreement**") between Lender and Servicer.  Borrower shall be responsible for any reasonable set-up fees and any other initial costs relating to or arising under the Servicing Agreement.  In addition, Borrower shall pay (i) any reasonable fees and expenses of Servicer (including, without limitation, third-party attorneys'

fees and disbursements) in connection with any release of the Property or a portion thereof, any prepayment, defeasance, transfer, assumption, amendment or modification of the Loan, any documents or other matters requested by Borrower or any Guarantor, any special servicing or workout of the Loan or enforcement of the Loan Documents, including, without limitation, any advances made by Servicer and interest on such advances, any liquidation fees in connection with the exercise of any or all remedies permitted under this Agreement and (ii) the costs of all property inspections and/or appraisals of the Property (or any updates to any existing inspection or appraisal) that a Servicer may be required to obtain (other than the cost of regular annual inspections required to be borne by Servicer under the Servicing Agreement). Without limiting the generality of the foregoing, Servicer shall be entitled to reimbursement of costs and expenses as and to the same extent (but without duplication) as Lender is entitled thereto pursuant to the terms of the Loan Documents.

(b)    Upon notice thereof from Lender, Servicer shall have the right to exercise all rights of Lender and enforce all obligations of Borrower and any Guarantor under the Loan Documents.

(c)    Provided Borrower shall have received notice from Lender of Servicer's address, Borrower shall deliver, and cause to be delivered, to Servicer duplicate originals of all notices and other documents and instruments which Borrower and/or any Guarantor delivers to Lender pursuant to the Loan Documents. No delivery of any such notices or other documents shall be of any force or effect unless delivered to Lender and Servicer as provided in this Section 11.3.

**11.4    Survival**. This Agreement and all covenants, agreements, representations and warranties made herein and in the certificates delivered pursuant hereto shall survive the making by Lender of the Loan and the execution and delivery to Lender of the Note, and shall continue in full force and effect so long as any of the Debt is unpaid or such longer period if expressly set forth in this Agreement or the other Loan Documents. Whenever in this Agreement any of the parties hereto is referred to, such reference shall be deemed to include the legal representatives, successors and assigns of such party. All covenants, promises and agreements in this Agreement, by or on behalf of Borrower, shall inure to the benefit of the legal representatives, successors and assigns of Lender.

**11.5    Lender's Discretion; Rating Agency Review Waiver.**

(a)    Whenever pursuant to this Agreement Lender exercises any right given to it to approve or disapprove any matter, or any arrangement or term is to be satisfactory to Lender, the decision of Lender to approve or disapprove such matter or to decide whether arrangements or terms are satisfactory or not satisfactory shall (except as is otherwise specifically herein provided) be in the sole and absolute discretion of Lender and shall be final and conclusive.

(b)    Whenever, pursuant to this Agreement or any other Loan Documents, a Rating Comfort Letter is required from each applicable Rating Agency, in the event that any applicable Rating Agency "declines review", "waives review" or otherwise indicates in writing or otherwise to Lender's satisfaction that no Rating Comfort Letter will or needs to be issued with respect to the matter in question (each, a "***Review Waiver***"), then the Rating Comfort Letter requirement shall be deemed to be satisfied with respect to such matter. It is expressly agreed and understood, however, that receipt of a Review Waiver (i) from any one Rating Agency shall not be binding or apply with respect to any other Rating Agency and (ii) with respect to one matter shall not apply or be deemed to apply to any subsequent matter for which Rating Comfort Letter is required.

117

(c)     Prior to a Securitization, or in the event that there is a Review Waiver, if Lender does not have a separate and independent approval right with respect to the matter in question, then the term Rating Comfort Letter shall be deemed instead to require the prior written consent of Lender.

**11.6     Governing Law.**

(a)     THIS AGREEMENT WAS NEGOTIATED IN THE STATE OF NEW YORK, AND DELIVERED TO LENDER BY BORROWER IN THE STATE OF NEW YORK, AND THE PROCEEDS OF THE NOTE DELIVERED PURSUANT HERETO WERE DISBURSED FROM THE STATE OF NEW YORK, WHICH STATE THE PARTIES AGREE HAS A SUBSTANTIAL RELATIONSHIP TO THE PARTIES AND TO THE UNDERLYING TRANSACTION EMBODIED HEREBY, AND IN ALL RESPECTS, INCLUDING, WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, MATTERS OF CONSTRUCTION, VALIDITY AND PERFORMANCE, THIS AGREEMENT AND THE OBLIGATIONS ARISING HEREUNDER SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK APPLICABLE TO CONTRACTS MADE AND PERFORMED IN SUCH STATE (WITHOUT REGARD TO PRINCIPLES OF CONFLICT OF LAWS) AND ANY APPLICABLE LAW OF THE UNITED STATES OF AMERICA.

(b)     ANY LEGAL SUIT, ACTION OR PROCEEDING AGAINST LENDER OR BORROWER ARISING OUT OF OR RELATING TO THIS AGREEMENT MAY AT LENDER'S OPTION BE INSTITUTED IN ANY FEDERAL OR STATE COURT IN THE CITY OF NEW YORK, COUNTY OF NEW YORK, PURSUANT TO SECTION 5-1402 OF THE NEW YORK GENERAL OBLIGATIONS LAW AND BORROWER WAIVES ANY OBJECTIONS WHICH IT MAY NOW OR HEREAFTER HAVE BASED ON VENUE AND/OR FORUM NON CONVENIENS OF ANY SUCH SUIT, ACTION OR PROCEEDING, AND BORROWER HEREBY IRREVOCABLY SUBMITS TO THE EXCLUSIVE JURISDICTION OF ANY SUCH COURT IN ANY SUIT, ACTION OR PROCEEDING.  BORROWER DOES HEREBY DESIGNATE AND APPOINT:

CORPORATION SERVICE COMPANY
80 STATE STREET
ALBANY, NY 12207-2543

AS ITS AUTHORIZED AGENT TO ACCEPT AND ACKNOWLEDGE ON ITS BEHALF SERVICE OF ANY AND ALL PROCESS WHICH MAY BE SERVED IN ANY SUCH SUIT, ACTION OR PROCEEDING IN ANY FEDERAL OR STATE COURT IN NEW YORK, NEW YORK, AND BORROWER AGREES THAT SERVICE OF PROCESS UPON SAID AGENT AT SAID ADDRESS AND WRITTEN NOTICE OF SAID SERVICE MAILED OR DELIVERED TO BORROWER IN THE MANNER PROVIDED HEREIN SHALL BE DEEMED IN EVERY RESPECT EFFECTIVE SERVICE OF PROCESS UPON BORROWER, IN ANY SUCH SUIT, ACTION OR PROCEEDING IN THE STATE OF NEW YORK.  BORROWER (i) SHALL GIVE PROMPT NOTICE TO LENDER OF ANY CHANGED ADDRESS OF ITS AUTHORIZED AGENT HEREUNDER, (ii) MAY AT ANY TIME AND FROM TIME TO TIME DESIGNATE A SUBSTITUTE AUTHORIZED NT WITH AN OFFICE IN NEW YORK, NEW YORK (WHICH SUBSTITUTE AGENT AND OFFICE SHALL BE DESIGNATED AS THE PERSON AND ADDRESS FOR SERVICE OF PROCESS), AND (iii) SHALL PROMPTLY DESIGNATE SUCH A SUBSTITUTE IF ITS AUTHORIZED AGENT CEASES TO HAVE AN OFFICE IN NEW YORK, NEW YORK OR IS DISSOLVED WITHOUT LEAVING A SUCCESSOR.

**11.7** **Modification, Waiver in Writing**. No modification, amendment, extension, discharge, termination or waiver of any provision of this Agreement or of any other Loan Document, nor consent to any departure by Borrower therefrom, shall in any event be effective unless the same shall be in a writing signed by the party against whom enforcement is sought, and then such waiver or consent shall be effective only in the specific instance, and for the purpose, for which given. Except as otherwise expressly provided herein, no notice to, or demand on, Borrower shall entitle Borrower to any other or future notice or demand in the same, similar or other circumstances. Neither any failure nor any delay on the part of Lender in insisting upon strict performance of any term, condition, covenant or agreement, or exercising any right, power, remedy or privilege hereunder, or under any other Loan Document, shall operate as or constitute a waiver thereof, nor shall a single or partial exercise thereof preclude any other future exercise, or the exercise of any other right, power, remedy or privilege. In particular, and not by way of limitation, by accepting payment after the due date of any amount payable under this Agreement or any other Loan Document, Lender shall not be deemed to have waived any right either to require prompt payment when due of all other amounts due under this Agreement or the other Loan Documents, or to declare an Event of Default for failure to effect prompt payment of any such other amount.

**11.8** **Trial by Jury**. BORROWER AND LENDER EACH HEREBY AGREE NOT TO ELECT A TRIAL BY JURY OF ANY ISSUE TRIABLE OF RIGHT BY JURY, AND WAIVE ANY RIGHT TO TRIAL BY JURY FULLY TO THE EXTENT THAT ANY SUCH RIGHT SHALL NOW OR HEREAFTER EXIST WITH REGARD TO THE LOAN DOCUMENTS, OR ANY CLAIM, COUNTERCLAIM OR OTHER ACTION ARISING IN CONNECTION THEREWITH. THIS WAIVER OF RIGHT TO TRIAL BY JURY IS GIVEN KNOWINGLY AND VOLUNTARILY BY BORROWER AND LENDER, AND IS INTENDED TO ENCOMPASS INDIVIDUALLY EACH INSTANCE AND EACH ISSUE AS TO WHICH THE RIGHT TO A TRIAL BY JURY WOULD OTHERWISE ACCRUE. EITHER PARTY IS HEREBY AUTHORIZED TO FILE A COPY OF THIS SECTION 11.8 IN ANY PROCEEDING AS CONCLUSIVE EVIDENCE OF THIS WAIVER BY THE OTHER.

**11.9** **Headings; Schedules and Exhibits**. The Article and/or Section headings and the Table of Contents in this Agreement are included herein for convenience of reference only and shall not constitute a part of this Agreement for any other purpose. The Exhibits attached hereto, are hereby incorporated by reference as a part of the Agreement with the same force and effect as if set forth in the body hereof. The Schedules and Exhibits annexed hereto are hereby incorporated herein as a part of this Agreement with the same effect as if set forth in the body hereof.

**11.10** **Severability**. Wherever possible, each provision of this Agreement shall be interpreted in such manner as to be effective and valid under any Legal Requirements, but if any provision of this Agreement shall be prohibited by or invalid under applicable law, such provision shall be ineffective to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Agreement.

**11.11** **Preferences**. Lender shall have the continuing and exclusive right to apply or reverse and reapply (or having so applied, to reverse and reapply) any and all payments by Borrower to any portion of the Debt. To the extent Borrower makes a payment or payments to Lender, or Lender receives proceeds of any collateral, which is in whole or in part subsequently invalidated, declared to be fraudulent or preferential, set aside or required to be repaid to a trustee, receiver or any other party under any bankruptcy law, federal, state or foreign law, common law or equitable cause, then, to the extent of such payment or proceeds received, the Debt or part thereof intended to be satisfied shall be revived and continue in full force and effect, as if such payment or proceeds had not been received by Lender. This provision shall survive the expiration or termination of this Agreement and the repayment of the Debt.

119

**11.12    Waiver of Notice.**  Borrower shall not be entitled to any notices of any nature whatsoever from Lender except with respect to matters for which this Agreement or any other Loan Document specifically and expressly provides for the giving of notice by Lender to Borrower and except with respect to matters for which Borrower is not, pursuant to applicable Legal Requirements, permitted to waive the giving of notice.  Borrower hereby expressly waives the right to receive any notice from Lender with respect to any matter for which this Agreement or the other Loan Documents do not specifically and expressly provide for the giving of notice by Lender to Borrower.

**11.13    Remedies of Borrower.**  If a claim or adjudication is made that Lender or any of its agents, including Servicer, has acted unreasonably or unreasonably delayed acting in any case where, by law or under this Agreement or the other Loan Documents, Lender or any such agent, as the case may be, has an obligation to act reasonably or promptly, Borrower agrees that neither Lender nor its agents, including Servicer, shall be liable for any monetary damages, and Borrower's sole remedy shall be limited to commencing an action seeking injunctive relief or declaratory judgment.  Any action or proceeding to determine whether Lender has acted reasonably shall be determined by an action seeking declaratory judgment.  Borrower specifically waives any claim against Lender and its agents, including Servicer, with respect to actions taken by Lender or its agents on Borrower's behalf.

**11.14    Prior Agreements.**  This Agreement and the other Loan Documents contain the entire agreement of the parties hereto and thereto in respect of the transactions contemplated hereby and thereby, and all prior agreements, understandings and negotiations among or between such parties, whether oral or written, are superseded by the terms of this Agreement and the other Loan Documents.

**11.15    Offsets, Counterclaims and Defenses.**  Any assignee of Lender's interest in and to the Loan Documents shall take the same free and clear of all offsets, counterclaims (excluding compulsory counterclaims) and defenses which are unrelated to such documents which Borrower may otherwise have against any assignor of such documents, and no such unrelated counterclaim or defense shall be interposed or asserted by Borrower in any action or proceeding brought by any such assignee upon such documents and any such right to interpose or assert any such unrelated offset, counterclaim or defense in any such action or proceeding is hereby expressly waived by Borrower.

**11.16    Publicity.**  All news releases, publicity or advertising by Borrower or its Affiliates through any media intended to reach the general public, which refers to the Loan, the Loan Documents, Lender, a Loan purchaser, the Servicer or the trustee in a Secondary Market Transaction, shall be subject to the prior written approval of Lender.  Lender shall have the right to issue any of the foregoing and use the same in its marketing efforts without Borrower's approval, and Borrower hereby consents thereto and to Lender's use of Borrower's name, Guarantor's name, Guarantor's logo, the name of the ultimate parent(s) of Borrower, the logo of the ultimate parent(s) of Borrower, the name and address of the Property, the amount of the Loan, and such other information, including but not limited to the reproduction, publication and distribution of photographs and other images, regarding the Property as were obtained or developed by or on behalf of Lender, or as were obtained, developed or provided by or on behalf of Borrower, its Affiliates, agents, counsel, representatives or brokers, including as may be available on any website or data site established or maintained by Borrower, its Affiliates, agents, representatives or brokers regarding the Property.  Borrower represents and warrants to Lender that Borrower has sufficient rights in such information, including but not limited to such photographs and other images, to grant Lender and its Affiliates the above rights to use such information, and agrees to hold Lender and its Affiliates harmless from any claim resulting from the failure or alleged failure to maintain such rights.  Furthermore, Borrower agrees to cooperate with Lender in a reasonable manner in connection with the use of such other information as may be reasonably requested by Lender.

DM_US 183358854-7.105065.0051

**11.17    Certain Additional Rights of Lender (VCOC).**    Notwithstanding anything to the contrary contained in the Loan Documents, Lender shall have:

(a)    the right to routinely consult with and advise Borrower's management regarding the significant business activities and business and financial developments of Borrower, including, but not limited to, with respect to (i) annual operating and capital budgets, (ii) insurance, (iii) material leases and lease forms, (iv) property management and leasing agents and amendments, modifications or termination of any agreements with such agents, and (v) changes in business; provided, however, that such consultations shall not include discussions of environmental compliance programs or disposal of hazardous substances. Consultation meetings should occur on a regular basis (no less frequently than quarterly) with Lender having the right to call special meetings at any reasonable times upon reasonable notice;

(b)    the right, in accordance with the terms of this Agreement, to examine the books and records of Borrower at any reasonable times upon reasonable notice;

(c)    the right, in accordance with the terms of this Agreement, including, without limitation, Section 6.3 hereof, to receive monthly, quarterly and year-end financial reports, including balance sheets, statements of income, shareholder's equity and cash flow, a management report and schedules of outstanding indebtedness; and

(d)    the right, without restricting any other rights of Lender under this Agreement (including any similar right), to approve any acquisition by Borrower of any other significant property (other than personal property required for the day to day operation of the Property) and to restrict any financing and/or Indebtedness with respect thereto.

Upon request of Lender, Borrower shall, at Borrower's sole cost and expense, furnish and deliver to Lender such documents, certificates, agreements instruments or other writings and do such other acts necessary or desirable, to evidence, preserve or protect the rights granted pursuant to this Section 11.17.

**11.18    Certain Waivers.**    Borrower hereby waives the right to assert a counterclaim, other than a compulsory counterclaim, in any action or proceeding brought against it by Lender or its agents or otherwise to offset any obligations to make the payments required by the Loan Documents. No failure by Lender to perform any of its obligations hereunder shall be a valid defense to, or result in any offset against, any payments which Borrower is obligated to make under any of the Loan Documents. Without limiting any of the other provisions contained herein, Borrower hereby unconditionally and irrevocably waives, to the maximum extent not prohibited by applicable law, any rights it may have to claim or recover against Lender in any legal action or proceeding any special, exemplary, punitive or consequential damages.

**11.19    Conflict; Construction of Documents.**    In the event of any conflict between the provisions of this Agreement and any of the other Loan Documents, the provisions of this Agreement shall control.  The parties hereto acknowledge that they were represented by competent counsel in connection with the negotiation, drafting and execution of the Loan Documents and that such Loan Documents shall not be subject to the principle of construing their meaning against the party which drafted same.  Borrower acknowledges that, with respect to the Loan, Borrower shall rely solely on its own judgment and advisors in entering into the Loan without relying in any manner on any statements, representations or recommendations of Lender or any parent, subsidiary or Affiliate of Lender.  Lender shall not be subject to any limitation whatsoever in the exercise of any rights or remedies available to it under any of the Loan Documents or any other agreements or instruments which govern the Loan by virtue of the ownership by it or any parent, subsidiary or Affiliate of Lender of any equity interest any of them may acquire in Borrower, and Borrower hereby irrevocably waives the right to raise any defense or take any action on the basis of the

foregoing with respect to Lender's exercise of any such rights or remedies. Borrower acknowledges that Lender engages in the business of real estate financings and other real estate transactions and investments which may be viewed as adverse to or competitive with the business of Borrower or its Affiliates.

**11.20   No Third Party Beneficiaries.**   The Loan Documents are solely for the benefit of Lender and Borrower and nothing contained in any Loan Document shall be deemed to confer upon anyone other than Lender and Borrower any right to insist upon or to enforce the performance or observance of any of the obligations contained therein.

**11.21   Set-Off**.   In addition to any rights and remedies of Lender provided by this Agreement and by law, Lender shall have the right, without prior notice to Borrower, any such notice being expressly waived by Borrower to the extent permitted by Legal Requirements, upon any amount becoming due and payable by Borrower hereunder (whether at the stated maturity, by acceleration or otherwise), to set-off and appropriate and apply against such amount any and all deposits (general or special, time or demand, provisional or final), in accordance with Legal Requirements, in any currency, and any other credits, indebtedness or claims, in any currency, in each case whether direct or indirect, absolute or contingent, matured or unmatured, at any time held or owing by Lender or any Affiliate thereof to or for the credit or the account of Borrower. Lender agrees promptly to notify Borrower after any such set-off and application made by Lender; provided that the failure to give such notice shall not affect the validity of such set-off and application.

**11.22   Assignments and Participations**.   Other than a Permitted Transfer, Borrower may not assign, transfer or delegate its rights or obligations under the Loan Documents without Lender's prior written consent, and any attempted assignment, transfer or delegation without such consent shall be null and void. Lender may assign, pledge, participate, transfer or delegate, as applicable, to one or more Persons, all or a portion of its rights and obligations under the Loan Documents. The assigning Lender shall have no further obligations under the Loan Documents from and after the date of any such assignment or transfer. In connection with any such assignment, pledge, participation, transfer or delegation, Lender may disclose to the assignee, pledgee, participant, transferee or delegee or proposed assignee, pledgee, participant, transferee or delegee, as the case may be, any information relating to the Property, Borrower or any of its Affiliates or to any aspect of the Loan that has been furnished to Lender by or on behalf of Borrower or any of its Affiliates. All covenants, promises and agreements in this Agreement, by or on behalf of Borrower, shall inure to the benefit of the legal representatives, successors and assigns of Lender.

**11.23   Counterparts**.   This Agreement may be executed in any number of counterparts, each of which when so executed and delivered shall be an original, but all of which shall together constitute one and the same instrument.

**11.24   Registers**.

(a)      Borrower shall maintain a copy of each assignment and assumption delivered to it and a register for the recordation of the names and addresses of the Lenders, and the commitments of, and principal amounts (and stated interest) of the Loans owing to, each Lender pursuant to the terms hereof from time to time (the "**Register**"). The entries in the Register shall be conclusive absent manifest error, and Borrower and Lender shall treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement. The Register shall be available for inspection by Borrower and any Lender, at any reasonable time and from time to time upon reasonable prior notice.

(b)     Each Lender that sells a participation shall, acting solely for this purpose as an agent of Borrower, maintain a register on which it enters the name and address of each participant and the principal amounts (and stated interest) of each participant's interest in the Loan or other obligations under the Loan Documents (the "**Participant Register**"); provided that no Lender shall have any obligation to disclose all or any portion of the Participant Register (including the identity of any participant or any information relating to a participant's interest in any obligations under any Loan Document) to any Person except to the extent that such disclosure is necessary to establish that such obligation is in registered form under Section 5f.103-1(c) of the United States Treasury Regulations and Section 1.163-5(b)(1) of the proposed United States Treasury Regulations. The entries in the Participant Register shall be conclusive absent manifest error, and such Lender shall treat each Person whose name is recorded in the Participant Register as the owner of such participation for all purposes of this Agreement notwithstanding any notice to the contrary.

## 12.    MEZZANINE LOAN.

### 12.1    Mezzanine Loan Notice.

(a)     Promptly after receipt (but no more than ten (10) Business Days after receipt), Borrower will deliver to Lender a true, correct and complete copy of all material notices, demands, requests or material correspondence (including electronically transmitted items) received from Mezzanine Lender by Mezzanine Borrower or any guarantor under the Mezzanine Loan Documents.

(b)     Unless otherwise delivered to Lender pursuant to the provisions of Section 6.3 hereof, Borrower will deliver to Lender all of the financial statements and material reports, certificates and related items delivered or required to be delivered by Mezzanine Borrower to Mezzanine Lender under the Mezzanine Loan Documents as and when due under the Mezzanine Loan Documents.

### 12.2    Mezzanine Loan Estoppels.    After written request by Lender, Borrower shall from time to time, use reasonable efforts to obtain from Mezzanine Lender such estoppel certificates with respect to the status of the Mezzanine Loan and compliance by Mezzanine Borrower with the terms of the Mezzanine Loan Documents as may reasonably be requested by Lender.  In the event or to the extent that Mezzanine Lender is not legally obligated to deliver such estoppel certificates and is unwilling to deliver the same, or is legally obligated to deliver such estoppel certificates but breaches such obligation, then Borrower shall not be in breach of this provision so long as Borrower furnishes to Lender estoppels executed by Mezzanine Borrower, each expressly representing to Lender the information requested by Lender regarding the status of the Mezzanine Loan and the compliance by Mezzanine Borrower with the terms of the Mezzanine Loan Documents.

### 12.3    Intercreditor Agreement.    Borrower hereby acknowledges and agrees that (a) an Intercreditor Agreement (as amended, restated, replaced, supplemented or otherwise modified from time to time, the "*Intercreditor Agreement*") entered into by and among Lender and Mezzanine Lender will be solely for the benefit of Lender and Mezzanine Lender, (b) neither Borrower nor Mezzanine Borrower shall be intended third party beneficiaries of any of the provisions therein, and (c) neither Borrower nor Mezzanine Borrower shall have any rights thereunder or shall be entitled to rely on any of the provisions contained therein.  Lender shall not have any obligation to disclose to Borrower or Mezzanine Borrower the contents of the Intercreditor Agreement.  Borrower's obligations hereunder are and will be independent of the Intercreditor Agreement and shall remain unmodified by the terms and provisions thereof.

### 12.4    Mezzanine Loan Notices.    Borrower and Lender hereby acknowledge and agree that Lender may conclusively rely on any notice delivered by Mezzanine Lender without any inquiry into the

validity thereof, including, without limitation, a notice from Mezzanine Lender that a Mezzanine Loan Event of Default has occurred and is continuing.

**12.5 Borrower Distributions**.    Notwithstanding anything to the contrary contained herein, Borrower and Lender hereby acknowledge and agree that transfers of any Borrower's funds from the Deposit Account, any of the Reserve Funds or otherwise to or for the benefit of Mezzanine Lender shall constitute distributions from Borrower to Mezzanine Borrower (which distributions shall be immediately paid by Mezzanine Borrower to Mezzanine Lender) and, in each case, must comply with the requirements as to distributions of the Delaware Limited Liability Company Act or similar statute in the state of such Borrower's formation and the provisions of Borrower's organizational documents.   The provisions of this Agreement, the Deposit Account Agreement and the other Loan Documents shall not create a debtor-creditor relationship between Borrower and Mezzanine Lender.

[THE REMAINDER OF THE PAGE IS INTENTIONALLY BLANK]

DM_US 183358854-7.105065.0051

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their duly authorized representatives, all as of the day and year first above written.

BORROWER:

**JERICHO PLAZA PORTFOLIO LLC,**
a Delaware limited liability company

By: _____
      Name: Menachem Meisner
      Title: Authorized Signatory

[SIGNATURES CONTINUE ON FOLLOWING PAGE]

LENDER:

**NATIXIS REAL ESTATE CAPITAL LLC,**
a Delaware limited liability company

By: _____
Name: Andrew Taylor
Title: Managing Director


By: _____
Name: Andrew Florio
Title: Executive Director

**<u>Schedule 1</u>**

**Rent Roll**

# Rent Roll

| Bldg Id | Suite Id | Occupant Name | Rent Start | Expiration | GLA Sqft | Monthly Base Rent | Annual Rate PSF | Monthly Cost Recovery | Expense Stop | Monthly Other Income | Cat | Date | Monthly Amt | PSF |
|---------|----------|---------------|------------|------------|----------|-------------------|-----------------|-----------------------|--------------|----------------------|-----|------|-------------|-----|
| | | | | | | | | | | | | ------------ Future Rent Increases ------------ | | |

**Total G&I IX Jericho Plaza LLC:**

| | | | Occupied Sqft: | 0.00% | 0 Units | 0 | 0.00 | | 0.00 | | 0.00 | | | | |
| | | | | | 0 Units | 0 | | | | | | | | | |
| | | | | | 0 Units | 0 | | | | | | | | | |
| | | | | | 0 Units | 0 | | | | | | | | | |
| | | | | | 0 Units | | | | | | | | | | |

# Rent Roll

| Bldg Id | Suite Id | Occupant Name | Rent Start | Expiration | GLA Sqft | Monthly Base Rent | Annual Rate PSF | Monthly Cost Recovery | Expense Stop | Monthly Other Income | Cat | Date | Monthly Amt | PSF |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Vacant Suites** | | | | | | | | | | | | | | |
| JERIC1 | 151 | Vacant | | | 10,272 | | | | | | | | | |
| JERIC1 | 202 | Vacant | | | 7,246 | | | | | | | | | |
| JERIC1 | 251 | Vacant | | | 4,207 | | | | | | | | | |
| JERIC1 | S00 | Vacant | | | 239 | | | | | | | | | |
| JERIC1 | S01 | Vacant | | | 2,850 | | | | | | | | | |
| JERIC1 | S02 | Vacant | | | 1,312 | | | | | | | | | |
| JERIC1 | S07 | Vacant | | | 239 | | | | | | | | | |
| **Occupied Suites** | | | | | | | | | | | | | | |
| JERIC1 | 100 | Kintetsu World Express Inc | 5/1/2021 | 4/30/2026 | 15,004 | 50,013.33 | 40.00 | 4,376.17 | | 94.63 | RTO | 5/1/2022 | 51,513.73 | 41.20 |
| | | | | | | | | | | | RTO | 5/1/2023 | 53,064.15 | 42.44 |
| | | | | | | | | | | | RTO | 5/1/2024 | 54,652.07 | 43.71 |
| | | | | | | | | | | | RTO | 5/1/2025 | 56,290.01 | 45.02 |
| JERIC1 | 101 | National Life Insurance Co | 8/1/2020 | 8/31/2022 | 5,664 | 17,237.44 | 36.52 | 1,652.00 | | | | | | |
| JERIC1 | 102 | The Lunch Box | 2/1/2009 | 1/31/2024 | 2,614 | | | 1,003.64 | | | | | | |
| JERIC1 | 103 | American Para Professionals | 12/1/2017 | 5/31/2027 | 12,404 | 38,392.23 | 37.14 | 3,617.83 | | | RTO | 12/1/2022 | 39,544.00 | 38.26 |
| | | | | | | | | | | | RTO | 12/1/2023 | 40,730.32 | 39.40 |
| | | | | | | | | | | | RTO | 12/1/2024 | 41,952.23 | 40.59 |
| | | | | | | | | | | | RTO | 12/1/2025 | 43,210.80 | 41.80 |
| | | | | | | | | | | | RTO | 12/1/2026 | 44,507.12 | 43.06 |
| | | Additional Space: JERIC1 - S05 | 12/1/2017 | 5/31/2027 | 458 | | | | | 708.78 | SSR | 12/1/2022 | 730.04 | 19.13 |
| | | | | | | | | | | | SSR | 12/1/2023 | 751.94 | 19.70 |
| | | | | | | | | | | | SSR | 12/1/2024 | 774.50 | 20.29 |
| | | | | | | | | | | | SSR | 12/1/2025 | 797.74 | 20.90 |
| | | | | Totals: | 12,862 | 38,392.23 | | 3,617.83 | | 708.78 | SSR | 12/1/2026 | 821.67 | 21.53 |
| JERIC1 | 105 | Ernst and Young U S LLP | 6/1/2020 | 5/31/2023 | 19,832 | 64,528.37 | 39.05 | 5,784.33 | | 394.31 | RTO | 6/1/2022 | 66,302.90 | 40.12 |

