UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| U.S. BANK TRUST COMPANY, NATIONAL ASSOCIATION, AS TRUSTEE FOR THE BENEFIT OF THE CERTIFICATEHOLDERS OF NATIXIS COMMERCIAL MORTGAGE TRUST 2022-JERI, COMMERCIAL MORTGAGE PASSTHROUGH CERTIFICATES, SERIES 2022-JERI, acting by and through Midland Loan Services, a division of PNC Bank, National Association as Special Servicer under the Trust Servicing Agreement dated as of April 18, 2022,<br><br>*Plaintiff*,<br><br>v.<br><br>JERICHO PLAZA PORTFOLIO LLC; MENACHEM MEISNER; POWER-FLO TECHNOLOGIES INC. d/b/a UNITED ELECTRIC POWER; NEW YORK STATE DEPARTMENT OF TAXATION AND FINANCE; LIBERTY ELEVATOR CORPORATION; JE GRANT ASSOCIATES LLC d/b/a ENERGY PLUS SOLUTIONS and "JOHN DOE" NO. 1 THROUGH "JOHN DOE" NO. 100,<br><br>*Defendants*. | Civil Action No. 24-cv-00917 |

**MEMORANDUM OF LAW IN SUPPORT OF MENACHEM MEISNER'S
<u>MOTION TO DISMISS PLAINTIFF'S COMPLAINT</u>**

QUINN EMANUEL URQUHART
 & SULLIVAN LLP

Blair Adams
Toby E. Futter
Alec S. Bahramipour
Grace Heinerikson

51 Madison Avenue, 22nd Floor
New York, NY 10010
(212) 849-7000

*Attorneys for Defendant Menachem Meisner*

## TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ...................................................................................................1
BACKGROUND .............................................................................................................................3
ARGUMENT ...................................................................................................................................7
I. THE COMPLAINT FAILS TO ALLEGE A BORROWER'S RECOURSE EVENT ...............................................................................................................................7
    A. The Complaint Fails To Allege Violation Of The Physical Waste Provision ..........................................................................................................7
    B. The Complaint Fails To Allege Violation Of The Misappropriation Of Revenue Provision ....................................................................................8
    C. The Complaint Fails To Allege Violation Of The Lien Provision .........................11
    D. The Borrower's Recourse Liability Claims Fail Because Plaintiff Has Not Alleged A Deficiency ..................................................................................12
II. THE COMPLAINT FAILS TO ALLEGE A FULL RECOURSE CLAIM ......................13
CONCLUSION ..............................................................................................................................14

## TABLE OF AUTHORITIES

**Page**

### Cases

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007) ............................................................................................................. 11

*CP III Rincon Towers, LLC v. Cohen*,
  2022 WL 61318 (S.D.N.Y. Jan. 6, 2022) ............................................................................. 13

*Galiano v. Fidelity Nat'l Title Ins. Co.*,
  684 F.3d 309 (2d Cir. 2012) ................................................................................................. 11

*Galli v. Metz*,
  973 F.2d 145 (2d Cir. 1992) ................................................................................................... 7

*IMH Broadway Tower Senior Lender, LLC v. Hertz*,
  415 F. Supp. 3d 455 (S.D.N.Y. 2019) ............................................................................. 7, 12

*Ross v. Am. Exp. Co.*,
  35 F. Supp. 3d 407 (S.D.N.Y. 2014) ..................................................................................... 5

*Staropoli v. Staropoli*,
  180 A.D.2d 727 (2d Dep't 1992) ........................................................................................... 8

*Stein v. JP Morgan Chase Bank*,
  279 F. Supp. 2d 286 (S.D.N.Y. 2003) ................................................................................... 5

*Travelers Ins. Co. v. 633 Third Assocs.*,
  14 F.3d 114 (2d Cir. 1994) .................................................................................................... 7

*U.S. Bank Nat. Ass'n v. Rich Albany Hotel, LLC*,
  42 Misc.3d 1201(A) (Sup. Ct. Albany Cnty. Dec. 16, 2013) .............................................. 13

