UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| U.S. BANK TRUST COMPANY, NATIONAL ASSOCIATION, SOLELY IN ITS CAPACITY AS TRUSTEE FOR NATIXIS COMMERCIAL MORTGAGE SECURITIES TRUST 2022-JERI, COMMERCIAL MORTGAGE PASS-THROUGH CERTIFICATES, SERIES 2022-JERI (FOR THE BENEFIT OF THE CERTIFICATEHOLDERS), acting by and Midland Loan Services, a division of PNC Bank National Association as Special Servicer under the Trust Servicing Agreement dated as of April 18, 2022,<br><br>Plaintiff,<br><br>v.<br><br>JERICHO PLAZA PORTFOLIO LLC; MENACHEM MEISNER; POWER-FLO TECHNOLOGIES INC. d/b/a UNITED ELECTRIC POWER; NEW YORK STATE DEPARTMENT OF TAXATION AND FINANCE; LIBERTY ELEVATOR CORPORATION; JE GRANT ASSOCIATES LLC d/b/a ENERGY PLUS SOLUTIONS; and "JOHN DOE" NO. 1 THROUGH "JOHN DOE" NO. 100,<br><br>The names of the "John Doe" Defendants being Fictitious and Unknown to Plaintiff, the Persons and Entities Intended Being Those Who May Be in Possession of, or May Have Possessory Liens or Other Interests in, the Premises Herein Described,<br><br>Defendants. | Civil Action File No.<br>1:24-cv-00917-PAE |

**DECLARATION OF CHRISTOPHER G. HAMILTON IN SUPPORT OF PLAINTIFF'S MOTION FOR THE APPOINTMENT OF A RECEIVER**

Pursuant to 28 U.S.C. § 1746, I, CHRISTOPHER G. HAMILTON, declare under penalty of perjury as follows:

1. I am a Senior Asset Resolution Consultant with Midland Loan Services, a division of PNC Bank National Association ("Special Servicer"), pursuant to the Trust and Servicing

1

Agreement dated as of April 18, 2022 (the "TSA"), as the authorized agent for plaintiff U.S. Bank Trust Company, National Association, solely in its capacity as Trustee ("Trustee") for Natixis Commercial Mortgage Securities Trust 2022-Jeri, Commercial Mortgage Pass-Through Certificates, Series 2022-Jeri (the "Trust"), for the benefit of the Certificateholders ("Plaintiff").

2. I submit this declaration in further support of Plaintiff's motion for an order in accordance with 28 U.S.C. § 2001 amending the Receivership Order to authorize the Receiver to: (i) engage Jeff Dune of DBRE, Inc., as broker, to market the Property; and (ii) sell the Property, by public or private sale, subject to the approval of this Court, pursuant to 28 U.S.C. § 2001, together with such other and further relief as this Court may deem just and proper ("Plaintiff's Motion"). (ECF Doc. Nos. 43-47).

**This Court Should Grant Plaintiff's Motion To Amend the Receiver Order to Engage a Broker to Market the Property for Sale and to Sell the Property, After Approval by the Court, pursuant to 28 U.S.C. §2001**

3. On February 7, 2024, Plaintiff commenced this action by filing a commercial mortgage foreclosure Complaint[1] (ECF Doc. No. 1), as a result of Borrower's defaults under the Loan Documents, including the Maturity Default on January 9, 2024, on a Loan in the original principal amount of $149,180,000.00, the repayment of which is secured by the Property and guaranteed pursuant to a Guaranty of Recourse Obligations of Menachem Meisner ("Guarantor").

4. On February 7, 2024, upon filing the Complaint, Plaintiff also filed an *ex parte* order to show cause for an order appointing a Receiver of the Borrower's Assets, which Borrower did not oppose. (ECF Doc. Nos. 4-7, 27-28).

5. On February 12, 2024, the Court issued an Order Appointing Ian V. Lagowitz, as receiver ("Receiver") of the Borrower's Assets (the "Receivership Order"). (ECF Doc. No. 33).

