UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

U.S. BANK TRUST COMPANY, NATIONAL ASSOCIATION, *as Trustee for the Benefit of the Certificateholders of Natixis Commercial Mortgage Securities Trust 2022-JERI*,

Plaintiff,

-v-

JERICHO PLAZA PORTFOLIO LLC, *et al.*,

Defendants.

24 Civ. 917 (PAE)

OPINION & ORDER

---

PAUL A. ENGELMAYER, District Judge:

Plaintiff U.S. Bank Trust Company, National Association ("U.S. Bank Trust"), as trustee for a mortgage-backed securities trust, acting by and through its special servicer, Midland Loan Services ("Midland" or "the special servicer"), brings this suit principally against defendants Jericho Plaza Portfolio LLC ("Jericho Plaza") and Menachem Meisner ("Meisner"). The suit seeks mortgage foreclosure, security interest foreclosure, possession, and breach of guaranty, all in connection with a mortgage loan secured by two office buildings located in Jericho, New York.[1] U.S. Bank Trust's predecessor-in-interest, Natixis Real Estate Capital LLC ("Natixis"), made the loan to Jericho Plaza pursuant to a loan agreement. Meisner later guaranteed the loan pursuant to a guaranty agreement it entered with Jericho Plaza.

---

[1] The Complaint also lists as defendants: Power-Flo Technologies Inc. ("Power-Flo"); New York State Department of Taxation and Finance; Liberty Elevator Corporation ("Liberty"); and JE Grant Associates LLC d/b/a Energy Plus Solutions ("JE Grant"). U.S. Bank Trust names these entities as defendants on account of any title or claim they may have as potential lienors or judgment creditors of the property due to Jericho Plaza's failures to pay taxes, expenses, and other amounts owed to these defendants. *See* Dkt. 1 ("Compl.") ¶¶ 7–14.

Pending now are Meisner's and Jericho Plaza's motions to dismiss under Federal Rule of Civil Procedure 12(b)(6). For the reasons that follow, the Court denies in part and grants in part Meisner's motion to dismiss, and denies Jericho Plaza's motion to dismiss.

I. **Factual Background**[2]

   A. **Relevant Parties**

U.S. Bank Trust is a national banking association that serves as the trustee for the benefit of certificate holders of Natixis Commercial Mortgage Securities Trust 2022-JERI ("the Trust")—a commercial mortgage-backed securities trust.[2] Compl. ¶ 1.

Jericho Plaza is a Delaware limited liability company located in Jersey City, New Jersey. *Id.* ¶ 3. In December 2021, it borrowed $149.18 million from Natixis ("the Loan"), by executing a note that serves as the basis for the Trust.[3] *Id.* ¶ 27. Meisner lives in Jersey City, New Jersey. *Id.* ¶ 5. He guaranteed the Loan. *Id.* ¶ 6.

   B. **Jericho Plaza Borrows $149.18 Million from Natixis**

On December 31, 2021, Jericho Plaza obtained a $149,180,00 loan from Natixis. Compl. ¶ 26. The loan is governed by a loan agreement dated December 31, 2021 (the "Loan Agreement"). *Id.* As collateral for the loan, Jericho Plaza granted Natixis a security interest in real property located at One Jericho Plaza and Two Jericho Plaza, Jericho, New York 11753 ("the Property"), *id.* ¶ 4, and in all leases and rents generated by the Property through a Consolidated, Amended and Restated Mortgage ("the Mortgage"), Assignment of Rents and

---

[2] The following facts are drawn from the Complaint and the contracts, agreements, and documents incorporated by reference in or integral to it. These are the loan agreement, Dkt. 69 ("Adams Decl."), Ex. 1 ("Loan Agreement"), and the guaranty agreement, *id.*, Ex. 2 ("Guaranty Agreement"). *See Koch v. Christie's Int'l PLC*, 699 F.3d 141, 147 (2d Cir. 2012).

[3] To memorialize the loan, Jericho Plaza executed a Consolidated, Amended, and Restated Consolidated Promissory Note (the "Note") dated December 13, 2021. *Id.* ¶ 27.