# Rent Roll

| Bldg Id | Suite Id | Occupant Name | Rent Start | Expiration | GLA Sqft | Monthly Base Rent | Annual Rate PSF | Monthly Cost Recovery | Expense Stop | Monthly Other Income | Cat | Date | Monthly Amt | PSF |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| JERIC1 | 106 | RBC Capital Markets, LLC | 9/11/2021 | 3/31/2029 | 8,939 | | | 2,495.47 | | 523.68 | RCO | 12/11/2021 | 0.00 | 0.00 |
| | | | | | | | | | | | RTO | 9/11/2022 | 27,926.93 | 37.49 |
| | | | | | | | | | | | RTO | 9/11/2023 | 28,686.74 | 38.51 |
| | | | | | | | | | | | RTO | 9/11/2024 | 29,461.45 | 39.55 |
| | | | | | | | | | | | RTO | 9/11/2025 | 30,265.96 | 40.63 |
| | | | | | | | | | | | RTO | 9/11/2026 | 31,085.37 | 41.73 |
| | | | | | | | | | | | RTO | 9/11/2027 | 31,927.13 | 42.86 |
| | | | | | | | | | | | RTO | 9/11/2028 | 32,798.68 | 44.03 |
| JERIC1 | 107 | Valley National Bank | 10/1/2020 | 2/28/2031 | 13,368 | 39,547.00 | 35.50 | 3,899.00 | | 28,423.78 | RTO | 3/1/2022 | 40,634.54 | 36.48 |
| | | | | | | | | | | | RTO | 3/1/2023 | 41,751.99 | 37.48 |
| | | | | | | | | | | | RTO | 3/1/2024 | 42,900.17 | 38.51 |
| | | | | | | | | | | | RTO | 3/1/2025 | 44,079.93 | 39.57 |
| | | | | | | | | | | | RTO | 3/1/2026 | 45,292.13 | 40.66 |
| | | | | | | | | | | | RTO | 3/1/2027 | 46,537.66 | 41.78 |
| | | | | | | | | | | | RTO | 3/1/2028 | 47,817.44 | 42.92 |
| | | | | | | | | | | | RTO | 3/1/2029 | 49,132.42 | 44.10 |
| | | | | | | | | | | | RTO | 3/1/2030 | 50,483.57 | 45.32 |
| JERIC1 | 108 | AmWINS | 10/1/2021 | 4/30/2029 | 6,765 | | | | | | RCO | 7/1/2022 | 0.00 | 0.00 |
| | | | | | | | | | | | RTO | 12/1/2022 | 20,757.28 | 36.82 |
| | | | | | | | | | | | RTO | 12/1/2023 | 21,383.04 | 37.93 |
| | | | | | | | | | | | RTO | 12/1/2024 | 22,020.08 | 39.06 |
| | | | | | | | | | | | RTO | 12/1/2025 | 22,685.30 | 40.24 |
| | | | | | | | | | | | RTO | 12/1/2026 | 23,361.80 | 41.44 |
| | | | | | | | | | | | RTO | 12/1/2027 | 24,066.49 | 42.69 |
| | | | | | | | | | | | RTO | 12/1/2028 | 24,788.09 | 43.97 |
| JERIC1 | 200 | Arthur J Gallagher Risk Manageme | 3/25/2016 | 10/31/2023 | 21,000 | 66,948.08 | 38.26 | 6,125.00 | | | RCO | 4/1/2023 | -71,025.22 | -40.59 |
| | | | | | | | | | | | RCO | 11/1/2023 | 0.00 | 0.00 |
| | | | | | | | | | | | RTO | 4/1/2022 | 68,956.52 | 39.40 |
| | | | | | | | | | | | RTO | 4/1/2023 | 71,025.22 | 40.59 |
| JERIC1 | 201 | First LI Investor LLC | 10/1/2018 | 9/30/2023 | 7,700 | 26,560.31 | 41.39 | 2,596.13 | | 29.10 | RTO | 10/1/2022 | 28,936.96 | 45.10 |
| | | Additional Space: JERIC1 - 201x | 10/1/2018 | 9/30/2023 | 1,201 | | | | | | | | | |
| | | Additional Space: JERIC1 - S06 | 10/1/2018 | 9/30/2023 | 450 | | | | | 752.37 | SSR | 10/1/2022 | 773.06 | 20.61 |
| | | Totals: | | | 9,351 | 26,560.31 | | 2,596.13 | | 781.47 | | | | |
| JERIC1 | 203 | Nathans Famous Services Inc | 1/1/2010 | 3/31/2029 | 12,582 | 38,743.61 | 36.95 | 3,512.48 | | 70.98 | RCO | 6/1/2028 | -46,846.04 | -44.68 |
| | | | | | | | | | | | RCO | 4/1/2029 | 0.00 | 0.00 |

# Rent Roll

| Bldg Id | Suite Id | Occupant Name | Rent Start | Expiration | GLA Sqft | Monthly Base Rent | Annual Rate PSF | Monthly Cost Recovery | Expense Stop | Monthly Other Income | Cat | Date | Monthly Amt | PSF |
|---------|----------|---------------|------------|------------|----------|-------------------|-----------------|------------------------|-------------|----------------------|-----|------|-------------|-----|
| | | | | | | | | | | | RTO | 4/1/2022 | 39,809.06 | 37.97 |
| | | | | | | | | | | | RTO | 4/1/2023 | 40,903.81 | 39.01 |
| | | | | | | | | | | | RTO | 4/1/2024 | 42,028.66 | 40.08 |
| | | | | | | | | | | | RTO | 4/1/2025 | 43,184.45 | 41.19 |
| | | | | | | | | | | | RTO | 4/1/2026 | 44,372.02 | 42.32 |
| | | | | | | | | | | | RTO | 4/1/2027 | 45,592.25 | 43.48 |
| | | | | | | | | | | | RTO | 4/1/2028 | 46,846.04 | 44.68 |
| | | | | | | | | | | | UTO | 4/1/2022 | 3,512.48 | 3.35 |
| | | | | | | | | | | | UTO | 4/1/2023 | 3,512.48 | 3.35 |
| | | | | | | | | | | | UTO | 4/1/2024 | 3,512.48 | 3.35 |
| | | | | | | | | | | | UTO | 4/1/2025 | 3,512.48 | 3.35 |
| | | | | | | | | | | | UTO | 4/1/2026 | 3,512.48 | 3.35 |
| | | | | | | | | | | | UTO | 4/1/2027 | 3,512.48 | 3.35 |
| | | | | | | | | | | | UTO | 4/1/2028 | 3,512.48 | 3.35 |
| JERIC1 | 204 | AIG (National Fire Union Co) | 1/1/2021 | 12/31/2025 | 7,000 | 21,029.17 | 36.05 | 1,312.50 | | | RTO | 9/1/2022 | 21,660.05 | 37.13 |
| | | | | | | | | | | | RTO | 9/1/2023 | 22,309.85 | 38.25 |
| | | | | | | | | | | | RTO | 9/1/2024 | 22,979.15 | 39.39 |
| | | | | | | | | | | | RTO | 9/1/2025 | 23,668.53 | 40.57 |
| JERIC1 | 205 | GP Harmon Recycling LLC | 2/8/2018 | 9/30/2025 | 8,748 | 26,096.78 | 35.80 | 2,551.50 | | 906.68 | RTO | 3/1/2022 | 26,814.44 | 36.78 |
| | | | | | | | | | | | RTO | 3/1/2023 | 27,551.84 | 37.79 |
| | | | | | | | | | | | RTO | 3/1/2024 | 28,309.52 | 38.83 |
| | | | | | | | | | | | RTO | 3/1/2025 | 29,088.03 | 39.90 |
| JERIC1 | 210 | UBS Financial Services Inc | 8/1/2015 | 7/31/2026 | 16,454 | 50,865.85 | 37.10 | 4,593.41 | | | RTO | 2/1/2022 | 52,391.83 | 38.21 |
| | | | | | | | | | | | RTO | 2/1/2023 | 53,963.58 | 39.36 |
| | | | | | | | | | | | RTO | 2/1/2024 | 55,582.49 | 40.54 |
| | | | | | | | | | | | RTO | 2/1/2025 | 57,249.96 | 41.75 |
| | | | | | | | | | | | RTO | 2/1/2026 | 58,967.46 | 43.01 |
| JERIC1 | 250 | BGC Partners, L.P. | 11/1/2021 | 8/31/2032 | 13,129 | | | | | | RTO | 11/1/2022 | 36,924.47 | 33.75 |
| | | | | | | | | | | | RTO | 11/1/2023 | 38,018.55 | 34.75 |
| | | | | | | | | | | | RTO | 11/1/2024 | 39,145.46 | 35.78 |
| | | | | | | | | | | | RTO | 11/1/2025 | 40,305.19 | 36.84 |
| | | | | | | | | | | | RTO | 11/1/2026 | 41,497.74 | 37.93 |
| | | | | | | | | | | | RTO | 11/1/2027 | 42,723.11 | 39.05 |
| | | | | | | | | | | | RTO | 11/1/2028 | 43,970.37 | 40.19 |
| | | | | | | | | | | | RTO | 11/1/2029 | 45,261.39 | 41.37 |
| | | | | | | | | | | | RTO | 11/1/2030 | 46,585.23 | 42.58 |
| | | | | | | | | | | | RTO | 11/1/2031 | 47,952.83 | 43.83 |
| JERIC1 | 304A | Sterling National Bank | 5/1/2018 | 4/30/2030 | 55,361 | 161,464.72 | 35.00 | 15,454.95 | | 1,684.58 | RTO | 5/1/2022 | 165,501.34 | 35.87 |

# Rent Roll

| Bldg Id | Suite Id | Occupant Name | Rent Start | Expiration | GLA Sqft | Monthly Base Rent | Annual Rate PSF | Monthly Cost Recovery | Expense Stop | Monthly Other Income | Cat | Date | Monthly Amt | PSF |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | | RTO | 5/1/2023 | 169,638.87 | 36.77 |
| | | | | | | | | | | | RTO | 5/1/2024 | 173,879.84 | 37.69 |
| | | | | | | | | | | | RTO | 5/1/2025 | 178,226.84 | 38.63 |
| | | | | | | | | | | | RTO | 5/1/2026 | 182,682.51 | 39.60 |
| | | | | | | | | | | | RTO | 5/1/2027 | 187,249.57 | 40.59 |
| | | | | | | | | | | | RTO | 5/1/2028 | 191,930.81 | 41.60 |
| | | | | | | | | | | | RTO | 5/1/2029 | 196,729.08 | 42.64 |
| | | Additional Space: JERIC1 - 300 | 5/1/2018 | 4/30/2030 | 56,128 | 163,701.73 | 35.00 | 15,669.07 | | 2,050.41 | RTO | 5/1/2022 | 167,794.28 | 35.87 |
| | | | | | | | | | | | RTO | 5/1/2023 | 171,989.13 | 36.77 |
| | | | | | | | | | | | RTO | 5/1/2024 | 176,288.86 | 37.69 |
| | | | | | | | | | | | RTO | 5/1/2025 | 180,696.08 | 38.63 |
| | | | | | | | | | | | RTO | 5/1/2026 | 185,213.49 | 39.60 |
| | | | | | | | | | | | RTO | 5/1/2027 | 189,843.82 | 40.59 |
| | | | | | | | | | | | RTO | 5/1/2028 | 194,589.92 | 41.60 |
| | | | | | | | | | | | RTO | 5/1/2029 | 199,454.67 | 42.64 |
| | | Additional Space: JERIC1 - GEN1 | 5/1/2018 | 4/30/2030 | 326 | | | | | 1,400.72 | SSR | 5/1/2022 | 1,435.73 | 52.85 |
| | | | | | | | | | | | SSR | 5/1/2023 | 1,471.63 | 54.17 |
| | | | | | | | | | | | SSR | 5/1/2024 | 1,508.42 | 55.52 |
| | | | | | | | | | | | SSR | 5/1/2025 | 1,546.13 | 56.91 |
| | | | | | | | | | | | SSR | 5/1/2026 | 1,584.78 | 58.34 |
| | | | | | | | | | | | SSR | 5/1/2027 | 1,624.40 | 59.79 |
| | | | | | | | | | | | SSR | 5/1/2028 | 1,665.01 | 61.29 |
| | | | | | | | | | | | SSR | 5/1/2029 | 1,706.64 | 62.82 |
| | | | | Totals: | 111,815 | 325,166.45 | | 31,124.02 | | 5,135.71 | | | | |
| JERIC1 | S03 | Cablevision | 8/1/2015 | 7/31/2020 | 0 | | | 285.64 | | 1,616.26 | | | | |
| JERIC1 | S04 | Nathans Famous Services | 1/1/2020 | 3/31/2029 | 607 | | | | | 961.27 | SSR | 4/1/2022 | 987.70 | 19.53 |
| | | | | | | | | | | | SSR | 4/1/2023 | 1,014.86 | 20.06 |
| | | | | | | | | | | | SSR | 4/1/2024 | 1,042.77 | 20.61 |
| | | | | | | | | | | | SSR | 4/1/2025 | 1,071.45 | 21.18 |
| | | | | | | | | | | | SSR | 4/1/2026 | 1,100.91 | 21.76 |
| | | | | | | | | | | | SSR | 4/1/2027 | 1,131.19 | 22.36 |
| | | | | | | | | | | | SSR | 4/1/2028 | 1,162.30 | 22.98 |
| JERIC1 | S08 | Sterling National Bank | 3/19/2019 | 4/30/2030 | 294 | | | | | 476.19 | SSR | 4/1/2022 | 488.09 | 19.92 |
| | | | | | | | | | | | SSR | 4/1/2023 | 500.29 | 20.42 |
| | | | | | | | | | | | SSR | 4/1/2024 | 512.80 | 20.93 |
| | | | | | | | | | | | SSR | 4/1/2025 | 525.62 | 21.45 |
| | | | | | | | | | | | SSR | 4/1/2026 | 538.76 | 21.99 |

# Rent Roll

| Bldg Id | Suite Id | Occupant Name | Rent Start | Expiration | GLA Sqft | Monthly Base Rent | Annual Rate PSF | Monthly Cost Recovery | Expense Stop | Monthly Other Income | Cat | Date | Monthly Amt | PSF |
|---------|----------|---------------|------------|------------|----------|-------------------|-----------------|----------------------|-------------|---------------------|-----|------|-------------|-----|
| | | | | | | | | | | | | ------ Future Rent Increases | | |
| | | | | | | | | | | | SSR | 4/1/2027 | 552.23 | 22.54 |
| | | | | | | | | | | | SSR | 4/1/2028 | 566.04 | 23.10 |
| | | | | | | | | | | | SSR | 4/1/2029 | 580.19 | 23.68 |
| | | | | | | | | | | | SSR | 4/1/2030 | 594.69 | 24.27 |

**Totals:**

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Occupied Sqft: | 91.56% | 23 Units | 286,028 | 765,128.62 | 74,929.12 | 40,093.74 |
| Leased/Unoccupied Sqft: | | 0 Units | 0 | | | |
| Vacant Sqft: | 8.44% | 7 Units | 26,365 | | | |
| Area Included Not Counted Sqft: | | 0 Units | 0 | | | |
| Total Sqft: | | 30 Units | 312,393 | 765,128.62 | | |

**Total One Jericho Plaza:**

| | | | | | | |
|---|---|---|---|---|---|---|
| Occupied Sqft: | 91.56% | 23 Units | 286,028 | 765,128.62 | 74,929.12 | 40,093.74 |
| Leased/Unoccupied Sqft: | | 0 Units | 0 | | | |
| Vacant Sqft: | 8.44% | 7 Units | 26,365 | | | |
| Area Included Not Counted Sqft: | | 0 Units | 0 | | | |
| Total Sqft: | | 30 Units | 312,393 | 765,128.62 | | |

# Rent Roll

| Bldg Id | Suite Id | Occupant Name | Rent Start | Expiration | GLA Sqft | Monthly Base Rent | Annual Rate PSF | Monthly Cost Recovery | Expense Stop | Monthly Other Income | Cat | ---------- Future Rent Increases ---------- | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | | | Date | Monthly Amt | PSF |
| **New Leases** | | | | | | | | | | | | | | |
| JERIC2 | 208 | Lee Korn - Opal Wealth | 9/1/2029 | 2/28/2033 | 6,106 | | | | | | | | | |
| **Vacant Suites** | | | | | | | | | | | | | | |
| JERIC2 | 100 | Vacant | | | 4,355 | | | | | | | | | |
| JERIC2 | 110 | Vacant | | | 8,935 | | | | | | | | | |
| JERIC2 | S01 | Vacant | | | 225 | | | | | | | | | |
| JERIC2 | S06A | Vacant | | | 752 | | | | | | | | | |
| JERIC2 | S11 | Vacant | | | 555 | | | | | | | | | |
| JERIC2 | S17 | Vacant | | | 140 | | | | | | | | | |
| **Occupied Suites** | | | | | | | | | | | | | | |
| JERIC2 | 101 | AJM Capital | 11/1/2014 | 3/31/2025 | 1,399 | 4,307.93 | 36.95 | 408.04 | | | RTO | 11/1/2022 | 4,426.40 | 37.97 |
| | | | | | | | | | | | RTO | 11/1/2023 | 4,548.13 | 39.01 |
| | | | | | | | | | | | RTO | 11/1/2024 | 4,673.20 | 40.08 |
| JERIC2 | 103 | RCF Management LLC | 1/27/2018 | 7/31/2025 | 4,240 | 12,934.25 | 36.61 | 1,236.67 | | | RTO | 2/1/2022 | 13,322.28 | 37.70 |
| | | | | | | | | | | | RTO | 2/1/2023 | 13,721.94 | 38.84 |
| | | | | | | | | | | | RTO | 2/1/2024 | 14,133.60 | 40.00 |
| | | | | | | | | | | | RTO | 2/1/2025 | 14,557.61 | 41.20 |
| JERIC2 | 104 | Duraviva Pharma LLC | 9/1/2021 | 8/31/2026 | 1,647 | 5,215.50 | 38.00 | | | | RTO | 9/1/2022 | 5,371.97 | 39.14 |
| | | | | | | | | | | | RTO | 9/1/2023 | 5,232.55 | 38.12 |
| | | | | | | | | | | | RTO | 9/1/2024 | 5,698.62 | 41.52 |
| | | | | | | | | | | | RTO | 9/1/2025 | 5,870.18 | 42.77 |
| JERIC2 | 105 | Morgan Stanley Smith Barney | 6/1/2016 | 9/30/2026 | 22,181 | 74,092.99 | 40.08 | 5,545.25 | | 2,539.00 | RTO | 10/1/2022 | 76,130.54 | 41.19 |
| | | | | | | | | | | | RTO | 10/1/2023 | 78,224.13 | 42.32 |
| | | | | | | | | | | | RTO | 10/1/2024 | 80,375.30 | 43.48 |
| | | | | | | | | | | | RTO | 10/1/2025 | 82,585.62 | 44.68 |
| JERIC2 | 105X | Morgan Stanley Smith Barney | 6/1/2016 | 9/30/2026 | 9,333 | 31,175.77 | 40.08 | 2,333.25 | | 917.76 | RTO | 10/1/2022 | 32,033.11 | 41.19 |
| | | | | | | | | | | | RTO | 10/1/2023 | 32,914.02 | 42.32 |
| | | | | | | | | | | | RTO | 10/1/2024 | 33,819.15 | 43.48 |
| | | | | | | | | | | | RTO | 10/1/2025 | 34,749.18 | 44.68 |

# Rent Roll

| Bldg Id | Suite Id | Occupant Name | Rent Start | Expiration | GLA Sqft | Monthly Base Rent | Annual Rate PSF | Monthly Cost Recovery | Expense Stop | Monthly Other Income | Cat | Date | Monthly Amt | PSF |
|---------|----------|---------------|------------|------------|----------|-------------------|-----------------|-----------------------|--------------|----------------------|-----|------|-------------|-----|
| | | | | | | | | | | | | ----------- | Future Rent Increases | --------- |
| JERIC2 | 106 | Insperity Support Services LP | 2/4/2020 | 10/31/2027 | 6,147 | 18,421.79 | 35.96 | 1,792.88 | | | RTO | 3/1/2022 | 18,928.39 | 36.95 |
| | | | | | | | | | | | RTO | 3/1/2023 | 19,448.92 | 37.97 |
| | | | | | | | | | | | RTO | 3/1/2024 | 19,983.77 | 39.01 |
| | | | | | | | | | | | RTO | 3/1/2025 | 20,533.32 | 40.08 |
| | | | | | | | | | | | RTO | 3/1/2026 | 21,097.99 | 41.19 |
| | | | | | | | | | | | RTO | 3/1/2027 | 21,678.18 | 42.32 |
| JERIC2 | 107 | Alliant Insurance Services Inc | 10/4/2019 | 5/31/2027 | 8,181 | 24,471.91 | 35.90 | 2,386.13 | | | RTO | 11/1/2022 | 25,144.89 | 36.88 |
| | | | | | | | | | | | RTO | 11/1/2023 | 25,836.37 | 37.90 |
| | | | | | | | | | | | RTO | 11/1/2024 | 26,546.87 | 38.94 |
| | | | | | | | | | | | RTO | 11/1/2025 | 27,276.91 | 40.01 |
| | | | | | | | | | | | RTO | 11/1/2026 | 28,027.03 | 41.11 |
| JERIC2 | 108 | Advanced Material Research Inc | 1/2/2018 | 1/31/2023 | 814 | 2,557.25 | 37.70 | 237.42 | | | RTO | 2/1/2022 | 2,633.96 | 38.83 |
| JERIC2 | 109 | Bamberger Polymers | 12/1/2017 | 10/31/2023 | 9,176 | 28,401.09 | 37.14 | 2,676.33 | | 471.26 | RTO | 12/1/2022 | 29,253.12 | 38.26 |
| | | Additional Space:  JERIC2   - S09 | 12/1/2017 | 10/31/2023 | 500 | | | | | 1,022.18 | | | | |
| | | | | Totals: | 9,676 | 28,401.09 | | 2,676.33 | | 1,493.44 | | | | |
| JERIC2 | 109A | Norcom Realty Corp | 12/22/2020 | 11/30/2022 | 2,016 | 6,056.40 | 36.05 | 605.64 | | | | | | |
| JERIC2 | 111 | Winthrop Financial Services | 8/1/2020 | 8/31/2023 | 5,690 | 13,646.61 | 28.78 | 1,588.46 | | | RTO | 8/1/2022 | 17,646.31 | 37.22 |
| | | | | | | | | | | | RTO | 8/1/2023 | 18,131.58 | 38.24 |
| JERIC2 | 111C | Conference Center | 6/1/2005 | 5/31/2016 | 1,500 | | | | | | | | | |
| JERIC2 | 112 | Onyx Management Group (Mgmt ( | 1/1/2015 | 12/31/2016 | 3,092 | | | | | | | | | |
| JERIC2 | 113 | Viner Finance Inc | 1/9/2018 | 1/31/2029 | 12,691 | 36,982.10 | 34.97 | 3,701.54 | | | RTO | 2/1/2022 | 38,091.56 | 36.02 |
| | | | | | | | | | | | RTO | 2/1/2023 | 39,234.31 | 37.10 |
| | | | | | | | | | | | RTO | 2/1/2024 | 40,411.34 | 38.21 |
| | | | | | | | | | | | RTO | 2/1/2025 | 41,623.68 | 39.36 |
| | | | | | | | | | | | RTO | 2/1/2026 | 42,872.39 | 40.54 |
| | | | | | | | | | | | RTO | 2/1/2027 | 44,158.56 | 41.75 |
| | | | | | | | | | | | RTO | 2/1/2028 | 45,483.32 | 43.01 |
| | | Additional Space:  JERIC2   - S02 | 9/1/2018 | 1/31/2029 | 533 | | | | | 873.64 | SSR | 9/1/2022 | 899.85 | 20.26 |
| | | | | | | | | | | | SSR | 9/1/2023 | 926.85 | 20.87 |
| | | | | | | | | | | | SSR | 9/1/2024 | 954.66 | 21.49 |
| | | | | | | | | | | | SSR | 9/1/2025 | 983.30 | 22.14 |
| | | | | | | | | | | | SSR | 9/1/2026 | 1,012.80 | 22.80 |
| | | | | | | | | | | | SSR | 9/1/2027 | 1,043.18 | 23.49 |

# Rent Roll

| Bldg Id | Suite Id | Occupant Name | Rent Start | Expiration | GLA Sqft | Monthly Base Rent | Annual Rate PSF | Monthly Cost Recovery | Expense Stop | Monthly Other Income | Cat | Date | Monthly Amt | PSF |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | | SSR | 9/1/2028 | 1,074.48 | 24.19 |
| | | | | Totals: | 13,224 | 36,982.10 | | 3,701.54 | | 873.64 | | | | |
| JERIC2 | 114 | Chasanoff Family Office LLC | 6/1/2021 | 12/31/2021 | 2,371 | 6,717.83 | 34.00 | | | | | | | |
| | | Additional Space:  JERIC2    - S07 | 6/1/2021 | 12/31/2021 | 824 | | | | | 990.17 | | | | |
| | | | | Totals: | 3,195 | 6,717.83 | | 0.00 | | 990.17 | | | | |
| JERIC2 | 204 | Purolator International Inc | 10/2/2015 | 8/31/2026 | 20,771 | 62,204.81 | 35.94 | 6,058.21 | | 788.62 | RCO | 2/2/2026 | -70,012.06 | -40.45 |
| | | | | | | | | | | | RCO | 8/3/2026 | 0.00 | 0.00 |
| | | | | | | | | | | | RTO | 2/2/2022 | 64,070.95 | 37.02 |
| | | | | | | | | | | | RTO | 2/2/2023 | 65,993.08 | 38.13 |
| | | | | | | | | | | | RTO | 2/2/2024 | 67,972.87 | 39.27 |
| | | | | | | | | | | | RTO | 2/2/2025 | 70,012.06 | 40.45 |
| JERIC2 | 207 | 1-800 Flowers | 9/1/2021 | 12/31/2032 | 92,700 | | | | | | RCO | 8/13/2022 | -277,134.38 | -35.88 |
| | | | | | | | | | | | RCO | 10/13/2022 | 0.00 | 0.00 |
| | | | | | | | | | | | RTO | 8/13/2022 | 277,134.38 | 35.88 |
| | | | | | | | | | | | RTO | 8/13/2023 | 284,062.74 | 36.77 |
| | | | | | | | | | | | RTO | 8/13/2024 | 291,164.31 | 37.69 |
| | | | | | | | | | | | RTO | 8/13/2025 | 298,443.42 | 38.63 |
| | | | | | | | | | | | RTO | 8/13/2026 | 305,904.50 | 39.60 |
| | | | | | | | | | | | RTO | 8/13/2027 | 313,552.11 | 40.59 |
| | | | | | | | | | | | RTO | 8/13/2028 | 321,390.91 | 41.60 |
| | | | | | | | | | | | RTO | 8/13/2029 | 329,425.68 | 42.64 |
| | | | | | | | | | | | RTO | 8/13/2030 | 337,661.32 | 43.71 |
| | | | | | | | | | | | RTO | 8/13/2031 | 346,102.85 | 44.80 |
| | | | | | | | | | | | RTO | 8/13/2032 | 346,102.76 | 44.80 |
| JERIC2 | 208 | Lee Korn - Opal Wealth | 2/13/2019 | 8/31/2029 | 6,106 | 18,626.54 | 36.61 | 1,780.92 | | | RCO | 11/1/2022 | -19,185.34 | -37.70 |
| | | | | | | | | | | | RCO | 1/1/2023 | 0.00 | 0.00 |
| | | | | | | | | | | | RCO | 11/1/2023 | -19,760.90 | -38.84 |
| | | | | | | | | | | | RCO | 1/1/2024 | 0.00 | 0.00 |
| | | | | | | | | | | | RCO | 11/1/2024 | -20,353.73 | -40.00 |
| | | | | | | | | | | | RCO | 1/1/2025 | 0.00 | 0.00 |
| | | | | | | | | | | | RTO | 11/1/2022 | 19,185.34 | 37.70 |
| | | | | | | | | | | | RTO | 11/1/2023 | 19,760.90 | 38.84 |
| | | | | | | | | | | | RTO | 11/1/2024 | 20,353.73 | 40.00 |
| | | | | | | | | | | | RTO | 11/1/2025 | 20,964.34 | 41.20 |
| | | | | | | | | | | | RTO | 11/1/2026 | 21,593.27 | 42.44 |
| | | | | | | | | | | | RTO | 11/1/2027 | 22,241.07 | 43.71 |

# Rent Roll

| Bldg Id | Suite Id | Occupant Name | Rent Start | Expiration | GLA Sqft | Monthly Base Rent | Annual Rate PSF | Monthly Cost Recovery | Expense Stop | Monthly Other Income | Cat | Date | Monthly Amt | PSF |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | | RTO | 11/1/2028 | 22,908.30 | 45.02 |
| | | | | | | | | | | | RTO | 9/1/2029 | 23,594.60 | 46.37 |
| | | | | | | | | | | | RTO | 9/1/2030 | 24,301.88 | 47.76 |
| | | | | | | | | | | | RTO | 9/1/2031 | 25,034.60 | 49.20 |
| | | | | | | | | | | | RTO | 9/1/2032 | 25,782.59 | 50.67 |
| JERIC2 | 300 | Schonfeld Group Holdings LLC | 7/10/2014 | 12/31/2024 | 10,045 | 32,984.19 | 39.40 | 2,804.23 | | 89.62 | RTO | 4/1/2022 | 33,973.72 | 40.59 |
| | | | | | | | | | | | RTO | 4/1/2023 | 34,992.93 | 41.80 |
| | | | | | | | | | | | RTO | 4/1/2024 | 36,042.72 | 43.06 |
| JERIC2 | 302 | RT Specialty LLC | 3/6/2020 | 10/31/2027 | 7,116 | 20,716.46 | 34.94 | 2,075.50 | | | RTO | 3/6/2022 | 21,286.16 | 35.90 |
| | | | | | | | | | | | RTO | 3/6/2023 | 21,822.35 | 36.80 |
| | | | | | | | | | | | RTO | 3/6/2024 | 22,473.00 | 37.90 |
| | | | | | | | | | | | RTO | 3/6/2025 | 23,091.00 | 38.94 |
| | | | | | | | | | | | RTO | 3/6/2026 | 23,726.00 | 40.01 |
| | | | | | | | | | | | RTO | 3/6/2027 | 24,378.47 | 41.11 |
| JERIC2 | 303 | Kang Long Group Inc | 2/1/2021 | 9/30/2031 | 3,795 | 11,628.51 | 36.77 | 1,106.88 | | | RTO | 4/1/2022 | 11,919.46 | 37.69 |
| | | | | | | | | | | | RTO | 4/1/2023 | 12,216.74 | 38.63 |
| | | | | | | | | | | | RTO | 4/1/2024 | 12,523.50 | 39.60 |
| | | | | | | | | | | | RTO | 4/1/2025 | 12,836.59 | 40.59 |
| | | | | | | | | | | | RTO | 4/1/2026 | 13,156.00 | 41.60 |
| | | | | | | | | | | | RTO | 4/1/2027 | 13,484.90 | 42.64 |
| | | | | | | | | | | | RTO | 4/1/2028 | 13,823.29 | 43.71 |
| | | | | | | | | | | | RTO | 4/1/2029 | 14,168.00 | 44.80 |
| | | | | | | | | | | | RTO | 4/1/2030 | 14,522.20 | 45.92 |
| | | | | | | | | | | | RTO | 4/1/2031 | 14,885.89 | 47.07 |
| JERIC2 | 304 | Navigators Management Company | 1/8/2018 | 10/31/2023 | 4,070 | 12,600.97 | 37.15 | 1,187.08 | | | RTO | 2/1/2022 | 12,978.99 | 38.27 |
| | | | | | | | | | | | RTO | 2/1/2023 | 13,368.36 | 39.42 |
| JERIC2 | 306 | Deloitte LLP | 10/1/2013 | 10/31/2024 | 42,662 | 137,350.31 | 38.63 | | | 1,663.18 | RTO | 11/1/2022 | 140,784.60 | 39.60 |
| | | | | | | | | | | | RTO | 11/1/2023 | 144,304.22 | 40.59 |
| JERIC2 | 307 | FINRA | 9/3/2020 | 8/31/2031 | 25,392 | 76,096.65 | 35.96 | 7,088.60 | | 1,107.30 | RTO | 8/11/2022 | 78,189.31 | 36.95 |
| | | | | | | | | | | | RTO | 8/11/2023 | 80,339.52 | 37.97 |
| | | | | | | | | | | | RTO | 8/11/2024 | 82,548.86 | 39.01 |
| | | | | | | | | | | | RTO | 8/11/2025 | 84,818.95 | 40.08 |
| | | | | | | | | | | | RTO | 8/11/2026 | 87,151.47 | 41.19 |
| | | | | | | | | | | | RTO | 8/11/2027 | 89,548.14 | 42.32 |
| | | | | | | | | | | | RTO | 8/11/2028 | 92,010.71 | 43.48 |
| | | | | | | | | | | | RTO | 8/11/2029 | 94,541.00 | 44.68 |
| | | | | | | | | | | | RTO | 8/11/2030 | 86,662.58 | 40.96 |