### Other Authorities

New York Federal Reserve, *Secured Overnight Financing Rate Data* (last visited
  April 4, 2024) .......................................................................................................................... 5

**PRELIMINARY STATEMENT**

Defendant Menachem Meisner is the guarantor for a mortgage loan (the "Loan") issued to his co-Defendant, Jericho Plaza Portfolio LLC ("Borrower"), secured by two office buildings located on Long Island, New York (the "Property"). Plaintiff, who purports to hold and service the Loan, has filed a Complaint asserting a cause of action (Count V) to enforce limited recourse guaranty claims against Mr. Meisner based on Borrower's alleged violation of Section 11.1(vii)(c), (d), and (e) ("Borrower's Recourse Liabilities") of the Loan Agreement.[1] In that same Count V, Plaintiff also appears to assert a full recourse guaranty claim against Mr. Meisner, apparently based on the same allegations. None of these guaranty claims is adequately pleaded, and all should be dismissed.

*First*, the Complaint fails to allege facts sufficient to state a violation of Loan Agreement Section 11.1(vii)(c) (the "Physical Waste Provision"), which permits recovery for "any intentional physical waste of the Property." To state a claim under this provision, Plaintiff must allege that the Property fell into disrepair or decay due to Borrower's acts or omissions. Yet the Complaint fails to make *any* allegations as to the Property's physical condition, let alone allege that it is in disrepair or has suffered decay. It instead alleges merely that Borrower failed to apply Property income released to it under the loan agreements to timely pay certain vendor expenses, resulting in delinquent accounts payable owed to those vendors. This falls far short of the required allegation of physical disrepair or decay. A reading of the Physical Waste Provision to cover the alleged misuse of funds would render superfluous other Loan Agreement provisions that expressly govern the use of funds received by the Borrower.

---

[1] Capitalized terms not otherwise defined herein shall have the same meanings as ascribed in the Loan Agreement. *See* Exhibit A to the Declaration of Blair Adams in Support of Menachem Meisner's Motion to Dismiss Plaintiff's Complaint, dated April 8, 2024 ("Adams Decl.").

*Second*, the Complaint fails to allege facts sufficient to state a violation of Loan Agreement Section 11.1(vii)(d) (the "Misappropriation of Revenue Provision"), which permits recovery for the "misapplication, misappropriation or conversion" of revenue from the Property. The Complaint alleges Borrower violated this provision by failing to pay certain of the Property's operating expenses from Property income that Plaintiff Midland Loan Services released to Borrower in accordance with the loan documents. But the Complaint incorrectly alleges that Borrower was obliged to apply the released funds solely to the operating expenses. It was not. The funds were released to Borrower before any default had occurred on the Loan. Accordingly, Borrower had full discretion to apply them as it deemed appropriate so long as it did not violate the Loan Agreement's priority of payment provisions (which Plaintiff does not allege). The Complaint also fails to allege that Borrower misapplied the advanced funds by using them for some other, inappropriate purpose. These deficiencies warrant dismissal of the Misappropriation of Revenue Provision claim.

*Third*, the Complaint fails to allege that Plaintiff has "actually incurred" any losses, as required for a claim under Loan Agreement Section 11.1(vii)(e) (the "Lien Provision"). This provision requires that Borrower cover costs incurred by Lender related to any Borrower expenses that might give rise to liens over the Property, and the Complaint alleges that such expenses went unpaid and two liens were filed as a result. But the Loan Agreement permits Lender to bring a claim under the Lien Provision only to the extent it "actually incurred" losses as a result of the filed liens. The Complaint fails to allege any actual losses, and Plaintiff's Lien Provision claim thus fails.

*Fourth*, all of Plaintiff's Borrower's Recourse Liability claims under the Loan Agreement fail for the additional reason that Plaintiff has not pleaded that the Property is worth less than the

2

amounts owed on the Mortgage Loan.  Without that allegation, Plaintiff has not plausibly pleaded the Loss necessary to bring a Borrower's Recourse Liability claim.