---

[1] Capitalized terms not otherwise defined herein shall have the same meanings as ascribed in the Loan Documents and Complaint.

On February 20, 2024, the Bond of Receiver and the Oath of Receiver were filed with the Court. (*See* ECF Doc. Nos. 33, 39-40).

6. As set forth below and in the accompanying memorandum of law, an Order should be issued permitting the Receiver to engage a broker to market the Property for sale and to then sell the Property – upon a further Order of this Count approving the sale by the Receiver and the terms thereof in accordance with the statutes governing such a sale.

### A. Borrower's Maturity Default and Failure to Pay Over $3,000,000.00 In Operating Expenses while it was in Possession, Ownership and Control Of the Property Should Preclude Borrower and Guarantor from Attempting To Dictate Powers Granted to the Receiver

7. Despite *admitting* that it defaulted under the Loan Documents by failing to pay the full amount of the Debt due on the Maturity Date,[2] Borrower and Guarantor, seek to impede Plaintiff's exercise of its rights and remedies and request to permit the Receiver to engage a broker to market the Property for sale.

8. In opposition to Plaintiff's Motion, Borrower and Guarantor argue that they ". . . have a strong interest in supporting the Receiver's efforts to preserve and maximize the value of the Jericho Plaza Offices." Yet, their conduct shows otherwise. Specifically, their failure to pay over $3,000,000.00 in operating expenses has resulted in safety, security and maintenance issues at the Property, waste and a diminution in value of the Property. *See* ECF Doc. No. 6 ¶50, Exs. 6-10-6-13.

9. Borrower and Guarantor further claim that "Borrower has offered to resolve the small mechanics liens against the property, as well as the larger PSEG invoice, as part of a

---

[2] *See* Declaration of Defendant Menachem Meisner in Support of Opposition to Plaintiff's Motion to Amend the Order Appointing a Receiver ("Meisner Declaration") (ECF No. 78), Ex. A (ECF No. 78-1), letter dated February 23, 2024 by Defendants' counsel, which states ". . . there was no such event *prior to the Borrower's maturity default last month* - . . ." (emphasis supplied).

3

restructuring discussion, but Lender has refused to meaningfully engage." *See* ECF Doc. No. 78-1, at 3.[3] Of course, Borrower and Guarantor only "offered" to pay those amounts in exchange for Lender's forbearance and agreeing to enter into a restructuring of the Loan, but also refuse to sufficiently answer Lender's questions relating to outstanding operating expenses at the Property.

10. Facing an imminent shut down of the electric at the Property, Plaintiff has paid more than $800,000.00 to PSEG and the Receiver has paid an additional $200,000.00, so that PSEG will continue electric service at the Property.

11. In addition, a tax payment for the Property in the amount of $1,284,402.69 is due on May 1, 2024. At the time of the Maturity Default, the tax escrow reserve account contained only $732,322.00, which is insufficient to cover the taxes. Despite a request to Borrower's counsel inquiring whether Borrower will pay the taxes, there has been no response. The failure to pay taxes could result in a tax lien on the Property, superior to Plaintiff's lien, which would result in further impairment of Plaintiff's security interest.

12. Borrower's conduct in failing to pay its operating expenses and maintain the Property is a classic example of a Borrower undermining the long-term profit potential of the Property in order to realize short term gains for itself to the detriment of Lender.