Leases ("ALR"), and Security Agreement. *Id.* ¶ 28. The Loan Agreement has a January 9, 2024 maturity date. Loan Agreement at 26.

### C.    Jericho Plaza and Meisner Enter into the Guaranty Agreement

On December 31, 2021, Meisner and Jericho Plaza executed a Guaranty of Recourse Obligations (the "Guaranty Agreement"). In the Guaranty Agreement, Meisner agreed to "irrevocably, absolutely and unconditionally guarantee[] the full, prompt and complete payment when due of the Guaranteed Obligations." Compl. ¶ 33; *see also* Guaranty Agreement at 1. The Guaranty Agreement defined "Guaranteed Obligations" to mean "(i) Borrower's [*i.e.*, Jericho Plaza's] Recourse Liabilities and (ii) from and after the date that any Springing Recourse Event occurs, payment of all the Debt." Guaranty Agreement at 1.

### D.    Natixis Transfers Loan to U.S. Bank Trust

On April 18, 2022, Natixis transferred its rights, title, and interest in the Note to U.S. Bank Trust pursuant to an allonge. Compl. ¶ 35. On May 14, 2022, Natixis also transferred its rights, title, and interest in the Mortgage and the ALR to U.S. Bank Trust. *Id.* ¶ 38.

### E.    Jericho Plaza Defaults on Loan

Under the Loan Agreement, Jericho Plaza was required to keep the Property in "good and safe condition and repair," Loan Agreement § 5.3.1, and to pay property taxes and other expenses incurred for the Property's maintenance, *id.* § 5.2. Jericho Plaza was also required to make monthly debt service payments to U.S. Bank Trust, Compl. ¶ 44, and to pay U.S. Bank Trust "all accrued and unpaid interest and all other amounts due . . . under the Note and the other Loan Documents" on the maturity date—January 9, 2024. *Id.* ¶ 53.

Between December 9, 2022 and December 9, 2023, in accordance with the Loan Agreement, the special servicer disbursed to Jericho Plaza $6,343,242.12 "to be used by [Jericho Plaza] solely for the payment of [its] approved Operating Budget expenses ($5,348,246.90) for

3

that period and the remainder (approximately $994,995.22) to be treated as Additional Excess Cash Flow." *Id.* ¶ 68. Despite receiving these funds, Jericho Plaza failed to pay basic operating expenses at the Property, thus "committing waste, causing liens to be filed against the Property and threatening the operation and maintenance of the Property and the safety of its tenants (and their employees)." *Id.* ¶ 71. AMI Management LLC prepared an "open invoice list," reporting that Jericho Plaza owed more than $3 million to the Property's vendors. *Id.* ¶ 72. These vendor expenses related to "vital services" such as "sanitation, elevator maintenance, electricity, fire safety, security and porter and cleaning services, and HVAC repairs." *Id.* ¶ 72. On January 22, 2024, Public Service Enterprise Group, Inc. ("PSEG"), the Property's electricity provider, posted a "Notice of Intention to Discontinue Electric Service" on the doors of all tenants at the Property, advising them that unless payment of approximately $660,000 was received before February 6, 2024, electricity would be discontinued at the Property. *Id.* ¶ 73; Dkt. 6 ("Hamilton Decl."), Ex. 11 ("PSEG Notice and Email").

As a result of Jericho Plaza's failure to pay vendors, several mechanics' liens and judgments were filed against the Property. On December 21, 2023, Liberty filed a mechanic's lien in the amount of $49,903.02. Compl. ¶ 76 n.3. On January 23, 2024, JE Grant filed a mechanic's lien in the amount of $78,514.13. *Id.* Power-Flo also filed a $20,867.94 judgment against the Property. *Id.* ¶ 77.

Jericho Plaza also failed to repay, on the Loan's maturity date of January 9, 2024, the remaining balance along with unpaid and accrued interest. *Id.* ¶ 56. As a result, on January 16, 2024, U.S. Bank Trust notified Jericho Plaza and Meisner that Jericho Plaza's failure to pay the Loan in full on the maturity date constituted an event of default under the Loan Agreement. *Id.* ¶ 61.