# Rent Roll

| Bldg Id | Suite Id | Occupant Name | Rent Start | Expiration | GLA Sqft | Monthly Base Rent | Annual Rate PSF | Monthly Cost Recovery | Expense Stop | Monthly Other Income | Cat | Date | Monthly Amt | PSF |
|---------|----------|---------------|------------|------------|----------|-------------------|-----------------|------------------------|--------------|----------------------|-----|------|-------------|-----|
| JERIC2 | 309 | Educational and Institutional | 3/22/2016 | 3/31/2026 | 13,839 | 44,118.78 | 38.26 | 3,863.39 | | | RTO | 4/1/2022 | 45,442.35 | 39.40 |
| | | | | | | | | | | | RTO | 4/1/2023 | 46,805.61 | 40.59 |
| | | | | | | | | | | | RTO | 4/1/2024 | 48,209.78 | 41.80 |
| | | | | | | | | | | | RTO | 4/1/2025 | 49,656.08 | 43.06 |
| | | Additional Space: JERIC2 - 305 | 3/22/2016 | 3/31/2026 | 5,451 | 17,377.81 | 38.26 | 1,521.74 | | | RTO | 4/1/2022 | 17,899.14 | 39.40 |
| | | | | | | | | | | | RTO | 4/1/2023 | 18,436.12 | 40.59 |
| | | | | | | | | | | | RTO | 4/1/2024 | 18,989.20 | 41.80 |
| | | | | | | | | | | | RTO | 4/1/2025 | 19,558.87 | 43.06 |
| | | Additional Space: JERIC2 - S08 | 4/1/2016 | 3/31/2026 | 625 | | | | | 1,086.82 | SSR | 4/1/2022 | 1,119.42 | 21.49 |
| | | | | | | | | | | | SSR | 4/1/2023 | 1,153.01 | 22.14 |
| | | | | | | | | | | | SSR | 4/1/2024 | 1,187.61 | 22.80 |
| | | | | | | | | | | | SSR | 4/1/2025 | 1,223.24 | 23.49 |
| | | | | Totals: | 19,915 | 61,496.59 | | 5,385.13 | | 1,086.82 | | | | |
| JERIC2 | 399X | Cablevision | 8/1/2015 | 7/31/2020 | 0 | 1,616.26 | | 285.64 | | | | | | |
| JERIC2 | LL1 | Health Club | 6/1/2005 | 5/31/2020 | 6,000 | | | | | | | | | |
| JERIC2 | S04 | Purolator International Inc | 8/1/2015 | 8/31/2026 | 200 | | | | | 338.31 | SSR | 8/1/2022 | 348.46 | 20.91 |
| | | | | | | | | | | | SSR | 8/1/2023 | 358.91 | 21.53 |
| | | | | | | | | | | | SSR | 8/1/2024 | 369.68 | 22.18 |
| | | | | | | | | | | | SSR | 8/1/2025 | 380.77 | 22.85 |
| | | | | | | | | | | | SSR | 8/1/2026 | 392.19 | 23.53 |
| JERIC2 | S06 | GP Harmon Recycling LLC | 2/8/2018 | 9/30/2025 | 475 | | | | | 772.91 | SSR | 3/1/2022 | 794.17 | 20.06 |
| | | | | | | | | | | | SSR | 3/1/2023 | 816.00 | 20.61 |
| | | | | | | | | | | | SSR | 3/1/2024 | 838.44 | 21.18 |
| | | | | | | | | | | | SSR | 3/1/2025 | 861.50 | 21.76 |
| JERIC2 | S10A | Schonfeld Group Holdings LLC | 9/1/2019 | 12/31/2024 | 1,339 | | | | | 2,863.65 | SSR | 9/1/2022 | 2,949.56 | 26.43 |
| | | | | | | | | | | | SSR | 9/1/2023 | 3,038.05 | 27.23 |
| JERIC2 | S19 | American Paraprofessional System | 1/1/2014 | 12/31/2023 | 201 | | | | | 311.05 | SSR | 1/1/2022 | 320.38 | 19.13 |
| | | | | | | | | | | | SSR | 1/1/2023 | 329.99 | 19.70 |
| JERIC2 | S20 | 1-800 Flowers | 9/1/2021 | 12/31/2032 | 4,163 | -4,908.87 | -14.15 | | | 4,908.87 | RCO | 9/1/2022 | -5,030.29 | -14.50 |
| | | | | | | | | | | | RCO | 11/1/2022 | 0.00 | 0.00 |
| | | | | | | | | | | | SSR | 9/1/2022 | 5,030.29 | 14.50 |
| | | | | | | | | | | | SSR | 9/1/2023 | 5,156.05 | 14.86 |
| | | | | | | | | | | | SSR | 9/1/2024 | 5,284.99 | 15.23 |
| | | | | | | | | | | | SSR | 9/1/2025 | 5,417.07 | 15.61 |
| | | | | | | | | | | | SSR | 9/1/2026 | 5,552.58 | 16.01 |

# Rent Roll

| Bldg Id | Suite Id | Occupant Name | Rent Start | Expiration | GLA Sqft | Monthly Base Rent | Annual Rate PSF | Monthly Cost Recovery | Expense Stop | Monthly Other Income | Cat | Date | Monthly Amt | PSF |
|---------|----------|---------------|------------|------------|----------|-------------------|-----------------|------------------------|--------------|----------------------|-----|------|-------------|-----|
| | | | | | | | | | | | SSR | 9/1/2027 | 5,691.31 | 16.41 |
| | | | | | | | | | | | SSR | 9/1/2028 | 5,833.60 | 16.82 |
| | | | | | | | | | | | SSR | 9/1/2029 | 5,979.43 | 17.24 |
| | | | | | | | | | | | SSR | 9/1/2030 | 6,128.92 | 17.67 |
| | | | | | | | | | | | SSR | 9/1/2031 | 6,282.15 | 18.11 |
| | | | | | | | | | | | SSR | 9/1/2032 | 6,439.20 | 18.56 |
| JERIC2 | S3A | Oxford and Simpson Realty | 5/8/2020 | 1/31/2031 | 217 | | | | | 325.50 | SSR | 2/1/2022 | 334.45 | 18.49 |
| | | | | | | | | | | | SSR | 2/1/2023 | 343.65 | 19.00 |
| | | | | | | | | | | | SSR | 2/1/2024 | 353.10 | 19.53 |
| | | | | | | | | | | | SSR | 2/1/2025 | 362.81 | 20.06 |
| | | | | | | | | | | | SSR | 2/1/2026 | 372.79 | 20.62 |
| | | | | | | | | | | | SSR | 2/1/2027 | 383.04 | 21.18 |
| | | | | | | | | | | | SSR | 2/1/2028 | 393.57 | 21.76 |
| | | | | | | | | | | | SSR | 2/1/2029 | 404.39 | 22.36 |
| | | | | | | | | | | | SSR | 2/1/2030 | 415.51 | 22.98 |
| | | Additional Space: JERIC2 - 301 | 5/8/2020 | 1/31/2031 | 3,642 | 10,622.50 | 35.00 | 1,016.73 | | | RTO | 2/1/2022 | 10,913.86 | 35.96 |
| | | | | | | | | | | | RTO | 2/1/2023 | 11,214.33 | 36.95 |
| | | | | | | | | | | | RTO | 2/1/2024 | 11,523.90 | 37.97 |
| | | | | | | | | | | | RTO | 2/1/2025 | 11,839.54 | 39.01 |
| | | | | | | | | | | | RTO | 2/1/2026 | 12,164.28 | 40.08 |
| | | | | | | | | | | | RTO | 2/1/2027 | 12,501.17 | 41.19 |
| | | | | | | | | | | | RTO | 2/1/2028 | 12,844.12 | 42.32 |
| | | | | | | | | | | | RTO | 2/1/2029 | 13,196.18 | 43.48 |
| | | | | | | | | | | | RTO | 2/1/2030 | 13,560.38 | 44.68 |
| | | | | Totals: | 3,859 | 10,622.50 | | 1,016.73 | | 325.50 | | | | |
| JERIC2 | SATT | AT&T | 3/1/2018 | 2/28/2023 | 100 | | | | | 2,025.82 | SSR | 3/1/2022 | 2,106.85 | 252.82 |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| **Totals:** | Occupied Sqft: | 95.80% | 39 Units | 341,244 | 706,016.34 | 51,300.53 | 23,095.66 |
| | Leased/Unoccupied Sqft: | | 0 Units | 0 | | | |
| | Vacant Sqft: | 4.20% | 6 Units | 14,962 | | | |
| | Area Included Not Counted Sqft: | | 0 Units | 0 | | | |
| | Total Sqft: | | 45 Units | 356,206 | 706,016.34 | | |

# Rent Roll

| Bldg Id | Suite Id | Occupant Name | Rent Start | Expiration | GLA Sqft | Monthly Base Rent | Annual Rate PSF | Monthly Cost Recovery | Expense Stop | Monthly Other Income | ------------ Future Rent Increases ------------ | | | |
|---------|----------|---------------|------------|------------|----------|-------------------|-----------------|-----------------------|-------------|---------------------|-----|------|-------------|-----|
| | | | | | | | | | | | Cat | Date | Monthly Amt | PSF |

**Total Two Jericho Plaza:**

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Occupied Sqft: | 95.80% | 39 Units | 341,244 | 706,016.34 | 51,300.53 | 23,095.66 |
| Leased/Unoccupied Sqft: | | 0 Units | 0 | | | |
| Vacant Sqft: | 4.20% | 6 Units | 14,962 | | | |
| Area Included Not Counted Sqft: | | 0 Units | 0 | | | |
| Total Sqft: | | 45 Units | 356,206 | 706,016.34 | | |

# Rent Roll

| Bldg Id | Suite Id | Occupant Name | Rent Start | Expiration | GLA Sqft | Monthly Base Rent | Annual Rate PSF | Monthly Cost Recovery | Expense Stop | Monthly Other Income | Cat | Date | Monthly Amt | PSF |
|---------|----------|---------------|------------|------------|----------|-------------------|-----------------|----------------------|-------------|---------------------|-----|------|-------------|-----|
| | | | | | | | | | | | | ----------- Future Rent Increases ----------- | | |

**Vacant Suites**

| JERGYM | 000001 | Vacant | | | 1 | | | | | | | | | |

| Totals: | | | | | | | | | | |
|---------|---|---|---|---|---|---|---|---|---|---|
| Occupied Sqft: | 0.00% | 0 Units | 0 | 0.00 | 0.00 | 0.00 |
| Leased/Unoccupied Sqft: | | 0 Units | 0 | | | |
| Vacant Sqft: | 100.00% | 1 Units | 1 | | | |
| Area Included Not Counted Sqft: | | 0 Units | 0 | | | |
| Total Sqft: | | 1 Units | 1 | | | |

**Total Jericho Plaza Gym:**

| | | | | | | |
|---|---|---|---|---|---|---|
| Occupied Sqft: | 0.00% | 0 Units | 0 | 0.00 | 0.00 | 0.00 |
| Leased/Unoccupied Sqft: | | 0 Units | 0 | | | |
| Vacant Sqft: | 100.00% | 1 Units | 1 | | | |
| Area Included Not Counted Sqft: | | 0 Units | 0 | | | |
| Total Sqft: | | 1 Units | 1 | | | |

**Grand Total:**

| | | | | | | |
|---|---|---|---|---|---|---|
| Occupied Sqft: | 93.82% | 62 Units | 627,272 | 1,471,144.96 | 126,229.65 | 63,189.40 |
| Leased/Unoccupied Sqft: | | 0 Units | 0 | | | |
| Vacant Sqft: | 6.18% | 14 Units | 41,328 | | | |
| Area Included Not Counted Sqft: | | 0 Units | 0 | | | |
| Total Sqft: | | 76 Units | 668,600 | 1,471,144.96 | | |

**TABLE 1 - IMMEDIATE REPAIRS & DEFERRED MAINTENANCE COST OPINION**

Jericho Plaza

One and Two Jericho Plaza

Jericho. New York

Partner Project No. 21-342099.2

November 1, 2021

| Sect. No. | Deficiency or Repair Item | Quantity | Unit | Unit Cost | Total Cost |
|---|---|---|---|---|---|
| **2.0** | **Regulatory Compliance** | | | | |
| | None Noted | | | | |
| **3.0** | **Site Improvements** | | | | |
| 3.2.1 | The subject property is located in a region of the country that was impacted by torrential rain and flash flooding prior to the assessment. Signifcant ponding/standing water was observed in the asphalt paved parking area to the southeast corner of the site and the drive aisle just north of the Jericho I building. Inlet drains and drywells should be checked and cleaned of any silt or organic material to ensure proper drainage. | 1 | ALLOW | $5,000 | $5,000 |
| 3.2.2 | Damaged asphalt pavement consisting of linear and alligator cracking, potholes, and raveling was observed at the parking area drive aisles around the property. Sectional full-depth replacement, repairs and crack sealing is recommended. | 9,000 | SF | $1.25 | $11,250 |
| 3.2.2 / 3.2.3 | Concrete pavement exhibted some linear cracking spalling and settlement at the access ramps and loading areas at both buildings. Additionally, some flatwork and walkway linear cracking spalling and settlement were observed around both building creating a trip hazard. Sectional repairs/replacement of damaged concrete is recommended. | 1 | LS | $3,000 | $3,000 |
| 3.2.5 | The areaway retaining walls around both buildings exhibited some cracked and spalling concrete. Additionally, some minor cracking and worn and peeling paint was observed along the loading dock area walls. Sectional repairs/replacement of damaged concrete and refinishing the wall sections with deteriorated paint finishes is recommended. | 1 | ALLOW | $3,000 | $3,000 |
| **4.0** | **Structural Frame and Building Envelope** | | | | |
| 4.4.1 | Areas of roof surface degradation, patch-type repairs, cracked and open lap-joints, wrinkles, and standing water were noted. The flashing and mastic covering on the inboard side of the parapet walls, and the joint sealant at the counterflashing was observed to be cracked, open and deteriorated in several sections. Active roof leaks were not reported at the time of our visit. However, based on the observed conditions some repairs and resealing are recommended at this time to ensure a water-tight condition. | 1 | ALLOW | $2,500 | $2,500 |
| **5.0** | **Mechanical and Electrical Systems** | | | | |
| | None Noted | | | | |
| **6.0** | **Interior Elements** | | | | |
| | None Noted | | | | |
| **7.0** | **Accessibility** | | | | |
| 7.0 | The subject property provides 2,602 total parking spaces, including 31 accessible parking spaces, of which none appear are van-accessible spaces. For a total of 2,602 parking spaces, the ADA requires a total of 37 accessible parking spaces, of which seven should be van-accessible. The reconfiguration and addition of seven ADA-compliant van-accessible parking spaces, including ADA compliant pavement markings and van-accessible vertical signage is recommended. | 7 | EA | $250 | $1,750 |
| 7.0 | ADA-compliant parking spaces are required to have a sign with the International Symbol of Accessibility at the head of each space. It did not appear that ADA-compliant signage was provided at each ADA parking space; several spaces were identified by a single sign only. Installation of compliant signage at each space is recommended where missing. | 31 | EA | $100 | $3,100 |
| 7.0 | ADA-compliant parking spaces are required to have an adjacent access aisle. Access aisles were not observed at many of the accessible parking spaces and inclusion is recommended. | 1 | LS | $1,500 | $1,500 |
| **8.0** | **Water Intrusion and Microbial Growth** | | | | |
| | None Noted | | | | |

**TOTAL** $ 31,100

**Schedule 3**

**Organization Chart of Borrower**



# Schedule 4

## Definition of Special Purpose Entity

Borrower hereby represents and warrants to, and covenants with, Lender that since the date of its formation and at all times on and after the date hereof and until such time as the Debt shall be paid in full:

(a)     Borrower (i) has been, is, and will be organized solely for the purpose of acquiring, developing, owning, holding, selling, leasing, transferring, exchanging, managing and operating the Property, entering into this Agreement with the Lender, refinancing the Property in connection with a permitted repayment of the Loan, and transacting lawful business that is incident, necessary and appropriate to accomplish the foregoing, (ii) has not owned, does not own, and will not own any asset or property other than (A) the Property, and (B) incidental personal property necessary for the ownership or operation of the Property and (iii) has been, is, and will be organized for the purpose of investing the equity capital that was contributed to Borrower by the Sole Member of Borrower in compliance with the provisions of this Schedule 4. No equity capital was raised by Borrower.  For the avoidance of doubt, there has been no direct or indirect commercial activity by the Borrower or a person or entity acting on its behalf to procure the transfer or commitment of capital by the Sole Member of the Borrower for the purpose of investing it in accordance with the provisions of this Schedule 4.

(b)     Borrower has not engaged and will not engage in any business other than the ownership, management and operation of the Property and Borrower will conduct and operate its business as presently conducted and operated.

(c)     Borrower has not and will not enter into any contract or agreement with any Affiliate of Borrower, any constituent party of Borrower or any Affiliate of any constituent party, except in the ordinary course of business and on terms and conditions that are disclosed to Lender in advance and that are intrinsically fair, commercially reasonable and substantially similar to those that would be available on an arm's-length basis with third parties other than any such party.

(d)     Borrower has not incurred and will not incur any Indebtedness other than Permitted Indebtedness.  No Indebtedness other than the Debt may be secured (senior, subordinate or *pari passu*) by the Property.

(e)     Borrower has not made and will not make any loans or advances to any Person (including any Affiliate or constituent party), and has not and shall not acquire obligations or securities of its Affiliates.

(f)     Borrower has been, is, and intends to remain solvent and Borrower has paid and intends to pay its debts and liabilities (including, as applicable, shared personnel and overhead expenses) from its assets; provided that the foregoing shall not require any direct or indirect member, partner or shareholder of Borrower to make any additional capital contributions to Borrower.

(g)     Borrower has done or caused to be done, and will do, all things necessary to observe organizational formalities and preserve its existence, and Borrower has not, will not (i) terminate or fail to comply with the provisions of its organizational documents, or (ii) unless (A) Lender has consented and (B) following a Securitization of the Loan, the applicable Rating Agencies have issued a Rating Comfort Letter, amend, modify or otherwise change its operating agreement or other organizational documents.

(h)     Except to the extent that Borrower is (i) required to file consolidated tax returns by law; or (ii) treated as a "disregarded entity" for tax purposes and is not required to file tax returns under applicable law, (1) Borrower has maintained and will maintain all of its books, records, financial statements and bank accounts separate from those of its Affiliates and any other Person; (2) Borrower's assets will not be listed as assets on the financial statement of any other Person; it being understood that Borrower's assets may be included in a consolidated financial statement of its Affiliates provided that (i) appropriate notation shall be made on such consolidated financial statements to indicate the separateness of Borrower and such Affiliates and to indicate that Borrower's assets and credit are not available to satisfy the debts and other obligations of such Affiliates or any other Person, and (ii) such assets shall be listed on Borrower's own separate balance sheet; and (3) Borrower will file its own tax returns (to the extent Borrower is required to file any tax returns) and will not file a consolidated federal income tax return with any other Person. Borrower has maintained and shall maintain its books, records, resolutions and agreements in accordance with this Agreement.

(i)     Borrower has been, will be, and at all times has held and will hold itself out to the public as, a legal entity separate and distinct from any other entity (including any Affiliate of Borrower or any constituent party of Borrower (recognizing that Borrower may be treated as a "disregarded entity" for tax purposes and is not required to file tax returns for tax purposes under applicable law)), shall correct any known misunderstanding regarding its status as a separate entity, shall conduct business in its own name, shall not identify itself or any of its Affiliates as a division or department or part of the other and shall, to the extent reasonably necessary for the operation of its business, maintain and utilize separate stationery, invoices and checks bearing its own name.

(j)     Borrower has maintained and intends to maintain adequate capital for the normal obligations reasonably foreseeable in a business of its size and character and in light of its contemplated business operations; provided that the foregoing shall not require any direct or indirect member, partner or shareholder of Borrower to make any additional capital contributions to Borrower.

(k)     Neither Borrower nor any constituent party of Borrower has sought or will seek or effect the liquidation, dissolution, winding up, consolidation or merger, in whole or in part, of Borrower.

(l)     Borrower has not and will not commingle the funds and other assets of Borrower with those of any Affiliate or constituent party or any other Person, and has held and will hold all of its assets in its own name.

(m)     Borrower has and will maintain its assets in such a manner that it will not be costly or difficult to segregate, ascertain or identify its individual assets from those of any Affiliate or constituent party or any other Person.

(n)     Borrower has not and will not assume or guarantee or become obligated for the debts of any other Person and does not and will not hold itself out to be responsible for or have its credit available to satisfy the debts or obligations of any other Person.

(o)     The organizational documents of Borrower shall provide that the business and affairs of Borrower shall be (A) managed by or under the direction of a board of one or more directors designated by Borrower's sole member (the "*Sole Member*") or (B) a committee of managers designated by Sole Member (a "*Committee*") or (C) by Sole Member, and at all times there shall be at least two (2) duly appointed Independent Directors or Independent Managers. In addition, the organizational documents of Borrower shall provide that no Independent Director or Independent Manager (as applicable) of Borrower may be removed or replaced without Cause and unless Borrower provides Lender with not less than three (3) Business Days' prior written notice of (a) any proposed removal of an Independent Director

or Independent Manager (as applicable), together with a statement as to the reasons for such removal, and (b) the identity of the proposed replacement Independent Director or Independent Manager, as applicable, together with a certification that such replacement satisfies the requirements set forth in the organizational documents for an Independent Director or Independent Manager (as applicable).

(p)     The organizational documents of Borrower shall also provide an express acknowledgment that Lender is an intended third-party beneficiary of the "special purpose" provisions of such organizational documents.

(q)     The organizational documents of Borrower shall provide that the board of directors, the Committee or Sole Member (as applicable) of Borrower shall not take any action which, under the terms of any certificate of formation, limited liability company operating agreement or any voting trust agreement, requires an unanimous vote of the board of directors (or the Committee as applicable) of Borrower unless at the time of such action there shall be (A) at least two (2) members of the board of directors (or the Committee as applicable) who are Independent Directors or Independent Managers, as applicable (and such Independent Directors or Independent Managers, as applicable, have participated in such vote) or (B) if there is no board of directors or Committee, then such Independent Managers shall have participated in such vote. The organizational documents of Borrower shall provide that Borrower will not and Borrower agrees that it will not, without the unanimous written consent of its board of directors, its Committee or its Sole Member (as applicable), including, or together with, the Independent Directors or Independent Managers (as applicable) (i) file or consent to the filing of any petition, either voluntary or involuntary, to take advantage of any applicable insolvency, bankruptcy, liquidation or reorganization statute, (ii) seek or consent to the appointment of a receiver, liquidator or any similar official of Borrower or a substantial part of its business, (iii) take any action that might cause such entity to become insolvent, (iv) make an assignment for the benefit of creditors, (v) admit in writing its inability to pay debts generally as they become due, (vi) declare or effectuate a moratorium on the payment of any obligations, or (vii) take any action in furtherance of the foregoing. Borrower shall not take any of the foregoing actions without the unanimous written consent of its board of directors, its Committee or its Sole Member, as applicable, including (or together with) all Independent Directors or Independent Managers, as applicable. In addition, the organizational documents of Borrower shall provide that, when voting with respect to any matters set forth in the immediately preceding sentence of this clause (q), the Independent Directors or Independent Managers (as applicable) shall consider only the interests of Borrower, including its creditors. Without limiting the generality of the foregoing, such documents shall expressly provide that, to the greatest extent permitted by law, except for duties to Borrower (including duties to the members of Borrower solely to the extent of their respective economic interest in Borrower and to Borrower's creditors as set forth in the immediately preceding sentence), such Independent Directors or Independent Managers (as applicable) shall not owe any fiduciary duties to, and shall not consider, in acting or otherwise voting on any matter for which their approval is required, the interests of (i) the members of Borrower, (ii) other Affiliates of Borrower, or (iii) any group of Affiliates of which Borrower is a part); provided, however, the foregoing shall not eliminate the implied contractual covenant of good faith and fair dealing.

(r)     The organizational documents of Borrower shall provide that, as long as any portion of the Debt remains outstanding, upon the occurrence of any event that causes Sole Member to cease to be a member of Borrower (other than (i) upon an assignment by Sole Member of all of its limited liability company interest in Borrower and the admission of the transferee, if permitted pursuant to the organizational documents of Borrower and the Loan Documents, or (ii) the resignation of Sole Member and the admission of an additional member of Borrower, if permitted pursuant to the organizational documents of Borrower and the Loan Documents), each of the persons acting as an Independent Director or Independent Manager (as applicable) of Borrower shall, without any action of any Person and simultaneously with Sole Member ceasing to be a member of Borrower, automatically be admitted as members of Borrower (in each case, individually, a "***Special Member***" and collectively, the "***Special***

*Members*") and shall preserve and continue the existence of Borrower without dissolution. The organizational documents of Borrower shall further provide that for so long as any portion of the Debt is outstanding, no Special Member may resign or transfer its rights as Special Member unless (i) a successor Special Member has been admitted to Borrower as a Special Member, and (ii) such successor Special Member has also accepted its appointment as an Independent Director or Independent Manager (as applicable).

(s)     The organizational documents of Borrower shall provide that, as long as any portion of the Debt remains outstanding, except as expressly permitted pursuant to the terms of this Agreement, (i) Sole Member may not resign, and (ii) no additional member shall be admitted to Borrower.

(t)     The organizational documents of Borrower shall provide that, as long as any portion of the Debt remains outstanding: (i) Borrower shall be dissolved, and its affairs shall be wound up, only upon the first to occur of the following: (A) the termination of the legal existence of the last remaining member of Borrower or the occurrence of any other event which terminates the continued membership of the last remaining member of Borrower in Borrower unless the business of Borrower is continued in a manner permitted by its operating agreement or the Delaware Limited Liability Company Act (the "*Act*"), or (B) the entry of a decree of judicial dissolution under Section 18-802 of the Act; (ii) upon the occurrence of any event that causes the last remaining member of Borrower to cease to be a member of Borrower or that causes Sole Member to cease to be a member of Borrower (other than (A) upon an assignment by Sole Member of all of its limited liability company interest in Borrower and the admission of the transferee, if permitted pursuant to the organizational documents of Borrower and the Loan Documents, or (B) the resignation of Sole Member and the admission of an additional member of Borrower, if permitted pursuant to the organizational documents of Borrower and the Loan Documents), to the fullest extent permitted by law, the personal representative of such last remaining member shall be authorized to, and shall, within ninety (90) days after the occurrence of the event that terminated the continued membership of such member in Borrower, agree in writing (I) to continue the existence of Borrower, and (II) to the admission of the personal representative or its nominee or designee, as the case may be, as a substitute member of Borrower, effective as of the occurrence of the event that terminated the continued membership of such member in Borrower; (iii) the bankruptcy of Sole Member or a Special Member shall not cause such Sole Member or Special Member, respectively, to cease to be a member of Borrower and upon the occurrence of such an event, the business of Borrower shall continue without dissolution; (iv) in the event of the dissolution of Borrower, Borrower shall conduct only such activities as are necessary to wind up its affairs (including the sale of the assets of Borrower in an orderly manner), and the assets of Borrower shall be applied in the manner, and in the order of priority, set forth in Section 18-804 of the Act; and (v) to the fullest extent permitted by law, each of Sole Member and the Special Members shall irrevocably waive any right or power that they might have to cause Borrower or any of its assets to be partitioned, to cause the appointment of a receiver for all or any portion of the assets of Borrower, to compel any sale of all or any portion of the assets of Borrower pursuant to any applicable law or to file a complaint or to institute any proceeding at law or in equity to cause the dissolution, liquidation, winding up or termination of Borrower.

(u)     Borrower shall conduct its business so that the assumptions made with respect to Borrower in the Insolvency Opinion shall be true and correct in all respects. In connection with the foregoing, Borrower hereby covenants and agrees that it will comply with or cause the compliance with, (i) all of the facts and assumptions (whether regarding Borrower or any other Person) set forth in the Insolvency Opinion, (ii) all of the representations, warranties and covenants on this <u>Schedule 4</u>, and (iii) all of the organizational documents of Borrower.

(v)     Borrower has paid and intends to pay its own liabilities and expenses, including the salaries of its own employees (if any) from its own funds, and has maintained and shall maintain a sufficient number of employees (if any) in light of its contemplated business operations; provided that the

foregoing shall not require any direct or indirect member, partner or shareholder of Borrower to make any additional capital contributions to Borrower.

(w)     Borrower has not permitted and will not permit any Affiliate or constituent party independent access to its bank accounts.

(x)     Borrower has compensated and shall compensate each of its consultants and agents from its funds for services provided to it and pay from its own assets all obligations of any kind incurred; provided that the foregoing shall not require any direct or indirect member, partner or shareholder of Borrower to make any additional capital contributions to Borrower.

(y)     Borrower has allocated and will allocate fairly and reasonably any overhead expenses that are shared with any Affiliate, including shared office space.

(z)     Except in connection with the Loan, Borrower has not pledged and will not pledge its assets for the benefit of any other Person.

(aa)     Borrower has and will have no obligation to indemnify its officers, directors, members or Special Members, as the case may be, or has such an obligation that is fully subordinated to the Debt and will not constitute a claim against it if cash flow in excess of the amount required to pay the Debt is insufficient to pay such obligation.

(bb)     Borrower has not, does not, and will not have any of its obligations guaranteed by an Affiliate (other than from the Guarantor with respect to the Loan).

As used herein:

"*Cause*" shall mean, with respect to an Independent Director or Independent Manager, (i) acts or omissions by such Independent Director or Independent Manager, as applicable, that constitute willful disregard of, or gross negligence with respect to, such Independent Director's or Independent Manager's, as applicable, duties, (ii) such Independent Director or Independent Manager, as applicable, has engaged in or has been charged with or has been indicted or convicted for any crime or crimes of fraud or other acts constituting a crime under any law applicable to such Independent Director or Independent Manager, as applicable, (iii) such Independent Director or Independent Manager, as applicable, has breached its fiduciary duties of loyalty and care as and to the extent of such duties in accordance with the terms of Borrower's organizational documents, (iv) there is a material increase in the fees charged by such Independent Director or Independent Manager, as applicable, or a material change to such Independent Director's or Independent Manager's, as applicable, terms of service, (v) such Independent Director or Independent Manager, as applicable, is unable to perform his or her duties as Independent Director or Independent Manager, as applicable, due to death, disability or incapacity, or (vi) such Independent Director or Independent Manager, as applicable, no longer meets the definition of Independent Director or Independent Manager, as applicable.