*Finally*, the Complaint appears to assert a full recourse guaranty claim against Mr. Meisner (*i.e.*, for the full outstanding principal balance of the loan) in addition to the limited recourse guaranty claims under Loan Agreement Section 11.1(vii)(c), (d), and (e).  Yet it provides no allegations that support a full recourse claim, nor does it reference any of the provisions in the Loan Agreement for which a full recourse guaranty claim might be available.  Plaintiff's full recourse guarantee claim against Mr. Meisner therefore also should be dismissed.

## BACKGROUND[2]

On or about December 31, 2021, Jericho Plaza Portfolio LLC (defined above as the "Borrower") obtained a limited recourse loan with a floating interest rate for the amount of $149,180,000.00 (defined above as the "Loan") from Natixis Real Estate Capital LLC ("Original Lender").[3]  Compl. ¶ 26.  The Loan is governed by a Loan Agreement between Original Lender and Borrower, dated December 31, 2021 (defined above as the "Loan Agreement").  *Id*.  As collateral for the Loan, Borrower granted Original Lender a security interest in the property located at One Jericho Plaza and Two Jericho Plaza, Jericho, New York 11753 (defined above as the "Property") through the Consolidated, Amended and Restated Mortgage, Assignment of Rents and Leases and Security Agreement, dated December 31, 2021 (the "Mortgage").  Compl. ¶ 28.

---

[2]  The allegations in the Complaint are presumed to be true for purposes of this Motion and are set out in this Motion as alleged.  By relying on the allegations, Defendant Meisner does not admit the truthfulness of such allegations.  Defendant Meisner reserves the right to challenge any and all allegations in the Complaint.

[3]  On or about December 31, 2021, pursuant to the Mezzanine Loan Agreement, Jericho Plaza Mezz LLC obtained a mezzanine loan in the original principal amount of $20,000,000.00 from Original Lender.  The mezzanine loan is subordinate to the Loan at issue.  Compl. ¶ 34.

The Loan Agreement provided for a Stated Maturity Date of January 9, 2024. Loan Agreement § 1.1.

The Loan Agreement provides that Borrower is liable for losses "actually incurred" by Original Lender (*i.e.*, limited recourse liability) in connection with certain events listed in the Loan Agreement's "Borrower's Recourse Liabilities" provision. Compl. ¶ 67; Loan Agreement § 11.1(vii)(a)-(n). The Loan Agreement also provides that Borrower is liable for the outstanding loan amount (*i.e.*, full recourse liability) following certain events listed in the Loan Agreement's "Springing Recourse Event" provision. Compl. ¶ 67; Loan Agreement § 11.1(1)-(9). Under a Guaranty of Recourse Obligations, dated December 31, 2021 (the "Guaranty"), Mr. Meisner guaranteed "full, prompt and complete payment" of any amounts due by Borrower pursuant to the Loan Agreement's Borrower's Recourse Liabilities and Springing Recourse Event provisions. Compl. ¶ 33. Plaintiff U.S. Bank (the "Lender") alleges that it is the current owner and assignee of the Loan. Compl. ¶ 42.

As required by the Loan Agreement, during the period of December 9, 2022, through December 9, 2023, Plaintiff Midland Loan Services, as Special Servicer, released funds to Borrower in the amount of $6,343,242.12. Compl. ¶ 68; Adams Decl. Ex. A (Loan Agreement), at 1 ("Annual Budget" definition). These amounts are comprised of Borrower revenue that is not needed by the Lender to make payments authorized in the Loan Agreement's "Property Cash Flow Allocation" waterfall before Excess Cash Flow is released to the Borrower for its own use (subject, of course, to the other terms of the Loan Agreement). *See* Adams Decl. Ex. A (Loan Agreement) § 3.12.1.