### B. The Receiver Should be Permitted to retain a Broker to Market the Property for Sale and then Move for a Further order from this Court Authorizing the Receiver to Sell the Property

13. Contrary to Borrower's arguments, Plaintiff is *not* seeking an order from the Court approving the sale of the Property by the Receiver *at this time*. Rather, Plaintiff is seeking an order

---

[3] Borrower submitted a report dated December 11, 2023 by its advisor, the Henley Group, Inc. (the "Henley Report"), to Plaintiff regarding the Property, which may contain confidential or proprietary information of the Borrower and/or tenants (which may violate provisions in the lease agreements). **Plaintiff requests that it be permitted to provide a copy of the Henley Report as <u>Exhibit 1</u> to the Court and Borrower without filing it on the ECF.**

4

#501442837_v4 516952.00645

amending the Receivership Order, to permit the Receiver to engage a broker to market the Property for sale and to authorize the Receiver to sell the Property at a public or private sale *subject to the approval of the Court* pursuant to the requirements of 28 U.S.C. § 2001. See ECF Doc. No. 43.

14. 28 USC §2001 (b) provides that the Court may order the sale of property at private sale, after a hearing, "if it finds that the best interests of the estate will be conserved thereby," and provided that notice to all interested parties shall be given by publication (or as directed by the Court).

15. The statute further provides that:

> Before confirmation of any private sale, the court shall appoint three disinterested persons to appraise such property or different groups of three appraisers each to appraise properties of different classes or situated in different localities. No private sale shall be confirmed at a price less than two-thirds of the appraised value. Before confirmation of any private sale, the terms thereof shall be published in such newspaper or newspapers of general circulation as the court directs at least ten days before confirmation. The private sale shall not be confirmed if a bona fide offer is made, under conditions prescribed by the court, which guarantees at least a 10 per centum increase over the price offered in the private sale.

16. Thus, in compliance with 28 USC §2001(b), any offers for the sale of the Property will be submitted to the Court for approval, and a hearing would be required prior to confirmation of any such sale, at which time Borrower would have the right to object and also bid on the Property or pay off the Debt in full, thereby negating any claim of an extinguishment of the Borrower's right of redemption.

17. Further, Plaintiff's intent is to proceed on *parallel* tracks: proceed with its commercial mortgage foreclosure action, in which it will be filing a motion for summary judgment (based on Borrower's acknowledged Maturity Default) and for a Judgment of Foreclosure and Sale; while the broker retained by the Receiver will be marketing the Property for sale.

18. As noted by the Receiver:

> "Due to current economic concerns, the increasing lower valuation of commercial office buildings, and projections that values will continue to decrease due to secular challenges facing the industry, engaging a broker to market the Property will provide insight as to the current value of the Property. Moreover, permitting the Receiver to engage a broker to market the Property would obviate the risk that any delay in litigating this action will further reduce the value of the Property. Engaging a broker to market the Property will also result in obtaining the highest net present value for the Property which could mitigate losses to Plaintiff and additional debt to Borrower.

ECF Doc. No. 44, ¶¶ 12-14.

19. Moreover, permitting the Receiver to engage a broker to market and sell the Property in an effort to obtain the highest sale price, would both serve to maximize the value of the Property and decrease the Borrower's and Guarantor's respective liabilities under the Loan Documents for the amounts remaining unpaid.

20. Thus, the Court should grant Plaintiff's Motion as: (i) a sale of the Property by the Receiver would not occur without a subsequent order from the Court approving any sale; and (ii) there would be no negative impact to Borrower or Guarantor as any sale of the Property would likely result in a higher sales price given decreasing market conditions and the conditions of the Property (both of which were detailed in the Report of the Borrower's Advisor) which, in turn, would result in a decrease in the amount owed by the Borrower and Guarantor to the Plaintiff after the sale of the Property.

### C. The Value of the Property and Borrower's Assets Have Been Negatively Impacted by the Actions and Omissions of the Borrower

21. In opposition to Plaintiff's Motion, the Guarantor argues:

> the Borrower has successfully maintained high occupancy and reduced expenses in order to optimize net operating income during its two years of ownership. Under the stewardship of its current management company, AMI, the Borrower has also improved operating efficiencies, generating healthy cash flow despite market

> headwinds. In the year since AMI took over, the Borrower has replaced janitorial and security vendors with more reasonably priced alternatives, reduced unnecessary staff headcount while increasing in-house handling of tenant work orders, and renegotiated its landscaping and snow removal contracts, resulting in nearly $2 million in savings per annum, as detailed in the table below . . .