## II. Procedural History

On February 7, 2024, U.S. Bank Trust filed the Complaint. Dkt. 1. On February 12, 2024, the Court issued an order appointing a receiver over the Property. Dkt. 33.

On April 8, 2024, Meisner filed a motion to dismiss, Dkt. 67, a supporting memorandum of law, Dkt. 68, and declaration, Dkt. 69 ("Adams Decl."). That same day, Jericho Plaza filed a motion to dismiss, Dkt. 71, and a supporting memorandum of law, Dkt. 72. On April 12, 2024, the Court issued an amend-or-oppose order. Dkt. 76. On April 29, 2024, U.S. Bank Trust opposed both motions. Dkts. 95–96. On May 13, 2024, Jericho Plaza and Meisner filed replies. Dkts. 102–03.

## III. Applicable Legal Standards

To survive a motion to dismiss under Rule 12(b)(6), a complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A complaint is properly dismissed where, as a matter of law, "the allegations in a complaint, however true, could not raise a claim of entitlement to relief." *Twombly*, 550 U.S. at 558. When resolving a motion to dismiss, the Court must assume all well-pled facts to be true, "drawing all reasonable inferences in favor of the plaintiff." *Koch*, 699 F.3d at 145. That tenet, however, does not apply to legal conclusions. *See Iqbal*, 556 U.S. at 678. Pleadings that offer only "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555.

## IV. Meisner's Motion to Dismiss

Meisner moves to dismiss Count Five of the Complaint, alleging breach of the Guaranty Agreement. That agreement, entered into between Meisner and Jericho Plaza, provides that:

5

"Guarantor hereby irrevocably, absolutely and unconditionally guarantees to Lender the full, prompt and complete payment and performance when due of the Guaranteed Obligations." Guaranty Agreement at 1. It defines "Guaranteed Obligations" as "(i) Borrower's Recourse Liabilities and (ii) from and after the date that any Springing Recourse Event occurs, payment of all the Debt." *Id.* In moving to dismiss Count Five, Meisner contends that the Complaint does not plausibly allege that his "Guaranteed Obligations" actually became due. It does not plausibly allege, he argues, either that the "Borrower's Recourse Liabilities" were triggered or that a "Springing Recourse Event" had occurred.

For the reasons that follow, the Complaint adequately pleads that Jericho Plaza violated the "Borrower's Recourse Liabilities" provision of the Loan Agreement. Thus, U.S. Bank Trust may pursue a limited recourse claim against Meisner, as the guarantor, for the prompt and complete payment of the Borrower's Recourse Liabilities. However, the Complaint does not adequately allege violations of the "Springing Recourse Event" provision of the agreement. Thus, U.S. Bank Trust cannot pursue a full recourse claim against Meisner that would permit recovery from Meisner of the entire outstanding balance of the loan.

### A.  Limited Recourse Claim: The Loan Agreement's Borrower's Recourse Liability Provision

Meisner first argues that, on the facts pled, the "Borrower's Recourse Liabilities," for which Meisner as guarantor is responsible for covering, were never triggered.

"Borrower's Recourse Liabilities" are defined by § 11.1 of the Loan Agreement. Section 11.1 provides that:

> Subject to the qualifications below, Lender shall not enforce the liability and obligation of Borrower to perform and observe the obligations contained in the Note, this Agreement, the Security Instrument and the other Loan Documents by any action or proceeding wherein a money judgment shall be sought against Borrower, except that Lender may bring a foreclosure action, an action for specific performance or any other appropriate action or proceeding to enable Lender to

6

enforce and realize upon its interest and rights under the Note, this Agreement, the Security Instrument and the other Loan Documents, or in the Property, the Gross Revenue or any other collateral given to Lender pursuant to the Loan Documents.