"*Independent Director*" or "*Independent Manager*" shall mean a natural person selected by Borrower (a) with prior experience as an independent director, independent manager or independent member, (b) with at least three (3) years of employment experience, (c) who is provided by a Nationally Recognized Service Company, and (d) who is duly appointed as an Independent Director or Independent Manager and is not, will not be while serving as Independent Director or Independent Manager (except pursuant to an express provision in Borrower's operating agreement providing for the appointment of such

Independent Director or Independent Manager to become a "special member" upon the last remaining member of Borrower ceasing to be a member of Borrower) and shall not have been at any time during the preceding five (5) years, any of the following:

(i)     a stockholder, director (other than as an Independent Director), officer, employee, partner, attorney or counsel of Borrower, any Affiliate of Borrower or any direct or indirect parent of Borrower;

(ii)    a customer, supplier or other Person who derives any of its purchases or revenues from its activities with Borrower or any Affiliate of Borrower;

(iii)   a Person or other entity Controlling or under Common Control with any such stockholder, partner, customer, supplier or other Person described in clause (i) or clause (ii) above;

(iv)    a member of the immediate family of any such stockholder, director, officer, employee, partner, customer, supplier or other Person described in clause (i) or clause (ii) above, or

(v)     the same Person acting in similar capacity with respect to Mezzanine Borrower.

A natural person who otherwise satisfies the foregoing definition and satisfies subparagraph (i) by reason of being the Independent Director or Independent Manager of a "special purpose entity" affiliated with Borrower shall be qualified to serve as an Independent Director or Independent Manager of Borrower, provided that the fees that such individual earns from serving as Independent Director or Independent Manager of affiliates of Borrower in any given year constitute in the aggregate less than five percent (5%) of such individual's annual income for that year.

A natural person who satisfies the foregoing definition other than clause (ii) shall not be disqualified from serving as an Independent Director or Independent Manager of Borrower if such individual is an independent director, independent manager or special manager provided by a Nationally Recognized Service Company that provides professional independent directors, independent managers and special managers and also provides other corporate services in the ordinary course of its business.

"*Nationally Recognized Service Company*" shall mean any of CT Corporation, Corporation Service Company, National Registered Agents, Inc., Wilmington Trust Company, National Corporate Research, Ltd., United Corporate Services, Inc., or such other nationally recognized company that provides independent director, independent manager or independent member services and that is reasonably satisfactory to Lender, in each case that is not an Affiliate of Borrower and that provides professional independent directors and other corporate services in the ordinary course of its business.

# JERICHO PLAZA PORTFOLIO LLC

[_____]
[_____]

_____, 20__

*Certified Mail*
*Return Receipt Requested*

[Name and Address of Tenant]
[_____]
[_____]

Re:    Lease of Space at [_____] (the "***Building***")

Ladies and Gentlemen:

The undersigned ("***Owner***") is the owner of the Building and the landlord under your lease of space in the Building (your "***Lease***").  By this letter, you are hereby directed all payments of rent and other sums due to the landlord under your Lease must be sent <u>directly</u> to the following account by wire transfer to the following account:

| | |
|---|---|
| If by Wire Transfer: | Bank: [_____] |
| | City & State: [_____] |
| | ABA: [_____] |
| | Account Name: [_____] |
| | Account No.: [_____] |
| If by Overnight Courier: | [_____] |
| | Lockbox No. [_____] |
| | [_____] |
| | [_____] |
| If by U.S. Mail: | [_____] |
| | [_____] |
| | [_____] |

The foregoing directions are irrevocable, except with the written consent of our mortgagee, Natixis Real Estate Capital LLC (together with its successors and assigns, "***Lender***"), notwithstanding any future contrary request or direction from the undersigned or any other person Lender.

This letter also serves as notice that Lender is the mortgagee of the Building and as such is entitled to all mortgagee protections and rights, if any, set forth in your Lease.  Lender's address for purposes of any notices under your Lease is as follows:

Natixis Real Estate Capital LLC

1251 Avenue of the Americas
New York, New York 10020
Attention: Real Estate Administration

In addition, reference is hereby made to Section 291-f of the Real Property Law of the State of New York pursuant to which Owner notifies you that it has assigned, by (i) that certain Consolidated, Amended and Restated Mortgage, Assignment of Leases and Rents and Security Agreement (the "**Mortgage**"), dated as of [_____], 2021, made by Owner to Lender and (ii) that certain Assignment of Leases and Rents, dated as of [_____], 2021, made by Owner to Lender (the "**Assignment of Leases**"), all its estate, right, title and interest in and to certain real property located at One Jericho Plaza and Two Jericho Plaza, Jericho, New York. The Mortgage and the Assignment of Leases each contain a provision referring to Section 291-f of the Real Property Law of New York. This statute provides that if a recorded mortgage or a recorded instrument relating to such mortgage restricts the right or power of the owner of the mortgaged real property, without the consent of the holder of such mortgage, to cancel, abridge or otherwise modify tenancies, subtenancies, leases or subleases of the mortgaged real property in existence at the time of the agreement, or to accept prepayment of installments of rent to become due, and notice of the making of the mortgage or recorded instrument which contains a reference to Section 291-f is given to a tenant accompanied by a copy of the text of the agreement, any cancellation, abridgment, modification or prepayment made by such tenant or subtenant under a lease coming under the provisions of Section 291-f, without the consent of the holder of such mortgage, shall be voidable as against the holder of the mortgage at the option of such holder.

A copy of the applicable provisions of the Mortgage and the Assignment of Leases relating to Section 291-f is attached hereto as <u>Exhibit A</u>.

The documents evidencing the indebtedness secured by the Mortgage do not impair or diminish any of our obligations to you under the provisions of the Lease, nor are any such obligations imposed upon Lender, its successors or assigns.

If you have any questions concerning this letter, please contact [_____] of Owner at [_____]. Thank you for your cooperation.

Very truly yours,

**JERICHO PLAZA PORTFOLIO LLC**, a Delaware limited liability company

Name: _____
        Name:
        Title:

## EXHIBIT A

**Section 29 of the Mortgage** provides as follows:

**Section 291-f of the Real Property Law**. Lender shall have all the rights against lessees of the Property set forth in Section 291-F of the New York Real Property Law

**Section 17 of the Assignment of Leases** provides as follows:

**Section 291-f Agreement**. This Assignment is intended to be, and shall operate as, the agreement described in Section 291-f of the Real Property Law of the State of New York and shall be entitled to the benefits afforded thereby. Borrower shall (unless such notice is contained in such tenant's Lease) deliver notice of this Assignment in form and substance reasonably acceptable to Lender, to all present and future Tenants under any Lease, by assignment or otherwise, and shall take such other action as may now or hereafter be reasonably required to afford Lender the full protections and benefits of Section 291-f.

# Schedule 6

## Calculation of UNOI

UNOI shall be equal to the Property's annualized in place operating income minus annualized in place
operating expenses and adjusted as follows:

(i)     Operating income will be adjusted (A) to include only fixed Rents based on Leases in place with Tenants who are in occupancy and paying Rent; (B) to exclude Rents from temporary or month to month Tenants, provided, however, that such income will be included only to the extent it is determined by Lender to be stabilized and recurring, but only in an amount not to exceed a maximum of 50% of such Rent collected in such trailing 12 month period; (C) to exclude Rents from Tenants operating under bankruptcy protection; (D) to mark any Rents from any Tenant which is an affiliate of Borrower to market Rents; (E) to exclude Rents from any Tenant which is more than one month delinquent in payment of Rent;  (F) to mark any above market Leases to market Rents (except with respect to Mathematica Rents which shall be included to the extent that it does not exceed 115% of market Rents); (G) to reflect any Rent adjustments or cancellation option in any Leases; (H) to include reimbursements, not in excess of corresponding expense items, based on such trailing 12 month period; (I) to include other income on a case-by-case basis but only to the extent it is determined by Lender to be both stabilized and recurring and (J) to reflect a vacancy and credit loss allowance equal to the greater of: (1) actual historical vacancy and/or credit loss (2) 7% of total revenues and (3) market vacancy allowances as determined by Lender.

(ii)     Operating expenses will be adjusted to reflect (A) the greater of: (1) the projected expenses for the next 12 month period (except real estate taxes, ground rent and insurance, which will be included at their stabilized, recurring levels), (2) the actual annualized in place expenses but excluding any non-recurring items and capital expenses and (3) the actual expenses on a trailing 12-month basis, but excluding any non-recurring items and capital expenses; (B) a management fee equal to the greater of the management fee or 2.5% of Rents; and (C) other adjustments as determined by Lender in its sole discretion consistent with its due diligence findings and prevailing market conditions.

In determining UNOI, all pro forma adjustments to revenue and expenses shall be approved by Lender in its sole discretion.

**Schedule 7**

**Existing Approved Leasing Expenses Deposit**

**Jericho Plaza**
**TI & LC – Buyer Credits**

| Outstanding TI | | | | |
|---|---|---|---|---|
| Building | Tenant | Total | Paid | Remaining |
| J1 | AMWins Brokerage of NY, Inc | 350,150.00 | 307,925.00 | 42,225.00 |
| J1 | BGC Partners, LP | 1,114,961.00 | 415,098.69 | 699,862.31 |
| J2 | Opal Wealth Advisors, LLC | 154,600.00 | - | 154,600.00 |
| J2 | Morgan Stanley | 183,187.83 | - | 183,187.83 |
| J1 | RBC | 509,523.00 | - | 509,523.00 |
| J1 | FLII | 24,032.70 | - | 24,032.70 |
| | **Total** | **2,336,454.53** | **723,023.69** | **1,613,430.84** |

| Tenant Buildout | | | | |
|---|---|---|---|---|
| Building | Tenant | Total | Paid | Remaining |
| J2 | 1-800 Flowers.com, Inc. | 562,738.07 | - | 562,738.07 |
| | **Total** | **562,738.07** | **-** | **562,738.07** |

| Outstanding LCs | | | | |
|---|---|---|---|---|
| Building | Tenant | Total | Paid | Remaining |
| J2 | 1-800 Flowers.com, Inc | 2,834,073.00 | 2,083,631.00 | 750,442.00 |
| J1 | AMWins Brokerage of NY, Inc | 154,638.00 | 133,578.00 | 21,060.00 |
| J1 | BGC Partners, LP | 403,949.00 | 350,131.00 | 53,818.00 |
| J2 | Duraviva Pharma Inc | 26,558.00 | 26,558.00 | - |
| J2 | Opal Wealth Advisors, LLC | 128,635.29 | - | 128,635.29 |
| J2 | Schonfeld Group Holdings, LLC | 263,068.00 | 185,022.00 | 78,046.00 |
| | **Total** | **3,810,921.29** | **2,778,920.00** | **1,032,001.29** |

## Schedule 8

## REA

Perpetual and Permanent Cross Access, Parking, and Utility Easement Agreement, made as of the Closing Date, by and between Borrower, as grantor, and JP OPTIONEE LLC, a Delaware limited liability company, as grantee, to be recorded in the Registry of Nassau County, State of New York

**Schedule 9**

**O&M Plan**

# Asbestos Operations & Maintenance Plan

1 & 2 Jericho Plaza
Jericho, New York

EBI Project No. 1121009450

December 13, 2021



Prepared for:

Natixis Real Estate Capital, LLC
1251 Avenue of the Americas
New York, NY 10020

Prepared by:

**EBI Consulting**
environmental | engineering | due diligence

**EBI CONSULTING**
**21 B STREET**
**BURLINGTON, MASSACHUSETTS 01803**
**(800) 786-2346**

**Project No. 1121009450**

**Asbestos Operations & Maintenance Plan**

**1 & 2 Jericho Plaza**
**Jericho, New York 11753**

**PREPARED FOR:**

**NATIXIS REAL ESTATE CAPITAL, LLC**
**1251 AVENUE OF THE AMERICAS**
**NEW YORK, NY 10020**

# TABLE OF CONTENTS

**1.0 INTRODUCTION** ..................................................................................................................... 1

    1.1    GENERAL ....................................................................................................................... 1
    1.2    STATEMENT OF POLICY ............................................................................................... 1
    1.3    OBJECTIVES ................................................................................................................... 1
    1.4    BENCHMARKS OF AN EFFECTIVE OPERATIONS AND MAINTENANCE PLAN ................ 2
    1.5    OPERATIONS AND MAINTENANCE PLAN ELEMENTS ................................................... 2
    1.6    FACILITY SURVEY .......................................................................................................... 2
    1.7    O&M PLAN IMPLEMENTATION OVERVIEW ................................................................ 3

**2.0 ASBESTOS-CONTAINING BUILDING MATERIALS** ................................................ 5

    2.1    GENERAL ....................................................................................................................... 5
    2.2    MEDICAL ASPECTS ....................................................................................................... 5
    2.3    REGULATORY ASPECTS ................................................................................................ 6

**3.0    ASBESTOS MANAGEMENT PLAN** ................................................................. 7

    3.1    GENERAL ....................................................................................................................... 7
    3.2    REMOVAL ...................................................................................................................... 7
    3.3    ENCAPSULATION ........................................................................................................... 7
    3.4    ENCLOSURE ................................................................................................................... 7
    3.5    IMPLEMENTATION OF AN OPERATIONS AND MAINTENANCE PLAN .......................... 8
    3.6    CONSIDERATIONS FOR CONTRACTING ASBESTOS WORK ......................................... 8
    3.7    DEFINITIONS ................................................................................................................. 9

**4.0 OPERATIONS AND MAINTENANCE PLAN** ............................................................ 13

    4.1    PROGRAM MANAGEMENT .......................................................................................... 13
    4.2    AWARENESS PROGRAM .............................................................................................. 14
    4.3    IDENTIFICATION AND LABELING OF ASBESTOS-CONTAINING MATERIALS ............. 16
    4.4    EMPLOYEE TRAINING PROGRAMS ............................................................................. 18
    4.5    WORK PERMIT SYSTEM .............................................................................................. 20
    4.6    MAINTENANCE PROCEDURES .................................................................................... 21
    4.7    COMBATING FIBER RELEASE EPISODES ..................................................................... 22
    4.8    MEDICAL SURVEILLANCE AND RESPIRATORY PROTECTION PROGRAMS ................. 23
    4.9    PERSONAL PROTECTIVE CLOTHING .......................................................................... 24
    4.10   PERIODIC FACILITY INSPECTION ............................................................................... 25
    4.11   RECORD-KEEPING ...................................................................................................... 26

APPENDICES

    **APPENDIX A**        **FORMS**
    **APPENDIX B**        **TRAINING PROGRAMS**
    **APPENDIX C**        **WORK PERMIT SYSTEM FORMS**
    **APPENDIX D**        **STANDARD PROCEDURES**

# 1.0 INTRODUCTION

## 1.1 General

This Operations and Maintenance (O&M) plan was developed for the owners, employees, and occupants of the buildings located at 1 & 2 Jericho Plaza in Jericho, New York (herein the Subject Property) for their use in managing suspect, assumed or known asbestos-containing materials (ACMs) in the building(s) [Refer to Section 3.7 for definition of terms]. The purpose of this Plan is maintenance of suspect, assumed, or known ACMs in their existing condition.

This O&M Plan specifies procedures for suspect, assumed and known ACMs. Within this O&M Plan, procedures specified for ACMs (generally) also apply to suspect and assumed ACMs. The sole term of ACM is frequently used for simplicity and to avoid repeated use of "suspect, assumed, or known ACM".

Friable asbestos hazard conditions, if present, must be addressed by remediation procedures, which are beyond the scope of this O&M Plan. Remediation activities should be conducted by licensed asbestos contractors. Nonetheless, the Facility Asbestos Coordinator should ensure that activities of asbestos contractors follow applicable regulatory requirements and guidelines.

This Plan has been designed to minimize the risk of human exposure to asbestos fibers and asbestos fiber release during general work activities, scheduled maintenance and renovation of the building. This Plan will be in effect until all the ACMs have been removed from the facility.

This O&M has been developed to cover all asbestos maintenance procedures and may contain information not applicable to the Subject Property owners, occupants, and employees. Sections of this O&M Plan (i.e., Sections 4.8-Medical Surveillance and Respiratory Protection Programs and 4.9-Personal Protective Clothing) may only be applicable if "in-house" ACM abatement work is undertaken.

## 1.2 Statement of Policy

Company policy dictates that personnel or tenants should not engage in the disturbance of asbestos-containing material (ACM), suspect or assumed ACM. The intent of this O&M Plan is to enable maintenance personnel to perform routine maintenance activities, housekeeping activities, and activities to clean up asbestos dust, waste, and debris without technically 'disturbing' ACM or assumed ACM. In the event that ACM is to be disturbed or removed, maintenance personnel will notify the Facility Asbestos Coordinator who will in turn notify a licensed asbestos abatement contractor.

This plan is based upon normal work activities necessary to maintain the facilities in good condition without disturbing ACM, suspect or assumed ACM.

## 1.3 Objectives

The primary objectives of an effective O&M are:

1) To minimize the future release of asbestos fibers.
2) To maintain the asbestos-containing materials in sound condition.
3) To monitor the condition of the asbestos-containing materials.
4) To provide for the identification and immediate remediation of asbestos hazardous conditions.

**1.4     Benchmarks of an Effective Operations and Maintenance Plan**

For an O&M to be effective, it must be fully implemented at all levels of management and by a single individual who manages any and all activities involving ACM.

**1.5     Operations and Maintenance Plan Elements**

This O&M is comprised of the following elements:

1)  Building occupant, tenant and employee notification.
2)  Provisions for labeling, where appropriate, the asbestos-containing materials.
3)  Employee training.
4)  Work permit system to ensure that employees, tradesman and contractors do not inadvertently come in contact with asbestos-containing materials.
5)  Special work practices allowing trained personnel to safely perform maintenance and cleaning operations involving ACM with the potential to release asbestos fibers.
6)  Procedures to effectively combat fiber release episodes.
7)  Employee protection and medical surveillance programs.
8)  Periodic surveillance of the asbestos-containing materials remaining in place to ensure that they are in stable condition.
9)  A record-keeping system.

**1.6     Facility Survey**

The Subject Property is currently improved with two three-story, multi-tenant office buildings, one at 1 Jericho Plaza and one at 2 Jericho Plaza.  The 'H' shaped building at 1 Jericho Plaza has a reported leasable area of approximately 310,296± square feet, and the 'T' shaped building at 2 Jericho Plaza has a reported leasable area of approximately 355,296± square feet.  The existing improvements were reportedly constructed in 1978 (1Jericho) and 1982 (2 Jericho) with renovations in 2018-2021.  There are currently no manufacturing or industrial operations conducted at the Subject Property.

On November 1, 2021, EBI Consulting (EBI) of Burlington, Massachusetts, conducted a Phase I Environmental Site Assessment (ESA) of the Subject Property.  Note that at the time of the EBI inspection, a comprehensive asbestos survey was not conducted at the Subject Property.

EBI conducted a limited visual screening survey for the presence of ACM at the Subject Property.  EBI identified friable suspect ACM in the form of textured ceiling and wall surfacing materials, sheetrock/joint compound composite material, 2'x4' white perforated acoustical ceiling tile, and structural spray-on fireproofing and non-friable suspect ACM in the form of vinyl floor tile and associated mastic, sheet vinyl flooring and associated mastic, cementitious insulating material on HVAC ductwork, various construction mastics and caulking, exterior transite wall panels, and roofing materials. These materials were observed to be undamaged and in good condition at the time of assessment.  Please note that this survey was limited to visual observations of accessible areas and that the scope of work for this assessment did not include the collection and laboratory analysis of bulk samples of undamaged suspect ACM.  Additional suspect ACM may be present in inaccessible areas, including, but not limited to, roofs, pipe chases behind solid walls and ceilings, concealed floor coverings, the interior of machinery or equipment, or water and sewer systems.

It should be noted that the limited visual screening survey conducted under the scope of work for this assessment does not constitute a full asbestos inspection, in which all areas of the building

would have been thoroughly surveyed and sampled. The possibility exists for ACM to be present in areas of the building not accessed or sampled by EBI personnel. Based on the limited scope of this assessment, additional suspect ACM may also be present in areas of the building that were accessed as part of this assessment.

Due to the continued manufacture and distribution of a wide variety of asbestos-containing building materials, asbestos may be present in some of the roofing, flooring, caulking/putties, adhesives, spackling compounds, and/or non-accessible insulation materials at the Subject Property. Sampling of these types of materials require techniques that may be destructive to subject facilities, and in the case of roofing material, may void warranties. It is recommended that all such suspect asbestos-containing materials be tested prior to renovation or demolition activities that could disturb the materials. Any testing, removal, or disturbance of ACM should be handled in compliance with federal, state, and local regulations. Licensed, qualified asbestos abatement personnel should be retained prior to demolition or renovation of subject facilities.

Based on EBI's limited scope of work, sampling of suspect ACMs was not performed. EBI's limited visual assessment shall not be used for determination of ACMs and non-ACMs per EPA, OSHA, and State and local regulatory requirements. Asbestos inspection shall be performed in full compliance with EPA, OSHA, and applicable State and local standards for determination of ACMs and non-ACM prior to any and all renovation, demolition, or other activity that will cause a material disturbance of suspect ACM. All materials referenced above shall be treated as suspect or assumed ACM. Any materials similar in appearance to the suspect ACMs discussed above shall be treated as suspect or assumed ACM. Additional suspect ACMs may be present at the Subject Property that were not identified as part of EBI's limited scope of work: such as the list of building materials included in Section 2.1. All such suspect ACMs at the Subject Property shall be treated as ACM unless sampled by an Asbestos Consultant, analyzed for asbestos content, and reported by the Consultant to be non-ACM. All such materials should be managed under the O&M Plan.

For the purpose of this O&M Plan, any suspect ACMs encountered in the future will be considered ACM unless inspected and sampled by an Asbestos Consultant and reported to be non-ACM.

No suspect ACM shall be disturbed or involved in any work, in any way, unless sampled by an Asbestos Consultant, analyzed for asbestos content, and reported by the Consultant to be non-ACM.

## 1.7    O&M Plan Implementation Overview

This O&M Plan is established with the intent of managing ACMs as follows:

1.    Abate any existing asbestos hazards utilizing a licensed asbestos removal contractor.
2.    ACMs in fair to good condition will be maintained in-place in their existing condition.
3.    Establish procedures to minimize and/or avoid ACM disturbance.
4.    Contract asbestos removal activities prior to any maintenance/repair, renovation, or other activities that may cause an asbestos disturbance. [In-house asbestos abatement capabilities can be established. However, this is not within the scope of this O&M Plan report. Guidance for in-house asbestos work can be obtained upon O&M worker training or can be provided by EBI as a supplement to this O&M report.]

Listed below is a checklist of the programs and/or procedures that should be implemented as part of this O&M Plan. These programs/procedures include immediate and on-going activities for

proper management of ACMs at the Property. Upon implementation of the O&M Plan, the Facility Asbestos Coordinator should be able to check off each of the activities listed within the **O&M Implementation Checklist**. Within the **O&M Implementation Checklist**, references are made to report section(s), which provide further description.

## O&M IMPLEMENTATION CHECKLIST

The Facility Asbestos Coordinator should check that each of the activities/programs listed below has been completed or is implemented on an on-going basis.

___ **Facility Asbestos Coordinator (Coordinator) Training** – Minimum two day training or equivalent knowledge through background and experience (Section 4.4).

___ **Visual Reinspection of Property** by the Coordinator after completion of O&M training (Section 4.10).

___ **Initial Clean-Up**, **Abatement**, and/or **Testing** of known or potential friable asbestos hazards (Section 3.5).

___ **Worker Training** (Section 4.4).

    ___ **Maintenance** and **Custodial Personnel (if applicable)** – Awareness Training (2-Hour).

    ___ **Maintenance Personnel (if applicable)** – O&M Worker Training (2-day), if workers conduct work that could potentially disturb ACM.

___ **Employee**, **Tenant** (if applicable), and **Contractor Notifications** (Section 4.2).

___ **Asbestos Labeling** (Section 4.3.2), *if necessary*.

___ **Signage** (Section 4.3.2), *if necessary*.

___ **Periodic Surveillance** procedures (Section 4.10).

___ **Record Keeping** procedures (Section 4.11).

___ **Work Control/Permit System** (Section 4.5).

# 2.0 ASBESTOS-CONTAINING BUILDING MATERIALS

## 2.1    General

Asbestos is a term used to describe a group of six naturally occurring crystalline fiber minerals. Asbestos has been used extensively throughout the world in the textile, insulation and building industries. It is readily available from vast deposits in the earth; has excellent thermal stability; and has a high degree of tensile strength. Due to these excellent properties, millions of tons of asbestos have been mined since the turn of the century. Asbestos has been used as a component in fireproofing, decorative coatings, insulation materials, and as reinforcement for plasters binders in building products.

Asbestos was used extensively in the construction industry until the late 1970's. However, since the early 1970's, public awareness of the potential health hazards associated with inhalation of airborne asbestos fibers has increased. Since 1973, the U. S. Environmental Protection Agency (EPA) has limited the use of asbestos for fireproofing and insulation purposes, and in 1978, decorative uses were prohibited. Asbestos may be found in the following building materials:

| | | |
|---|---|---|
| Acoustical Plaster Skim Coat | Ductwork Flex Connectors | Packing Materials (at wall/ |
| Acoustical Plaster Base Coat | Electrical Cloth | /floor penetrations) |
| Adhesives | Electrical Panel Board | Roofing Materials |
| Asphalt Floor Tile | Electric Wiring Insulation | Roofing Shingles |
| Blown-in Insulation | Elevator Brake Shoes | Rooftop Equipment Sealant |
| Boiler Insulation | Elevator Equipment Panels | Sheetrock Wallboard |
| Breeching Insulation | Fire Blankets | Spackling Compounds |
| Caulking/Putties | Fire Curtains | Spray-Applied Insulation |
| Ceiling Tiles | Fire Doors | Stucco |
| Cement Pipes | Fireproofing Materials | Textured Ceiling Surfacing |
| Cement Siding | Floor Backings | Textured Paints/Coatings |
| Cement Wallboard | Heating/Electrical Ductwork | Thermal Paper Products |
| Chalkboard | HVAC Duct Insulation | Thermal Taping Compounds |
| Construction Mastics (floor | High Temperature Gaskets | Transite Panels |
| tile, carpet, ceiling tile, etc.) | Joint Compound | Vinyl Floor Tile |
| Cooling Towers | Laboratory Hoods/Table Tops | Vinyl Sheet Flooring |
| Decorative Plaster | Pipe Insulation | Vinyl Wall Coverings |

Asbestos-containing building materials are generally classified as friable or non-friable. Friable materials are those which can be crumbled, pulverized or reduced to powder by hand pressure or by normal use or maintenance and emits or can be expected to emit asbestos into the air. As an example, vinyl asbestos floor tile is generally considered non-friable until it is mechanically removed from the substrate. At that time, it may be considered friable.

## 2.2    Medical Aspects

Asbestos fibers enter the body via inhalation of airborne particles or by ingestion and can be become imbedded in the tissues of the respiratory or digestive systems. Excessive inhalation can cause a pneumoconiosis condition known as asbestosis, an emphysema-like condition. Medical research has indicated that even inhalation of asbestos fibers at the lowest detectable limits can cause other diseases such as lung cancer, pleural mesothelioma, a cancerous tumor that spreads rapidly in the cells of membranes covering lungs and body organs, and gastrointestinal cancer.

## 2.3    Regulatory Aspects

Occupational Safety and Health Administration (OSHA) began regulating exposure to asbestos in general industry in 1972.  Housekeeping work not related to a construction activity is regulated by the "General Industry Standard (Title 29 Code of Federal Regulations (CFR), Part 1910.1001). These provisions cover routine cleaning in public and commercial buildings where construction activities are not taking place.  Housekeeping work related to a construction activity is regulated by the "Construction Standard" (Title 29 CFR, Part 1926.1101).   For the Subject Facility, construction activities are most likely Class IV Asbestos work.  Class IV is defined as maintenance and custodial activities during which employees contact, but do not disturb ACM.

Emissions of asbestos to ambient air are controlled by Section 112 of Clean Air Act which established National Emission Standards for Hazardous Air Pollutants (NESHAPS) (40 CFR, Part 61).  NESHAPS regulations require filing of notices prior to the commencement of asbestos abatement activities.

Additional information regarding Federal regulatory requirements can be obtained on the USEPA Asbestos website (http://www.epa.gov/asbestos/index.html) and the U.S. Department of Labor OSHA website (http://www.osha.gov/SLTC/asbestos/standards.html).

Additional New York State regulations can be found on the New York State Department of Health (NYSDOH) website (https://www.health.ny.gov/environmental/indoors/asbestos/laws.htm).  The regulations for the training of asbestos abatement workers and training providers are established in 10 NYCRR Part 73 by the NYSDOH.  The New York State Department of Labor (NYSDOL) regulates the removal, encapsulation, enclosure, repair, or the disturbance of friable and non-friable asbestos, or any handling of asbestos material that may result in the release of asbestos fiber under 12 NYCRR Part 56.  The New York State Department of Environmental Conservation-Solid Waste Management Facilities regulations can be found in 6 NYCRR Part 360 regarding asbestos waste disposal and the New York State Department of Environmental Conservation-Waste Transporter Permits regulates transportation of asbestos waste under 6 NYCRR Part 364.

# 3.0    ASBESTOS MANAGEMENT PLAN

## 3.1    General

Upon discovery of ACM in a facility, the building owner develops an asbestos management plan to effectively control the asbestos-containing materials in order to prevent an inadvertent release and human exposure to asbestos fibers.

The asbestos management plan and consequent abatement options are developed by review of asbestos survey results as well as health and safety of the building occupants. The asbestos management plan considers the hazard assessment of the asbestos containing material, the short and long-term costs of abatement options, and the expected life of the facility.

Generally, there are four alternatives for asbestos management that can be used in conjunction.

1) Remove the asbestos-containing materials.
2) Encapsulate the asbestos-containing materials.
3) Enclose the asbestos-containing materials.
4) Implement an Operations and Maintenance Plan (O&M).

## 3.2    Removal

The major advantage of removing asbestos-containing materials is that potential exposure is ended and the development of future problems is prevented. Therefore, removal is the most complete solution. The main disadvantage to the removal option is the cost and time for removal of ACM and replacement of substitute material. However, if the material is friable, deteriorating, damaged or accessible by employees or tenants, removal is generally the most appropriate option. Removal must be performed by trained personnel. As such, removal should be performed by a licensed asbestos contractor.