4

Starting in mid-2022, interest rates skyrocketed, causing floating interest rate loans like the Loan to be considerably more expensive to maintain.[4] On January 9, 2024, Borrower did not repay the principal balance under the Loan Agreement, resulting in an Event of Default (the "Maturity Default"). Compl. ¶¶ 54-57.[5]

Lender agreed to assume the risks of the Loan with only limited recourse and guaranty rights. Compl. ¶ 33. Under the Guaranty, Guarantor "guarantees to Lender the full, prompt and complete payment and performance when due of the Guaranteed Obligations," defined as the "(i) Borrower's Recourse Liabilities and (ii) from and after the date that any Springing Recourse Event occurs, payment of all the Debt." Adams Decl. Ex. B (Guaranty) § 2(a). The Loan Agreement defines the terms "Borrower's Recourse Liabilities" and "Springing Recourse Event." Adams Decl. Ex. A (Loan Agreement) § 1.1.

Loan Agreement Section 11.1 provides a list of "Borrower's Recourse Liabilities." Adams Decl. Ex. A (Loan Agreement) § 11.1(vii)(a)-(n). Three Borrower's Recourse Liabilities are relevant here:

---

[4] The floating interest rate is pegged to the Secured Overnight Financing Rate ("SOFR"). *See* Adams Decl. Ex. A (Loan Agreement), at 12 ("Interest Rate" definition). This Court may take judicial notice of the SOFR. *See Stein v. JP Morgan Chase Bank*, 279 F. Supp. 2d 286, 290 (S.D.N.Y. 2003) ("The Court takes judicial notice of the prime rates published in the Wall Street Journal."); *Ross v. Am. Exp. Co.*, 35 F. Supp. 3d 407, 435 (S.D.N.Y. 2014) ("Courts may take judicial notice of data contained in Government reports."). The SOFR data from the Federal Reserve Bank of New York shows a multifold increase in the SOFR from the date of the Loan Agreement (*i.e.*, December 31, 2021) to the date of the Maturity Default (*i.e.*, January 9, 2024).

*See* Federal Reserve Bank of New York, *Secured Overnight Financing Rate Data*, https://www.newyorkfed.org/markets/reference-rates/sofr (last visited April 4, 2024).

[5] The Complaint incorrectly alleges the Stated Maturity Date as "January 9, 202<u>3</u>." Compl. ¶ 54. It is in fact January 9, 202<u>4</u>. *See* Adams Decl. Ex. A (Loan Agreement), at 26 ("Stated Maturity Date" definition). The Complaint does correctly allege that Plaintiff sent a Notice of Maturity Default, dated January 16, 2024, to Borrower and Guarantor.

5

- "[A]ny intentional physical waste of the Property …." *Id.* § 11.1(vii)(c) (defined above as the "Physical Waste Provision")[6];

- "[T]he misapplication, misappropriation or conversion by Borrower of … (y) any Gross Revenue (including any Rents, security deposits, advance deposits or any other deposits and Lease Termination Payments … (including any distributions or payments to members/partners/shareholders of Borrower during a period which Lender did not receive the full amounts required to be paid to Lender under the Loan Documents)." *Id.* § 11.1(vii)(d) (defined above as the "Misappropriation of Revenue Provision")[7]; and

- [F]ailure to pay charges (including charges for labor or materials) that can create Liens on any portion of the Property to the extent such Liens are not bonded over or discharged in accordance with the terms of the Loan Documents," unless, among other exceptions, such charges are disputed in accordance with the Loan Documents or "there is insufficient cash flow from the Property to pay the same." *Id.* § 11(vii)(e) (defined above as the "Lien Provision").

Section 11.1(vii)(c), (d), and (e) are the only Borrower's Recourse Liabilities that the Complaint mentions. For Borrower's Recourse Liabilities, the Borrower (and therefore the Guarantor) has agreed to cover "any loss, damage, reasonable third-party out-of-pocket cost, expense, liability, claim or other obligation *actually incurred* by Lender (including attorneys' fees and costs reasonably incurred) arising out of or in connection with" the listed Borrower's Recourse Liabilities. *Id.* § 11.1(vii).

Loan Agreement Section 11.1 also lists several events that give rise to a Springing Recourse Event. *See id.* § 11.1(1)-(9). The Complaint does not reference any of the events on the list of Springing Recourse Events. *See* Compl. ¶¶ 106-118.