ECF Doc. No. 78-1, at pages 1-2.

22. Guarantor further claims that it was able to reduce annual operating expenses in the amount of $1,885,237.00 when AMI was managing the property. ECF Doc. No. 78-1, pages 1-2.

23. However, Guarantor's claim of a purported reduction in operating expenses, omits to disclose that its "savings" resulted in major disruption of services and failure to maintain the Property. It also fails to provide any information as to the use of those funds, as during the same period, it failed to pay over $3 million in operating expenses at the Property despite having more than sufficient net operating income. ECF Doc. No. 78, 78-1, pages 1-2, ECF Doc. No. 6 Ex. 6-10 (Open Invoice List prepared by AMI); and ECF Doc. No. 6 ¶ 48.

24. For example, as noted in the Henley Report:

> "Ownership has reduced staff, suspended and/or reduced services, and *deferred scheduled projects* meant to enhance the building's market position. *Specific cost cutting measures have been taken including the following: reducing the number of engineers on site, terminating service contracts with manufacturers, and using third parties who are less expensive, but who are not as familiar with the Property's equipment.*"

*See* Henley Report, Ex. 1, at 2 (emphasis supplied).

25. The Henley Report also provides that due to the condition of the various rental suites "an estimate of the required tenant improvement and leasing commissions needed to retain tenancy and invest in the Property over the next three years (through December 2026) is approximately $8,600,000.00." *See id*, at 9-10. Telling, Borrower and Guarantor are completely

silent as to whether they have expended funds or made any efforts for tenant improvements (because they have not).

26. Further, Guarantor's claims of superior service are directly belied by statement and reports by current tenants at the Property. For example, Ottavio Mattia, the Director, Lease Administration, Real Estate & Construction for tenant 1-800 Flowers, in an October 5, 2023, email to Jon Silverman of AMI, noted the following issues:

> Elevator Maintenance. Middle elevator has been out of service for months. Real Estate Service Elevator has been out of service for weeks;
>
> Fire Doors Safety Device. We alerted you months ago to not having the legal hold open devices on any of the fire doors in the building which is a huge safety issue for the entire building;
>
> Security. Parking lot patrolling has resumed after 9 months yet is still not performed in accordance with the lease agreement.

A true and correct copy of Mr. Mattia's email is annexed hereto as **Exhibit 2**.

27. In addition, by letter dated October 26, 2023, which clearly shows that the issues raised in the tenant's email were never resolved by AMI, the tenant stated:

> I am writing to you today regarding the lack of services provided to our premises and landlord's duty to maintain the parking lots, grounds and other improvements at the land upon which the building is located in a first-class manner, including, without limitation, repair, snow and ice removal, parking lot stripping, exterior lighting and the like.
>
> In addition to the above, we have several "Critical Services" that also have gone without repairs for several months. Per our lease Section 4.4, please see below request for specific performance.

This correspondence shows not only Borrower's complete lack of maintenance and care at the Property, but also that Borrower has breached the terms of leases of its tenants. A true and correct copy of the letter dated October 26, 2023 is annexed hereto as **Exhibit 3**.

8

28. In light of Borrower's blatant disregard for the operation, management and safety of the tenants at the Property, payment of amounts due and owing to vendors who provided services, materials and labor at the Property, payment of Operating Expenses in accordance with its obligations under the Loan Documents, and payment of the Debt due and owing to Plaintiff on the Maturity Date, it is respectfully requested that the Court grant Plaintiff's Motion to Amend the Receivership Order.

I declare, under penalty of perjury, that the foregoing is true and correct.

Executed on this __18th__ day of April, 2024.

Christopher G. Hamilton
Digitally signed by Christopher G. Hamilton
Date: 2024.04.18 12:32:00 -05'00'

CHRISTOPHER HAMILTON