Loan Agreement § 11.1. Section 11.1 then adds these qualifications:

> The provisions of this <u>Section 11.1</u> shall not, however . . . (vii) constitute a waiver of the right of Lender to enforce the liability and obligation of Borrower, by money judgment or otherwise, to the extent of any loss, damage, reasonable third-party out-of-pocket cost, expense, liability, claim or other obligation actually incurred by Lender (including attorneys' fees and costs reasonably incurred) arising out of or in connection with the following (all such liability and obligation of Borrower for any or all of the following being referred to herein as **"*Borrower's Recourse Liabilities*"**):
>
> . . .
>
> (c) any intentional physical waste of the Property or, after the occurrence and during the continuance of an Event of Default, the removal or disposal of any portion of the Property that is not promptly replaced with items of similar or greater value and utility;
>
> (d) the misapplication, misappropriation or conversion by Borrower of . . . (y) any Gross Revenue (including any Rents, security deposits, advance deposits or any other deposits and Lease Termination Payments (other than the Valley National Termination Fee)), and (z) any, refund of Taxes or amounts in any Subaccount (including any distributions or payments to members/partners/shareholders of Borrower during a period which Lender did not receive the full amounts required to be paid to Lender under the Loan Documents);
>
> (e) failure to pay charges (including charges for labor or materials) that can create Liens on any portion of the Property to the extent such Liens are not bonded over or discharged in accordance with the terms of the Loan Documents.

*Id.*

The Complaint alleges that Jericho Plaza triggered its Borrower's Recourse Liabilities in three ways: by (1) committing "intentional physical waste of the Property," *id.* § 11.1(c); (2) misappropriating funds, *id.* § 11.1(d); and (3) failing to pay charges that resulted in liens on the property, *id.* § 11.1(e). Meisner argues that the Complaint does not adequately plead that Jericho Plaza violated the three pertinent provisions of the Loan Agreement, and thus that it is not liable as a guarantor. That is wrong.

7

First, contrary to Meisner's argument that the Complaint alleges only financial waste, the Complaint adequately alleges that Jericho Plaza committed "intentional physical waste of the Property" within the meaning of § 11.1(c). It alleges that Jericho Plaza "failed to pay operating expenses at the Property—committing waste, causing liens to be filed against the Property and *threatening the operation and maintenance of the Property and the safety of its tenants (and their employees)*." Compl. ¶ 71 (emphasis added). It further alleges that Jericho Plaza owed "more than $3 million" to vendors of the Property, with some "open vendor expenses relate[d] to vital services such as: sanitation, elevator maintenance, electricity, fire safety, security and porter and cleaning services, and HVAC repairs." *Id.* ¶ 72. As an illustration of the physical consequences of Jericho Plaza's failure to meet these obligations, the Complaint alleges that the Property's electricity provider placed a "Notice of Intention to Discontinue Electric Service" on the doors of all tenants at the Property, advising them that services will be discontinued unless payment of $660,000 was received. *Id.* ¶ 73.

The allegations that Jericho Plaza widely and deliberately failed to pay for necessary services at the Property, including services required for its upkeep and protection, are sufficient to state a claim that Jericho Plaza has committed intentional physical waste of the property. These allegations convey that Jericho Plaza let lapse basic services necessary for the physical upkeep and maintenance of the property—*e.g.*, sanitation, elevator maintenance, electricity, fire safety, and security. *Cf. Travelers Ins. Co. v. 633 Third Assocs.*, 14 F.3d 114, 121 (2d Cir. 1994) ("Under New York law, an action for waste will lie against a tenant who fails to undertake certain repairs on the property."); *IMH Broadway Tower Senior Lender, LLC v. Hertz*, 415 F. Supp. 3d 455, 461 (S.D.N.Y. 2019) (a "failure to make repairs to a commercial property's elevator and HVAC system" plausibly states claim for waste under New York law).

8

Second, the Complaint adequately alleges that Jericho Plaza "misappropriate[ed] . . . Gross Revenue (including any Rents, security deposits, advance deposits or any other deposits and Lease Termination payments)." Loan Agreement § 11.1(d). It alleges that between December 9, 2022 and December 9, 2023, the special servicer, an agent of U.S. Bank Trust, disbursed $6,343,242.12 to Jericho Plaza so that Jericho Plaza could pay the Property's operating expenses, Compl. ¶ 68, and that Jericho Plaza, despite taking these funds, failed to pay for vital services, like sanitation, elevator maintenance, electricity, fire safety, and security, *id.* ¶ 71. Meisner argues that the Complaint fails to plead misappropriation because the Loan Agreement did not oblige Jericho Plaza to use the funds disbursed to it to pay its operating expense obligations. Dkt. 68 at 8.