## 3.3    Encapsulation

Encapsulation involves coating the ACM with a sealant to bind the asbestos fibers and other components together. Encapsulation reduces the risk of fiber release and increases ACM's resistance to damage. The initial cost of encapsulation may be lower than removal; however, an O&M must be implemented and remain in effect until the asbestos-containing materials are finally removed. With encapsulation, the source of the hazard remains in the building and must be considered when planning renovation, maintenance, or demolition activities. In addition, encapsulation can make subsequent removal more difficult and hazardous since it creates a hard-crusted surface that cannot easily be wetted to facilitate removal. The placement of a second (non-asbestos) layer of floor tile over the existing asbestos containing floor tile is a form of encapsulation. Note that encapsulation is considered an abatement activity and must be done by trained personnel (see Section 4.4).

## 3.4    Enclosure

Enclosure involves the construction of an air-tight barrier around the asbestos-containing materials. Carefully constructed airtight enclosures can reduce and even eliminate release of airborne fibers into the building environment. This alternative does not require replacement of the asbestos-containing materials and usually exhibits a lower initial cost than removal. An O&M

must be implemented in the event that asbestos-containing materials remain in the building(s) and remain in effect until the ACM is removed.

## 3.5    Implementation of an Operations and Maintenance Plan

The Facility Asbestos Coordinator shall immediately address any damaged ACM conditions identified during EBI's assessment or inspections performed by or arranged by the Facility Asbestos Coordinator.  Actions taken by the Coordinator may be self-directed or based on consultation with EBI or other Asbestos Consultant.  Appropriate response actions may be as simple as restricting access to affected areas of the Subject Property to properly trained and/or protected personnel.  Response actions may also include abatement (repair, removal, enclosure, etc.) of damaged material or hazardous conditions.  Sampling of damaged materials may also be necessary prior to determination of appropriate response actions.

Damaged ACM conditions or any other evidence of an asbestos fiber release will be recorded. The Coordinator will immediately arrange remediation of the condition.

An O&M is a long-term management approach to managing the asbestos-containing materials remaining in place. The program is designed to clean up asbestos fibers previously released, prevent future releases by minimizing the disturbance or damage of asbestos-containing materials, and provide for continued monitoring of the condition of asbestos-containing materials.  The program remains in effect until all asbestos-containing materials are removed from the building(s).

The O&M alerts workers and building occupants to the location of asbestos-containing materials, trains custodial and maintenance personnel in proper cleaning and maintenance procedures, establishes a process that assures asbestos containing material are not disturbed during building repairs and renovations, and periodically re-inspects areas with asbestos- containing materials. The Facility Asbestos Coordinator and the supervisor of the custodial staff are key participants in the O&M.

## 3.6    Considerations for Contracting Asbestos Work

The asbestos Work Permit System (Section 4.5) shall include contract work.  Many building owners contract for at least some custodial and maintenance services.  Contracts with service trades or abatement companies should include the following provisions to ensure that the service or abatement workers can and will follow appropriate work practices:

- Proof that the contractor's workers have been properly notified about ACM and suspect/assumed ACM in the owner's building and that they are properly trained and accredited (if necessary) to work with ACM.

- Copies of documentation of use of respiratory protection, medical surveillance, and worker training as required by OSHA, EPA, and/or state regulatory agencies.

- Notification to building tenants and visitors that abatement activity is under way (performed by owner).

- Submission of written work practices by the vendor or contractor to the Facility Asbestos Coordinator for approval or modification. The vendor or contractor should then agree to abide by the work practices as finally accepted by the Facility Asbestos Coordinator.

- Assurance that the contractor will use proper work area isolation techniques, proper equipment, and required waste disposal practices.

- Historical air monitoring data for representative examples of the contractor's previous projects, with emphasis on projects similar to those likely to be encountered in the building.

- Provision for inspections of the area by the owner's representative to ensure that the area is acceptable for re-entry of occupants/tenants.

- Evaluation of resumes for each abatement contractor/supervisor or maintenance crew chief, known as the "competent person" in the OSHA standard and EPA Worker Protection Rule.

- Criteria for determining successful completion of the work (i.e., visual inspections and air monitoring).

- Notification to EPA (and other appropriate agencies) if the abatement project is large enough to trigger asbestos NESHAP or New York State requirements.

- Any other information deemed necessary by the owner's legal counsel.

## 3.7 Definitions

Aerosol:  A system consisting of particles, solid or liquid, suspended in air.

Air Cell:  Insulation normally used on pipes and ductwork that is comprised of corrugated cardboard that is frequently comprised of asbestos combined with cellulose or refractory binders.

Air Monitoring:  The process of measuring the fiber content of a specific volume of air.

Amended Water:  Water to which a surfactant has been added to increase the ability of the liquid to penetrate asbestos.

Asbestos:  The asbestiform varieties of serpentinite (chrysotile), riebeckite (crocidolite), cummingtonite-grunerite, amosite, anthophylite, and actinolite-tremolite.  For purposes of determining respiratory and worker protection both the asbestiform and non-asbestiform varieties of the above minerals and any of these materials that have been chemically treated and/or altered shall be considered as asbestos.

Asbestos-Containing Material (ACM):  Any material containing more than 1% of asbestos of any type or mixture of types.

Asbestos-Containing Waste Material: Any material, which is or is suspected of being or any material contaminated with an asbestos-containing material that is to be removed from a work area for disposal.

Asbestos Consultant: Person and/or company currently accredited and/or licensed as an asbestos inspector in accordance with EPA and applicable State and local regulations.

Assumed Asbestos-Containing Material:  Any suspect ACM that has not been appropriately tested to confirm whether or not it contains asbestos.

Authorized Visitor:  The Owner's Representative or his designee, testing lab personnel, the Architect or a representative of any federal, state and local regulatory or other agency having authorizing over the project.

Barrier:  Any surface that seals off the work area to inhibit the movement of fibers.

Breathing Zone:  A hemisphere forward of the shoulders with a radius of approximately 6 to 9 inches.

Ceiling Concentration:  The concentration of an airborne substance that shall not be exceeded.

Certified Industrial Hygienist (C.I.H.):  An industrial hygienist certified in Comprehensive Practice by the American Board of Industrial Hygiene.

Class I Work (OSHA):  Work activities, performed by an outside licensed abatement contractor that involve the removal of boiler, pipe and duct insulation, and surfacing material such as spray-applied fireproofing.

Class II Work (OSHA):  Work activities, performed by an outside licensed abatement contractor, that involve the removal of asbestos-containing materials other than boiler, pipe and duct insulation, and surfacing material such as spray-applied fireproofing.

Class III Work (OSHA):  Work activities that involve the repair of minor amounts of damaged asbestos-containing materials.

Class IV Work (OSHA):  Work activities that involve the maintenance and custodial activities during which tenants and employees contact but do not disturb asbestos-containing materials or presumed ACM.  Class IV work may involve the clean-up of dusts, wastes and debris in areas where asbestos is, was or may be located.

Critical Barrier: Airtight barrier, usually of sheet plastic, which separates the contaminated work area from any other air space.  Installed first, these barriers cover items such as, but not limited to: windows, doors, HVAC components, floor drains and containment walls that are not at existing building walls.

Decontamination:  Wet cleaning and HEPA vacuuming of all work area surfaces to remove all visible debris prior to the final visual inspection, encapsulation and testing of the containment.

Demolition:  The wrecking or taking out of any building component, system, finish or assembly of a facility together with any related handling operations.

Disposal Bag: A properly labeled 6 mil thick leak-tight plastic bag used for transporting asbestos waste from work and to disposal site.

Encapsulant:  A material that surrounds or embeds asbestos fibers in an adhesive matrix, to prevent release of fibers.

> Bridging encapsulant:  an encapsulant that forms a discrete layer on the surface of an in situ asbestos matrix.

> Penetrating encapsulant:  an encapsulant that is absorbed by the in situ asbestos matrix without leaving a discrete surface layer.

> Removal encapsulant:  a penetrating encapsulant specifically designed for removal of asbestos-containing materials rather that for in situ encapsulation.

Encapsulation:  Treatment of asbestos-containing materials, with an encapsulant.

Enclosure:  The construction of an airtight, impermeable, permanent barrier around asbestos-containing material to control the release of asbestos fibers into the air.

Fiber Release:  Any uncontrolled or unintentional disturbance of ACBM resulting in visible emission.

Filter:  A media component used in respirators to remove solid or liquid particles from the inspired air.

Fitting:  Within any piping system, any valve, tee, elbow, 45°, flange, union, reducer, or other piping connector which may be insulated with asbestos.

Friable Asbestos Material:  Material that contains more than 1.0% asbestos by weight, and that can be crumbled, pulverized, or reduced to powder by hand pressure when dry.

Glovebag:  A sack (typically constructed of 6 mil transparent polyethylene or polyvinyl chloride plastic) with two inward projecting long sleeve gloves, which are designed to enclose an object from which an asbestos-containing material is to be removed.

HEPA Filter:  A High Efficiency Particulate Air (HEPA) filter capable of trapping and retaining 99.97% of asbestos fibers greater than 0.3 microns in length.

HEPA Filter Vacuum Collection Equipment (or vacuum cleaner):  High efficiency particulate air filtered vacuum collection equipment with a filter system capable of collecting and retaining asbestos fibers.  Filters should be 99.97% efficient for retaining fibers of 0.3 microns or larger.

High-Efficiency Particulate Air Filter (HEPA):  A filter that removes from air 99.97% or more of monodisperse dioctyl phthalate (DOP) particles having a mean particle diameter of 0.3 micrometer.

Lock-out:  Installation of a locking device to prevent activation of an electrical circuit, which has been deactivated for safety reasons.  Always utilized in conjunction with tag-out procedures to advise who has deactivated the circuit and in compliance with OSHA 1910.147, "Control of Hazardous Energy Source."

NESHAP:  National Emission Standard for Hazardous Air Pollutants, 40 CFR, Part 61, Subpart M.

Negative Pressure Respirator:  A respirator in which the air pressure inside the respiratory-inlet covering is positive during exhalation in relation to the air pressure of the outside atmosphere and negative during inhalation in relation to the air pressure of the outside atmosphere.

Negative Pressure Ventilation System:  A pressure differential and ventilation system.

Personal Monitoring:  Sampling of the asbestos fiber concentrations within the breathing zone of an employee.

Plastic Barrier:  Sheet plastic barrier installed after critical barrier that protects building components and non-movable objects from water damage and asbestos contamination.  The primary barrier is normally two independently attached plastic sheets.

Pre-Cleaning:  Wet cleaning and HEPA vacuuming of work area surfaces prior to the installation of polyethylene sheeting and the construction of containment.

Presumed Asbestos-Containing Material (PACM):  Thermal systems insulation, surfacing material or miscellaneous materials found in buildings constructed prior to 1980 that has not been appropriately tested to confirm whether or not it contains asbestos.

Protection Factor:  The ratio of the ambient concentration of an airborne substance to the concentration of the substance inside the respirator at the breathing zone of the wearer.  The protection factor is a measure of the degree of protection provided by a respirator to the wearer.

Repair:  Returning damaged ACM to an undamaged condition to prevent fiber release.

Respirator:  A device designed to protect the wearer from the inhalation of harmful atmospheres. Must be approved by NIOSH and used in accordance with the employer's respiratory protection program and all manufacturer's procedures.

Secondary Barrier: Sheet plastic "drop cloth" installed on floors and/or walls of containment during removal activities to protect primary layers.

Surfactant:  A chemical wetting agent added to water to improve penetration, thus reducing the quantity of water required for a given operation or area.

Surgical Removal:  A process by which small amounts of asbestos are removed with extreme care from substrates to which critical barriers or other seals are to be applied.  This process usually involves scraping with small hand tools directly into the inlet of a HEPA vacuum.

Suspect Asbestos-Containing Material (Suspect ACM):  The term "suspect ACM" is used by the asbestos industry to refer to any building material that is suspected of being asbestos-containing (based on appearance, usage, age of building, etc.), but has not been proven conclusively to be ACM (based on sampling and analysis).  Suspect material would include any material that a building owner suspects of containing asbestos and is found in a building of any age or construction date. Refer to Section 2.1 for a list of typical suspect ACMs.

Time Weighted Average (TWA):  The average concentration of a contaminant in air during a specific time period.

Visible Emissions:  Any emissions containing particulate asbestos material that are visually detectable without the aid of instruments.  This does not include condensed uncombined water vapor.

Wet Cleaning:  The process of eliminating asbestos contamination from building surfaces and objects by using cloths, mops, or other cleaning utensils that have been dampened with amended water or diluted removal encapsulant and afterwards thoroughly decontaminated or disposed of as asbestos contaminated waste.

Work Area:  The area where asbestos related work or removal operations are performed which is defined and/or isolated to prevent the spread of asbestos dust, fibers or debris, and entry by unauthorized personnel.  Work area is a Regulated Area as defined by 29 CFR, Part 1926.

# 4.0 OPERATIONS AND MAINTENANCE PLAN

## 4.1    Program Management

4.1.1    Overview of O&M Plan

### Key Personnel

**Facility Asbestos Coordinator:**

Company:_____

Address:_____

Name / Title:_____

Phone Number (Direct / Mobile):_____

**Asbestos Response Team:**

Company:_____

Address:_____

Name / Title:_____

Phone Number (Direct / Mobile):_____

**Asbestos Abatement Contractor – Asbestos Removal, Disposal, or Emergency Response:**

Company:_____

Address:_____

Name / Title:_____

Phone Number (Direct / Mobile):_____

**Asbestos Consultant – Asbestos Sampling and Analysis:**

Company:_____EBI Consulting_____

Address:_____21 B Street, Burlington, MA 01803_____

Name / Title:_____Mike Walther, National Manager, Building Sciences_____

Phone Number (Corporate / Direct / Mobile):__800-786-2346 / 410-696-2565 / 443-956-1689__

4.1.2    Facility Asbestos Coordinator

The Facility Asbestos Coordinator is the individual responsible for managing the overall O&M and acts as the decision-maker on all routine, as well as emergency, asbestos-related matters.  The person selected as the Facility Asbestos Coordinator should be involved with, aware of, or oversee daily operations at the Subject property.  It is recommended that this person be someone who is on site during operational hours.

The Facility Asbestos Coordinator should obtain advice from relevant parties such as the company physician, attorney, consultant, and contractors when facing abatement or monitoring needs.  The Facility Asbestos Coordinator is, however, ultimately responsible for overseeing all aspects of the program.  These include:

1)    Providing information on the asbestos-containing materials.

2) Notifying employees and occupants of the presence, and management protocol for, asbestos-containing materials remaining in place.
3) Labeling asbestos-containing materials remaining in place.
4) Training workers.
5) Implementing and managing a work permit system.
6) Supervising special work practices.
7) Controlling of fiber release episodes.
8) Managing employee protection and medical surveillance programs.
9) Conducting periodic surveillance of the asbestos-containing materials remaining in place.
10) Maintaining the record-keeping system.

### 4.1.3   Asbestos Response Team

When asbestos-containing materials have the potential to be disturbed because of repairs, renovation or demolition, the Facility Asbestos Coordinator will be notified. If in-house workers will perform the action, then the Facility Asbestos Coordinator will utilize the specially trained staff that makes up the Asbestos Response Team to perform the work. Their actions will be guided by the procedures provided in this document and good construction practice.

When asbestos fibers are inadvertently released, the Facility Asbestos Coordinator will be notified. The coordinator will utilize the Asbestos Response Team to contain the area, eliminate the fiber-producing source, and clean the area. The Facility Asbestos Coordinator, the Owner's Consultant, or Contractor will notify NYSDOL Asbestos Program Manager's Office, Asbestos Control Bureau (518-457-1255), in order to proceed with the emergency cleanup. The notification and filing fee must be submitted by 2 business days to the NYSDOL.

### 4.1.4   Maintenance/Custodial-Staff

Maintenance/Custodial employees are generally the most familiar with the facility and are therefore most likely to notice a change in material condition within the Subject Property building(s). Also, these employees are most likely to be given the direct responsibility of minimizing the potential for airborne fiber release and thus are the key individuals to implement a functional Operations and Maintenance Plan.

To ensure an adequate level of knowledge of asbestos-related procedures, a two-tiered training program for the maintenance and custodial staff will be conducted. (refer to Section 4.4)

## 4.2   Awareness Program

The Facility Asbestos Coordinator is responsible for fulfilling all notification requirements mandated by regulatory agencies. Written notification shall be provided within 30 days of establishing the O&M Plan and at the time of lease. Update notifications shall be provide annually if there is a change to the ACM inventory. The notification shall include instructions to report damage of ACMs to the building management. Building occupants shall also be notified of renovation and O&M activities that may impact ACMs, if such work will be conducted in areas potentially accessible to employees or commercial tenants. Consideration can be given to notification of residential tenants. Section 4 of the EPA Green Book (*Managing Asbestos In Place, A Building Owner's Guide to Operations and Maintenance Programs for Asbestos-Containing Materials*) includes information on occupant, tenant and worker notification of the presence of ACM that might be helpful to the Facility Asbestos Coordinator.

Commercial tenants shall be notified; and commercial tenants are required to notify their employees. Owners and tenants are required to notify contractors or employees. All persons who perform repair, maintenance, or other work within the building shall be informed of the presence, location, and quantity of materials that contain or are presumed to contain asbestos. Notifications concerning the locations of ACM should be given to all employees during Asbestos Awareness training.

The Hazard Communication requirements of the OSHA Asbestos in Construction Standard (29 CFR, Part 1926.1101(k)) contain mandatory notification requirements. Prior to the performance of work, all persons that will be directly or indirectly affected by the ACM work must be notified. The Facility Asbestos Coordinator shall notify the following persons:

- Prospective employers applying or bidding for work whose employees reasonably can be expected to work in or adjacent to areas containing ACM/PACM.
- Employees of the owner who will work in or adjacent to areas containing ACM/PACM (Maintenance and Custodial personnel).
- On multi-employer worksites, all employers of employees who will be performing work within or adjacent to areas containing ACM/PACM.
- Employers of employees (commercial tenants) who will occupy areas containing ACM/PACM.

The Facility Asbestos Coordinator shall notify all personnel through written correspondence or through verbal communications. However, written documentation of all notifications shall be maintained on the O&M Plan files.

The following information should be included in the notifications:

- ACM/PACM has been identified in the building and is located in areas where the material could be disturbed.
- The type, location, condition and quantity of the ACM/PACM, and the response that is appropriate for that condition.
- Asbestos only presents a health hazard when fibers become airborne and are inhaled. The mere presence of Asbestos within a building does not represent a health hazard.
- Do not disturb the ACM/PACM.
- Report any evidence of disturbance or damage of ACM/PACM to the Facility Asbestos Coordinator.
- Report any dust or debris that might come from the ACM or PACM, any change in the condition of the ACM/PACM, or any improper action (relative to ACM/PACM) of building personnel to the Facility Asbestos Coordinator.
- Cleaning and maintenance personnel are taking special precautions during their work to properly clean up any asbestos debris and to guard against disturbing ACM/PACM.
- All ACM/PACM is inspected periodically and additional measures will be taken if needed to protect the health of building occupants.

In addition to personnel notification, there is an U.S. EPA NESHAP requirement to notify the appropriate agency when abatement activities affect large quantities of ACM. Any notification of federal and state authorities will be handled by the asbestos contractor. Documentation verifying this notification must be kept in the office of the Facility Asbestos Coordinator.

Through the use of the acknowledgment forms provided in Appendix A, the owner of the Subject Property building(s) is demonstrating the intent to abide not only by EPA and OSHA regulations, but also by EPA and OSHA recommendations. When completed, these forms shall be maintained for 30 years.

### 4.2.1 Employee and Occupant Notification Letter (Form A-1)

This notification letter provides information regarding the presence of ACM and pertinent O&M procedures to appropriate employees.

### 4.2.2 Employee Notification Form (Form A-2)

Upon receipt of appropriate training, this notification form will be signed by employees who may work with ACM at the Subject Facility.

### 4.2.3 Contractor, Vendor, and Repairman Notification Form (Form A-3)

The Contractor, Vendor, and Repairman Notification Form is used to notify outside agents of the presence of asbestos-containing materials within the Subject Facility in conjunction with the Work Permit System described in Section 4.5. Notification Form A-3 is used to ensure outside agents are notified of the presence of asbestos-containing materials and that they have been informed, and acknowledge the potential hazards associated with working in the presence of ACM.

## 4.3 Identification and Labeling of Asbestos-Containing Materials

### 4.3.1 Identification

As referenced in Section 1.6, EBI's ESA identified suspect ACM at the Subject Property.

The above-referenced inspection is not a comprehensive asbestos survey and should not be relied upon as such. Additional ACMs and/or assumed ACMs may be located at the Subject Property in areas not accessed by the inspector or because of limited sampling and analysis conducted as part of the prior inspections. Therefore, additional inspection is recommended of any areas that may undergo renovation or demolition. Furthermore, initial or additional sampling may be necessary prior to disturbance of specific suspect/assumed ACMs.

Prior to conducting any maintenance work that may disturb any suspect ACMs, the Facility Asbestos Coordinator should determine whether any known or suspect ACM(s) will be potentially disturbed. The Coordinator should review O&M Plan records to determine whether all materials which may be disturbed have been adequately sampled and analyzed for asbestos content. If suspect ACM(s) will be potentially disturbed, the Coordinator should arrange for sampling and analyses of the suspect ACM(s) and determination of asbestos content prior to commencement of work. In lieu of sampling and analyses, suspect ACMs can be assumed to be and treated as asbestos-containing.

Determining whether any suspect ACMs will be disturbed by maintenance work, renovation, or demolition may be accomplished through review of previous inspection and sampling records. However, if insufficient data is available, inspection and possibly sampling must be conducted by either a properly trained and/or licensed Coordinator, properly trained/licensed O&M personnel, or a properly certified and/or licensed asbestos consultant.

Drawings depicting areas of abatement should be developed in the event that remediation activity is performed. The Facility Asbestos Coordinator shall maintain all drawings and /or plans.

4.3.2    Warning Signs and Labels

Signs and labels shall be designed, to the extent feasible, in a fashion to ensure that the desired message is communicated to the targeted audience. Signs and labels can be written in one or multiple languages to ensure comprehension. Means to ensure comprehension may include the use of foreign languages, pictographs, graphics, and awareness training.

Additional steps may be needed for illiterate or non-English speaking workers and other occupants who may encounter language difficulties. For example, owners should consider providing information sessions in languages other than English where a significant number of workers, occupants, or visitors do not speak English. Furthermore, OSHA regulations require that employers ensure employees can comprehend the warning signs posted. Owners may wish to consider developing a warning label system for illiterate workers showing them pictures about potential hazards of disturbing ACM and showing them where ACM is located. Translations of the warning labels should be provided by the owner for non-English speaking personnel.

**Labeling**

In order to inform Maintenance, Custodial, and other personnel of potential asbestos hazards, asbestos labeling and/or signage may be necessary at the Property. If easily damaged ACMs or assumed ACMs are present in maintenance areas of the Property, labels should be affixed directly to the ACMs or warning signs should be posted (as discussed in the following section). Easily damaged ACMs include thermal system insulation (TSI) materials, surfacing material, or any other friable materials.

If ACM labeling is conducted, then labels shall be affixed to all friable ACMs within each mechanical or other building area that is not accessible to the public, but is accessible to maintenance, custodial, or contracted personnel.

Labels must also be affixed to all containers containing such products, including waste containers, regardless of signage.

Labels shall be printed in large, bold letters on a contrasting background.

Labels shall bear the following information:

**DANGER**
**CONTAINS ASBESTOS FIBERS**
**MAY CAUSE CANCER**
**CAUSES DAMAGE TO LUNGS**
**DO NOT BREATHE DUST**
**AVOID CREATING DUST**

**Signage**

If signage is conducted at the Subject Property in addition to or in-place of labeling, then warning signs should be posted at the entrance to mechanical rooms/areas in which employees reasonably can be expected to enter and which contain thermal system insulation material, surfacing ACM,

or other friable ACM(s). This includes each mechanical or other building area that is not accessible to the public, but is accessible to maintenance, custodial, or contracted personnel. The Facility Asbestos Coordinator shall post signs which identify the ACMs which is/are present, its/their location, and appropriate work practices which, if followed, will ensure that ACM will not be disturbed.

No example of a mechanical room/area sign is provided since they can vary greatly, depending on the types of ACMs present.

The Coordinator should also ensure that warning signs are posted by any asbestos removal contractors conducting work within their building(s). Warning signs that demarcate the regulated area during a response action shall be provided and displayed at each location where a regulated area is established. Signs shall be posted at such a distance from the regulated area that an employee may read the signs and take necessary protective steps before entering the area marked by the signs.

These warning signs shall bear the following information [An example sign is included in Appendix A, A-7]:

**DANGER:
ASBESTOS
MAY CAUSE CANCER
CAUSES DAMAGE TO LUNGS
AUTHORIZED PERSONNEL ONLY
WEAR RESPIRATORY PROTECTION AND
PROTECTIVE CLOTHING IN THIS AREA**

Warning signs should also be posted in building areas where construction, maintenance or remodeling work creates the potential for employees to come into contact with, release or disturb asbestos or ACM. The signs should be posted by the owner, tenant or agent responsible for the performance of or contracting for, such work.

The warning signs must read:

**DANGER
ASBESTOS
MAY CAUSE CANCER
CAUSES DAMAGE TO LUNGS
AUTHORIZED PERSONNEL ONLY**

The lettering must be in large print and in a bright color to maximize visibility. This signing requirement is separate from the notification requirement, and complying with one requirement will not satisfy the other.

## 4.4    Employee Training Programs

All designated employees will be required to attend formal asbestos-training programs to ensure an adequate level of knowledge commensurate with their job descriptions.

4.4.1    Facility Asbestos Coordinator

The Facility Asbestos Coordinator should be properly qualified, through training and experience. Formal training is not required; but, if the designated person is not already appropriately knowledgeable and experienced, formal training is recommended. The Coordinator shall be appropriately knowledgeable of regulatory requirements pertinent to this O&M Plan: such as asbestos material identification and testing, labeling, signage, notification, periodic surveillance, and emergency response actions. The Coordinator should also be appropriately knowledgeable of asbestos handling procedures, work practices, worker protection, methods of reducing asbestos exposure, and other applicable OSHA, EPA, state and local regulations. Completion of an EPA approved 16-hour Operations and Maintenance course is an option. Other training options include EPA accreditation under the Asbestos Hazard Emergency Response Act (AHERA) or state certification as a Building Inspector/Management Planner and/or Abatement Supervisor. Four-hour to eight-hour courses are also available that are specifically designed for building owners. For all training scenarios, annual refresher training is recommended in order to stay abreast of regulatory and industry changes.

4.4.2    OSHA Class IV (Awareness)

Two hours of training is required for all custodial and maintenance personnel who may work in a building that contains either friable or non-friable asbestos-containing building materials.

Training, at a minimum, shall include information regarding:

1)   Characterization of asbestos.
2)   Information on health effects.
3)   Locations of asbestos-containing materials.
4)   Recognition of damage or deterioration of asbestos-containing materials.
5)   Name and phone number of Facility Asbestos Coordinator.

The curriculum for this course and a suggested course schedule are in Appendix B under Level I Training.

4.4.3    OSHA Class III (Minimum Skills)

Sixteen hours of training is required for custodial and maintenance staff who conduct activities that will result in the disturbance of ACM.

Topics shall include:

1)   Description of proper methods for handling asbestos-containing materials.
2)   Information on use of respiratory protection.
3)   Applicable regulations.
4)   Hands-on training in the use of respiratory protection, other personal protection measures, and good work practices.

The curriculum for this course and a suggested course schedule are in Appendix B under Level II Training.

**4.5      Work Permit System**

The work permit system controls the access of maintenance personnel, vendors, contractors and others to the asbestos-containing materials that will remain in place. To the greatest extent possible, the implementation of the O&M should be incorporated into the existing system for managing work at the Subject Facility. Approval and documentation forms should parallel those in use, or the existing forms can be expanded to include the content of the forms discussed here.

4.5.1      Goal of the Work Permit

The goal of the work permit system is two-fold. First, it will ensure that personnel who may disturb asbestos-containing materials while performing maintenance, cleaning or renovation are notified of the potential hazard and have been appropriately trained. Secondly, the work permit system will demonstrate the owner's commitment to appropriate management of the asbestos-containing materials.

4.5.2      Work Permit Procedures

Designated employees shall complete a work permit for all work involving contact with ACM. The work permit will be reviewed by the Facility Asbestos Coordinator once all of the following conditions are met:

The proposed work will not affect the asbestos-containing materials remaining in place.

OR

The disturbance of the asbestos-containing materials by the accomplishment of the proposed work is understood and proper personnel and environmental precautions have been established.

AND

An Employee Notification Form (Form A-2) and/or a Contractor, Vendor, and Repairman Notification Form (Form A-3) are on file for each individual taking part in the proposed work.

AND

If the proposed work disturbs ACM, only personnel who are in medical surveillance and respiratory protection programs described in Section 4.8 and who have been trained to at least the competency of Level II described in Section 4.4 will be utilized.

For all work at the facility, the Facility Asbestos Coordinator shall ensure that the following forms (included in Appendix C) are completed:

- Work Permit Form for Maintenance Work
- Evaluation of Work Affecting Asbestos-Containing Materials
- Work Permit Log

4.5.3      Sample Work Permit

A sample work permit and work permit log are provided in Appendix C.

## 4.6  Maintenance Procedures

This section discusses the procedures to be followed by maintenance personnel performing maintenance and cleaning in areas where asbestos-containing materials are located and the potential to disturb the material exists. These operating procedures are to be utilized for all day-to-day maintenance activities. For all maintenance areas described in this section, air monitoring should be performed during the first few times each type of activity is performed to establish the typical level of airborne fibers. The strategy for sampling and the evaluation of results should be performed by an outside consultant specializing in asbestos abatement air monitoring and who is properly trained/licensed. The Special O&M Cleaning Practices described in below (in this section) may be performed by personnel with Class IV (Level I) training.

In Appendix D of this O&M Plan, procedures are presented associated with performance of small scale, short duration asbestos abatement work. The training that the maintenance personnel receive, as described in Section 4.4 (OSHA Class III (Level II)), is necessary for this small scale, short duration work. Additional requirements are also applicable such as Respiratory Protection Program and Medical Monitoring as outlined in Section 4.8.

Neither Class III (Level II) nor Class IV (Level I) training provide workers with requisite knowledge to perform full-scale asbestos abatement operations. If the scope of work to be performed is greater than that defined in Appendix D as Class III or Class IV, or if a maintenance project involves the removal of ACM, then site personnel will not perform the work. Such work will require special expertise and preparation and will only be done by a licensed asbestos abatement contractor experienced in asbestos abatement procedures.

The following practices may be used in conjunction with daily activities with the appropriate Class IV (Level I) training.

### 4.6.1  Special O&M Cleaning Practices

**Wet Cleaning:** Proper O&M cleaning will involve the use of wet cleaning or wet-wiping practices to pick up asbestos fibers. Dry sweeping or dusting can result in asbestos fibers being re-suspended into the building's air and therefore should not be used. Once wet cloths, rags, or mops have been used to pick up asbestos fibers, they should be properly discarded as asbestos waste while still wet. They should not be allowed to dry out, because the collected fibers might be released at some later time when disturbed.