---

[6] The "intentional physical waste" clause also covers "after the occurrence and during the continuance of an Event of Default, the removal or disposal of any portion of the Property that is not promptly replaced with items of similar or great value and utility," *id.*, but the Complaint does not allege removal or disposal of the Property, either before or after the Maturity Default.

[7] The "misappropriation of funds" clause also covers misappropriation of Insurance Proceeds, Condemnation proceeds, and tax refunds, *id.*, but the Complaint does not allege that any of these things occurred.

At Lender's request, on February 12, 2024, this Court appointed a receiver to take immediate possession of the Property and other related assets. Order Appointing Receiver, ECF No. 33.

## ARGUMENT

### I. THE COMPLAINT FAILS TO ALLEGE A BORROWER'S RECOURSE EVENT

#### A. The Complaint Fails To Allege Violation Of The Physical Waste Provision

Plaintiff alleges (Compl. ¶ 113) that Guarantor is liable for Borrower's violation of the Physical Waste Provision, which prohibits "any intentional physical waste of the Property …." Loan Agreement § 11.1(vii)(c). New York law "recogniz[es] … two distinct categories of waste," one for physical damage to a property encumbered by a mortgage and one for impairment of the security of a mortgage without any physical damage requirement. *Travelers Ins. Co. v. 633 Third Assocs.*, 14 F.3d 114, 120-121 (2d Cir. 1994). Section 11.1(vii)(c)'s plain terms cover only physical damage, not purely financial harm or impairment of security. This plain reading is confirmed by the separate Borrower's Recourse Liabilities covering specific types of financial harm, including the Misappropriation of Revenue and Liens Provisions. These provisions would be superfluous if the conduct covered were already addressed in the Physical Waste Provision. *Galli v. Metz*, 973 F.2d 145, 149 (2d Cir. 1992) ("[A]n interpretation that gives … effective meaning to all terms of a contract is generally preferred to one that leaves a part … of no effect.").

Despite the plain meaning of the Physical Waste Provision, the Complaint fails to allege *any* physical impairment of the Property whatsoever. Instead, Plaintiff claims that "failure to pay Operating Expenses amounts to an 'intentional physical waste of the Property.'" Compl. ¶ 80; *see also id.* ¶ 71. But that is, at best, an allegation of financial waste, not physical waste. The Complaint nowhere alleges that failure to pay operating expenses resulted in the requisite *physical* decay needed for a *physical* waste claim. *See IMH Broadway Tower Senior Lender, LLC v. Hertz*,

7

415 F. Supp. 3d 455, 461 (S.D.N.Y. 2019) (recognizing physical waste claim for failure "to make repairs to a commercial property's elevator and HVAC system"); *Staropoli v. Staropoli*, 180 A.D.2d 727, 727-28 (2d Dep't 1992) (recognizing waste claim for "[p]ermitting property to remain in disrepair"). Plaintiff's claim under the Physical Waste Provision must therefore be dismissed.

### B. The Complaint Fails To Allege Violation Of The Misappropriation Of Revenue Provision

Plaintiff next alleges (Compl. ¶ 67) that Guarantor is liable for Borrower's violation of the Misappropriation of Revenue Provision, which prohibits:

> the misapplication, misappropriation or conversion of … (y) any Gross Revenue (including any Rents, security deposits, advance deposits or any other deposits and Lease Termination Payments ....

Loan Agreement § 11.1(vii)(d).[8] Plaintiff's claim based on the Misappropriation of Revenue Provision fails for at least three reasons: (1) the claim is predicated on an obligation that does not exist in the Loan Agreement; (2) the Lender is the party responsible for the allocation of the funds; and (3) Plaintiff fails to adequately allege that the funds were not used for another permissible purpose.

*First*, Plaintiff's only support for its Misappropriation of Revenues Provision claim is the false premise that $5.3 million out of the $6.3 million released to the Borrower during the period from December 9, 2022, to December 9, 2023, could "be used by Borrower solely for the payment of Borrower's approved Operating Budget Expenses." Compl. ¶ 68. Because the Loan Agreement contains no such restriction, Plaintiff's misappropriation theory fails.