That argument fails. The Loan Agreement in multiple provisions reflects Jericho Plaza's obligation, in its capacity as the receiver of rents, to pay for property-related expenses. To this end, § 5.2 provides:

> Borrower shall pay (or cause to be paid) all Property Taxes and Other Charges now or hereafter levied, assessed or imposed as the same become due and payable, and deliver to Lender receipts for payments or other evidence satisfactory to Lender that the Property Taxes and Other Charges have been so paid.

Loan Agreement § 5.2. The agreement defines "Other Charges" as "all ground rents, maintenance charges, impositions other than Property Taxes and any other charges, including vault charges and license fees for the use of vaults, chutes and similar areas adjoining the Property, now or hereafter levied or assessed or imposed against the Property or any part thereof." *Id.* at 18. Section 10.1 states that an event of default occurs "if any of the Taxes or Other Charges are not paid when due." *Id.* § 10.1(c). And § 3.7 states that the "[a]mounts deposited from time to time into the Operating Expense Subaccount" should be "used to pay Approved Operating Expenses." *Id.* § 3.7. Together, these provisions make viable an allegation

9

that, by receiving disbursements like rents from the special servicer intended for the payment of basic operating expenses and then breaching its duty to pay for such expenses, Jericho Plaza misappropriated the disbursed funds.

And the Complaint alleges such conduct. It alleges that U.S. Bank Trust, through the special servicer, disbursed funds to Jericho Plaza that were "to be used by [Jericho Plaza] solely for the payment of [Jericho Plaza's] approved Operating Budget Expense ($5,348,246.90) for that period and the remainder (approximately $999,995.22) to be treated as Additional Excess Cash Flow for Borrower." Compl. ¶ 68. The Complaint also alleges that despite this large disbursement of funds, Jericho Plaza nevertheless "failed to pay operating expenses at the Property." *Id.* ¶ 71. These allegations comfortably support the claim that Jericho Plaza "misappli[ed], misappropriat[ed], or conver[ted]" funds intended to be used to pay for the Property's basic operating expenses, thus triggering Jericho Plaza's recourse liability pursuant to § 11.1(d) of the Loan Agreement.

Third, the Complaint adequately alleges that Jericho Plaza violated the lien provision of the Loan Agreement, § 11.1(e), by failing to pay charges that gave rise to liens. It alleges that Jericho Plaza's "fail[ure] to pay charges" caused two vendors—Liberty and JE Grant—to file mechanic's liens against the Property. Compl. ¶¶ 76 n.3, 79. In moving to dismiss, Meisner argues that this aspect of Borrower's Recourse Liability can only be triggered to the extent that the lender, *i.e.*, U.S. Bank Trust, "actually incurred" "loss, damage, reasonable third-party out-of-pocket cost, expense, liability, claim or other obligation" as a result of the liens filed. Dkt. 68 at 11–12. He argues that the Complaint does not so allege. *Id.*

That, too, is wrong. The Complaint alleges conduct within the scope of § 11.1(e). It does so by alleging that, as a result of Jericho Plaza's failure to pay charges, Liberty filed a

10

mechanic's lien in the amount of $49,903.02, and JE Grant filed a mechanic's lien in the amount of $78,514.13. Compl. ¶ 76 n.3. These allegations of pending liens in specific amounts adequately plead "the loss, damage, reasonable third-party out-of-pocket cost, expense, liability claim or other obligation" that will be incurred by U.S. Bank Trust as the lender. Section 11.1(e) does not require that U.S. Bank Trust have actually paid the amounts embodied in the lien, but that it merely have incurred this exposure. The Complaint so pleads.

Meisner makes a final, global argument for dismissal of the claim of a breach of the Guaranty Agreement. He contends that, to state any claim under any subsection, the Complaint must plausibly allege that the Property is necessarily worth less than the amounts owed on the mortgage loan such that, in the event of a foreclosure and sale, there would be outstanding liability that the guarantor, Meisner, would need to cover.