**HEPA Vacuums:** The use of special vacuum cleaners, commonly referred to as HEPA (high efficiency particulate air) vacuums, may be preferable to wet cleaning in certain situations. These vacuums are equipped with filters designed to remove very small particles or fibers—such as asbestos—by filtering those particles from the air passing through the vacuum. Because the exhaust air from an ordinary vacuum cleaner is not filtered sufficiently, it is possible for tiny asbestos fibers to pass through the filter and back into the building air.

It is important for O&M workers to use caution when emptying HEPA vacuums and changing the filters because exposures could result from such activities. Before emptying the HEPA vacuums, workers should move the HEPA vacuum to a physically isolated area of the facility and put on proper personal protective equipment before emptying the dust and debris into properly labeled, sealed, and leak-tight containers for disposal as asbestos-containing waste. When custodial workers are not trained to work with ACM, trained maintenance workers can be used to empty the HEPA vacuums and change their filters.

## 4.7 Combating Fiber Release Episodes

A Fiber Release is any uncontrolled or unintentional disturbance of ACM resulting in visible emission. As long as ACM remains at the Subject Property, a fiber release episode could occur if the ACM is inadvertently disturbed. Evidence of a fiber release includes, but is not limited to, the presence of suspect asbestos-containing debris on the floor or other surface; water or other physical damage to the ACM.

Special operating procedures are needed in the event of an emergency situation where asbestos fibers are immediately released. These operating procedures are needed to limit contamination of the building environment by reducing the potential for release airborne asbestos fibers.

### 4.7.1 Causes of Fiber Release Episodes

Typical situations that might cause a fiber release episode are:

1) Fire.
2) Extensive water damage via a pipe break, or other means.
3) Construction procedures causing excessive vibrations such as coring, jack-hammering, or vibration from other mechanical devices.
4) Improperly executed renovations or remodeling activities.
5) Routine maintenance activities such as:

- Carpet removal over asbestos flooring
- Duct system repair or maintenance
- Leaking pipe fitting repair
- Accessing voids above fixed or suspended ceilings, within walls and mechanical equipment; accessing pipe and mechanical runs and chases
- Light fixture repair
- Thermal pipe system maintenance
- Fluorescent bulb replacement
- Floor buffing, sanding or grinding

### 4.7.2 Fiber Release Episode-Initial Response

In the event of a fiber release episode, or when it is recognized that a fiber release episode may occur, the Facility Asbestos Coordinator will notify the Asbestos Response Team. The Facility Asbestos Coordinator will proceed to the scene and take charge of the asbestos related issues until duly relieved. The Asbestos Response Team will respond and assist the Facility Asbestos Coordinator in managing and controlling the fiber release episode by:

1) Evaluating the ACM damage.
2) Vacating all personnel and occupants from the immediate area.
3) Blocking the entrance to the contaminated areas to prevent entry by unauthorized personnel.
4) Turning off the air handling system in the affected area.
5) Isolating the affected area by closing all doors leading to the area.
6) Sealing openings and penetrations to the contaminated areas (i.e. doors and vents) with polyethylene sheeting and duct tape.

7) Posting warning sign at the perimeter or at entrances to the contaminated area.
8) Providing for appropriate worker personnel protection (e.g., respirators, protective clothing, etc.).
9) If feasible, stopping the cause of the contamination.
10) Contacting the Asbestos Consultant and/or Asbestos Abatement Contractor, as applicable. All asbestos material disturbances shall be performed and/or remediated by properly trained personnel or a licensed asbestos abatement contractor. Disturbances of greater than three square or three linear feet of ACM shall be performed by the licensed asbestos abatement contractor.
11) Notifying the NYSDOL Asbestos Program Manager's Office, Asbestos Control Bureau (518-457-1255), in order to proceed with the emergency cleanup. The notification and filing fee must be submitted by two business days to the NYSDOL.

4.7.3    Fiber Release Episode-Recovery

After the contaminated area has been isolated and source of contamination addressed, emergency abatement procedures may need to be implemented. Such abatement must be conducted by an experienced abatement contractor under the observation of an asbestos consultant.

Before conducting such abatement, the asbestos consulting firm should conduct air monitoring inside and outside the contaminated area to evaluate the airborne fiber concentration. Based upon these results, a determination will be made by the building owner as to the procedure for emergency abatement and clean up of the area.

Until the contaminated area has been cleaned and prevalent level air monitoring indicates that the total airborne fiber concentration is below 0.01 fibers per cubic centimeter, no employee or occupant should enter the area. If entrance to the area is required, only personnel trained in accordance with the Level II curriculum of Section 4.4, or equivalent, and respirator qualified may enter.

Following each emergency asbestos-related activity, an Emergency Abatement Form from Appendix A (Form A-5) will be completed and filed.

## 4.8    Medical Surveillance and Respiratory Protection Programs

The Facility Asbestos Coordinator shall provide respirators, and ensure that they are used, where required by this Program. Respirators shall be used in the following circumstances:

- During all repair and maintenance operations where ACM is likely to be disturbed and wet methods are not being used.
- During all repair and maintenance operations where ACM is likely to be disturbed and the Coordinator does not produce a "negative exposure assessment."
- During all repair and maintenance operations where asbestos-containing thermal systems insulation or surfacing material is being disturbed.
- During all maintenance and custodial activities performed within regulated areas where employees performing other work are required to wear respirators.
- During all work covered by this Program where employees are exposed above the PELs.
- In emergencies.

If respirators are used, the Facility Asbestos Coordinator shall select and provide, at no cost to the employee, the appropriate respirator as specified in 29 CFR 1910.134. All respirators shall be approved by the National Institute for Occupational Safety and Health (NIOSH). The Facility Asbestos Coordinator shall provide a tight-fitting powered, air-purifying respirator in lieu of any negative pressure respirator whenever an employee chooses to use this type of respirator, provided the air-purifying respirator provides adequate protection to the employee.

When respiratory protection is used, the facility must institute a respirator protection program in accordance with 29 CFR 1910.134. A respiratory protection program must be a written program that is reviewed annually by a designated Program Administrator. The program must include, but is not limited to: engineering and administrative controls to reduce employee exposure; respirator selection criteria; medical surveillance procedures; respirator assignment, training, inspection, and maintenance procedures; and fit test procedures.

The Facility Asbestos Coordinator shall institute a medical surveillance program for all employees who, for a combined total of 30 or more days are engaged in repair and maintenance operations, where asbestos-containing material is likely to be disturbed or are exposed to airborne fiber concentrations above the PELs and for employees who wear negative pressure respirators.

To comply within the OSHA Asbestos Standard for General Industry (29 CFR 1910.1001), employees required to wear respiratory protection equipment will be enrolled in a Medical Surveillance Program; and the Employer shall have a Respiratory Protection Program. An acceptable medical surveillance program must include pre-placement, annual, and termination examinations; and the medical exam generally consists of a review of the employees history to determine the presence of any respiratory diseases as well as pulmonary function testing including FVC and FEV1O, and a chest x-ray.

Subject Property owners, employees, and occupants may not currently be required to wear respirators. While the use of such respiratory protection may only be needed on an intermittent basis, a physical examination and evaluation is necessary to ensure that those designated employees are physically able to do so. Adequate medical supervision of respirator users is needed to determine the extent of individual stress tolerance and to prevent potential health problems. In the event that Subject Property owners, occupants, and employees are authorized and/or required to utilize respirators, Section 4.8 of this O&M will apply.

## 4.9   Personal Protective Clothing

Protective clothing for workers typically consists of disposable coveralls, gloves and boots. Coveralls should have hood and booties attached and should provide complete coverage of the body with the exception of the hands and face. Coveralls are generally made of Tyvek™ or equivalent and are not meant to be modified.

If potential for exposure to asbestos-containing dust and debris is low and localized, workers shall use a minimum of one disposable coverall over street clothes. Where the potential for exposure to asbestos-containing dust and debris is moderate or dispersed, workers shall use a minimum of two disposable coveralls over street clothes. When possible, street clothes should be removed before protective clothing is put on. Protective clothing should be put on after donning the respirator and the coverall hood should cover the respirator straps.

Workers shall also wear protective gloves during work activities that are taped at the cuffs to the protective coveralls. Rubber slip-resistant boots are recommended for work areas where slip

hazards might occur (protective booties should cover feet inside the boots). Steel-toed boots, eye, hearing and head protection should also be used where needed.

Contaminated clothing shall be removed at the work site; properly wrapped and disposed. Used protective clothing shall not be taken home. Used protective clothing poses asbestos exposure risk to workers and others.

## 4.10 Periodic Facility Inspection

A regularly scheduled inspection plan must be implemented for all areas where asbestos-containing material(s) are located. The inspections are necessary so that prompt and appropriate action can be initiated, if necessary, before a release of asbestos fibers occurs. Inspection forms will be completed as required after each inspection.

### 4.10.1 Daily

During the general activities done on a daily basis, maintenance and custodial employees should observe and become aware of the condition of the asbestos containing material in the building(s). They should document any change in the ACM such as color, separation from the applied surface, water damage, or damage due to routine maintenance procedures. When such changes are noted, the following must be implemented:

1) Notify the Facility Asbestos Coordinator that a change in conditions exists. Include information concerning date noted, location, cause of change (if known), size of area involved and any other information available.
2) The Facility Asbestos Coordinator will immediately initiate a formal inspection of the area and document the results on the Building Inspection Form found in Appendix A.

### 4.10.2 Semi-Annual Inspection

This inspection, conducted by the Facility Asbestos Coordinator, will be conducted of all ACM remaining in place within the facility. The goals of this semi-annual inspection are:

1) Determine if any change in material conditions has occurred.
2) Increase awareness of the program administrator.
3) Document that an on-going inspection process is in place.
4) Review of inspection record-keeping system.

The inspection should include all areas of the Subject Facility where ACM have been identified.

### 4.10.3 Annual Inspection

On an annual basis, the overall status of the program will be reviewed. An outside consultant, specializing in asbestos evaluation and control, should perform the inspection and audit with the assistance of the Facility Asbestos Coordinator, the Consultant will:

1) Inspect the building(s), noting condition of materials.
2) Note areas where asbestos-containing materials have been removed.
3) Re-define exposure potential, if necessary.
4) Perform prevalent area air monitoring.
5) Conduct a full review of the record keeping files, the O&M, and other administrative controls.

After the Consultant has reviewed the building(s) and the administration of the O&M, a written report of the findings of the annual inspection, with recommendations, will be provided to the Facility Asbestos Coordinator.

## 4.11 Record-Keeping

The following records (as applicable) of O&M work should be retained in permanent files:

- Inspection and Assessment Reports
- A copy of the O&M Plan (initial program and all updated versions)
- The Work Practices Used
- Respiratory Protection Program
- Fiber Release Reports
- Work Permit Forms
- Evaluations of Work Affecting Asbestos-Containing Materials
- Work Permit Logs
- Reinspection/Periodic Surveillance Reports
- Asbestos Waste Disposal Forms
- Air Monitoring Data
- Qualifications and Performance Records for Outside Contractors performing O&M work
- Notification forms and letters
- Emergency Abatement Forms
- Building Inspection Forms

For employers with employees engaged in asbestos-related work, federal regulations require that the employer retain:

- Personal Air Sampling/Exposure Monitoring Records
- Historical Data (used to qualify for exemptions from OSHA's initial monitoring requirements)
- Medical Records (for employees subject to a medical surveillance program)
- Employee Training Records
- Fit Test Records (for employees that use respirators)
- Data to rebut presumption that materials are asbestos-containing.
- If settled dust sampling is used it is advisable to maintain these records also.

Different types of records have different retention requirements. In general, O&M Plan records; inspection, testing, abatement, work permit, waste disposal, contractor, and notification records; and data to rebut presumption that materials are asbestos-containing should all be retained for the life of the O&M Plan and life of the facility. Retention requirements for other records are noted in the sections below.

OSHA requires that employers provide to each employee their record of exposure and medical surveillance under the Records Access Standard (29 CFR 1910.20) and the Hazard Communication Standard (29 CFR 1910.1200 & 1926.59) and the construction asbestos standard (29 CFR 1926.1101(n). Also see the OSHA Asbestos Construction Rule (29 CFR 1926.1101), the EPA Worker Protection Rule (40 CFR 763 Subpart G) and the Green Book for details on Record keeping requirements and record retention requirements. Note that state and local regulations may require that additional information be recorded and retained.

EPA recommends that building owners make available all written elements of the O&M program to the building's O&M staff as well as to tenants and building occupants, if applicable. Building owners are also encouraged to consult with their legal counsel concerning appropriate Record keeping strategies as a standard part of their O&M programs.

### 4.11.1 Objective Data Records

Objective data relied upon as part of an initial or negative exposure assessment must contain the following information:

- The product qualifying for exemption;
- The source of the objective data;
- The testing protocol, results of testing, and/or analysis of the material for the release of asbestos;
- A description of the operation exempted and how the data support the exemption;
- Other data relevant to the operations, materials, processing, or employee exposures covered by the exemption.

Objective data records shall be maintained for the duration of the employer's reliance upon such objective data.

### 4.11.2 Exposure Assessment Records

Exposure assessment records must include the following information:

- The date of measurement;
- The operation involving exposure to asbestos that is being monitored;
- Sampling and analytical methods used and evidence of their accuracy;
- Number, duration, and results of samples taken;
- Type of protective devices worn, if any;
- Name, social security number, and exposure of the employees whose exposures are represented.

Exposure assessment records shall be maintained for at least 30 years.

### 4.11.3 Medical Surveillance Records

Medical surveillance records must include:

- The name and social security number of the employee;
- A copy of the employee's medical examination results, including the medical history, questionnaire responses, results of any tests, and physician's recommendations;
- Physician's written opinions;
- Any employee medical complaints related to the exposure to asbestos;
- A copy of the information provided to the physician;

Medical surveillance records must be maintained for the duration of employment plus 30 years.

4.11.4    Training Records

Training records must be maintained for one year beyond the last date of employment by that employer.

4.11.5    Inspection, Hazard Assessment and Abatement Records

Asbestos inspections, hazard assessments, abatement records and any other information concerning the identification, location and quantity of ACM shall be maintained by the Facility Asbestos Coordinator for the life of the facility and must be transferred to successive owners of the facility.

4.11.6    Transfer of Records

If the employer ceases to do business and there is no successor employer to receive and retain records for the prescribed period, the employer shall notify the Department of Labor (DOL) at least 90 days prior to disposal and, upon request, transmit the records to the DOL.

4.11.7    Recordkeeping Required by This Program

All documentation required by this program shall be stored in permanent files for the life of the facility and must be transferred to successive owners of the facility.  Records shall be maintained for all activities involving asbestos-containing materials (ACM) and shall include: those records listed above, contractor and other personnel notifications, and all other documentation of Plan compliance.

**APPENDIX A**

*FORMS*

APPENDIX A - Forms

Employee Notification Letter ................................................................................................ A-1

Employee Notification Form.................................................................................................. A-2

Contractor, Vendor and Repairman Notification Form ....................................................... A-3

Asbestos Waste Disposal Form............................................................................................. A-4

Emergency Abatement Form................................................................................................. A-5

Building Inspection Form ...................................................................................................... A-6

Example Warning Sign at Regulated Area ............................................................................ A-7

## EMPLOYEE NOTIFICATION LETTER

Dear _____:

EBI CONSULTING (EBI) was recently retained by the building owner to prepare an Operations and Maintenance (O&M) plan for suspect asbestos-containing materials (ACM) used in the construction and building materials at the buildings located at 1 & 2 Jericho Plaza in Jericho, New York (herein the Subject Property). As you may already know, asbestos was used extensively in the construction industry from the mid 1930's until approximately 1989 in many different materials. In fact, surveys conducted by the Environmental Protection Agency (EPA) estimate that asbestos-containing materials can be found in over 750,000 buildings, including schools, public buildings, residential buildings and office buildings in this country.

Note that EBI's scope of work did not include a comprehensive asbestos survey of the Subject Property. There is the possibility for ACM to be present. EBI observed suspect ACM at the Subject Property in the form of textured ceiling and wall surfacing materials, sheetrock/joint compound composite material, 2'x4' white perforated acoustical ceiling tile, structural spray-on fireproofing, vinyl floor tile and associated mastic, sheet vinyl flooring and associated mastic, cementitious insulating material on HVAC ductwork, various construction mastics and caulking, exterior transite wall panels, and roofing materials.

Based on the limited assessment conducted at the Subject Property, all suspect ACMs will be considered assumed ACM. This Asbestos O&M Plan has been prepared based on this presumption. All of the materials were observed to be in good condition at the time of inspection. Please note that inaccessible areas and 90% of the units were not visited by EBI during the assessment. Building tenants, as well as other non-resident personnel working in the buildings will be informed in writing of the presence and location of ACMs. Building tenants will be informed of the hazards associated with the ACMs.

EBI CONSULTING has prepared an O&M Plan that will enable us to manage the asbestos-containing materials without adversely affecting the operation of our facility and, more importantly, the health and safety of our employees and occupants. This O&M defines specific operating and maintenance procedures to be followed at all times. For the O&M Program, I have been designated as the Facility Asbestos Coordinator. All work shall be coordinated through me. Together, we will ensure that the requirements of the O&M Plan are understood, identify the locations of the asbestos-containing materials and provide the procedures that must be followed so that asbestos fibers are not released into the air.

Please be assured that the implementation of the O&M Plan will play a major role in the continued safe operations in the building(s). If you have any questions concerning this matter, please contact me.

Sincerely,

Facility Asbestos Coordinator

## EMPLOYEE NOTIFICATION FORM

| DATE: | |
|---|---|
| LOCATION: | |
| RE: | *Notification of Presence of Asbestos* |

I have received Asbestos Awareness Training. I have been advised of the presence of suspect ACM (Asbestos-Containing Materials) at the buildings located at 1 & 2 Jericho Plaza in Jericho, New York. I am aware that suspect ACM is present at the Subject Property in the form of textured ceiling and wall surfacing materials, sheetrock/joint compound composite material, 2'x4' white perforated acoustical ceiling tile, structural spray-on fireproofing, vinyl floor tile and associated mastic, sheet vinyl flooring and associated mastic, cementitious insulating material on HVAC ductwork, various construction mastics and caulking, exterior transite wall panels, and roofing materials. The suspect ACM is in good condition and should not produce airborne fibers unless subjected to damage or improper maintenance action. Additional suspect ACM such as pipe insulation, floor tile, floor tile mastic, and carpet mastic may be present below flooring, behind walls or above ceilings throughout Subject Property. I have been advised that, if it remains intact, there is minimal health risk but, if made friable or disturbed by processes such as, but not limited to, grinding, scraping, or drilling, asbestos-containing materials will produce airborne asbestos fibers.

Building tenants, as well as other non-resident personnel working in the buildings will be informed in writing of the presence and location of ACMs. I have been advised of the dangers inherent in handling asbestos and breathing asbestos dust, including, but not limited to, the fact that asbestos can cause asbestosis and is a known carcinogen and can, therefore, cause various types of cancer. I acknowledge and understand that any contact with airborne asbestos fibers whether visible or not, may cause asbestosis and other types of cancer, which may not be detectable for many years.

I have been advised of the following:
- Do not disturb the ACM or suspect/assumed ACM (e.g., do not push furniture against the ACM, do not damage thermal system insulation (TSI)).
- Report any evidence of disturbance or damage of ACM or suspect/assumed ACM to the Facility Asbestos Coordinator.
- Report any dust or debris that might come from the ACM or suspect/assumed ACM, any change in the condition of these materials, or any improper action (relative to ACM or suspect/assumed ACM) of building personnel to the Facility Asbestos Coordinator.
- Cleaning and maintenance personnel are taking special precautions during their work to properly clean up any asbestos debris and to avoid disturbing ACM and suspect/assumed ACM.
- All ACM and suspect/assumed ACM is inspected periodically and additional measures will be taken if needed to protect the health of building occupants.

| SIGNATURE: | |
|---|---|
| SOCIAL SECURITY NO.: | (Last Four Digits): |
| WITNESS: | |

## CONTRACTOR, VENDOR AND REPAIRMAN NOTIFICATION FORM

| DATE: | |
|---|---|
| LOCATION: | |
| RE: | *Notification of Presence of Asbestos* |

I have received Asbestos Awareness Training. I have been advised of the presence of suspect ACM (Asbestos-Containing Materials) at the buildings located at 1 & 2 Jericho Plaza in Jericho, New York. I am aware that suspect ACM is present at the Subject Property in the form of textured ceiling and wall surfacing materials, sheetrock/joint compound composite material, 2'x4' white perforated acoustical ceiling tile, structural spray-on fireproofing, vinyl floor tile and associated mastic, sheet vinyl flooring and associated mastic, cementitious insulating material on HVAC ductwork, various construction mastics and caulking, exterior transite wall panels, and roofing materials. The suspect ACM is in good condition and should not produce airborne fibers unless subjected to damage or improper maintenance action. I have been advised that, if it remains intact, there is minimal health risk but, if made friable or disturbed by processes such as, but not limited to, grinding, scraping, or drilling, asbestos-containing materials will produce airborne asbestos fibers.

Building tenants, as well as other non-resident personnel working in the buildings will be informed in writing of the presence and location of ACMs. I have been advised of the dangers inherent in handling asbestos and breathing asbestos dust, including, but not limited to, the fact that asbestos can cause asbestosis and is a known carcinogen and can, therefore, cause various types of cancer. I understand that, at a minimum, completion of a formal asbestos awareness training program is required prior to my participation in any asbestos disturbance, abatement or removal activities.

I acknowledge and understand that any contact with airborne asbestos fibers whether visible or not, may cause asbestosis and other types of cancer, which may not be detectable for many years.

I have been advised of the following:
- Do not disturb the ACM or suspect/assumed ACM (e.g., do not push furniture against the ACM, do not damage thermal system insulation (TSI)).
- Report any evidence of disturbance or damage of ACM or suspect/assumed ACM to the Facility Asbestos Coordinator.
- Report any dust or debris that might come from the ACM or suspect/assumed ACM, any change in the condition of these materials, or any improper action (relative to ACM or suspect/assumed ACM) of building personnel to the Facility Asbestos Coordinator.
- Cleaning and maintenance personnel are taking special precautions during their work to properly clean up any asbestos debris and to avoid disturbing ACM and suspect/assumed ACM.
- All ACM and suspect/assumed ACM is inspected periodically and additional measures will be taken if needed to protect the health of building occupants.

| SIGNATURE: | |
|---|---|
| SOCIAL SECURITY NO.: | (Last Four Digits): |
| WITNESS: | |

| ASBESTOS WASTE DISPOSAL FORM | | | | |
|---|---|---|---|---|
| NAME OF BUILDING: | | | | |
| DATE: | | | | |
| **OWNER OR OPERATOR OF LANDFILL:** | | | | |
| NAME: | | | | |
| ADDRESS: | | | | |
| CITY, STATE, ZIP: | | | | |
| PHONE: | | | | |
| **NAME OF LANDFILL:** | | | | |
| NAME: | | | | |
| ADDRESS: | | | | |
| CITY, STATE, ZIP: | | | | |
| PHONE: | | | | |
| LICENSED HAZARDOUS WASTE TRANSPORTER: | | | | |
| APPROXIMATE VOLUME OF ASBESTOS RECEIVED: | | | | |
| TYPE OF CONTAINER ASBESTOS IS IN: | | | | |
| ASBESTOS CONTAINERS LABELED? | YES | | NO | |
| LANDFILL OWNER/OPERATOR SIGNATURE: | | | | |
| DATE: | | | | |

| EMERGENCY ABATEMENT FORM |
|---|
| DATE: |
| BUILDING: |
| LOCATION: |
|  |
| **CAUSE OF EMERGENCY ABATEMENT** |
|  |
|  |
|  |
|  |
| **OPERATION AND MAINTENANCE PROCEDURES FOLLOWED:** |
|  |
|  |
|  |
|  |
| **DESCRIPTION OF ACTIONS TAKEN:** |
|  |
|  |
|  |
|  |
| SIGNATURE: |
| TITLE: |

## BUILDING INSPECTION FORM

| DATE: | BUILDING: | FLOOR: |
|---|---|---|

| INSPECTION LOCATIONS: | | |
|---|---|---|

| REASON FOR INSPECTION: | DAMAGED MATERIAL: | | PERIODIC SURVEY: | |
|---|---|---|---|---|

**IF DAMAGED MATERIAL IS REASON FOR INSPECTION,**

**PLEASE COMPLETE 1 THROUGH 5**

1 TYPE OF MATERIAL DAMAGED:

2. CAUSE OF DAMAGE:

3. APPROXIMATE SIZE OF DAMAGED AREA:

4. IS THERE MATERIAL DEBRIS ON FLOOR OR OTHER LOCATIONS?

5. ARE EMPLOYEES/TENANTS/SUBCONTRACTORS IN IMMEDIATE AREA?

6. HAS MATERIAL CONDITION CHANGED SINCE LAST INSPECTION?

IF CHANGE HAS OCCURRED, PLEASE DESCRIBE THE CHANGE.

COMMENTS:

NEXT SCHEDULED INSPECTION DATE:

INSPECTOR'S SIGNATURE(S):

DANGER

ASBESTOS

CANCER AND LUNG DISEASE

HAZARD

AUTHORIZED PERSONNEL ONLY

WEAR RESPIRATORY PROTECTION AND

PROTECTIVE CLOTHING

IN THIS AREA

Required by 29 CFR 1926.1101 Paragraph (k)(7)(ii)(A)"...at each regulated area. In addition, warning signs shall be posted at all approaches to regulated areas...".

**APPENDIX B**

*TRAINING PROGRAMS*

## AWARENESS TRAINING FOR CUSTODIAL AND MAINTENANCE PERSONNEL

<u>Purpose:</u>  To provide participants with a basic understanding of the characteristics of asbestos, why and where it is used, health-related concerns, and how to avoid inadvertent exposure.

<u>Learning Objectives:</u>   After completing this session participants should be able to:
1) Provide a general definition of asbestos.
2) Define friability.
3) Describe the unique properties of asbestos.
4) Describe the common uses of asbestos.
5) Describe the health effects associated with asbestos exposure.
6) Know the primary uses and locations of asbestos in the buildings where they work.
7) Recognize a potential health hazard (damage, deterioration or delamination of asbestos.
8) Understand the general in-house procedures for handling asbestos materials.
9) Know the name and telephone number of the Facility Asbestos Coordinator.

<u>Topic Outline</u>
1) Characterization of Asbestos and Its Uses
   a) Definition of asbestos, examples of various types in naturally occurring rock form
   b) Description of unique properties
   c) EPA definition of friability, examples of friable and non-friable materials
   d) Common uses of asbestos (fireproofing, pipe lagging, brake linings, gaskets, etc.)
2) Health-Related Concerns
   a) Diseases associated with asbestos exposure
   b) Dose-response relationship
   c) Latency period
   d) Routes of entry into the body
   e) Defense mechanisms of the body
3) Recognition of Potential Hazards
   a) Damage
   b) Deterioration
   c) Other
4) Site-Specific Information
   a) Primary locations and uses of asbestos at the Subject Property
   b) How to avoid inadvertent exposures
5) Overview of the Subject Property's Operations and Maintenance Plan and Asbestos Control Program
   a) Description of asbestos-related work procedures
   b) Plans for future
   c) Where to go for more information
6) Questions and answers

**TRAINING PROGRAM FOR
OPERATIONS AND MAINTENANCE STAFF**

EXAMPLE AGENDA

DAY I

**LEVEL I (Awareness Training)**

| | | |
|---|---|---|
| 8:30-8:45 | Characterization of Asbestos and Its Uses | 15 Minutes |
| 8:45-9:15 | Health Effects of Asbestos Exposures | 30 Minutes |
| 9:15-9:45 | Location & Condition of Asbestos-Containing Materials/ Recognition of Damage, Deterioration and Delamination | 30 Minutes |
| 9:45 - 10:00 | How to Avoid Disturbance | 15 Minutes |
| 10:00-10:15 | Break | 15 Minutes |
| 10:15-10:30 | Overview of Facility's Operations & Maintenance Plan/ Asbestos Control Plan | 15 Minutes |
| 10:30-10:45 | Questions and Answers | 5 Minutes |

**LEVEL II (OSHA Class III)**

### CUSTODIAL AND MAINTENANCE PROCEDURES FOR HANDLING ASBESTOS-CONTAINING MATERIALS (SMALL SCALE, SHORT DURATION PROJECTS)

<u>Purpose:</u>  To provide participants with necessary information to properly protect themselves from exposure to asbestos and to minimize asbestos contamination of the building during performance of maintenance and custodial activities.

<u>Learning Objectives:</u>    After completing this session participants should be able to:
1. Understand the primary aspects of regulations that protect them and the public from exposure to asbestos.
2) Understand the meaning and importance of a medical surveillance program.
3) Understand the proper use, maintenance and limitations of respirators and protective clothing (see Section 4.8.2).
4) Know how to perform cleaning using wet wiping techniques and HEPA filter vacuuming.
5) Know proper work practices and equipment for conducting small-scale short duration projects including use of mini-enclosures.
6) Understand proper decontamination techniques.
7) Know how to respond to a fiber release episode.
8) Know how to properly dispose of asbestos-containing materials and associated wastes.
9) Understand how the work permit system operates to avoid inadvertent disturbances of asbestos-containing materials.

<u>Topic Outline</u>
1) Regulations
    a) Occupational Safety and Health Administration (OSHA) Standard
    b) Environmental Protection Agency (EPA) Regulations
    c) State Regulations
2) Medical Surveillance Program
    a) Importance
    b) Who needs an examination
    c) What is needed on an examination
    d) Reasons for specific procedures
    e) When is an examination needed
    f) Where are records kept for review
3) Respirators and Protective Clothing
    a) Why they are needed
    b) Types of respirators
    c) Method of protection
    d) Respirator program
    e) Protective clothing
    f) Fit testing
    g) Respirator maintenance

***LEVEL II TRAINING (continued)***

4) Proper Cleaning Techniques
   a) Understanding potential for resuspension of fibers into the air
   b) Wet wiping techniques
   c) Use and maintenance of a HEPA filter vacuum
   d) Identifying proper techniques for type of material (fabric, hard surfaces, etc.)
   e) Appropriate personal protection
5) Work Practices for Routine Maintenance Activities
   a) Routine maintenance involving surfacing materials
   b) Maintenance activities in confined or restricted spaces
   c) Maintenance work related to renovation
   d) Routine maintenance involving miscellaneous asbestos-containing materials (floor tiles, etc.)
6) Procedures for Fiber Release Episodes
   a) Equipment contained in an emergency response kit
   b) Location of emergency response kit
   c) Appropriate personal protection
   d) Procedures for clean-up of asbestos-containing materials
   e) Repair of in-place asbestos-containing materials
7) Proper Disposal Procedures
   a) Wetting techniques
   b) Use of 6-mil impermeable bags
   c) Use of rigid containers for transport
   d) Proper labeling
   e) Use of approved landfill
8) Work Management System
   a) Purpose of a work permit system
   b) Proper procedure to follow before beginning maintenance activity

| ASBESTOS _____ TRAINING SESSION |
| ATTENDANCE ROSTER |

| Name (Print) | Signature | Job Title | Employee Number |
|---|---|---|---|
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |

The program addressed the potential adverse health effects due to asbestos exposure. Relevant OSHA and EPA regulations plus applicable state and local rules were reviewed. The locations of asbestos-containing materials within the facility were identified.