---

[8] The Loan Agreement goes on to include, as an example, "any distributions or payments to members/partners/shareholders of Borrower during a period which Lender did not receive the full amounts required to be paid to Lender under the Loan Documents." *Id.* But Plaintiff does not allege that any such distributions or payments occurred. To the contrary, the only payment failure alleged in the Complaint is the Maturity Default. *See* Compl. ¶ 60. Plaintiff has not (and cannot) allege that Borrower failed to pay any debt service obligations before the Maturity Date, nor does Plaintiff allege any distributions after the Maturity Date (or, for that matter, before the Maturity Date).

8

Conspicuously absent from the Complaint is any reference to the Loan Agreement provision that Plaintiff alleges contains this supposed restriction. Presumably, the Plaintiff is referencing the requirement in the "Property Cash Flow Allocation" waterfall in the Loan Agreement that, "during a Cash Management Trigger Event Period," funds must be allocated to "make payments for Approved Operating Expenses into the Operating Expense Subaccount as required under Section 3.7." Loan Agreement § 3.12.1(vii); *see also id.* § 3.7 ("During a Cash Management Trigger Event Period, Borrower shall deposit or cause to be deposited with or on behalf of Lender on each Payment Date an amount sufficient to pay monthly Approved Operating Expenses at the Property in accordance with the Approved Annual Budget."). But a "Cash Management Trigger Event" exists only after "an Event of Default" occurs or when Borrower fails "to maintain a Debt Yield of at least seven and thirty-seven hundredths of one percent (7.37%)." *Id.* at 5-6. It is only *after* such an event that Borrower is required "to make payments for Approved Operating Expenses." *Id.* § 3.12.1(vii). Before or absent such an event, the Loan Agreement permits Borrower to release property cashflow not required to pay taxes, insurance, bank fees, debt service, required capital expenditure, and certain specified Rollover Funds as Excess Cash Flow, which is held and utilized by the Borrower without restriction. *Id.* § 3.12.1(xii) ("Lastly, provided no Cash Management Trigger Event Period shall be then in effect and Lender has not received notice that a Mezzanine Loan Event of Default has occurred and is continuing, payment to the Borrower of all Excess Cash Flow."); *see also id.* § 3.12.1(i)-(vi). Borrower may use its discretion in allocating all rents and other revenue from the Property, provided it adheres to the Loan Agreement's "Property Cash Flow Allocation" priority. *Id.* § 3.12.1 (i)-(xii).[9] Yet the Complaint

---

[9] This allocation sets an "order of priority" for application of "all funds deposited in the Deposit Account," *id.* § 3.12.1, including "mak[ing] payments for Approved Operating Expenses" during a "Cash Management Trigger Event Period." *Id.* § 3.12.1(vii).

9

does not allege that Borrower's use of any advanced funds occurred during a "Cash Management Trigger Event Period." *Compare* Compl. ¶¶ 68, 70 (alleging funds were advanced by Special Servicer to Borrower from "December 9, 2022 through December 9, 2023"), *with* Compl. ¶ 61 (alleging Event of Default "dated January 16, 2024").[10]  Nor does it allege that Borrower failed to follow the Loan Agreement's cashflow priority. Borrower therefore had no obligation to apply any funds to "Approved Operating Expenses," and Plaintiff's misappropriation theory fails. Plaintiff's conclusory allegations to the contrary (*see* Compl. ¶ 69) ignore the Loan Agreement's plain terms and are unavailing.

*Second*, if any funds were not properly applied under the "Property Cash Flow Allocation" waterfall, that would be the fault of Lender, not Borrower. That waterfall applies to funds deposited in Deposit Account, which is defined as the "an Eligible Account at the Deposit Bank *controlled by Lender* …." Loan Agreement § 3.1, at 48 (emphasis added). If cashflow were required to be allocated to Approved Operating Expenses—which it was not—then it was Lender that controlled that allocation under the Loan Agreement's clear terms.