That is also incorrect. The Complaint plausibly pleads that that scenario may occur after the foreclosures it seeks. It alleges that U.S. Bank Trust "seeks to foreclose upon the Mortgage and recover the full amount of the Indebtedness pursuant to the terms of the Loan Documents." Compl. ¶ 117. As a remedy, it asks that the "Guarantor be adjudged to pay the whole residue or so much thereof as the Court may determine to be just and equitable, *of the Indebtedness remaining unsatisfied after the sale of the Property*." *Id.* That is all that a Complaint can responsibly allege at the pre-foreclosure stage. By definition, before the foreclosure and sale of the Property, U.S. Bank Trust cannot know with certainty that the sale price would fall short of covering the indebtedness to it. But given the multi-million-dollar scale of Jericho Plaza's deficiencies, the Complaint's allegation that a sale of the Property may leave unsatisfied

11

indebtedness is plausibly pled.[4]  The Court therefore denies Meisner's motion to dismiss on this ground.

Accordingly, the Complaint adequately alleges that Jericho Plaza triggered its Borrower's Recourse Liability under each of §§ 11.1(c), (d), and (e) of the Loan Agreement.  As such, Meisner is plausibly pled as responsible, under the Guaranty Agreement, for the "Borrower's Recourse Liabilities," which form part of its "Guaranteed Obligations."

### B. Full Recourse Claim: The Loan Agreement's Springing Recourse Event Provision

Meisner next argues that to the extent the Complaint asserts a breach of the Guaranty Agreement based on an alleged violation of the Springing Recourse Event provision, that claim is ill-pled.  On that discrete point, Meisner is correct.

Under the Guaranty Agreement, Meisner is responsible for the prompt and complete payment of its Guaranteed Obligations.  Guaranty Agreement at 1.  Relevant here, these include: "payment of all debt" "from and after the date that any Springing Recourse Event occurs." *Id.* Section 11.1(n)(1)–(9) of the Loan Agreement lists nine "Springing Recourse Events."

The Complaint, however, does not cite to any of these provisions.  Nor does it allege that Jericho Plaza's conduct triggered any Springing Recourse Event.  Instead, it recites only the provision of the Guaranty Agreement that defines "Guaranteed Obligations" as "(1) Borrower's Recourse Liabilities and (ii) from and after the date that any Springing Recourse Event occurs,

---

[4] Separately, as U.S. Bank Trust notes, under New York law, a lender is required to include a guarantor in a foreclosure action if it plans to seek a deficiency judgment against the guarantor. *See La Jolla Bank, FSB v. Whitestone Jewels, LLC*, No. 09 Civ. 13920, 2011 WL 6689859 (N.Y. Sup. Ct. Dec. 7, 2011) ("A mortgagee that fails to name a guarantor as a defendant in a mortgage foreclosure proceeding could lose the right to seek a deficiency judgment against the guarantor."). But "a deficiency judgment cannot be rendered until after the sale of the premises." *Id.* For that reason, U.S. Bank Trust's inclusion of Meisner, the guarantor, as a defendant here was not only procedurally proper but necessary, to enable U.S. Bank Trust to preserve its ability to pursue a deficiency judgment against Meisner in the future.

payment of all the Debt." Compl. ¶ 109. Absent allegations that a Springing Recourse Event has actually occurred, the Complaint's bid for relief based on the premise of such an event must fail. The Court accordingly grants Meisner's motion to dismiss the breach of guaranty claim, to the extent such a claim is based on an alleged violation of the Springing Recourse Event.[5]

## V.  Jericho Plaza's Motion to Dismiss

Jericho Plaza moves to dismiss Count One, which seeks a mortgage foreclosure, to the extent it seeks a default judgment against it as the borrower. Compl. ¶¶ 82–91.[6] Jericho Plaza contends that the Complaint does not adequately allege that U.S. Bank Trust is entitled to a default judgment under § 11.1 of the Loan Agreement.