Instructor: _____

Date: _____  Time: _____

**APPENDIX C**

*WORK PERMIT SYSTEM FORMS*

APPENDIX C - Work Permit System Forms

Work Permit Form for Maintenance Work ........................................................................................... C-1

Evaluation of Work Affecting Asbestos-Containing Materials........................................................ C-2

Work Permit Log................................................................................................................................. C-3

## WORK PERMIT FORM FOR MAINTENANCE WORK

NAME:

DATE:

TELEPHONE NUMBER:

1.  Address, building, and room number(s) (or description of area) where work is to be performed:

2.  Requested starting date:
    Anticipated finish date:

3.  Description of work:

4.  Description of any asbestos-containing materials that might be affected, if known (include location and type):

5.  Name and telephone number of requester:

6.  Name and telephone number of supervisor:

Submit this application to: (the Facility Asbestos Coordinator)

**NOTE: An application must be submitted for all maintenance work regardless of whether asbestos-containing materials might be affected. An authorization must then be received before any work can proceed.**

| | |
|---|---|
| REQUESTER SIGNATURE: | DATE: |
| SUPERVISOR'S SIGNATURE: | DATE |
| GRANTED: (JOB REQUEST NO._____) | |
| DENIED: | |
| FACILITY ASBESTOS COORDINATOR SIGNATURE: | DATE |

**Evaluation of Work Affecting Asbestos-Containing Materials**

This evaluation covers the following maintenance work:

Location of work (address, building, room number(s), or general description):_____
_____
_____
_____
_____

Date(s) of work: _____

Description of work: _____

Work approval form number: _____

Evaluation of work practices employed to minimize disturbance of asbestos: _____
_____
_____
_____
_____
_____

Evaluation of work practices employed to contain released fibers and to clean up the work area: _____
_____
_____
_____

Evaluation of equipment and procedures used to protect workers: _____
_____
_____
_____

Personal air monitoring results: (in-house worker or contract?)

Worker name _____     Results: _____

Worker name _____     Results: _____

Handling or storage of ACM waste: _____

Signed:_____     Date:_____
            (Facility Asbestos Coordinator)

| WORK PERMIT LOG | | | | | |
|---|---|---|---|---|---|
| WORK PERMIT NO. | REQUESTED BY | ROOM | START DATE | COMPLETION DATE | APPROVED |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

**APPENDIX D**

*WORK PRACTICES*

## Work Practice Levels

Three work practice levels are judged to sufficient to encompass a broad range of situations, which are likely to be encountered. The levels are simply a means of structuring the guidance, which the Program provides. Up to three levels are included for each work practice to address different degrees of potential asbestos fiber release. A different number of levels might be selected by a Facility Asbestos Coordinator or designed into a specific asbestos O&M program.

A change of level does not imply a different task to be accomplished. It implies a changed potential for asbestos fiber release, typically related to either the condition of asbestos, nature of the work practice, skill of the workers or the building context in which the task will be performed.

The levels for each work practice included in this Program are defined principally in relation to the OSHA asbestos standards. There are three standards that may apply. The OSHA construction standard, 29 CFR 1926.1101, applies to most O&M activities, including cleaning that is associated with construction. Normal cleaning, that is not associated with construction or other O&M work, including cleaning and buffing of resilient flooring, is covered by the OSHA general industry standard, 29 CFR 1910.1001.

The OSHA construction standard sets forth four classes of construction-related work. Operations and maintenance and cleaning activities connected with construction work are defined as Class III and IV work. The principal difference for O&M activities is that Class III work disturbs the ACM and Class IV only contacts, but does not disturb the ACM. This Program also contains some work practices that can involve housekeeping operations that are subject to either the OSHA construction or the general industry standard.

Activities that are not intended to contact ACM and are not likely to disturb ACM are not given a level designation, but require control to insure that a disturbance does not occur. Areas where ACM is located and where access can be controlled should be designated as "Controlled Areas." ACM systems in the vicinity of work but which do not need to be contacted should be designated as "Controlled Systems." Exposure monitoring is not required for these activities as ACM is not being contacted. Awareness training is needed to inform workers about the location of the ACM, and to advise them to avoid contacting it, and to report any damaged ACM they observe.

In general, an O&M program is easier to implement and is more cost effective if maintenance work can be performed without the need for enclosures. Maintenance work that contacts or disturbs ACM is governed by OSHA. To be able to perform maintenance work governed by the Construction Standard (1926.1101) without an enclosure and still comply with OSHA, it is necessary to make a negative exposure assessment (NEA). This effectively makes the OSHA PEL a limit on the level of airborne asbestos that can be generated by a work practice before enclosure is required. In general, Level A and B maintenance activities related to construction are un-enclosed and as such require a negative exposure assessment. Level C work practices are enclosed and as such may generate airborne fiber levels above the OSHA PEL. Note that a negative exposure assessment alone does not eliminate the requirement for respiratory protection. Respiratory protection is required, even with an NEA, if ACM is removed in a non-intact state, if wet methods are not used, or for removal of TSI or surfacing material. Intact is defined by OSHA as ACM that has not crumbled, been pulverized, or otherwise deteriorated so that the asbestos is no longer bound with its matrix.

Cleaning work not related to construction or dust and debris generated by such activity is governed by the OSHA General Industry Standard (1910.1001). This standard does not contain provisions for a negative exposure assessment. Routine cleaning activities are performed as Level A based on a determination having been made that cleaning activities using the work practices in this Program (which are based on those contained in the OSHA regulation) are not reasonably expected to result in exposures exceeding the PEL.

The three work practice levels are defined as follows:

■ **Level A:** Level A is work that may contact ACM, but which will not disturb it. Level A is defined in terms of Class IV work in the construction standard (29 CFR 1926.1101). It is Class IV work (except for cleanup work) with a negative exposure assessment that involves maintenance and custodial activities during which employees contact ACM, but do not disturb it. Note that clean up of asbestos-containing debris and waste is not Level A work (Refer to Level B for this type of cleanup work). It is also Class II work (involving non-friable materials such as gaskets, roofing, and cement asbestos board) with a negative exposure assessment.

Work practices required for Level A are those set forth in paragraph (g)(10) of the OSHA asbestos construction standard for Class IV work and (g)(8) and (g)(11) for Class II work. See Figure 1 for checklist of requirements

■ **Level B:** Level B is work that may disturb ACM, but where the OSHA PEL is not exceeded and release of ACM, dust and debris is confined to the immediate location of the disturbance. In the construction standard, it is Class III work on TSI or Surfacing ACM with a negative exposure assessment, Class IV work activities to clean up waste and debris containing ACM with an NEA. Class III asbestos work includes repair and maintenance operations, where ACM, including thermal system insulation and surfacing material, is likely to be disturbed. Operations where TSI or surfacing are worked on using "aggressive" methods, such as drilling, cutting, abrading, etc. are Level C work, as OSHA requires area isolation for these procedures whether or not a negative exposure assessment is made. In the general industry standard, clean up of ACM waste, debris and accompanying dust that are not from construction activities, and where the PEL is not exceeded is Level B work. If the quantity of material disturbed during Class III work exceeds one 60 inch x 60 inch glovebag or waste bag, then the activity becomes Class I or II and exceeds the limitation of the work practices in this manual.

Work practices required for Level B are those set forth in paragraph (g)(9) of the OSHA construction standard for Class III work and (g)(7, 8 and 11) for Class II work. These include O&M training, respirators, engineering controls and work practices, wet methods, local exhaust ventilation (Note: A respirator is not required if work is on non-TSI or non-surfacing material, there is a negative exposure assessment, wet methods are used, and the material remains intact.). In the construction standard, asbestos-containing debris and waste from construction activities (including O&M) are to be promptly cleaned up and disposed of in leak-tight containers. The general industry standard covers clean up of non-construction waste, debris and accompanying dust. These must be cleaned up with wet methods and HEPA vacuums. The construction standard requires that in areas with accessible, friable TSI and surfacing material, waste or debris must be presumed to contain asbestos. See Figure 2 for checklist of requirements.

■ **Level C:** Level C is work where ACM is disturbed and the PEL may be exceeded or ACM, dust, and/or debris may be scattered beyond the immediate location of the disturbance. It is Class III work described in the OSHA construction standard: paragraph (g)(9)(iii) where the disturbance involves drilling, cutting, abrading, sanding, chipping, breaking, or sawing of thermal system insulation or surfacing material; or (g)(9)(iv) where there is no negative exposure assessment or where the PEL is exceeded. It is also Class II work without an NEA.

Work practices required for Level C are mini-enclosures, glovebags and other enclosure devices set forth in paragraph (g)(5) of the construction standard as well as work practices set forth in paragraph (g)(9) of the OSHA construction standard for Class III work. These include O&M training, respirators, engineering controls and work practices, wet methods, and local exhaust ventilation. Debris and waste are to be promptly cleaned up and disposed of in leak-tight containers. See Figure 3 for checklist of requirements.

A "disturbance" of ACM, as used in the level definitions, refers to any activity that disrupts the matrix of ACM, crumbles or pulverizes ACM, or generates visible debris or dust from ACM.

Figures 1 through 3 that follow summarize the engineering controls and practices recommended for each level. The Facility Asbestos Coordinator should determine the appropriate level, based on the O&M program objectives, the O&M program elements, and level of training needed for each level of work practices used in a facility.

### Figure 1: Level A Worker Checklist for Operations and Maintenance Work Practices

*Level A work may contact ACM but not disturb it. If you encounter damaged ACM, or if the work could damage the ACM, stop work and notify your supervisor.*

*Level B is work that may disturb ACM, but where the OSHA PEL is not exceeded and release of ACM, dust and debris is confined to the immediate location of the disturbance.*

*Level C is work where ACM is disturbed and the PEL may be exceeded or ACM, dust, and/or debris may be scattered beyond the immediate location of the disturbance. Level C work must take place in an enclosure (glovebag or mini-enclosure).*

**Pre-Work Activities**

____ Obtain and review copies from Supervisor or Facility Asbestos Coordinator of:

     ____ Completed Work Permit Form

     ____ Work practice(s) to be used including personal protective equipment options

     ____ Work Notification(s) (as applicable)

     ____ Schedule for work

____ Review work practices and **General Procedure W1** and any other general procedures used in work practice.

____ Inspect work area for visible dust or debris. If present, stop work and notify Facility Asbestos Coordinator.

____ Obtain recommended tools, equipment and materials as described in **General Procedure W1, work practice(s) item 2,** and Work Permit Form.

     ____ Move tools, equipment and materials to work area.

____ Shut off and lock out any HVAC or electrical systems to be worked on.

____ If required on Work Permit Form, put on respirators and perform fit checks - **See General Procedure W6.**

**Work Practices**

*Always use wet methods, HEPA vacuums, prompt clean-up and disposal of waste. Do not dry clean-up dust and debris, or use compressed air or high-speed abrasive saws.*

____ Perform work per steps in work practice(s).

**Clean-Up and Tear Down**

____ Remove lockout tags (if used) & restart any HVAC/electrical system(s) that were shut off.

____ Return tools, equipment and remaining materials to storage area.

____ Notify Facility Asbestos Coordinator or supervisor that work is completed & return documents to Facility Asbestos Coordinator.

**Figure 2: Level B Worker Checklist for Operations and Maintenance Work Practices**

**Pre-Work Activities**

____ Obtain and review copies from Supervisor or Facility Asbestos Coordinator of:
    ____ Completed Work Permit Form
    ____ Work practice(s) to be used including personal protective equipment options
    ____ Work Notification(s) (as applicable)
    ____ Schedule for work
____ Review work practices and referenced general procedures used in work practice(s).
____ Obtain recommended tools, equipment and materials - *See General Procedure W1 and work practice(s) item 2.*
____ Obtain required respirators as listed on Work Permit Form.
____ Move tools, equipment and materials to work area.
____ Shut off and lock out HVAC and electrical systems serving work area - *See General Procedure W3.*
____ Vacate and secure work area, such as by locking doors and/or setting up temporary barriers - *See General Procedure W4.*
____ Put on respirators and perform fit checks - *See General Procedure W6.*
____ Put on protective clothing - *See General Procedure W7.*
____ Air monitoring personnel begins air monitoring work (if required) - *See General Procedure W8.*
____ Preclean work area if visible dust or debris is present - *See General Procedure W9.*

**Work Area**

____ Set up work area as required by work practice - *See General Procedure W10.*

**Work Practices**

____ Perform work per steps in work practice(s).

**Clean-Up and Tear Down**

____ Package and label asbestos waste for disposal - *See General Procedure W11.*
____ Apply lockdown encapsulant, where required, using garden sprayer, to surfaces where ACM was removed or disturbed - *See General Procedure W12.*
____ Perform ceiling panel replacement work or ceiling repair work if needed.
____ Clean tools, equipment and work area using wet wiping and HEPA vacuuming as appropriate and return tools and equipment to outside work area - *See General Procedure W13.*
____ Decontaminate packaged waste & move waste to outside work area - *See General Procedure W14.*
____ Workers decontaminate and remove protective clothing and respirators. If contaminated, dispose of protective clothing as ACM - *See General Procedure W15.*
____ Complete visual inspection. Complete air monitoring work - *See General Procedure W16.*
____ If feasible, get Facility Asbestos Coordinator or designee to complete Evaluation of Work Form.
____ Transport waste to designated asbestos waste storage area - *See General Procedure W17.*
____ Remove drop cloth, clean with HEPA/wet methods or properly dispose of as contaminated.
____ Return decontaminated tools, equipment and remaining materials to storage area.
____ Remove lockout tags and restart HVAC/electrical system(s).
____ Restore normal accessibility to work area.
____ Notify Facility Asbestos Coordinator or Supervisor that work is completed & return documents to Facility Asbestos Coordinator.

### Figure 3: Level C Worker Checklist for Operations and Maintenance Work Practices

**Pre-Work Activities**

\_\_\_ Obtain and review copies from Supervisor or Facility Asbestos Coordinator of:
    \_\_\_ Completed Work Permit Form
    \_\_\_ Work practice(s) to be used including personal protective equipment options
    \_\_\_ Work Notification(s) (as applicable)
    \_\_\_ Schedule for work
\_\_\_ Review work practices and referenced general procedures used in work practice(s).
\_\_\_ Obtain recommended tools, equipment and materials - *See General Procedure W1 and work practice(s) item 2.*
\_\_\_ Obtain required respirators as listed on Work Permit Form.
\_\_\_ Move tools, equipment and materials to work area.
\_\_\_ Shut off and lock out HVAC and electrical systems serving work area - *See General Procedure W3.*
\_\_\_ Vacate and secure work area, such as by locking doors and/or setting up temporary barriers - *See General Procedure W4.*
\_\_\_ Put on respirators and perform fit checks - See General Procedure W6.
\_\_\_ Put on protective clothing - *See General Procedure W7.*
\_\_\_ Air monitoring personnel begins air monitoring work (if required) - *See General Procedure W8.*
\_\_\_ Preclean work area if visible dust or debris is present - *See General Procedure W9.*

**Work Area**

\_\_\_ Perform all Level C work inside an enclosure (glovebag or mini-enclosure) Set up work area and decontamination facilities as required by work practices - *See General Procedures W5, W10, W18, and W20.*

**Work Practices**

\_\_\_ Perform work per steps in work practice(s).

**Clean-Up and Tear Down**

\_\_\_ Package and label asbestos waste for disposal - *See General Procedure W11.*
\_\_\_ Apply lockdown encapsulant, where required, using garden sprayer, to surfaces where ACM was removed or disturbed - *See General Procedure W12.*
\_\_\_ Perform ceiling panel replacement work or ceiling repair work if needed.
\_\_\_ Clean tools, equipment and work area using wet wiping and HEPA vacuuming as appropriate and return tools and equipment to outside work area - *See General Procedure W13.*
\_\_\_ Decontaminate packaged waste & move waste to outside work area - *See General Procedure W14.*
\_\_\_ Workers decontaminate and remove protective clothing and respirators. If contaminated, dispose of protective clothing as ACM - *See General Procedure W15.*
\_\_\_ Complete visual inspection. Complete air monitoring work - *See General Procedure W16.*
\_\_\_ If feasible, get Facility Asbestos Coordinator or designee to complete Evaluation of Work Form.
\_\_\_ Transport waste to designated asbestos waste storage area - *See General Procedure W17.*
\_\_\_ Remove drop cloth and/or mini-enclosure, clean with HEPA/wet methods or properly dispose of as contaminated.
\_\_\_ Return decontaminated tools, equipment and remaining materials to storage area.
\_\_\_ Remove lockout tags and restart HVAC/electrical system(s).
\_\_\_ Restore normal accessibility to work area.
\_\_\_ Notify Facility Asbestos Coordinator or Supervisor that work is completed & return documents to Facility Asbestos Coordinator.

## W-1 Tools, Equipment and Materials

The following is a list of tools, equipment and materials that are referenced in the work practices and are recommended to perform the work practices. Tools, equipment or materials that are unique to a certain work practice are listed under item 2 in each work practice. For frequent O&M work, it might be helpful to maintain an "O&M cart" containing the necessary tools, equipment and materials.

### Tools and Equipment

* Utility knife
* Ground fault circuit interrupters (GFCIs), Extension cords and adapters - GFCIs should be used on any electrical equipment or tools used in O&M work where water might be in use or present in the work area.
* Lockout tags
* Temporary work lights
* Ladder or scaffold for elevated work
* Wet wipes or bucket with clean water for wet wiping
* Smoke test bulb and tubes
* Bone saw
* Wire cutters
* Tin snips
* Safety glasses

### Abatement Equipment and Materials

* Polyethylene sheet
* Duct tape
* Disposal bags with labels
* High efficiency particulate air (HEPA) vacuum with hose, attachments and proper HEPA filter (wet/dry type needed for some work practices)
* Respirators (if required)
* Disposable coveralls (if required)
* Disposable towels or wet wipes
* Asbestos barrier tape
* Warning signs
* Garden sprayer with amended water or removal encapsulant (Level B and C practices). See general procedure W2.
* Aerosol cans or garden sprayer with lockdown encapsulant (Level B and C practices)
* Air monitoring pumps, cassettes and calibration equipment (if required)
* Frame for mini-enclosure or prefabricated mini-enclosure (Level C practices)
* Negative pressure machine (HEPA filtered exhaust fan) as required for size of enclosure (level C practices - could be negative pressure machine or additional HEPA vacuum)
* Manometer (if pressure differential measurements are desired)
* Glovebags (if required)

## W-2 Preparing Amended Water or Removal Encapsulant

Amended water or removal encapsulant solutions are prepared by mixing a measured amount of surfactant or encapsulant with clean water in accordance with the manufacturer's instructions. Surfactants and encapsulants materials might be considered hazardous substances. Containers of amended water or removal encapsulant should be labeled to identify the contents in accordance with the OSHA Hazard Communication Standard (29 CFR 1910.1200). Review and comply with Safety Data Sheet (SDS) before mixing and using these materials. Amended water or removal encapsulant should be mixed in a labeled garden sprayer unit prior to the start of an O&M activity. Liquid dishwashing detergent might be used as a surfactant for O&M work. They have used a mix of 8 parts water to one part detergent.

## W-3 Shut-off and Lockout of HVAC and Electrical Systems

Any electrical systems that might be worked on or affected by O&M activities should be shut off, locked and tagged with electrical lockout tags at the circuit breaker panel or disconnect switch. Affected systems include systems that could create electrical hazards during O&M activities that involve wetting.

HVAC systems in a work area, systems that serve a work area or systems that will be worked on should be shut down during O&M activities. Level A activities usually do not require HVAC shut down unless a work will occur on a system or a disturbance of asbestos will occur. Any air-handling systems (supply, return and exhaust) required to be shut down should be shut off, locked, and tagged with electrical lockout tags at the circuit breaker panel or disconnect switch.

Lockout tags should note when and why power is shut down and the personnel performing the lockout. There should only be one key for each lock used on lockout tags to prevent accidental reactivation of equipment.

## W-4 Securing Work Area

When asbestos fibers might be released, work areas should be vacated and secured (where feasible) by scheduling, locking doors (from inside the area if possible) or other means. If this is not feasible, access to the work area should be restricted, such as by asbestos barrier tape around the perimeter of the work area. If barrier tape is used to denote a work area, it should be placed 5 to 10 feet (1.5 to 3 meters) outside of any polyethylene protection used in the work area. Install barrier tape by taping or tying it to fixed objects.

Do not block access to any emergency exits, and when asbestos fibers might be released, post OSHA required "danger" signs at all entrances to the work area. For such projects, it might be desirable to have a visual barrier installed several feet in front of warning signs to avoid having warning signs readily visible to occupants. A "keep out of construction area" sign should be posted on visual barriers. A visual barrier would be arranged so that a person who goes past the visual barrier will then see required warning signs.

## W-5 Critical Barriers

Completely Separate the Work Area from other portions of the building, and the outside by closing all openings with sheet plastic barriers at least 6 mil (0.15 mm) in thickness, or by sealing cracks leading out of Work Area with duct tape.

Individually seal all ventilation openings (supply and exhaust), lighting fixtures, clocks, doorways, windows, convectors and speakers, and other openings into the Work Area with duct tape alone or with polyethylene sheeting at least 6 mil (0.15 mm) in thickness, taped securely in place with duct tape. Maintain seal until all work including Project Decontamination is completed. Take care in sealing of lighting fixtures to avoid melting or burning of sheeting.

Provide Sheet Plastic barriers at least 6 mil (0.15 mm) in thickness as required to seal openings completely from the Work Area into adjacent areas. Seal the perimeter of all sheet plastic barriers with duct tape or spray cement.

## W-6 Putting on Respirators and Performing Fit Checks

The procedures described below are based on the assumption that workers wearing respirators have been trained in the use of respirators and, for negative pressure respirators, fit tested, and enrolled in a medical surveillance program as part of a Respiratory Protection Program. Respirators used should be approved by NIOSH. These procedures are not a substitute for a Respiratory Protection Program in accordance with OSHA standard 29 CFR 1910.134 or regulatory requirements regarding respirators.

### Putting on Respirators

Wearers should inspect their respirators before each use of the respirator.

Respirators must not be damaged, have missing parts or be deformed in any way. The straps must be intact and well attached. Proper filter cartridges for the hazards to be encountered must be installed. Verify that filters have been replaced in accordance with the Respiratory Protection Program. Batteries for powered respirators should be fully charged. The respirator should also be cleaned if it was not cleaned after the last use. If any problems exist, the respirator should be repaired or replaced in accordance with the Respiratory Protection Program.

When putting on a respirator, the straps should be loosened before it is put on. Filter caps (such as those used on some Powered Air Purifying Respirators) should be taped to the filter body or stored where it will not be lost. Powered respirators should be turned on and flow checked before the facepiece is put on. The respirator should be put on and then the straps tightened as recommended in the manufacturer's information provided with the respirator. Fit checks should then be performed.

### Fit Checks

Fit checks should be performed in accordance with the Respiratory Protection Program by each worker each time they put on a respirator. Both positive and negative pressure fit checks should be performed. When feasible, powered respirators should be checked with the motor unit turned off. A negative pressure fit check is done by donning the respirator and pulling the respirator straps so the unit fits snugly. Inhale gently while placing hands over filters to block off inhalation side. Respirator should pull to face and no air should leak in around face seal.

A positive pressure fit check is done by exhaling gently (without breaking respirator seal to face) breathing normally while blocking off the exhalation valve. The face piece should then expand away from face while exhaling.

Adjust respirator straps as needed to obtain a good seal of the facepiece to the face. If a good seal cannot be obtained, obtain a new respirator and perform fit tests again.

## W-7 Putting on Protective Clothing

Protective clothing for workers typically consists of disposable coveralls, gloves and boots. Coveralls should have hoods and booties attached. They should provide complete coverage of the body with the exception of hands and face. Cloth coveralls that are cleaned by a facility equipped to launder asbestos contaminated clothing might also be used. Do not modify coveralls.

Protective clothing options available for O&M work include the following:

* **Level A & B:** If level A or B work is to be performed and the potential for exposure to asbestos-containing dust and debris is low and localized, use one disposable coverall with no street clothes, or one disposable coverall over street clothes.

* **Level C:** Level C work is to be performed inside of a mini-enclosure and if potential for exposure to asbestos-containing dust and debris is moderate or dispersed, use two disposable coveralls with no street clothes; or if street clothes are required, two coveralls should be worn over the street clothes. Preferably, the street clothes should be removed before the start of work.

When possible, street clothes should be removed in a changing area before protective clothing is put on. Protective clothing should be put on after respirators. The coverall hood should cover respirator straps.

Workers are encouraged to wear protective gloves that are duct taped at the cuffs to the protective coveralls. Eye, hearing, and head protection should also be used where needed. Rubber slip-resistant boots or other non-slip footwear is to be worn for all activities. (protective booties should cover feet inside the boots). Steel-toed boots should be used in areas where foot hazards exist. Do not use coveralls with loose foot coverings for activities that involve climbing ladders or working on scaffold.

## W-8 Beginning & Conducting Air Monitoring During Work Practices

***Note:*** *This section is not intended as a substitute for a complete Air Monitoring Program and specific protocols needed for O&M work. This section notes air monitoring issues that need to be addressed by the air monitoring person.*

Air monitoring during O&M activities can consist of personal monitoring, area monitoring and clearance monitoring. Air monitoring required for the work practice being performed should be listed on the Work Permit Form and be conducted in accordance with applicable regulations (such as 29 CFR 1926.1101 Appendix A), the O&M Plan and Air Monitoring Program. All air monitoring work should be conducted by a trained person assigned by the Facility Asbestos Coordinator.

The air monitor person should calibrate, adjust, and record the flow rate of all air monitoring pumps to be used before air monitoring is started for an O&M activity. General procedure W16 covers visual inspections and the completion of air monitoring at the end of the work.

### Personal Monitoring

To perform personal monitoring, attach a personal air monitoring pump to a belt worn by the worker. Attach an air sampling cassette to the hose from the pump. Route the hose up the worker's back and tape the hose to the worker's protective coveralls using duct tape. The cassette should be located with the open end facing downwards at approximately a forty-five degree angle in the worker's "breathing zone" at about collar level. Turn the pump on and record start time. The air monitoring person will retrieve or change the cassette when necessary, or when work is completed.

### Area Monitoring

Area monitoring is usually performed using high volume air sampling pumps. Place pumps inside the work area and outside the work area in occupied areas or areas where occupants could be exposed if fibers are released from the work area. Pumps should be located where they obtain meaningful measurements of potential worker exposure during monitoring as well as measure any area contamination. Attach sampling cassettes to the hoses from the pumps and attach the cassettes to the top of tripod stands or other stable structures (do not use the pump as a stand due to its vibrations) to locate the sample at four to five feet (1.2 to 1.5 meters) above the floor. These cassettes should be located with the open end facing downwards at approximately a forty-five degree angle. The air monitoring person will retrieve or change cassettes as needed or when the work is completed.

If any samples analyzed during the work exceed predetermined "stop work levels" specified in the O&M program, productive work shall be stopped, the area cleaned and additional engineering controls implemented, as necessary.

## W-9 Wet Wiping, HEPA Vacuuming, and Steam Cleaning

These work practices are used either to pre-clean the work area prior to start of work, or for cleaning surfaces as part of a work procedure.

Precleaning of work areas prior to the start of work is done to remove accumulated debris and dust that could be disturbed during the work. Precleaning might include picking up dust and debris with a HEPA vacuum, wet wiping non-porous surfaces, HEPA vacuuming surfaces that cannot be wet wiped, and cleaning any carpeted surfaces using steam extraction equipment. (Note: EPA has determined in a research study that HEPA vacuuming and steam cleaning of carpets does not completely remove asbestos contamination.) Precleaning might reduce the extent of cleaning required after the work and for clearances (if required).

The following work procedures are be used for cleaning when required in a Work Practice.

### Wet Wiping

1. Immerse disposable towel in bucket containing amended water.
2. Wring out towel and fold into quarters.
3. Wipe surface and refold to have a clean face exposed. Do not place towel back into bucket or water will become contaminated and will need to be replaced.
4. Repeat step 3 until all faces of towel have been used. Obtain a clean towel if more wiping is needed.
5. Dispose of used towels in disposal bags.
6. Dispose of contaminated water as required by applicable regulations -See general procedure W19.

### HEPA Vacuuming

1.  For floors, use a floor attachment with rubber floor seals and adjustable floor-to-attachment height. For furniture, fabrics or other surfaces use an upholstery attachment or brush attachment.
2.  Vacuum hard or smooth surfaces with attachment about 1/16" (2 mm) above the surface.
3.  Vacuum carpet or fabrics with attachment just touching the surface.
4.  Vacuum all surfaces in parallel passes with each pass overlapping the previous one by one-half the width of the attachment.
5.  Once surfaces are cleaned in one direction, clean a second time at right angles to the first cleaning.
6.  Use crevice brush or other tools to clean irregularly shaped surfaces.

### Steam Cleaning Carpet

1.  Steam clean carpet using carpet tool.
2.  Steam clean all surfaces in parallel passes with each pass overlapping the previous one by one-half the width of the attachment.
3.  Once surfaces are cleaned in one direction, clean a second time at right angles to the first cleaning.
4.  Water from cleaning process should be treated in accordance with applicable regulations - See W19.

*Note: EPA has determined in a research study that HEPA vacuuming and steam cleaning of carpets does not completely remove asbestos contamination.*


## W-10 Polyethylene Drop Cloth

Preparation of work areas for O&M activities typically involves demarcation of the work area, restricting access to the work area and the use of a polyethylene drop cloth.

Preparing a work area with a drop cloth requires that a single layer of polyethylene be spread on the floor of the work area and taped or weighted in place. Do not use more than one layer if ladders (or similar equipment) will be used, unless a hard surface, such as plywood is laid over the drop cloth. If floor is a soft material, such as carpet, use caution to prevent tearing of polyethylene under equipment. The drop cloth should cover an area large enough to catch falling debris. If work is to be performed at an elevated level, the drop cloth should be placed on the work platform, or extended at ground level beyond the immediate work location to catch any debris that might be generated. Note that the use of a drop cloth introduces potential slip hazards in the work area. Non-slip foot coverings are recommended where drop cloths are used. Drop cloths should be thoroughly cleaned if they are moved from one spot to another or reused.


## W-11 Packaging and Labeling Waste

Asbestos-containing waste material from O&M activities should be adequately wet in accordance with the NESHAP requirements (40 CFR 61.150). Verify waste packaging and other waste disposal requirements with the landfill that will receive the asbestos waste. Pre-labeled asbestos disposal bags should be used for asbestos waste disposal where possible, appropriate and permissible. Disposal bags should be collapsed by evacuating the air from the bag with a HEPA vacuum in the work area or enclosure. Once collapsed, twist the bag to form a neck and wrap it tight with duct tape. Fold neck of bag over to form a loop, then again wrap duct tape around neck and loop.