*Third*, the mere fact that Borrower did not pay certain vendor expenses after receiving Excess Cash Flow that exceeded the Operating Expenses identified in its Annual Budget is not enough to state a claim under the Misappropriation of Revenue Provision. The Borrower's Annual Budget is a "good faith estimate" of the Property's anticipated Operating Expenses and Capital Expenditures for the upcoming fiscal year. *See* Loan Agreement § 1.1, at 1. Estimates are not intended as an obligation and are, by their nature, subject to changing circumstances. Thus, for

---

[10] As above, *supra* note 5, the Complaint correctly alleges a "Notice of Maturity Default" was issued on January 16, 2024 (Compl. ¶ 61) but incorrectly alleges that the "Stated Maturity Date" for that notice was "January 9, 202<u>3</u>" (Compl. ¶ 53) (emphasis added). The correct Stated Maturity Date is in fact January 9, 202<u>4</u>. *See* Adams Decl. Ex. A (Loan Agreement), at 26 ("Stated Maturity Date" definition).

10

example, an unanticipated increase in capital expenditures (which, in fact, occurred) could equally explain the non-payment of certain Operating Expenses that might otherwise be covered by Excess Cash Flow. And, in any event, the Borrower's expenses are not limited to the Operating Expenses and Capital Expenditures listed in the budget—they also include, for example, the debt service payable on the Mezzanine Loan, which skyrocketed in 2022 and remained high through 2023. Plaintiff, however, does not specify why certain vendor expenses were not paid. The Complaint's threadbare allegations say nothing about how the funds were actually used and leave the Court to guess whether they were actually misappropriated—rather than needed for some other, permissible purpose. To plead liability, the "plausibility standard asks for more than a sheer possibility that a defendant has acted unlawfully." *Galiano v. Fidelity Nat'l Title Ins. Co.*, 684 F.3d 309, 313 (2d Cir. 2012) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)) (cleaned up). For this additional reason, the Complaint again fails to allege a Misappropriation of Revenue Provision claim.

### C. The Complaint Fails To Allege Violation Of The Lien Provision

Plaintiff predicates its third attempt to assert that the Guarantor is liable for the Borrower's alleged violation on the Lien Provision, which prohibits:

> [any] failure to pay charges (including charges for labor or materials) that can create Liens on any portion of the Property to the extent such Liens are not bonded over or discharged in accordance with the terms of the Loan Documents; unless … there is insufficient cash flow from the Property to pay the same.

Loan Agreement § 11.1(vii)(e). While the Complaint alleges that liens were recorded against the Property on December 21, 2023 ($49,903.02; 19 days before maturity) and January 23, 2024 ($78,514.13; two weeks after maturity), Compl. ¶¶ 71 & n.3, 76, it fails to allege that Plaintiff "actually incurred" any losses or costs from these liens. This omission is fatal because the Loan Agreement grants Plaintiff the right to enforce against Guarantor the Borrower's Recourse

11

Liabilities only "to the extent of any loss, damage, reasonable third-party out-of-pocket cost, expense, liability, claim or other obligation *actually incurred by Lender*." Loan Agreement § 11.1(viii) (emphasis added). The Complaint, by contrast, merely alleges Liens that, if not discharged or otherwise paid, could potentially cause a loss to the Lender in the future. *Cf.* Compl. ¶¶ 71, 76. Plaintiff therefore fails to plead a claim under the Lien Provision.

### D. The Borrower's Recourse Liability Claims Fail Because Plaintiff Has Not Alleged A Deficiency

To state a claim under the Guaranty Agreement for any Borrower's Recourse Liability, "plaintiff[] must plausibly allege that [it is], in fact, undersecured; and any recovery … may be no greater than the amount by which plaintiff[] [is] undersecured." *IMH Broadway Tower Senior Lender, LLC v. Hertz*, 415 F. Supp. 3d 455, 460 (S.D.N.Y. 2019) (interpreting identical limited recourse provision in commercial mortgage loan agreement). While the Complaint seeks a deficiency judgment against the Borrower *if* there is a deficiency after the foreclosure requested by Lender, *see* Compl. ¶ 91(D), Plaintiff nowhere alleges that any deficiency exists or that the Property is worth less than the amounts owed on the Mortgage Loan. Without these allegations, Plaintiff's Borrower's Recourse Liability claims must be dismissed. *See id.* ("Allowing plaintiffs to collect anything from guarantors in excess of that amount would, in effect, permit double recovery on the loans, a result equally contrary to the language of [the Borrower's Recourse Liability provision].").[11]