That is wrong, for reasons substantially tracking the analysis above. Although § 11.1 of the Loan Agreement generally prohibits the lender, U.S. Bank Trust, from seeking a deficiency judgment against the borrower, Jericho Plaza, it, as reflected above, is subject to exceptions. *See* Loan Agreement § 11.1 ("[E]xcept as specifically provided herein . . . Lender by accepting the Note, this Agreement, the Security Instrument and the other Loan Documents, shall not sue for,

---

[5] In its opposition to the motion to dismiss, U.S. Bank Trust attempts to explain—for the first time—how Jericho Plaza triggered a Springing Recourse Event. The Court, however, cannot consider factual theories developed outside the Complaint. *See, e.g., Perez v. Int'l Bhd. of Teamsters, AFL-CIO*, No. 00 Civ. 1983 (LAP) (JCF), 2002 WL 31027580, at *4 (S.D.N.Y. Sept. 11, 2002) ("[W]hen opposing a motion to dismiss, a party may not amend his complaint through new allegations made in his briefs."); *Cal Distrib., Inc. v. Cadbury Schweppes Americas Beverages, Inc.*, No. 06 Civ. 0496 (RMB) (JCF), 2007 WL 54534, at *6 (S.D.N.Y. Jan. 5, 2007) ("It is axiomatic that a complaint cannot be amended by the briefs in opposition to a motion to dismiss." (cleaned up)).

[6] *See id.* ¶ 91(D) ("Plaintiff demands judgment against the defendants as follows: . . . Adjudging and decreeing that Borrower be adjudged to pay *any deficiency* remaining under the loan Documents after the application of the monies as aforesaid in accordance with Section 1371 of the Real Property Actions and Proceedings Law. (emphasis added)); *id.* ¶ 91 (F) ("Plaintiff shall be permitted to enforce said other lien(s) and/or seek determination of priority thereof in any independent action(s) or proceeding(s), including . . . *deficiency proceedings*." (emphasis added)).

13

seek or demand any deficiency judgment against Borrower."). These include the Borrower's Recourse Liabilities reviewed above. The Court has sustained as well pled the claim that three exceptions have been triggered here: under § 11.1(c), for intentional physical waste; § 11.1(d), for misappropriation of funds; and § 11.1(e), for failure to pay charges that resulted in a lien against the Property. There is thus a legal basis on which U.S. Bank Trust may seek, as it does in Count One, a deficiency judgment against Jericho Plaza.

The Court therefore denies Jericho Plaza's motion to dismiss.

## CONCLUSION

For the foregoing reasons, the Court grants in part and denies in part Meisner's motion to dismiss, and denies Jericho Plaza's motion to dismiss. The Clerk of Court is respectfully directed to terminate the motions pending at Dockets 67, 71, and 104.

Pursuant to Federal Rule of Civil Procedure 12(a)(4)(A), defendants Meisner and Jericho Plaza must answer the Complaint by October 11, 2024.[7]

SO ORDERED.

*Paul A. Engelmayer*
Paul A. Engelmayer
United States District Judge

Dated: September 27, 2024
       New York, New York

---

[7] In its opposition to Meisner's motion to dismiss, U.S. Bank Trust alternatively moved to amend its Complaint under Federal Rule of Civil Procedure 15(a). The Court denies that motion. Upon filing of the motions to dismiss, the Court issued an amend-or-oppose order that gave U.S. Bank Trust an opportunity to amend. *See* Dkt. 76. The order warned that "[n]o further opportunities to amend will ordinarily be granted." *Id.* U.S. Bank Trust chose to oppose the motion rather than amend. There is thus good cause to deny leave to amend, and denying amendment will avoid potential delay from an amendment. *See, e.g., Nightingale Grp., LLC v. CW Cap. Mgmt., LLC*, No. 11 Civ. 9293 (PAE), 2012 WL 2674539, at *11 (S.D.N.Y. July 5, 2012) (finding good cause to deny leave to amend where plaintiff "had a known opportunity to amend, so as to cure the defects Defendants had identified in the RICO claim, but chose to forego it"); *Brown v. Kay*, 889 F. Supp. 2d 468, 489 & n.24 (S.D.N.Y. 2012), *aff'd*, 514 F. App'x 58 (2d Cir. 2013) (same).