Although not a federal regulatory requirement, asbestos waste is often placed into second disposal bag and sealed as described above. Label disposal bags as required by applicable NESHAP, OSHA and DOT regulations.

Asbestos waste that does not fit into disposal bags should be wrapped leak-tight in one or two layers of 6 mil (0.15 mm) polyethylene sheet. Each layer should be sealed tightly with duct tape. Label outer layer as required by regulations.

Sharp objects that might puncture polyethylene (such as floor tile) should be placed into cardboard boxes before wrapping in one or two layers of 6 mil (0.15 mm) polyethylene.

All waste should be labeled as required by federal, state and local regulations. Federal regulations requiring labeling of waste include OSHA regulations 29 CFR 1910.1200, 1910.1001 and 1926.1101, EPA's NESHAP regulation 40 CFR 61.150, and the Department of Transportation's Hazardous Materials Regulations 49 CFR 171 and 180. ACM packaging, with some exceptions, must meet general DOT and EPA requirements and be protective, marked and labeled. Review current labeling requirements with Facility Asbestos Coordinator and disposal site. The OSHA requirements apply regardless of the amount of waste or measured exposure levels (see 29 CFR 1926.1101(k).

\*  **OSHA 29 CFR 1926. 1101(k)(8)**

DANGER
CONTAINS ASBESTOS FIBERS
AVOID CREATING DUST
CANCER AND LUNG DISEASE HAZARD

\*  **Department of Transportation (DOT)**

DOT's shipping paper and marking format, used with some exceptions is as follows:

| | |
|---|---|
| **RQ** | Reportable Quantity, if 1 lb. (.4 kg) or more friable asbestos |
| **WASTE** | For waste material, if applicable |
| **ASBESTOS** | Shipping name; for domestic transportation only. |
| **MIXTURE** | For asbestos mixed with a binder or filler, etc. |
| **9** | Class 9, Miscellaneous Hazardous Materials, includes asbestos |
| **NA2212** | North American identification number; for domestic transportation only. |
| **PGIII** | Packing Group; for domestic transportation only |
| **LTD QTY** | Limited quantity, if applicable. |
| **20 OZ.** | Total quantity of material describe; may abbreviate unit. |

\*  **NESHAP**

NESHAP requires that readily visible and legible warning labels as specified by OSHA be used on waste containers or wrapped materials (this is the same as the OSHA 29 CFR 1926.1101 label listed above). Waste material to be transported off the facility site must also be labeled with the name of the waste generator and the location at which the waste was generated.

OSHA requires leak-tight containers and labeling for Class II materials (Note that under the EPA NESHAP regulation these are Category I and II materials that are not regulated as long as the materials remain non-friable). For purposes of this O&M program, treat OSHA Class II materials as EPA regulated waste. Maintain OSHA required labels in place and dispose of as asbestos-containing waste in accordance with the NESHAP regulation.

## W-12 Applying Lockdown Encapsulant

A lockdown encapsulant should be applied to areas where ACM is removed. Lockdown encapsulants used should be tested per 1978 Battelle/EPA report "Tests for the Evaluation of Encapsulants for Friable Asbestos-Containing Materials". Encapsulants should be water resistant after curing and be Class "A" fire rated per ASTM 84-81A "Standard Method for Surface Burning Characteristics of Building Materials.

Lockdowns need to be compatible with any materials that will be installed over the encapsulant. Note that many lockdown encapsulants will act as an adhesive and could be objectionable on some surfaces when dry. Care should be taken to avoid getting encapsulant on or in HVAC units, HEPA vacuums, and negative pressure machines.

Lockdown is typically applied for O&M work using a garden sprayer. It should be applied in accordance with the manufacturers' recommendations in two light coats sprayed from opposite directions to seal all portions of surfaces including any exposed edges of remaining ACM.

DO NOT APPLY LOCKDOWN ENCAPSULANT ON FIREPROOFING OR TO STEEL THAT IS GOING TO BE FIREPROOFED, WITHOUT PRIOR APPROVAL FROM THE Facility Asbestos Coordinator. The use of spray fireproofing is based on full-scale fire endurance tests of fireproofed steel. Anything that differs from the tested assembly voids the test, and could result in a fireproofing failure. Fireproofing is a non-combustible insulator of steel. Coating it or saturating it with an encapsulant could render it combustible and could reduce it insulating properties. This could cause the fireproofing to fail and as such voids the fire rating. The introduction of an encapsulant between the fireproofing and the steel could cause the fireproofing to fail. The bond of the fireproofing to the steel could be weakened causing the fireproofing to fall off, or the encapsulant could soften and allow the fireproofing to fall off during a fire. Unless the encapsulant has been tested and approved for use by the manufacturer of the fireproofing used, its use will void the fire rating of the fireproofing material.

## W-13 Cleaning Tools, Equipment, and Work Area

Clean tools and equipment using HEPA vacuuming and/or wet wiping procedures. Special attention should be given to cleaning extension cords, equipment wheels, vacuum hoses and other items that could pick up debris during the work. Tools and equipment should be placed outside of the work area as soon as cleaning is completed. Drop cloths and mini-enclosures can be cleaned or disposed of as ACM.

Any items that cannot be fully cleaned (such as boots or tools) that might be used in another O&M activity should be placed into disposal bags, sealed and labeled as ACM. These bags should be wet wiped and then placed outside of the work area with the other tools and equipment. Do not open bags containing contaminated tools, or open equipment such as a HEPA vacuum, except during another O&M activity or in a designated work area. HEPA vacuum hoses can be sealed with tape over both ends if the outside of the hose is clean.

Cleaning of the work area where an O&M activity is conducted consists of HEPA vacuuming and/or wet wiping (as appropriate) all surfaces in the area. HEPA vacuuming and wet wiping shall be performed as described in general procedure W9 above.

## W-14 Decontaminating Waste

Packaged waste should be HEPA vacuumed and wet wiped before it is moved out of the work area. Use the wet wiping and HEPA vacuuming procedures in general procedure W9. Packaged waste should be placed on a sheet of polyethylene when it is moved outside of the work area. This polyethylene can be the outer portion of a drop cloth, if a drop cloth is being used.

*Removal of Protective Clothing*

\* **Level B Requirements** (Removal of Protective Clothing When Drop Cloth Work Area Protection, or no Work Area Protection, is Used):

HEPA vacuum all parts of protective clothing while standing at perimeter of drop cloth. Leaving respirator in place, remove protective clothing and fold inside out as it is removed. Place clothing, if contaminated, into a disposal bag and label as ACM waste.

\* **Level C Requirements Where Work Is Performed Inside A Mine-Enclosure Or Other Physical Barrier** (Removal of Protective Clothing If A Mini-Enclosure and Change Room is Provided):

HEPA vacuum all parts of protective clothing while inside work area enclosure.

If two disposable coveralls are used, remove outer coveralls in work area while leaving respirator in place. Fold coveralls inside out as they are removed. Move to change room, HEPA vacuum protective clothing, and remove second set of coveralls in the same manner.

If only one set of disposable coveralls is worn, remove in change room while leaving respirator in place. Fold coveralls inside out as they are removed.

Place protective clothing, if contaminated, into a disposal bag and label as ACM waste. Wash hands, face and surface of respirator with clean water and disposable towels. Use caution to avoid breaking seal between respirator facepiece and face. Place disposable towels into a disposal bag. Remove respirator and follow procedures specified in Respiratory Protection Program for cleaning and storing respirator. Change respirator filters if needed or required and dispose of used filters as ACM. Put street clothes on and exit change room.

\* **Level C Requirements** (Removal of Protective Clothing if an enclosure or mini-enclosure is used and a Shower is Available):

HEPA vacuum all parts of protective clothing while inside work area enclosure. Remove outer coveralls in work area while leaving respirator in place. Fold coveralls inside out as they are removed. Move to change room. Wash hands and wet wipe face and respirator, HEPA vacuum protective clothing. Put on a clean set of protective coveralls over the coveralls already being worn to prevent any ACM debris or dust that may be on the coverall from falling off on the way to the shower. Proceed to shower with respirator still in place. At shower facility, remove protective coveralls, folding inside out during removal. Place clothing, if contaminated, into a disposal bag and label as ACM waste. Shower completely, and remove and clean respirator while showering as described below.

*Street Clothing*

If street clothes are worn under protective clothing and are contaminated during the work, the street clothes should be HEPA vacuumed, removed during decontamination and placed into a labeled disposal bag. These street clothes should then be disposed of as ACM or taken to a facility that has equipment designed for cleaning asbestos-contaminated clothing.

### Removal of Respirator

The procedures described below are based on the assumption that workers wearing respirators have been trained in the use of respirators and, for negative pressure respirators, fit tested, and enrolled in a medical surveillance program as part of a Respiratory Protection Program.

Remove respirator after removing protective clothing (if used). Before removing respirator, wash hands, face and surface of respirator with clean water and disposable towels. Use caution to avoid breaking seal between respirator facepiece and face. Avoid getting water into filter cartridges of respirator. Place disposable towels into a disposal bag. Remove respirator and follow procedures specified in Respiratory Protection Program for cleaning and storing respirator.

## W-16 Visual Inspection and Completing Air Monitoring

### Visual Inspection

Conduct a visual inspection prior to the start of clearance air sampling. The person performing the inspection can be a worker if authorized by the Facility Asbestos Coordinator. Verify that there is no debris or residue from removed ACM and that all visible dust or debris in the work area has been cleaned up. If visible residue, dust or debris remains, it must be cleaned up using wet wiping and/or HEPA vacuuming before clearance sampling is started.

Perform the visual inspection using procedures approved for use in the facility by the Facility Asbestos Coordinator. If you have not been trained in visual inspection procedures notify the Facility Asbestos Coordinator. The EPA's Purple Book and the American Society for Testing and Materials (ASTM) "Standard Practice for Visual Inspection of Asbestos Abatement Projects" (Document E1368-90) provide visual inspection procedures that might be helpful in developing O&M inspection procedures.

### Air Samples

Complete air monitoring work in accordance with Air Monitoring Program and requirements noted on a Work Authorization Form. Verify that removal areas have been encapsulated ("locked down"), that the work area, tools, and equipment have been cleaned, and that the area has passed a visual inspection. When air sampling cassettes are retrieved, the air monitoring person should record the stop time for the samples and check and record the flow rate of the air monitoring pumps. Samples should be analyzed on-site (for PCM analysis) if possible, or sent to a laboratory for analysis. When sample results are received, compare results to Air Monitoring Program criteria for work release or clearance. If sample results exceed criteria, the work area should be recleaned, reinspected, and then additional air samples should be obtained. If samples are equal to or below release criteria, tear down work can proceed. Collect air sampling pumps and equipment from work area and other locations when air sampling work is completed.

## W-17 Waste Transportation, Storage and Disposal

Transport asbestos waste from O&M activities to a designated storage area or an approved landfill after the work is completed. Workers transporting waste should follow Respiratory Protection Program recommendations concerning respirator requirements for transporting asbestos waste. Do not drag packaged waste. All waste should be lifted and carried, or transported in wheeled carts, when moved from one area to another. Packaged waste should be placed, not thrown or dropped, into vehicles, storage areas and the landfill.

Any asbestos waste that is not taken to a landfill should be stored in a secure, lockable area. Signage in accordance with NESHAP should be posted at the storage area and on vehicles used to transport asbestos-containing waste material during loading and unloading. When asbestos waste in the storage area is taken to a landfill, it should be transported in accordance with all applicable federal, state and local regulations. Asbestos waste shipment records should be completed in accordance with the requirements in NESHAP Section 61.150.

The workers conducting the O&M activity should fill out part 1 of the waste tracking form included in Appendix D or an equivalent form. Once part 1 is completed and the waste is stored or taken to a landfill, the form should be turned over to the Facility Asbestos Coordinator to complete part 2 and file with O&M records. NESHAP waste shipment records must also be completed (where applicable) and filed with waste disposal records.

## W-18 Glovebag Removal (Also includes other types of prefabricated removal enclosures)

Remove asbestos-containing material inside a glove bag according to the following procedures. Glovebags should be used only once and should not be moved to another location to perform additional removal work, or reused in any way. Use only 60" X 60" standard glovebags. Do not use glovebags on surfaces or equipment that is over 150°F. If you encounter a situation that requires a special type or size of glovebag, or if hot surfaces are involved, notify Facility Asbestos Coordinator.

Other types of prefabricated removal enclosures include "glovebox" type enclosures, glovebags with self-supporting frames, and glovebags that funnel waste into standard disposal bags. Check with equipment suppliers for information on these enclosures.

Glovebags might be used with a framework for O&M work on flat areas such as surfacing materials. Note that significant asbestos exposures to workers can result from the improper use of glovebags. Workers should obtain information on current regulatory requirements on glovebag use from the Facility Asbestos Coordinator.

### Glovebag Removal Procedures

Check area where the work will be performed. If damaged ACM is present (broken lagging, hanging, etc.), wrap in polyethylene and cover polyethylene with strips of duct tape for reinforcement. Place one layer of duct tape around the removal area where the glove bag will be attached. Also, protect any damaged ACM outside the glovebag area that could be disturbed during the work.

Slit top of the glove bag open (if necessary) and cut down the sides to accommodate the removal area.

Place necessary tools into pouch located inside glove bag (or into a sleeve turned inside out). Tools needed typically include: scraper, bone saw, utility knife, disposable towels, nylon brush, abrasive pads, wire cutters, tin snips and pre-wetted lag cloth. Cut lag cloth to sizes needed to cover any ACM that will remain after glovebag work is completed.

Place one strip of duct tape along the edge of the open top slit of glove bag for reinforcement.

Place the glove bag around area to be worked on and staple top together through reinforcing duct tape. Provide 8-12" (200-300 mm) of space inside glovebag between removal surface and glovebag for working room. Secure glovebag to duct tape previously installed around removal area.

Use smoke tube and aspirator bulb to test seal. Place tube into water sleeve (two-inch [50 mm] opening to glove bag) squeezing bulb and filling bag with visible smoke. Remove smoke tube and twist water sleeve closed. While holding the water sleeve tightly, gently squeeze glove bag and look for smoke leaking out, (especially at the top and ends of the glove bag). If leaks are found, tape closed using duct tape and re-test.

If a negative pressure glovebag with a supporting framework and HEPA filtered makeup air port is being used, attach hose from an operating HEPA vacuum to glovebag to provide negative pressure in glovebag. Follow equipment manufacturer's instructions on use of negative pressure equipment.

Insert wand from garden sprayer with amended water through water sleeve. Duct tape water sleeve tightly around the wand to prevent leakage.

Insert arms into glovebag sleeves.

Remove any metal jacketing or covering over the area where removal is required using tin snips and/or wire cutters. Fold in any sharp edges to avoid cutting the bag. Pierce any painted coverings to permit water to soak into the ACM.

Adequately wet material to be worked on with amended water and allow to soak in. Wet adequately to penetrate and soak material through to substrate.

Cut insulation section to be removed using bone saw or utility knife. Use caution to avoid cutting glovebag. Lift glovebag away from cutting area if necessary.

Throughout this process, spray amended water or removal encapsulant on the cutting area to keep dust to a minimum.

Remove insulation using scraper or other tools. Place pieces in bottom of bag without dropping. Rinse all tools with amended water inside the bag and place back into pouch or a sleeve of the glovebag turned inside out.

Using nylon brush, scrub pads, disposable towels and amended water, scrub and wipe down the removal area.

Seal exposed ACM around removal area using pre-wetted lag cloth or encapsulate with a bridging encapsulant. Encapsulate removal area with an appropriate lockdown encapsulant. Use suitable high temperature encapsulants for hot piping.

Wash down inside of glovebag with amended water and wipe as necessary to move all debris and residue to lower part of glovebag (below where bag will be twisted and cut).

Remove water wand from water sleeve, twist water sleeve closed and seal with duct tape.

From outside the bag, pull the tool pouch or sleeve away from the bag and twist pouch to seal it from rest of bag. Place duct tape over twisted portion and then cut the tool bag from the glove bag, cutting through the twisted/taped section.

Contaminated tools might then be placed directly into another glove bag without cleaning. Alternatively, tool pouch with the tools can be placed in a bucket of water, opened underwater, and tools cleaned and dried. Discard disposable towels and nylon brush with asbestos waste. Dispose of contaminated water as set forth in general procedure W19 below.

Evacuate air from glovebag using HEPA vacuum. With HEPA vacuum operating and removed insulation in the bottom of the bag, twist the bag several times and tape it to keep the material in the bottom during removal of the glove bag from the removal area.

Slip a 6 mil (0.15 mm) disposal bag over the glove bag (still attached to removal area). With the hose of an operating HEPA vacuum inserted in the upper part of glovebag, remove tape or cut bag and open the top of the glove bag and fold it down into disposal bag.

### Use of a Glovebag with Self-Supporting Frame

Glovebags on self-supporting frames can be used for some O&M activities on surfacing materials, and might be able to be adapted for other types of ACM. The general procedures for using these units are as follows:

Construct a rectangular or square frame of 1 ½" (38mm) diameter PVC or ABS pipe. Supporting legs can be made of lengths of pipe and fittings as needed to achieve the required height. Proprietary frames with telescoping legs are available.

To install glovebag on the frame, fold top edge of bag over the frame sides and extend the open edge of the bag at least 10" (25 cm) beyond the frame. Secure the open edges to the rest of the bag using duct tape. Place tools and supplies needed procedure above) in tool pouch inside glovebag.

Place frame and glovebag assembly below work location so that frame is close to, but not touching, ACM. Location and proximity of frame to ACM should allow for some movement without disturbing ACM during the work.

Insert wand of garden sprayer with amended water into bag and seal in place.

Cut hole in glovebag for negative pressure equipment hose. Negative pressure equipment could be a HEPA vacuum or small negative pressure machine. Install hose and seal in place. A prefilter might be needed to prevent any gross ACM debris from being drawn into the negative pressure device.

Install a hose from an operating HEPA vacuum into the bag in a position where it can be used during the work. Turn on negative pressure device and smoke test all sides of glovebag frame unit to verify that negative pressure is present. If sufficient negative pressure is not present, reduce clearance between ACM and frame (if possible), or add additional negative pressure device(s).

Insert hands into glove arms and wet ACM where work is required. Perform work as needed. Caution: If bag is overloaded with tools or other materials, bag might break or release from frame.

HEPA vacuum and wet wipe tools and inside of bag. Adequately wet any ACM debris in glovebag.

Slowly lower frame to allow tools to be removed from bag.

Gently remove glovebag from frame and twist to form a neck. Evacuate air from bag using HEPA vacuum and tape bag closed.

Remove garden sprayer wand, negative pressure device hose, and HEPA vacuum hose and seal holes with duct tape.

Place glovebag into a labeled 6 mil (0.15 mm) asbestos disposal bag and seal bag.

## W-19 Disposal of contaminated water

Contaminated water from O&M activities should be disposed of in accordance with all applicable federal, state and local regulations. Filtering might be required. If filtering is required, water should typically be filtered through a maximum 5 micron (5 µm) water filter before discharging water into a sanitary sewer system, if permitted. If a filter unit is not available at the work location, contaminated water can be put into leaktight drums and transported to a location with filtering equipment. If a portable shower unit with filtering equipment is available, contaminated water can be emptied into the shower and filtered through the shower filter system.

## W-20 Mini-Enclosures

*Note: Polyethylene work area protection is not to be used in place of other engineering controls and good work practices. Work practices such as wetting ACM, careful handling, local collection by HEPA vacuum and local exhaust ventilation should be the primary means of fiber control during O&M work. Mini-enclosures are intended to protect the environment, workers are protected by work procedures and engineering controls that prevent elevated airborne fiber levels, and by respiratory protection, protective clothing, decontamination procedures and other worker protection methods. State or local codes might require that fire retardant polyethylene be used for asbestos related work.*

Preparation of work areas for O&M activities sometimes involve the use of a mini-enclosure. Other techniques, such as the use of a glovebag taped over a self-supporting framework might be used as a substitute for a mini-enclosure where appropriate. For small amounts of removal work (such as removing a small amount of fireproofing, or cutting a hole in asbestos-containing plaster) where an enclosure is desired or needed, a glovebag can be used in lieu of a full mini-enclosure.

### Mini-Enclosure

A mini-enclosure is usually a polyethylene enclosure around a work area. Mini-enclosures are sealed enclosures used to protect the facility environment as a secondary means to help, or attempt to, contain fibers or debris generated during the work.

Mini-enclosures also serve to provide a visual barrier between the workers and any other personnel around the work area. As noted above, careful work practices should be the primary means of fiber control during the work in order to prevent gross contamination of the mini-enclosure.

It is sometimes appropriate to extend mini-enclosures above ceilings, such as by using polyethylene sheet and framing taped together to provide enclosure around the work area. The mini-enclosure should not contact ACM covered surfaces. The construction will vary depending on whether the enclosure will be attached to pipes, conduit, metal hangers, or some other form of existing construction.

There are a variety of commercially available types of mini-enclosures, including prefabricated pop-up boxes and adjustable framework assemblies to permit different sizes of enclosures to be constructed. Disposable liners for mini-enclosures (to facilitate set up and dismantling of the enclosure) are available from some manufacturers. It might be beneficial to construct or purchase a portable mini-enclosure unit that works for the typical conditions found in a given facility.

It is recommended that two workers be used to set up and operate mini-enclosures. To construct a mini-enclosure, erect a framework of wood, PVC piping or metal framing that will enclose the work area and be large enough for one person to work inside. The minimum width and depth of the enclosure should be at least 3 feet (1 meter). The height of the enclosure will vary depending upon the work to be performed and the height of the work area. A larger enclosure is preferable where space permits. However, if the enclosure is too large, the final cleaning process will require more time. A mini-enclosure can include a separate 3 foot by 3 foot by 7 foot (1 x 1 x 2.1 meters) change room, with curtain doorways, attached to the mini-enclosure for changing and removing protective clothing.

If an entire room will be enclosed for performing work, the framework is usually not necessary, unless wall surfaces will be damaged by tape used to support polyethylene. A room can be enclosed for O&M work by installing one layer of polyethylene sheet on the walls and floor of the room.

If the work to be performed is in an elevated location, the enclosure (and change room, if used) should be erected on a scaffold platform large enough to support the enclosure, change room (if used), and a step off area outside the enclosure.

Refer to OSHA regulations 29 CFR 1910.28 and 29 CFR 1926.451 concerning scaffold requirements. Any ladders and/or scaffolds used must be built and used in conformance with the OSHA construction standards, and applicable state and local standards.

Cover the floor and the framework for the enclosure and change room with one layer of polyethylene attached using duct tape. A second layer of polyethylene laid on the floor might facilitate cleanup work, or reduce the possibility of tearing the polyethylene if equipment is used (do not use two layers under the legs of ladders). Construct curtain doorways between the change room and the enclosure and between the change room and the area outside the change room. A curtain doorway is made of three overlapping sheets of polyethylene. Attach sheets to framework at top and one side. The middle sheet should be attached on one side, and the inner and outer sheets attached on the other side. A sheet of polyethylene approximately 5 feet by 5 feet (1.5 meters by 1.5 meters) or larger should be installed outside the change room for use as a step off area and as a place to put decontaminated materials removed from the work area.

Mini-enclosures should be constructed with a ceiling of polyethylene if work will not be performed above the enclosure. If work is to be performed above the enclosure and the ceiling is not ACM, the enclosure should extend to and be sealed to the ceiling or grid system. If the enclosure is below an ACM finished surface, use one of the following methods:

*       If ACM cannot be contacted, the enclosure should be separated from the ceiling by a narrow space.

*       If ACM will withstand contact without damage and is in good condition, foam tape (1" (25mm) or thicker) can be placed on the top edge of the enclosure. Gently lift enclosure into place until sufficient contact is made to provide a seal to the surface.

After enclosure is in place, check for, and clean up any debris generated by enclosure installation.

Mini-enclosures should be set up with a negative pressure system as described below to reduce the possibility of fibers being released from the enclosure and to filter the air inside the enclosure.

### Negative Pressure System and HEPA Filtered Local Exhaust Ventilation

Mini-enclosures should be provided with a negative pressure system to reduce the possibility of fibers being released from the enclosure during the work, and to filter inside air discharged from the enclosure. Negative pressure inside mini-enclosures is commonly provided by a High Efficiency Particulate Air (HEPA) filtered vacuum or by negative pressure machines, depending upon the size of the enclosure.

A HEPA vacuum will usually provide sufficient negative pressure for a small enclosure. Larger enclosures might require a small negative pressure machine (HEPA filtered fan unit) to achieve a negative pressure inside the enclosure.

A negative pressure system for a mini-enclosure most commonly locates the HEPA vacuum or negative pressure machine outside the enclosure. The intake side of the unit is ducted to the enclosure through the vacuum hose or flexible duct material taped to a hole in the enclosure on the side opposite from the change room or as close as possible to where the work will be performed. The filtered exhaust side of the unit should be ducted to the outside if possible. However, most vacuum units do not provide a connection for an exhaust duct, and are commonly exhausted to the inside. Additional protection might be desirable for an area where air is exhausted inside a building. A work practice is provided for changing filters in HEPA vacuums and negative pressure machines (HEPA filtered exhaust fans) when needed. Filters should not be changed without following these work practices.

When HEPA filtered local exhaust ventilation is used in a work practice, this can be in addition to, or in place of, a negative pressure system. A HEPA filtered local exhaust ventilation system might replace a negative pressure system if the ventilation system provides adequate negative pressure in the work area. Some work practices use HEPA filtered local exhaust ventilation for fiber control where an enclosure is not used. A HEPA ventilation system can use a HEPA vacuum or negative pressure machine. The hose attached to the HEPA unit should be kept as close as possible to the location where ACM might be, or is, disturbed.

## Schedule 10

## Rent Abatement Schedule

# Free Rent Credit Schedule

| | |
|---|---|
| **End of Month** | **12/31/2021** |
| **Closing Date** | **12/29/2021** |
| **Days Due Buyer** | **3** |

| | |
|---|---|
| J1 | 1,527,312.74 |
| J2 | 3,836,605.28 |
| Jericho Plaza | 5,363,918.02 |

**J1**

| Tenant | | Size | Free Rent |
|---|---|---|---|
| AJG | | 21,000 | 497,176.54 |
| AMWINS | | 6,765 | 122,874.75 |
| BGC | (A) | 13,129 | 388,399.60 |
| FLII Renewal | (D) | 8,901 | 33,800.83 |
| Nathan's | | 12,582 | 468,460.00 |
| APPS | | 12,405 | 16,601.02 |
| Total J1 | | | **1,527,312.74** |

**J2**

| Tenant | | Size | Free Rent |
|---|---|---|---|
| 1-800 Flowers (office) | | 92,700 | 2,564,201.61 |
| 1-800 Flowers (STR) | | 4,163 | 46,555.09 |
| Winthrop | (C) | 5,690 | 70,889.56 |
| Opal Wealth Advisors | | 6,106 | 118,599.94 |
| Opal Wealth Advisors (expansion | (A) | 3,092 | 107,704.67 |
| Purolator | | 20,771 | 490,084.42 |
| Schonfeld | | | 438,570.00 |
| Total J2 | | | **3,836,605.28** |

# **Exhibit A**

**Approved 2022 Annual Budget**

| Budget for Year | 2022 |
|---|---|
| | |
| **Rental Revenue** | |
| Potential Base Rent | 23,830,880 |
| Absorption & Turnover Vacancy | -1,213,205 |
| Free Rent | -125,391 |
| Scheduled Base Rent | 22,492,284 |
| Total Rental Revenue | 22,492,284 |
| | |
| **Other Tenant Revenue** | |
| Expense Recoveries | |
| Utilities | 1,882,909 |
| Real Estate Taxes | 246,250 |
| Total Expense Recoveries | 2,129,159 |
| Total Other Tenant Revenue | 2,129,159 |
| | |
| Total Tenant Revenue | 24,621,443 |
| | |
| **Other Revenue** | |
| Tenant Routine Cleaning | 186,804 |
| Tenant Supervision/ Work Order Income | 238,920 |
| Tenant - OTElectricity | 414,899 |
| Tenant - OT HVAC | 207,819 |
| Tenant - Fuel Adjustment | 217,639 |
| Health Club | 21,528 |
| Total Other Revenue | 1,287,609 |
| | |
| Potential Gross Revenue | 25,909,052 |
| | |
| **Vacancy & Credit Loss** | |
| Vacancy Allowance | -69,228 |
| Total Vacancy & Credit Loss | -69,228 |
| | |
| Effective Gross Revenue | 25,839,824 |
| | |
| **Operating Expenses** | |
| Cleaning | 1,410,797 |
| Repairs & Maintenance | 1,588,452 |
| Utilities | 1,982,793 |
| Electric | 1,910,678 |
| Gas/Water/Cable/Fuel Oil | 72,115 |
| Roads & Grounds | 516,800 |
| Security Expenses | 395,351 |
| General & Administrative | 321,456 |
| Insurance | 352,182 |
| Management Fee | 387,597 |
| Real Estate Taxes | 4,689,445 |

| | |
|---|---:|
| Two Jericho - Estimated Cafe Subsidy | 91,400 |
| Total Operating Expenses | 13,719,065 |
| | |
| Net Operating Income | 12,120,759 |

## Exhibit B

### Hotel Parcel

All that certain plot, piece or parcel of land with any improvements existing thereon, being, lying and situated in Jericho, Town of Oyster Bay, County of Nassau, State of New York, being bounded and more particularly described as follows:

Beginning at a point on the northerly side of the "North Service Road" of the Long Island Expressway (Interstate 495) also known as North Marginal Road, said point being 1402.24 feet easterly as measured from the intersection formed by the northerly side of the "North Service Road" and the southerly side of Jericho Turnpike (New York State Route 25),

Running thence over and through Tax Lot 31 the following six (6) courses and distances:

1. North 36 degrees 07 minutes 44 seconds West, 275.61 feet,
2. North 09 degrees 55 minutes 28 seconds West, 28.60 feet,
3. North 36 degrees 09 minutes 16 seconds West, 84.37 feet,
4. North 53 degrees 50 minutes 44 seconds East, 456.70 feet,
5. South 36 degrees 09 minutes 16 seconds East, 351.64 feet,
6. North 53 degrees 46 minutes 05 seconds East, 29.48 feet to the division line of Tax Lots 31 and 32 in Section 11 Block 355,

Running thence along the aforementioned division line, South 36 degrees 12 minutes 08 seconds East, 333.35 feet to the northerly side of the "North Service Road",

Running thence westerly, along the northerly side of the "North Service Road", along the arc of a curve to the right, Radius 19279.57 feet, Length 582.09 feet to the place or point of beginning.

**FOR INFORMATION ONLY: Section: 11, Block: 355, Part of Lot 31**

Intending to describe 5.88+/- acres of real property designated Parcel 3 on a certain map entitled "Lot Line Adjustment Map of Jericho Plaza Hotel" prepared by VHB Engineering in conjunction with Jerry P. LaRue, L.S.,P.C. dated December 17, 2021,
also being part of "Parcel 2 – (Jericho Plaza, Lot 31)" described in Liber 13808 of deeds, page 487.