---

[11] To be clear, if Plaintiff *had* plausibly alleged a deficiency, then it may not need to wait for the foreclosure sale to bring its Borrower's Recourse Liability claims under the Guaranty Agreement. *See* Guaranty Agreement § 5. But that is not so here, where Plaintiff fails to allege any deficiency to support a Loss in the first place.

## II. THE COMPLAINT FAILS TO ALLEGE A FULL RECOURSE CLAIM

Plaintiff brings guaranty claims against Mr. Meisner for alleged violations of the Borrower's Recourse Liabilities provision of the Loan Agreement. *See supra* Part I; Compl. ¶¶ 106-118. It also appears, however, that the Complaint asserts a guaranty claim against Mr. Meisner under the Loan Agreement's Springing Recourse Event provision. *See, e.g.*, Compl. ¶ 113 (asserting "a full recourse Guaranty against the Guarantor"); ¶ 117 (seeking order that "Guarantor be adjudged to pay the whole residue" of the Loan indebtedness). A claim under the Loan Agreement's Springing Recourse Event provision, if successful, would require Guarantor to cover the entire outstanding the balance of the Mortgage Loan (rather than just losses associated with the liability-triggering event). As pleaded, however, this full recourse claim is conclusory and cannot be reconciled with the allegations in the Complaint.

*First*, and as an initial matter, Plaintiff's full recourse claim appears to be based on the identical allegations as made for their limited recourse claims. Yet where contracts contain both limited and full recourse liability provisions "[they] should be interpreted to give effect to each provision, and to avoid a construction that renders a clause meaningless." *U.S. Bank Nat. Ass'n v. Rich Albany Hotel, LLC*, 42 Misc.3d 1201(A), *3 (Sup. Ct. Albany Cnty. Dec. 16, 2013) (rejecting interpretation of "springing recourse event" that would completely nullify a loan's non-recourse structure). Similarly, full recourse liability provisions should not be read to apply to allegations that are addressed by limited recourse liability provisions. *See CP III Rincon Towers, LLC v. Cohen*, 2022 WL 61318, at *10 (S.D.N.Y. Jan. 6, 2022) (rejecting claim that full recourse event had occurred because relevant events were "explicitly addressed via a different provision, which provides for loss recourse rather than full recourse").

*Second*, and even assuming the Complaint could clear the first hurdle, it nowhere alleges any acts or omissions that plausibly meet the Loan Agreement's defined Springing Recourse

13

Events. Loan Agreement § 11.1(1)-(9). Nor does it cite to or otherwise reference any of the relevant subsections of the Springing Recourse Events provision. The Complaint should therefore also be dismissed to the extent it purports to assert a full recourse claim against Mr. Meisner.

## CONCLUSION

For the reasons stated above, Count V against Mr. Meisner should be dismissed in its entirety.

Case 1:24-cv-00917-PAE  Document 68  Filed 04/08/24  Page 18 of 19

Dated: April 8, 2024  
      New York, New York

/s/ Blair Adams  
QUINN EMANUEL URQUHART  
  & SULLIVAN LLP

Blair Adams  
Toby E. Futter  
Alec S. Bahramipour  
Grace Heinerikson

51 Madison Avenue, 22nd Floor  
New York, NY 10010  
(212) 849-7000

blairadams@quinnemanuel.com  
tobyfutter@quinnemanuel.com  
alecbahramipour@quinnemanuel.com  
graceheinerikson@quinnemanuel.com

*Attorneys for Defendant Menachem Meisner*

15

## CERTIFICATE OF SERVICE

    I hereby certify that on April 8, 2024, I electronically served a copy of the foregoing to all counsel of record via ECF.

                                               /s/ Blair Adams
                                                 Blair Adams